## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **In Re:** | **Case No.: 24-70418-JAD** |
| **POTTSVILLE OPERATIONS, LLC, *et al.,*[1]** | **Chapter 11** |
| **Debtors.** | ***Jointly Administered*** |
| | **Doc. No.:** |
| **POTTSVILLE OPERATIONS, LLC, *et al.,*** | **Related to Document No.** |
| **Movant,** | **Hearing Date:** |
| -vs - | **Hearing Time** |
| **OXFORD FINANCE, LLC, EDEN SENIOR CARE, LLC,** | **Response Deadline:** |
| **Respondents.** | |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, OTHER THAN ACCOUNTS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, OTHER THAN ACCOUNTS, (C) APPROVING STALKING HORSE BID PROTECTIONS, (D) SCHEDULING AUCTION FOR AND HEARING TO APPROVE THE SALE OF THE DEBTORS' ASSETS, (E) APPROVING FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE ORDER HEARING, (F) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (G) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (H) GRANTING RELATED RELIEF**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Pottsville Operations, LLC (9467); Pottsville Propco, LLC (8685); Hampton House Operations, LLC (8969); Hampton House Propco, LLC (7258); Kingston Operations, LLC (1787); Kingston Propco, LLC (8562); Williamsport North Operations, LLC (9927); Williamsport Propco, LLC (2039); Williamsport South Operations, LLC (0298); Yeadon Operations, LLC (9296); and Yeadon Propco, LLC (5785). The Debtors' address is 425 West New England Avenue, Suite 300, Winter Park, Florida 32789.

Pottsville Operations, LLC, and its debtor affiliates in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), as debtors and debtors in possession (collectively, the "Debtors"), hereby file the *Debtors' Motion for Entry of Orders (A) Approving Sale of Substantially All of the Debtors' Assets, Other than Accounts, Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, Other Than Accounts, (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* (the "Motion"), pursuant to sections 105(a), 363, 364, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101¬1532 (the "Bankruptcy Code"), and Rules 2002, 4001, 6004, 6006, 9007, 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Debtors respectfully request approval of the following:

  a.  following entry of, and compliance with, the Bidding Procedures Order (as defined herein), entry of an order (the "Sale Order") authorizing and approving, the following, as applicable: (A) the sale of substantially all of the assets of the Debtors (as defined herein) (as more particularly defined in the governing sale agreements, the "Purchased Assets") free and clear of all liens, interests, Claims, and Encumbrances[2] (other than any specifically assumed liabilities and Permitted Encumbrances) to the fullest extent permitted by section 363(f) of the Bankruptcy Code (the "Sale Transaction"); (B) the assumption and assignment of the Assumed Contracts in connection with the Sale Transaction to the fullest extent permitted under section 365 of the Bankruptcy Code; and (C) granting related relief;

  b.  establishing the below dates and deadlines for the sale process, subject to the Court's approval and availability:

---

[2] Capitalized terms not defined in this Motion shall have the meaning ascribed to them in the Stalking Horse Agreements (as defined herein).

| Proposed Date | Milestone |
|---|---|
| **On or before November 15, 2024** | Bidding Procedures Hearing (subject to Court availability) |
| **On or before November 15, 2024** | Entry of Bidding Procedures Order (subject to Court availability) |
| **Within 5 business days following entry of the Bidding Procedures Order** | Deadline to serve Sale Notice |
| **November 25, 2024 at 5:00 p.m. (ET)** | Deadline to serve the Contract Assumption and Assignment Notice |
| **December 9, 2024 at 5:00 p.m. (ET)** | Sale Objection Deadline and Contract Objection Deadline[3] |
| **December 16, 2024 at 12:00 p.m. (ET)** | Bid Deadline |
| **December 16, 2024 at 5:00 p.m. (ET)** | Deadline for Debtors to Designate Qualifying Bids and Opening Bid |
| **December 17, 2024 commencing at 10:00 a.m. (ET)** | Auction |
| **As soon as practicable after completion of the Auction** | File and Serve Post-Auction Notice |
| **December 18, 2024 at 5:00 p.m.** | Deadline for Supplemental Objections[4] |
| **December 19, 2024 at 10:00 a.m. (ET)** | Sale Order Hearing |
| **On or before January 15, 2024** | Sale Closing |

---

[3]The Sale Objection Deadline and Contract Objection Deadline apply to all objections to the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts (including adequate assurance of future performance by the Stalking Horse Bidder), with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder.

[4] Supplemental Objections are objections related to adequate assurance of future performance if Successful Bidder is not the Stalking Horse Bidders.

c.    entry of an order substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order") authorizing and approving, among other things, the bidding, auction and sale procedures for the Purchased Assets (including the bid protections afforded the Stalking Horse Bidders (as defined herein)) substantially in the form attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures");

d.    scheduling an auction for the sale of the Purchased Assets (the "Auction") in accordance with the Bidding Procedures;

e.    scheduling a hearing to consider approval of a Sale Transaction (the "Sale Order Hearing") and entry of the proposed Sale Order;

f.    authorizing and approving the form and manner of notice of the Sale Transaction, the Auction, and the Sale Order Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Auction and Sale Notice");

g.    authorizing and approving the form and manner of notice of the Sale Transaction, the Auction, and the Sale Order Hearing that will be provided to residents and patients of the Facilities, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Resident Notice");

h.    authorizing and approving, as applicable, the form and manner of notice to each non-Debtor counterparty (each a "Counterparty" and collectively, the "Counterparties") to a relevant executory contract or unexpired lease relating to the Purchased Assets (collectively, the "Executory Contracts") regarding the potential assumption and assignment of such Executory Contracts and the Debtors' calculation of the amount necessary to cure any monetary defaults under such Assumed Contracts (the "Cure Costs"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 4** (the "Contract Assumption and Assignment Notice");

i.    authorizing and approving the form and manner of notice following the Auction, which shall include (A) the applicable Successful Bid and Backup Bid (as such terms are defined below), and (B) the identity of the Successful Bidder and Backup Bidder (as such terms are defined below), substantially in the form attached to the Bidding Procedures Order as **Exhibit 5** (the "Post-Auction Notice"); and

j.    granting related relief.

In support of this Motion, the Debtors respectfully represent as follows:

4

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Western District of Pennsylvania (the

"Court") has jurisdiction over the Chapter 11 Cases and this Motion pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Debtors consent to

entry of a final order under Article III of the United States Constitution.

2.      Venue of the Chapter 11 Cases and this Motion in this District is proper under 28

U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested in this Motion are section 105(a), 363(b),

364, 365, 503, and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6004, 6006,

9007, 9014.

## BACKGROUND

4.      On October 15, 2024 (the "Petition Date"), the Debtors filed with the Court

voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtors are authorized to operate their businesses and manage their property

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the

date hereof, no trustee or examiner has been appointed in the Chapter 11 Cases. The Court

appointed an official committee of unsecured creditors on October 25, 2024.

6.      Additional factual background regarding the Debtors, including their business

operations, capital structure, and the events leading to the filing of the Chapter 11 Cases, is set

forth in detail in the *Declaration of Neil Luria, Chief Restructuring Officer of the Debtors, In

Support of Chapter 11 Petitions and Various First Day Applications and Motions* (the "First Day

Declaration") [Doc. No. 4], which is incorporated herein by reference.

**PREPETITION MARKETING AND SALE PROCESS**

7.      In June 2024, Eastern Union Healthcare Group ("Eastern Union") conducted an expedited marketing process attempting to locate a buyer for the Debtors' property and operations. Despite Eastern Union's efforts in contacting potential buyers in the Commonwealth of Pennsylvania, it was unable to identify any potential buyers.

8.      After continuing their efforts to obtain a buyer for the Debtors' property, the Debtors identified a potential buyer – consisting of numerous affiliates of Eden Health Care LLC (collectively, the "Stalking Horse Bidders") – willing to serve as stalking horse bidder with respect to the Purchased Assets. The Stalking Horse Bidders are third parties with no previous relationship with the Debtors.

9.      Certain Stalking Horse Bidders and the PropCo Debtors[5] have entered into a contract of sale dated October 15, 2024 (the "Stalking Horse APA"). The OpCo Debtors[6] and certain of the Stalking Horse Bidders have also entered into an operations transfer agreement dated October 15, 2024 (the "Stalking Horse OTA," and together with the Stalking Horse APA, the "Stalking Horse Agreements"). The bid submitted by the Stalking Horse Bidders (the "Stalking Horse Bid") is subject to higher and better offers made in accordance with the Bidding Procedures Order requested herein. Copies of the Stalking Horse Agreements are attached hereto collectively as **Exhibit B**.

10.      The Stalking Horse Agreements include various customary representations,

---

[5] "PropCo Debtors" means Hampton House Propco LLC, Kingston Propco LLC, Yeadon Propco LLC, Pottsville Propco LLC, and Williamsport Propco LLC, collectively.

[6] "OpCo Debtors") means Hampton House Operations LLC, Kingston Operations LLC, Pottsville Operations LLC, Williamsport North Operations LLC, and Williamsport South Operations LLC, collectively.

warranties, and covenants by the Debtors and the Stalking Horse Bidders, and certain conditions to Closing and rights of termination related to the Sale and the Chapter 11 Cases generally. Additionally, subject to the Court's approval, the Stalking Horse Agreements provide the Stalking Horse Bidders with certain bid protections as the sale process continues in bankruptcy, including a Termination Fee and Expense Reimbursement (as defined below) if the Stalking Horse Bidders ultimately are not the successful purchasers of the Purchased Assets. The Debtors believe that the Stalking Horse Bid is a competitive offer that merits granting these bid protections to the Stalking Horse Bidders.

11.    Pursuant to an agreement dated October 15, 2024, the Debtors retained Meridian Capital Group ("Meridian") as broker to market and sell substantially all of the Debtors' assets. The Debtors will be filing an application to approve Meridian as their exclusive broker to continue marketing the Debtors' assets in an effort to find competing bids to the Stalking Horse Bid.

12.    The Debtors believe that completing a sale through chapter 11 and on an expedited basis is the best option for the patients and residents of the Facilities, as well as the creditors and stakeholders of the Debtors. The OpCo Debtors are not profitable, but they operate in a highly competitive industry where parties have opportunities to compete for senior care. The success of the Debtors' operations depends on their ability to provide a welcoming environment and high-quality care to their patients and residents. Minimal disruption to the Debtors' operations is necessary to maintain their patients' and residents' loyalty. Accordingly, during this process, the Debtors must ensure that they continue to maintain the standard of care their patients and residents deserve. Such requires that the Debtors continue to provide exceptional food and medical care and that their facilities remain clean and well-maintained. The Debtors also must maintain sufficient staff to provide high-quality service to the patients and residents. Given the Debtors' current

financial difficulties, an expedited sales process is required to ensure that the Debtors can continue to provide these essential services and appropriate care for the residents during the sales process.

13.    As the Debtors implement the procedures outlined in this Motion, Meridian, on the Debtors' behalf, will continue to market and solicit offers for the Purchased Assets to a wide range of potential purchasers and will work diligently with all parties that have expressed an interest in some or all of the Purchased Assets. This will allow the Debtors to expand the number of participants in the sale process and maximize the amount received by the Debtors' estates for the Purchased Assets.

## NEED FOR AN EXPEDITIOUS SALE PROCESS

14.    As noted above and as set forth in the First Day Declaration, the OpCo Debtors financial condition continues to deteriorate rapidly. They are not operating profitably and cannot operate without outside funding. The Debtors are currently projecting a loss of at least $5,000,000 over the course of the initial thirteen weeks of their above referenced bankruptcy cases. A prompt sale is the only path to keeping the Facilities operational, maintaining quality care for residents, and maximizing value for all creditors and parties in interest. The auction process and time periods set forth in the Bidding Procedures are reasonable under these circumstances and will provide parties with sufficient time and information necessary to formulate a bid to purchase some or all of the Purchased Assets. The proposed Sale Transaction timeline is the result of consensus reached through arms-length, good faith negotiations between the Debtors and the Stalking Horse Bidder. Given that the Debtors started a marketing process months before filing for bankruptcy that targeted a broad universe of potential interested parties, the proposed timeline allows ample opportunity to engage with and promote active bidding from interested parties. This ensures a fair and transparent sale process that maximizes the value obtained for the Purchased Assets.

## STALKING HORSE PROTECTIONS

15.      By this Motion, the Debtors request approval of the Stalking Horse Agreements and the Stalking Horse Bidders to serve as the stalking horse for the Purchased Assets and authority to, among other things, provide the Stalking Horse Bidders with certain bid protections as a component of the Stalking Horse Agreements. The Debtors seek approval to provide the Stalking Horse Bidders with a Termination Fee of $1,890,000.00 (3% of the Purchase Price) (the "Termination Fee"), actual legal and diligence expense reimbursement in an amount not to exceed $300,000.00 (the "Expense Reimbursement"), and other buyer protections provided for in the Bidding Procedures and in the Stalking Horse Agreements (collectively, the "Bid Protections"). The Bid Protections, which are capped at approximately 3.5% of the Purchase Price (not including Assumed Liabilities or payment of Cure Costs) are reasonable in light of, among other things, the Stalking Horse Bidders' considerable efforts to establish a minimum bid threshold for the auction of the Purchased Assets.

16.      In addition, the Bidding Procedures and the Stalking Horse Agreements provide for an initial overbid amount of cash consideration equal to or exceeding $65,690,000.00 (the "Minimum Initial Topping Bid"), based on the sum of (i) the aggregate dollar amount of the Purchase Price under the Stalking Horse Agreements, (ii) $2,190,000.00 for the maximum Bid Protections, and (iii) $500,000.00. Subsequent incremental bids at any Auction must be in the amount of $500,000.00 or more (the "Minimum Bid Amount").

## THE SALE MUST BE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

17.      The Stalking Horse Bidders have made clear that they will only close on the Purchased Assets if the Sale Order expressly provides that the Purchased Assets are being acquired free and clear of all liens, interests, Claims and Encumbrances (other than Assumed Liabilities and

Permitted Encumbrances) and free from any successor liability claims, including, without limitation, any identified Medicaid overpayments and potential nursing facility assessments (the "Department Assessments") due to the Pennsylvania Department of Human Services ("DHS") in connection with the Facilities and any amounts owed to, or required to be paid to, the Pennsylvania Department of Health ("DOH") in connection with the Facilities.

18.    The chart below summarizes the terms of the stalking Horse Agreements:[7]

| **MATERIAL TERMS OF THE STALKING HORSE AGREEMENTS[8]** | |
|---|---|
| **Purchased Assets/Excluded Assets** | Purchased Assets:<br><br>(i)  the property consisting of certain plots, pieces or parcels of land (the "Land");<br><br>(ii) all improvements on the Land;<br><br>(iii)    all right, title and interest, if any, of Seller in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof;<br><br>(iv) all easements, licenses, rights and appurtenances relating to any of the assets identified in the foregoing (i), (ii) and (iii);<br><br>(v) all bed rights associated with the Facilities;<br><br>(vi) the Warranties;<br><br>(vii) all machinery, equipment (including all transportation and office equipment), tools, fixtures, trade fixtures, furniture, furnishings, computer equipment, telephone systems and furniture owned by Seller wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Seller or used or held for use in or useful for the Business or located on or used in connection with the ownership, use, operation or maintenance of the Property or the Facilities; |

---

[7] To the extent there is any inconsistency between the terms of the Stalking Horse Agreements and the summary of such terms in this Motion, the terms of the Stalking Horse Agreements shall control.

[8] All capitalized terms in this chart not otherwise defined in this Motion shall have the meanings ascribed to them in the Stalking Horse Agreements.

(viii) all other tangible property of any kind wherever located, including all property of any kind located in any building, office or other space leased, owned or occupied by Seller other than the Supplies (as such term is defined in the OTA), which will be transferred to New Operator pursuant to the OTA (assets identified in (vii) and (viii), collectively, the "Personal Property");

(ix) all claims, deposits, prepayments, award, prepaid expenses, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) of Seller with respect to the Purchased Assets, including all right, title and interest, if any, of Seller to any unpaid award for (1) any taking by condemnation or (2) any damage to the Land or the Improvements by reason of a change of grade of any street or highway;

(x) all transferable Permits from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records held by such permitting, licensing and certifying agencies;

(xi) all rights to proceeds of or claims under any loss of income insurance or equivalent insurance maintained by Seller and any rent insurance or equivalent coverage maintained by Seller that are, in each case, required to be assigned by Seller to Purchaser pursuant to Section 11 of the Stalking Horse APA; and

(xii) all intangible property not otherwise specified above, including all goodwill symbolized and associated with the Facilities or Seller.

Excluded Assets:

(i) cash and cash equivalents of Sellers and Operators;

(ii) all accounts receivable of Operators or Sellers;

(iii) with respect to the Williamsport facilities, parcels 26-330-144.A and 26-330-144.Z; provided that the second such parcel shall only be excluded to the extent not used in the operation, and/or necessary for legal compliance, of such facilities, and also does not reduce the area reflected as parcels 26-330-144.B and 26-330-144.C on the survey attached as Schedule 1(b)(iii) to the Stalking Horse APA;

(iv) subject to Section 1(viii) of the Stalking Horse APA, all insurance policies of Seller and all rights to proceeds under Seller's insurance policies and all proprietary computer software owned or developed by Seller (including but not limited to source code, executable code data, databases and documentation);

|  | (v) any and all rights, claims, or causes of action of Sellers against third parties arising out of Closing events occurring prior to the Closing Date and any and all rights, claims or cases of action of Sellers against third parties with respect to the Excluded Assets arising out of events occurring after the Closing Date;<br><br>(vi) the articles of incorporation, bylaws, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, company procedure manuals, equity transfer books, equity certificates, and other documents relating to the organization, maintenance and existence of Seller as a corporation;<br><br>(vii) all deposits or prepaid charges and expenses paid prior to the Closing Date;<br><br>(viii) all personnel records and other records and files that Sellers are required by law to retain in its possession; and<br><br>(ix) all of the rights of Seller under this Agreement, any document executed in connection herewith, and any other agreement between Seller on the one hand and Purchaser on the other hand entered into on or after the Effective Time. |
|---|---|
| **Purchase Price Provisions Providing Bid Protections to "Stalking Horse" Bidder** | The Purchase Price is $63,000,000.00 plus Assumed Liabilities and Cure Costs, provided that the Cure Costs shall not include any amounts owing by the Sellers as of the Closing Date under any Provider Agreements or Medicaid Provider Agreements.<br><br>At Closing, the Purchase Price shall be paid to Seller as follows:<br><br>(i)    The promissory note of Purchaser in the form attached as Exhibit C to the Stalking Horse APA ("Holdback Note") in the initial principal amount of Ten Million Dollars ($10,000,000), which shall have a term of two (2) years, bearing 0% interest, and provide for the payment of $3,000,000 on the first anniversary of the Closing Date, and the remaining balance of the note shall be paid at maturity, which shall be subordinate to and subject to all requirements of Purchaser's lender including Lender, if applicable.<br><br>(ii)    The remainder of the Purchase Price, if any, subject to credits and prorations set forth in the Stalking Horse APA as well as under the Stalking Horse OTA, shall be paid to Seller in cash or by wire transfer of immediately available funds at Closing. In no event, however, shall the cash portion of the Purchase Price be less than the secured debt owed to Oxford. |

| | |
|---|---|
| | In accordance with the Bidding Procedures Order and Stalking Horse Agreements, the Debtors shall pay to Stalking Horse Bidders at the time of, and as a condition to, the closing of any Alternative Transaction, and from the proceeds of such Alternative Transaction, an amount in cash equal to (i) $1,890,000.00, and (ii) Stalking Horse Bidders' actual legal and diligence expenses in an amount of up to $300,000.00 that have been reasonably substantiated by Stalking Horse Bidders, including, without limitation, any such prepetition legal and diligence expenses.<br><br>Stalking Horse Bidders shall also be entitled to the Expense Reimbursement in the event the Stalking Horse Agreements are terminated because (i) the Bankruptcy Court enters an Order approving the sale of the Purchased Assets to Purchaser and New Operators, but such Order is not free and clear all Liens, Claims and Encumbrances of DHS and DOH (other than Permitted Encumbrances and Assumed Liabilities), or (ii) Closing does not otherwise occur because Purchaser and New Operators are unable to obtain the necessary licensure and/or Medicaid provider agreements from DHS and DOH as a result of the Liens, Claims and Encumbrances of DHS and DOH, and Purchaser and New Operators have complied in all material respects with all covenants and obligations required under this Agreement and the OTA to be performed by Purchaser and New Operators through the date of termination. |
| **Good Faith Deposit** | $1,500,000.00 credit toward obligations under the DIP Loan as more fully set forth in the Stalking Horse Agreements. |
| **Record Retention** | On or before the Closing Date, Old Operator shall, at its sole cost and expense, deliver to New Operator the Books and Records of the Facility, including resident medical records with respect to residents at the Facility at Closing, and financial records. Provided, however, that nothing herein shall be construed as precluding Old Operator from removing from the Facility on the Closing Date its corporate financial records which relate to its operations at the Facility or to its overall corporate operations; and provided, further, that Old Operator shall give New Operator access to any information in any such removed records as is necessary for the efficient and lawful operation of the Facility by New Operator or is otherwise required by law to be maintained at the Facility.<br><br>Subsequent to the Closing Date, New Operator shall allow Old Operator and its Representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at its own expense, to the extent reasonably necessary to enable Old Operator to investigate and defend malpractice, employee or other claims, to file or defend cost |

| | |
|---|---|
| | reports and tax returns.<br><br>Old Operator shall, if allowed by applicable law and subject to the terms of such applicable law, be entitled to remove any records delivered to New Operator, for purposes of litigation involving a resident or employee to whom such record relates, as certified to New Operator in writing prior to removal by an officer of or counsel for Old Operator in connection with such threatened or actual litigation. Any record so removed shall promptly be returned to New Operator following its use.<br><br>New Operator agrees to maintain such books, records and other material comprising records of the Facility's operations prior to the Closing Date that have been received by New Operator from Old Operator or otherwise, including resident records and records of patient funds, to the extent required by law, but in no event less than three (3) years. |
| **Requested Findings as to Successor Liability** | The Stalking Horse Agreements require that Sellers and Operators file this Motion seeking entry of an order that contains findings of fact and conclusions of law that, among other things, Stalking Horse Bidders are good faith purchasers entitled to the protections of section 363(m) of the Bankruptcy Code, not successors to Sellers or Operators, and are acquiring the Purchased Assets free and clear of all liens, interests, Claims and Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) to the fullest extent permitted by section 363(f) of the Bankruptcy Code. |
| **Holdback Note** | The Purchaser has executed a Holdback Note in the amount of $10,000,000 and indemnification obligations of Seller under the APA and/or OTA are limited to the amount of and secured by the Holdback Note. To the extent any amounts due to Purchaser under section 12 of the APA and/or due to New Operator under section 15 of the OTA (both sections pertaining to indemnification rights and obligations) are not paid upon demand, Purchaser may set off such amounts against any payments due to Seller and/or Old Operator under the Holdback Note. |
| **Credit Bid** | At the Auction, the Stalking Horse Bidders shall be entitled to credit bid any outstanding balance of that certain loan (the "DIP Loan") made by Eden Senior Care, LLC (the "DIP Lender") to Seller and Old Operators pursuant to section 363(k) of the Bankruptcy Code, against any amount of the Purchase Price in excess of satisfaction of any and all amounts due and owing by Seller to Oxford Finance in cash at closing. Oxford Finance shall also be permitted to credit bid, but it has agreed not to credit bid so long as its entire debt will be paid in cash at closing. Moreover, to the extent the Stalking Horse Bidders' Qualified Bid contains a cash component necessary to satisfy the Prepetition Loan Obligations (as defined in the Interim DIP Order [Dkt. No. 71]), the Stalking Horse Bidders may also credit bid the DIP Obligations (as defined in the Interim |

| | |
|---|---|
| | DIP Order). |
| **Lease Terminations** | All leases between or among any of the PropCos and OpCos comprising the Debtors, including but not limited to Old Lease, will be terminated as of the Closing of the Sale Transaction. The current manager will cooperate with the Buyers in the transition of operations of the Facilities pursuant to the terms of the Stalking Horse OTA. |
| **Relief from Bankruptcy Rule 6004(h)** | The Debtors believe that any Transaction should be consummated as soon as practicable to preserve and maximize value. Accordingly, the Debtors request that any Sale Order approving the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts be effective immediately upon entry of such order and that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) be waived. |

## **BIDDING PROCEDURES**

### A. Overview

19.     The Bidding Procedures are designed to promote a competitive and expedient sale process. If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest and/or best offer(s) for the Purchased Assets in an efficient manner and on a reasonable timeline.

20.     The Debtors believe the proposed Bidding Procedures summarized below are fair and appropriate. Because the Bidding Procedures are attached as **Exhibit 1** to the Bidding Procedures Order, they are not restated in their entirety herein. Among other things, the Bidding Procedures provide the following[9]:

(i)     The Debtors may select one or more bids for the purchase of all or a portion of the Purchased Assets.

(ii)     The Debtors will solicit binding bids other than the Stalking Horse Bid by December 16, 2024 at 12:00 p.m. (prevailing Eastern Time) (the "Bid Deadline");

---

[9] To the extent there is any inconsistency between this summary and the Bidding Procedures, the Bidding Procedures will govern.

(iii)    To be eligible to participate in the Auction, each bid and bidder submitting such a bid ("<u>Potential Bidder</u>") must conform to the following requirements (collectively, the "<u>Participation Requirements</u>"):

  i.    Except in the case of a bid for less than all of the Purchased Assets, an offer to consummate the Sale Transaction on terms no less favorable to the Debtors than those set forth in the Stalking Horse Agreements, taking into account the Bid Protections, including the Minimum Initial Topping Bid;

  ii.    Include (a) a redlined copy of the Stalking Horse PSA and the Stalking Horse OTA to show any proposed amendments thereto (the "<u>Modified PSA</u>" and "<u>Modified OTA</u>", respectively, and, collectively, the "<u>Modified Agreements</u>"), and (b) clean, executed copies of the Modified Agreements;

  iii.    Include a statement that there are no conditions precedent to the Potential Bidder's ability to enter into definitive Modified Agreements, including that (a) there are no financing contingencies to the bid, (b) there are no due diligence contingencies to the bid, and (c) all necessary internal and shareholder approvals have been obtained prior to submitting the bid;

  iv.    State that such offer is binding and irrevocable until the approval of the Successful Bid by the Court, unless designated as the Back-Up Bid (as defined below);

  v.    Accompanied by an executed letter stating that the Potential Bidder's offer is irrevocable until consummation of a transaction involving the assets identified in such bid and that such bidder agrees to serve as a Backup Bidder (as defined herein) in accordance with these Bid Procedures;

  vi.    Disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation;

  vii.    Include the names and contact information of members of the Potential Bidder who will be available to answer questions regarding the offer, including any advisors and related parties;

  viii.    Not be conditioned on the receipt of any third-party approvals or consents (excluding required Court approval and required governmental, licensing or regulatory approvals or consents, if any), including, without limitation, board of director approval. With respect to any governmental, licensing or regulatory approvals or consents, each bid must include a description of all such approvals

or consents that are required to consummate the proposed transaction, together with evidence satisfactory to the Debtors, of the ability of the Potential Bidder to obtain such approvals or consents in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents;

ix. Include sufficient financial or other information (the "Adequate Assurance Information") to establish adequate assurance of future performance with respect to any lease or contract to be assigned to the Potential Bidder in connection with the proposed Sale Transaction. The bid shall also identify a contact person (with relevant contact information) of the Potential Bidder that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information;

x. Include a cash deposit in the amount of $1,500,000.00;

xi. Provide satisfactory written evidence of available funds or a firm commitment for financing sufficient to consummate the Sale Transaction;

xii. Provide information on the Potential Bidder's ability to continue to operate the Debtors' Facilities;

xiii. Represent and warrant that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' business and the Purchased Assets prior to submitting its bid and a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Purchased Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' business or the Purchased Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Modified Agreements, if ultimately accepted and executed by the Debtors;

xiv. Acknowledge that the Potential Bidder is not entitled to any of the Bid Protections.

(iv)     Potential Bidders will have a due diligence period that expires at the conclusion of the Bidding Solicitation Period, which shall occur simultaneously with the Bid Deadline;

(v)      The Debtors will provide each Potential Bidder who has executed a Confidentiality Agreement with reasonable access to Debtors' confidential electronic data room concerning the Purchased Assets (the "Data Room") and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances; provided, however, that the Debtors may withhold or limit access by any Potential Bidder to the Data Room or other diligence materials if the Potential Bidder does not become or, the Debtors determine that the Potential Bidder is not likely to become, a Qualified Bidder;

(vi)     Potential Bidders who have satisfied the Participation Requirements in the Debtors' judgment, will be deemed "Qualified Bidders" and each a "Qualified Bidder" and Bids that satisfy all bid requirements, as determined by the Debtors, will be deemed "Qualified Bids." The Debtors will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether their bid is a Qualified Bid before the Auction.

(vii)    The Stalking Horse Bidders and Oxford Finance are deemed Qualified Bidders and the Stalking Horse Bid is a Qualified Bid in all respects. At the Auction, the Stalking Horse Bidders shall be entitled to credit bid the amount of the Termination Fee and the maximum amount of the Expense Reimbursement (i.e., a total of $2,190,000.00). The Stalking Horse Bidders shall be required to serve as the Backup Bidder if they are not the Successful Bidder but are selected as the Backup Bidder. At the Auction, Oxford Finance shall be entitled to credit bid the entire amount of its debt (but shall only bid in the event that the proposed purchase price from the Stalking Horse Bidders or any other Qualified Bidders is not sufficient to satisfy its debt in full in cash at closing). Moreover, to the extent the Stalking Horse Bidders' Qualified Bid contains a cash component necessary to satisfy the Prepetition Loan Obligations (as defined in the Interim DIP Order [Dkt. No. 71]), the Stalking Horse Bidders may also credit bid the DIP Obligations (as defined in the Interim DIP Order).

(viii)   All Qualified Bidders shall be deemed to have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to due diligence, the submission of its bid, the Bid Procedures, the Auction and the Sale Transaction, provided that the Stalking Horse Bidders are entitled to the Bid Protections.

(ix)     If there are other Qualifying Bidders, an Auction will be held no more than three (3) days after the Bid Deadline (unless such different date is established by the Bankruptcy Court in the Bidding Procedures Order);

(x)    At the Auction, the Debtors shall determine, in their reasonable judgment, which of the Qualified Bids is the highest and/or best bid for the Purchased Assets (the "Successful Bid", and the bidder submitting such Successful Bid, the "Successful Bidder"), and the second highest and/or best bid for the Purchased Assets (the "Backup Bid," and the bidder submitting the Backup Bid, the "Backup Bidder");

(xi)    Successful Bid(s) and Backup Bid(s) will be subject to approval by the Court at the Sale Order Hearing. At the Sale Order Hearing, the Debtors will seek the entry of the Sale Order approving the Sale Transaction to the Successful Bidder on the terms and conditions of the Successful Bid, as well as approval of the Backup Bid;

(xii)    Following the Sale Order Hearing and entry of the Sale Order, if the Successful Bidder fails to consummate an approved Sale Transaction, the Backup Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized to consummate the Sale Transaction with the Backup Bidder without further order of the Court and the Backup Bidder and Backup Bid shall thereupon be deemed the Successful Bidder and Successful Bid.

(xiii)    If there are no other Qualifying Bidders as of the Bid Deadline, then Stalking Horse Bidders shall be deemed the Successful Bidder. Additionally, the Stalking Horse Bidders shall be required to serve as the Backup Bidder upon the Debtors' selection of another party or parties as the Successful Bidder(s); provided that Stalking Horse Bidders shall not be required to serve as Backup Bidder for longer than sixty (60) days following such selection of another party as the Successful Bidder; and

(xiv)    There will be no extension of the Bidding Solicitation Period, the Bid Deadline, or date of the Auction unless ordered by the Bankruptcy Court or approved by Stalking Horse Bidders and Oxford Finance in writing. Without limiting the foregoing, Debtors shall not file any motion or otherwise seek to change, modify or amend: i) the Stalking Horse Agreements, without prior written approval of the Buyers and Oxford Finance, or ii) the Sale Order, without prior consultation with Stalking Horse Bidders and Oxford Finance; provided that any such matter that would negatively impact Buyers and/or New Operators and/or Oxford Finance shall not be pursued without the prior written consent of Buyers and/or Oxford Finance.

**B. The Assumption and Assignment Procedures**

21.    The Debtors also request that the Court approve the form of the Contract Assumption and Assignment Notice attached to the Bidding Procedures Order as Exhibit 3 and the

assumption and assignment procedures described below (the "<u>Assumption and Assignment</u>
<u>Procedures</u>"). The Debtors submit that service of the Contract Assumption and Assignment Notice
on the applicable Counterparties is proper and sufficient to provide notice to the Counterparties of
the Assumption and Assignment Procedures.

22.     To facilitate the Sale Transaction, the Debtors seek authority to assume and assign
the Assumed Contracts to the Successful Bidder(s) in accordance with the following procedures
Assumption and Assignment Procedures:

(i)     By no later than November 25, 2024, the Debtors shall serve an initial notice
on all counterparties to each Contract on the Available Contracts List
specifically stating that the Debtors are or may be seeking the assumption and
assignment of such Contracts, the Debtors' calculation of the associated Cure
Costs, and the deadline for objecting to the Cure Costs or any other aspect of
the proposed assumption and assignment of their Contracts to Purchaser, New
Operators, or any other Successful Bidder (the "<u>Initial Assumption and</u>
<u>Assignment Notice</u>"). The Debtors will not serve any such notice to a current
resident or patient of any Facility without Purchaser's prior approval of the
form of such notice.

(ii)    Pursuant to the Bidding Procedures Order, the counterparties to the Contracts
shall have an opportunity to file any objections to the assumption and/or
assignment of any Contracts on the Available Contracts List. Upon any such
objection, such Contract shall become a "Disputed Contract" and, unless the
Disputed Contract is a Rejected Contract, the Debtors, with Purchaser's and
New Operators' consent to be provided or withheld in their sole discretion,
shall either settle the objection of such counterparty or shall litigate such
objection under such procedures as the Bankruptcy Court shall approve as
part of the Bidding Procedures Order. The Debtors shall not settle a disputed
Cure Cost for any amount with regard to any Contract that has been
designated as an Assumed Contract pursuant to a Designation Notice without
the express written consent of Purchaser or New Operators, as applicable.
Upon a Final Order or settlement determining any Cure Costs regarding any
Disputed Contract after the Closing or at any time prior to such Final Order
or settlement, Purchaser and New Operators shall have the option to (x) pay
the Cure Cost with respect to such Disputed Contract and assume the
Disputed Contract as an Assumed Contract or (y) designate the Disputed
Contract as an Rejected Contract and not be responsible for the Cure Cost.

(iii)   At the Sale Order Hearing, the Debtors will seek Court approval of the
assumption and assignment to the applicable Successful Bidder of the

Assumed Contracts that have been selected by such Successful Bidder to be assumed and assigned and request authority to assume and assign to the Successful Bidder any additional Assumed Contracts selected by the Successful Bidder prior to Closing of the Sale Transaction upon payment by the Successful Bidder of the necessary Cure Amount. If additional Assumed Contracts are selected by the Successful Bidder after the Sale Order Hearing, but before Closing of the Sale Transaction, Debtors will file with the Court and serve on the applicable Counterparties, a notice identifying the Assumed Contracts and the Cure Costs, if any, that the Debtors believe are required to be paid. If the parties are unable to consensually agree to the required Cure Amount, the Debtors will seek a hearing with the Court.

(iv)     If no Contract Objection is timely filed with respect to an Assumed Contract in accordance with the foregoing procedures: (i) the Counterparty to such Assumed Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the applicable Successful Bidder of the Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Amount set forth in the Contract Assumption and Assignment Notice (and any Amended Assumption and Assignment Notice); and (iii) the Counterparty shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections and Adequate Assurance Objections, as applicable, and the Sale Order.

(v)      To the extent that the parties are unable to consensually resolve any dispute with respect to the Cure Amount required to be paid to the applicable Counterparty under the Bankruptcy Code sections 365(b)(a)(1)(A) and (B) (any such dispute, a "Cure Dispute"), the Debtors may (i) assume the applicable Executory Contract prior to the resolution of the Cure Dispute; provided that the applicable Successful Bidder(s) shall (A) pay to the applicable Counterparty the undisputed portion of the Cure Amount within five (5) business days of the Closing of the Sale Transaction and (B) reserve cash in an amount sufficient to pay the disputed portion of the Cure Amount reasonably asserted by the applicable Counterparty (or such lesser amount as may be fixed or estimated by the Court or otherwise agreed to by the Counterparty and the Debtors), or (ii) adjourn their request to assume the Assumed Contract pending resolution of the Cure Dispute (an "Adjourned Cure Dispute"); provided further that, to the extent the Adjourned Cure Dispute is resolved or determined unfavorably to the Debtors' and/or Successful Bidder's interests, the Debtors (with the consent of the Successful

Bidder(s)) may withdraw the proposed assumption of the applicable Assumed Contract after such determination by filing a notice of withdrawal, which, in the case of a lease, shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under section 365(d)(4) of the Bankruptcy Code.

(vi)     Nothing herein or in the Bidding Procedures will obligate the Stalking Horse Bidders to satisfy and Cure Amount related to any Executory Contract unless the Stalking Horse Bidders expressly designate such Executory Contract for assumption and agree to pay the Cure Amount as a condition to assumption and assignment.

(vii)    At Closing, Purchaser or New Operators, as applicable, shall pay all Cure Costs in connection with the assumption and assignment of the Assumed Contracts.

**C.  The Notice Procedures**

23.     The Debtors request that the Court approve the form of the Auction and Sale Notice, the Resident Notice, the Contract Assumption and Assignment Notice, and the Post-Auction Notice (collectively, the "<u>Notices</u>"), each attached to the proposed Bidding Procedures Order as **Exhibits <u>2</u>**, **<u>3</u>**, **<u>4</u>** and **<u>5</u>** respectively. The Debtors submit that service of the Notices as set forth below (the "<u>Notice Procedures</u>") is proper and sufficient to provide notice of this Motion and the deadlines that will be set in the Bidding Procedures Order.

24.     <u>Bidding Procedures Hearing Notice.</u> This motion and notice of the Bidding Procedures Hearing, as set by the Court, will initially be served on the Master Service List in accordance with the case management order entered in these Chapter 11 Cases.

25.     <u>Auction and Sale Notice</u>. After entry of the Bidding Procedures Order, the Debtors will comply with Bankruptcy Rule 2002(a), which provides that all creditors of a bankruptcy estate are entitled to receive at least 21 days' notice by mail of a proposed sale or property of the estate other than in the ordinary course of business, unless the bankruptcy court for cause shown shortens the time or directs another method of giving notice. To satisfy this requirement, the Debtors

propose to serve notice of the filing of this Motion and the Bidding Procedures Hearing ("Auction and Sale Notice") by first-class mail, postage prepaid, or electronic mail to counsel who has filed an appearance in the Debtors' cases on behalf of any party, and on the following parties (collectively, the "Sale Notice Parties"): (a) all of the Debtors' creditors; (b) all entities that have, to the best knowledge of the Debtors' management and advisors, expressed written interest in purchasing any of the Facilities or Purchased Assets within the past one (1) year; (c) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Facilities and/or Purchased Assets; (d) counsel to Oxford Finance, LLC; (e) DOH; (f) DHS; (g) counsel to the Official Committee of Unsecured Creditors (to the extent one is appointed in these Chapter 11 Cases); (h) the U.S. Trustee; (i) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (j) all federal, state, and local regulatory or taxing authorities, including any applicable taxing bodies or recording offices which have a reasonably known interest in the relief granted herein; (k) the Internal Revenue Service; (l) any other governmental authority known or reasonably believed by the Debtors to have or assert a claim against any of the Debtors in the Chapter 11 Cases, including the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services; (m) the Office of the Attorney General and Office of the Secretary of State for the Commonwealth of Pennsylvania; (n) the counterparties to the Executory Contracts; (o) all patients and residents at the Facilities at any point in time dating back to two (2) years prior to the Petition Date and any of such persons' present legal representatives to the extent known by the Debtors, (p) all persons or entities that have asserted, or threatened to assert, any tort claims against any of the Debtors at any point in time dating back to two (2) years prior to the Petition Date, and (q) all of the Debtors' employees at any point in time dating back to two (2) years prior to the Petition Date.

26.     <u>The Resident Notice</u>. In addition to the Auction and Sale Notice, the Debtors shall

send the Resident Notice to all patients and residents at the Facilities at any point in time dating

back to two (2) years prior to the Petition Date and any of such persons' present legal

representatives to the extent known by the Debtors. The Resident Notice is intended to provide

further information to the patients and residents regarding the sale process and intention of the

Debtors and Successful Bidder(s) to continue operations at the Facilities.

27.     <u>Contract Assumption and Assignment Notice</u>. By no later than November 25, 2024

or such other date as may be set in the Bidding Procedures Order, the Debtors shall file the Contract

Assumption and Assignment Notice with the Court, post such notice on the Case Website, and

serve such notice by first class mail, postage prepaid, on the following parties (collectively, the

"<u>Contract Notice Parties</u>"):

> (i)      each Counterparty to an Executory Contract;
>
> (ii)     counsel to the Official Committee of Unsecured Creditors (to the extent one
> is appointed in these Chapter 11 Cases);
>
> (iii)    counsel to Oxford Finance LLC;
>
> (iv)     counsel to the Stalking Horse Bidders;
>
> (v)      counsel to other Potential Bidders;
>
> (vi)     the U.S. Trustee; and
>
> (vii)    all parties that have requested notice pursuant to Bankruptcy Rule 2002.

If applicable, and as soon as practicable, the Debtors shall file any Amended Assumption and

Assignment Notice with the Court, post such notice on the Case Website, and serve such notice,

by overnight delivery, on the Contract Notice Parties.

28.     <u>Post-Auction Notice</u>. As soon as practicable following the Auction, the Debtors

shall file the Post-Auction Notice with the Court, post such notice on the case information website

at https://cases.stretto.com/pottsville, and serve such notice by overnight delivery on the Sale Notice Parties.

29.    The Debtors believe the Notice Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the Contract Objection Deadline, the Sale Objection Deadline, the applicable Bid Deadlines, and the date, time, and location of the Auction and Sale Order Hearing. Accordingly, the Debtors request that the Court find that the Notice Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002, 6004 and 6006.

## **BASIS FOR RELIEF**

### I.    **APPROVAL OF THE SALE TRANSACTION IS APPROPRIATE AND IN THE BEST INTEREST OF THE DEBTORS' ESTATES**

### A.    *The Sale Transaction should be Approved as an Exercise of the Debtors' Sound Business Judgment.*

30.    Ample authority exists for approval of the Sale Transaction contemplated by this Motion. Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have required that such use, sale, or lease be based upon the debtor's sound business judgment. *See*, *e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi*

*Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

31.    The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

32.    The Debtors submit that their decision to consummate the sale of the Purchased Assets represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale Transaction should be approved under sections 105(a) and 363(b) of the Bankruptcy Code. The Debtors are conducting and will continue to conduct an extensive and fulsome process to market the Purchased Assets. The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive the highest or otherwise best value available for the Purchased Assets and will provide a greater recovery than would be provided by any other available alternative. Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Bidders or other Successful Bidder and establish that the Debtors and such bidder have proceeded in good faith.

33.    The Debtors have a sound business justification for selling the Purchased Assets pursuant to a competitive-bidding process consistent with the Bidding Procedures. Based on an analysis of the Debtors' ongoing and future business prospects, the Debtors concluded that a sale of the Purchased Assets pursuant to a competitive-bidding process would likely be the best way to

maximize recoveries for creditors in these Chapter 11 Cases. The Debtors believe that the proposed

sale process will produce a fair and reasonable purchase price for the Purchased Assets. The

Stalking Horse Bid is an offer to purchase the Purchased Assets for a price that the Debtors, with

the advice of the Debtors' advisors, already have determined to be fair and reasonable. Given the

prepetition marketing process and that the Stalking Horse Bid will serve as a floor for Qualifying

Bids for the Purchased Assets, the Debtors are confident that the postpetition sale process will

culminate in the Debtors obtaining the highest or otherwise best offer for such assets, while

minimizing on-going operational losses at the facilities.

34.    As such, the Debtors' determination to sell the Purchased Assets pursuant to a

competitive bidding process as provided for in the Bidding Procedures is a valid and sound

exercise of the Debtors' business judgment. The Debtors believe that they have proposed a fair

process for obtaining the highest and/or best offer and sale of the Purchased Assets for the benefit

of the Debtors' estates and their creditors. The fairness and reasonableness of the consideration to

be received by the Debtors will be demonstrated by a "market check" through the process outlined

in the Bidding Procedures.

**B.    *The Sale Transaction should be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.***

35.    Section 363(f) of the Bankruptcy Code permits a debtor to sell assets free and clear

of all liens, claims, interests, and encumbrances (with any such liens, claims, interests, and

encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein

as in the sold assets) if any one of the following conditions is satisfied:

i.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

ii.    such entity consents;

iii.    such interest is a lien and the price at which such property is to be sold is greater

than the value of all liens on such property;

iv.      such interest is in bona fide dispute; or

v.       such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). As section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f). *In Messina*, 687 F.3d 74, 77 n.4 (3d Cir. 2012); *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007); *see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code § 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code § 363(f) is met).

36.      The Court may also authorize the sale of a debtors' assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) of the Bankruptcy Code does not apply. *See In re Ditech Holding Corp.*, 606 B.R. 544, 591 (Bankr. S.D.N.Y. 2019) ("[P]lan sales can be free and clear of claims without invoking section 363(f)."); *In re Trans World Airlines, Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("[B]ankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of section 363(f)."); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11."); *see also In re White Motor Credit Corp.*, 75 B.R. 944 (Bankr. N.D. Ohio 1987) (holding that section 363(f) precluded tort claims against asset purchaser); *In re Appalachia Fuels, LLC*, 503 F.3d 538 (6th Cir. 2007) (approving a sale free

and clear of "claims" arising as coal commission sales). The Debtors submit, and to the extent necessary will demonstrate at the Sale Order Hearing, that the sale of the Purchased Assets free and clear of all liens, Claims, interests, and Encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.[10] Accordingly, the Debtors request that the Court authorize the sale of the Purchased Assets free and clear of any liens, claims, interests and Encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests and Encumbrances attaching to the proceeds thereof in the same order of relative priority, with the same validity, force and effect as prior to such transfer.

37.     Specifically, but without limitation of other liens and interests, in these Chapter 11 Cases, the Debtors request that the Sale Transaction be free and clear of all liens, interests, Claims, and Encumbrances held by Oxford Finance LLC. The Purchase Price is greater than the amount of any alleged lien in favor of Oxford Finance LLC against the Purchased Assets and Oxford Finance LLC's debt will be paid in full in cash at closing, thereby satisfying the requirements of section 363(f)(3) of the Bankruptcy Code.

38.     Furthermore, to the extent that there are liens against the Purchased Assets to secure unpaid real estate taxes, those will be satisfied at Closing from the proceeds of the Sale Transaction.

---

[10] Moreover, the Debtors will send the Auction and Sale Notice to purported creditors and lienholders. If such creditors and lienholders do not object to the proposed Sale Transaction, then their consent should be presumed. Accordingly, the Debtors request that, unless a party asserting a prepetition lien, Claim or Encumbrance on any of the Purchased Assets timely objects to this Motion, such party shall be deemed to have consented to any Sale Transaction approved at the Sale Order Hearing. *See, e.g.*, *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent"); *Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

39.    The Debtors may also be subject to unpaid Department Assessments owed to DHS.

Without waiver of any of their rights to challenge or contest the amount, validity, priority and/or

extent of the Department Assessments and any potential lien in favor of DHS, the Debtors

anticipate that the Department will assert a statutory lien pursuant to 62 P.S. 811-A[11] against the

assets of the Debtors in an effort to collateralize the Department Assessments. However, DHS has

not recorded any liens against the Debtors, and, in any event, upon information and belief, any

such liens arose subsequent to the duly recorded liens of Oxford Finance LLC,[12] which means that

---

[11]        Any assessments implemented and interest and penalties assessed against a
nursing facility pursuant to this article shall be a lien on the real and personal
property of the nursing facility in the manner provided by section 1401 of
[72 Pa. Stat. Ann. §§ 1 *et seq.* (the "Fiscal Code")] and may be entered by
the department in the manner provided by section 1404 of 'The Fiscal Code'
and shall continue and retain priority in the manner provided in section
1404.1 of 'The Fiscal Code.'

62 Pa. Stat. Ann. § 811-A.

Section 1404.1 of the Fiscal Code provides, in pertinent part,

"All tax liens shall have priority to and be fully paid before any other
obligation, judgment, claim, lien or estate paid and satisfied out of the
judicial sale of the real and personal property with which that property may
subsequently become charged or for which that property may subsequently
become liable, *subject, however, to mortgage or other liens existing and
duly recorded at the time the tax lien is recorded*."

72 Pa. Stat. Ann. § 1404.1 (emphasis added).

[12] Section 1404 of the Fiscal Code provides, in pertinent part,

"All State taxes imposed under the authority of any law of this Commonwealth, now
existing or that may hereafter be enacted, and unpaid bonus, penalties, and all public
accounts settled, assessed or determined against any corporation, association, or person,
including interest thereupon, shall be a first lien upon the franchises and property, both real
and personal, of such corporation, association, or person, *from the date of settlement,
assessment or determination*, except as otherwise expressly provided by law under which
the claim of the Commonwealth arises…"

any such lien is junior and subordinate to the recorded liens of Oxford Finance LLC. Also, because

Section 1404.1 of the Fiscal Code provides that a tax lien must be recorded in order to establish its

priority, any DHS statutory lien is subject to avoidance under section 544(a)(1) of the Bankruptcy

Code.

40.     The existence of any purported statutory lien rights for unpaid Department

Assessments makes clear that the amounts owed to DHS for Department Assessments are no

different than any other purported lien right. As such, the claim for payment of these Department

Assessments constitutes an interest in the Debtors' property that is subject to section 363(f)(5) of

the Bankruptcy Code. Because this interest may be satisfied by a payment of money, this Court

may approve the sale of the Purchased Assets free and clear of any lien, interest, Claim, or

Encumbrance asserted by DHS.

41.     The leading case in this Circuit regarding what constitutes an "interest in property"

under section 363(f) of the Bankruptcy Code is *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d

Cir. 2003) (concluding that the purchaser could not be held liable for federal employment

discrimination claims). In *Trans World*, the Court adopted the Airlines' argument that "while

Congress did not expressly define 'interest in property,' the phrase should be broadly read to

authorize a bankruptcy court to bar any interest that could potentially travel with the property being

sold, even if the asserted interest is unsecured." *Id.* at 288. In support of its conclusion, the Court

noted that the definition of interests in section 363(f) is broader than simply liens or *in rem*

interests, and quoted a portion of *Collier's* treatise providing that "[o]bviously there must be

situations in which the interest is something other than a lien; otherwise section 363(f)(3) would

not need to deal explicitly with the case in which the interest is a lien." *Id.* at 290 (citing 3 *Collier*

---

72 Pa. Stat. Ann. §1401 (emphasis added).

*on Bankruptcy* ¶ 363.06[1]).

42.     Another case cited by the *Trans World* court in support of its holding was *In re P.K.R. Convalescent Centers, Inc.*, 189 B. R. 90 (Bankr. E.D. Va. 1995), which is directly on point with the facts in this bankruptcy. In the *P.K.R. Convalescent* case, the court expressly enjoined the Virginia Department of Medical Assistance Service from pursuing collections against the prospective purchaser for amounts owed under a Virginia statute relating to depreciation recapture realized upon a transfer of the debtors' property. *Id*. at 96. The Court found that Virginia's right to repayment was an interest as defined in section 363(f) of the Bankruptcy Code and that the nursing facility could be sold free and clear of that interest because the amount owed could be satisfied by a payment of money. *Id.*

## C.     *The Sale Order Must Provide that the Stalking Horse Bidders do not have Successor Liability for the Debtors' Debts.*

43.     The Debtors further request that the Sale Order specifically provide that the Stalking Horse Bidders or any other Successful Bidder shall have no successor liability of any kind, including, without limitation, for any Department Assessments or any other fines/penalties owed by the Debtors to DHS or DOH for periods prior to the Closing of the Sale Transaction

44.     The analysis in the *Trans World* case shows that the concepts of what constitutes an "interest in property" and a debtor's ability to sell free and clear of liabilities are closely related. If a potential liability arises from the debtor's operation of an integral part of its business, then section 363 of the Bankruptcy Code authorizes a sale of the assets comprising that business free and clear of the liability. *In re Trans World Airlines, Inc.*, 322 F.3d at 290. *See also In re WBQ Partnership*, 189 B.R. 98, 105 (Bankr. E.D. Va. 1995) (enjoining state from pursuing recovery of depreciation recapture from purchaser) ("DMAS's right of recapture falls with the category of 'any interest' that is subject to §363(f)."). In these Chapter 11 Cases, any amounts owed to DHS or

DOH arise exclusively from the operation of the nursing facilities being sold; therefore, the Court may approve a sale of the Purchased Assets free and clear from these claims or any other claims that could be asserted based on a theory of successor liability.

45.      In *Trans World*, the Court reasoned that the claims asserted qualified as interests subject to section 363(f) of the Bankruptcy Code because "it was the assets of the debtor which gave rise to the claims. Had TWA not invested in airline assets, which required the employment of the EEOC claimants, those successor liability claims would not have arisen." *Id*. (citing *In re Leckie*, 99 F.3d 573, 585 (4th Cir. 1996) (Sale of debtor's assets pursuant to section 363 of the Bankruptcy Code was free and clear of any liability imposed upon successors under the federal Coal Act.))[13]

46.      Like the EEOC claims in the *Trans World* case, any of the DHS's and DOH's claims in this bankruptcy clearly arise from the OpCo Debtors' operation of their skilled nursing facilities—the property being sold. The Debtors' "investment in [their nursing facilities] is inextricably linked to its employment of [the staff who were allegedly underpaid]". *Cf In re Trans World Airlines, Inc.*, 322 F.3d at 290 ("TWA's investment in commercial aviation is inextricably linked to its employment of the Knox-Schillinger claimants as flight attendants, . . . "). Clearly, the Department Assessments and any other amounts owed to DHS or DOH would not exist but for the fact that the OpCo Debtors operate nursing facilities within the meaning of the Pennsylvania Nursing Facility Assessment Program. Because any liability owed to these entities is "inextricably linked" to the Purchased Assets, this Court may approve a sale free and clear of those claims and

---

[13] In *Leckie*, the Court reasoned that "[b]ecause there is therefore a relationship between (1) the Fund's and Plan's rights to demand premium payments from [the debtors] and (2) the use to which [the debtors] put their assets, we find that the Fund and Plan have interests in those assets within the meaning of section 363(f) [of the Bankruptcy Code]." *See In re Leckie*, 99 F.3d at 582. The court explained that "[t]hose rights are grounded, at least in part, in the fact that [the debtors'] assets have been employed for coal-mining purposes: if [the debtors] had never elected to put their assets to use in the coal-mining industry, and had taken up business in an altogether different area, the [claimants] would have no right to seek premium payments from them." *Id.* at 582.

any other claims based on successor liability.

47.    The Debtors are actively seeking to maximize the Purchased Assets' value. The Debtors retained Meridian to market and sell the Purchased Assets, and the Debtors are prepared to sell the Purchased Assets to any competing bidder that makes an offer that will generate a higher return for their bankruptcy estates than the Stalking Horse Agreements provide. Under these circumstances, this Court and all others routinely include in orders approving sales of assets pursuant to section 363 of the Bankruptcy Code a finding that a purchaser is not a successor to the debtor and is not liable for payment of amounts the debtors owe. *See, e.g., In re Leckie*, 99 F.3d at 576 ("even if [buyers] would be a successor in interest, the Bankruptcy Court may extinguish Coal Act successor liability pursuant to 11 U.S.C. § 363(f)(5)"); *In re Rockdale Marcellus Holdings, LLC*, Case No. 21-bk-22080 (Bankr. W.D. Pa. 2021) (Docket No. 617, ¶AA. "No Successor Liability"); *In re. Claim Jumper Acquisition Company, LLC*, Case No. 22-bk-21941 (Bankr. W.D. Pa.) (Docket No. 330, ¶¶ U, 11 and 13).

48.    Thus, this Court should hold that the sale of the Purchased Assets will be free and clear of any claim held by the DHS or DOH and to enjoin those entities (and all other creditors holding claims against the Debtors) from attempting to collect any liability of the Debtors from the Stalking Horse Bidders or any other Successful Bidder.

**D.    *Liens and Other Interests will Attach to the Proceeds in Accordance with their Existing Priority.***

49.    As provided by the Bankruptcy Code, all valid liens or other interests against the Purchased Assets being sold will attach against the sale proceeds in the order of their existing priority. The Debtors assert that Oxford Finance LLC has a first priority lien on all of the Purchased Assets and will have a first priority lien in the proceeds thereof. The Debtors request authority to pay the net sale proceeds, subject to carve-outs for any Bidding Protections afforded the Stalking

Horse Bidders, to Oxford Finance LLC for application to its debt. Any proceeds in excess of the

amounts required to pay Oxford Finance LLC in full will be paid to the DIP Lender in satisfaction

of DIP Obligations. Any proceeds in excess of the amounts required to pay Oxford Finance LLC

and the DIP Obligations in full will be held by the Debtors pending further order of this Court.

Furthermore, the Debtors reserve for further determination by this Court the issue of the proper

allocation of any excess proceeds among the Debtors.

### E. *The Sale Transaction has been Proposed in Good Faith and without Collusion, and each Successful Bidder will be a "Good Faith Purchaser."*

50.    Pursuant to section 363(m)[14] of the Bankruptcy Code, a good-faith purchaser is one

who purchases assets for value, in good faith, and without notice of adverse claims. *O'Dwyer v.

O'Dwyer (In re O'Dwyer)*, 611 Fed. App'x. 195, 200 (5th Cir. 2015); *In re Mark Bell Furniture

Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th

Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11,

2007); see also *In re Abbotts Dairies*, 788 F.2d at 147 (to constitute lack of good faith, a party's

conduct in connection with the sale must usually amount to fraud, collusion between the buyer and

other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders); *In re

Made In Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir. 2005) (following the *Abbotts Dairies* standard).

51.    Courts in this Circuit have upheld section 363 purchase agreements "negotiated,

proposed, and entered into . . . in good faith, without collusion . . . [resulting from] arm's-length

---

[14] Section 363(m) provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

bargaining with . . . parties represented by independent counsel." *In re THQ Inc.*, No. 12-13398 (MFW), 2013 Bankr. LEXIS 781 (Bankr. D. Del. Jan. 24, 2013); *In re Rockdale Marcellus, LLC*, Case No. 21-22080 (Bankr. W.D. Pa. Dec. 29, 2021); *In re Gottschalks Inc.*, Case Nos. 09-10157 (KJC), 526, 603, 2009 Bankr. LEXIS 4880 (Bankr. D. Del. June 10, 2009); *In re Against All Odds USA, Inc.*, Case Nos. 09-10117 (DHS), TIN: 22-3391747, 2009 Bankr. LEXIS 5234, at *1 (Bankr. D.N.J. May 28, 2009); *In re Allegheny Health, Educ. & Research Found.*, Case Nos. 98-25773, 98-25774, 98-25775, 98-25776, 98-25777, 1998 Bankr. LEXIS 1684, at *31 (Bankr. W.D. Pa. Oct. 30, 1998).

52.    In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders to demonstrate a lack of good faith. An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir.1981) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *Made In Detroit, Inc.*, 414 F.3d at 581 (6th Cir. 2005) (quoting *In re Rock Indus.*, 572 F.2d at 1998).

53.    The Debtors submit that the Stalking Horse Bidders are "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code. The Debtors and the Stalking Horse Bidders, and their respective advisors, have entered into the Stalking Horse Agreements without collusion, in good faith and after extensive arms'-length negotiations. To the best of the Debtors' knowledge, information and belief, no party has engaged in any conduct that would cause or permit the Stalking Horse Agreements to be set aside under section 363(m) of the Bankruptcy Code.

54. Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualifying Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Purchased Assets. Any asset purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's-length and in good faith. Accordingly, the Debtors seek a finding that any Successful Bidder (including the Stalking Horse Bidders) are good faith purchasers and entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

55. The Debtors submit, and the testimony presented at the Sale Order Hearing will demonstrate, that the terms and conditions of the Sale Transaction were negotiated by the Debtors and the Stalking Horse Bidders or Successful Bidder, as applicable, at arm's-length and in good faith, with the assistance of the Debtors' professional advisors, and that the parties did not engage in any conduct that would cause or permit the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.

56. Based on the foregoing, the Debtors submit that they have demonstrated that the proposed sale of the Purchased Assets is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**F.  *The Court should Waive the Stay of Bankruptcy Rules 6004 and 6006***

57. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

58.     The Debtors believe that any sale should be consummated as soon as practicable to preserve and maximize value. Accordingly, the Debtors request that any Sale Order approving the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## II.     THE BIDDING PROCEDURES, INCLUDING THE BID PROTECTIONS, SHOULD BE APPROVED

59.     The Bidding Procedures are appropriate and in the best interests of the Debtors, their estates, and the creditors. The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same).

60.     Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Integrated Res.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

61.     The Debtors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, maximize value for the Debtors' estates and creditors. The Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Purchased Assets.

Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare any bids received to determine which bids are in the best interests of the Debtors' estates and their creditors.

62.     The Debtors submit that the Bidding Procedures are fair and transparent and will derive the highest or best bids for the Purchased Assets. Therefore, the Debtors request the Court approve the Bidding Procedures.

**A.   *The Stalking Horse Bidders and Stalking Horse Bid Protections should be Approved.***

63.     As discussed in further detail above, the Debtors, in consultation with their advisors, determined that it was best for the Debtors and their estates to accept the Stalking Horse Bid and enter into the Stalking Horse Agreements, subject to higher and better offers. The Stalking Horse Bidders further satisfied all the Participation Requirements applicable to the Stalking Horse Bidders. For the reasons set forth above, the Court should approve the Stalking Horse Bidders and the Stalking Horse Bid as Qualified Bidders and a Qualified Bid, respectively.

64.     Moreover, to the extent the Stalking Horse Bidders' Qualified Bid contains a cash component necessary to satisfy the Prepetition Loan Obligations (as defined in the Interim DIP Order [Dkt. No. 71]), the Stalking Horse Bidders may also credit bid the DIP Obligations (as defined in the Interim DIP Order).

65.     The Stalking Horse Agreements provide for the Bid Protections discussed above, including a Termination Fee in an amount of $1,890,000 and an Expense Reimbursement of up to $300,000 to be paid to the Stalking Horse Bidders on the terms set forth in the Stalking Horse Agreements. The Bid Protections are the result of active and arm's-length negotiations, and the Bid Protections, including the Termination Fee and Expense Reimbursement, were an essential prerequisite for the Stalking Horse Bidders to enter into the Stalking Horse Agreements. Moreover,

the total requested Bid Protections represent less than three and a half percent (3.5%) of the Purchase Price which is reasonable under the circumstances. Stalking horse bidders virtually always require termination fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Official Comm. of Unsecured Creditors v. Interforum Holding, LLC*, No. 11-CV-219, 2011 U.S. Dist. LEXIS 73421, at *4 n.2 (E.D. Wis. July 7, 2011). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

66.    In this circuit, whether termination fees and expenses are allowable is subject to the same standard as other general administrative expenses under section 503 of the Bankruptcy Code. *In re O'Brien,* 191 F.3d at 532; *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) ("The Third Circuit has expressly recognized as an administrative claim a stalking-horse bidder's claim for a break-up fee and expense reimbursement if granting such claim provides a benefit to the estate."). These expenses are allowable if they are actually necessary to preserve the value of the bankruptcy estates or if they benefit the debtor's estate. *Id.*

67.    In these Chapter 11 Cases, the Opco Debtors are currently not profitable, and the Termination Fee and Expense Reimbursement included in the Stalking Horse Agreements were necessary to incentivize the Stalking Horse Bidders to commit to the purchase and establish a minimum sales price for the Purchased Assets. Indeed, the Stalking Horse Bidders insisted on the Bid Protections. If these protections were not offered, the Debtors and its advisors believe that no entity would be willing to act as a stalking horse bidder, and absent these protections, the Debtors would have no choice but to proceed to an auction of their assets with no floor, which could lead to a sale of the Purchased Assets at much less than the values established in the Stalking Horse

Agreements. Accordingly, the Bid Protections are necessary to preserve the value of the Debtors'

estates because they enable the Debtors to secure an adequate floor for the Purchased Assets—a

clear benefit to the Debtors' estates.

68.    Moreover, there has been no self-dealing or manipulation of any kind in the

negotiation of the Bid Protections; rather, the Bid Protections resulted from good faith, arm's-

length negotiations between the Debtors and the Stalking Horse Bidders. The Debtors believe that

the agreement to pay the Bid Protections is reasonable and necessary to induce the Stalking Horse

Bidders to enter into the Stalking Horse Agreements.

69.    Pursuant to the Bidding Procedures, any bidder that wishes to participate in the

Auction must submit a higher or better offer than the bid of the Stalking Horse Bidders, which

would be used to fund the Bid Protections. The Stalking Horse Bidders' bid attracts additional

bidders because they can save time and costs by utilizing documents the Stalking Horse Bidders

heavily negotiated, including the Stalking Horse Agreements and the schedules thereto.

Ultimately, if the Purchased Assets are sold to a Successful Bidder other than the Stalking Horse

Bidders, it is likely because the Stalking Horse Bidders played a crucial role in initiating interest

and setting a minimum acceptable price for others to bid against.

70.    Finally, for all the reasons described above, the dollar amount of the Bid Protections

is appropriate and reasonable and consistent with other bid protections approved by courts in this

Circuit, as it is approximately 3.5% of the Purchase Price (including the maximum expense

reimbursement, but not including Assumed Liabilities and payment of certain Cure Costs). *See In

re Abarta Oil & Gas Co, LLC*, Case No. 21-22406, Doc. No. 110 (Bankr. W.D. Pa. Nov. 11, 2021)

(court approved Termination Fee of 3.0% in a transaction with $8,000,000 purchase price); *In re

America Classic Voyages Co.,* Case No. 01-10954, Doc. No. [] (EIK) (Bankr. D. Del. March 20,

2002) (court approved breakup fee of 6.6% or $250,000 in connection with a $3.75 million sale transaction); *In re Chi-Chi's, Inc.*, Case No. 03-13063, Doc. 143 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted). The Bid Protections are a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, and all stakeholders. Accordingly, the Court should approve the Bid Protections.

**B.**    ***This Court should Approve the Assumption and Assignment Procedures, as well as the Proposed Assumption and Assignment of Contracts.***

71.    The Debtors respectfully submit that the proposed Assumption and Assignment Procedures set forth above are appropriate and reasonably tailored to provide all necessary notices to the Counterparties, including the deadlines for objecting to the assignment and assumption of their Executory Contracts. Without limitation, the Assumption and Assignment Procedures provide for the payment of any Cure Costs (and resolution of disputes related thereto) owed under the Assumed Contracts upon the assumption and assignment of such contracts. Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these Chapter 11 Cases, and that this Court should authorize the Assumption and Assignment Procedures and further authorize the Debtors to assume and assign the Assumed Contracts as may be set forth in the purchase agreement with the Successful Bidder in accordance with such procedures.

72.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). "The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993)

(quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

73.     The standard applied to determine whether the assumption of a contract or an

unexpired lease should be authorized is the "business judgment" standard. *See Sharon Steel Corp.

v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *In re AbitibiBowater Inc.*, 418

B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an

executory contract will stand so long as "a reasonable business person would make a similar

decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511

(Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by

the business judgment standard and can only be overturned if the decision was the product of bad

faith, whim, or caprice). As described above, "[t]he business judgment rule 'is a presumption that

in making a business decision the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interest of the company.'"

*Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872). Indeed,

"the sole issue is whether the rejection benefits the estate." *In re HQ Global*, 290 B.R. at 511.

74.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's

management from judicial second-guessing. *See id.*; *see also Comm. of Asbestos Related Litigants

and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16

(Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and

a presumption of reasonableness attaches to a debtor's management decisions."). Generally, courts

defer to a debtor in possession's business judgment to assume or reject an executory contract or

lease. *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh

Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test

"requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection

of the executory contract will benefit the estate."); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42–43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424–25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

75.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Assumed Contracts is in the best interests of the Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See, e.g., In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182–83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

76.     As set forth above, the Sale Transaction will provide significant benefits to the Debtors' estates. To that end, the assumption and assignment of the Assumed Contracts is necessary for the Debtors to obtain the benefits of any asset purchase agreement or Stalking Horse Agreements, as applicable. In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Thus, following an assignment to the Successful Bidder of any Assumed Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

77.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. 11 U.S.C. § 365(b)(1). The Debtors propose to file with the Court, and serve on each Counterparty to an Assumed Contract, the Contract Assumption and Assignment Notice (and, if applicable, an Amended Assumption and Assignment Notice) that indicates the proposed Cure Amount for each such contract or lease. As such, each Counterparty will have the opportunity to object to the proposed Cure Amount, if applicable. Moreover, the payment or reserve of the applicable Cure Amount will be a condition to the Debtors' assumption and assignment of any Assumed Contract.

78.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption. *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

79.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re*

*Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

80.     Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract. In order for its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "Adequate Assurance Information"), including: (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; and (b) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance. Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts have been satisfied at the Sale Order Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.

81.     Therefore, the Debtors respectfully request the Court (a) approve the Assignment and Assumption Procedures, (b) approve the proposed assumption and assignment of the Assumed Contracts, and (c) find that all anti-assignment provisions of such contracts are unenforceable

under section 365(f) of the Bankruptcy Code.[15]

## NO PRIOR REQUEST

82.     No prior motion for the relief requested herein has been made to this Court or any

other Court.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding

Procedures Order, substantially in the form attached hereto as **Exhibit A**, and, after the Sale Order

Hearing, a Sale Order, granting the relief requested herein and such other and further relief as the

Court may deem just and proper.

*[Signature Page to Follow]*

---

[15] Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

Dated: October 30, 2024
Pittsburgh, Pennsylvania

Respectfully submitted:

**RAINES FELDMAN LITTRELL, LLP**

By: */s/ Daniel R. Schimizzi*
Daniel R. Schimizzi (PA ID No. 311869)
Mark A. Lindsay (PA ID No. 89487)
Harry A. Readshaw (PA ID No. 204287)
Jordan N. Kelly (PA ID No. 328896)
Sarah E. Wenrich (PA ID No. 325834)
11 Stanwix Street, Suite 1100
Pittsburgh, PA 15222
Telephone: 412-899-6462
Email: mlindsay@raineslaw.com
dschimizzi@raineslaw.com
hreadshaw@raineslaw.com
jkelly@raineslaw.com
swenrich@raineslaw.com

*Proposed Local Counsel to the Debtors and
Debtors in Possession*

-    and -

**BAKER & HOSTETLER LLP**

Elizabeth A. Green, Esq.
FL Bar No.: 0600547
Email: egreen@bakerlaw.com
Andrew V. Layden, Esq.
FL Bar No.: 86070
E-mail: alayden@bakerlaw.com
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, Florida 32801-3432
Telephone: (407) 540-7920
Facsimile: (407) 841-0168

*Proposed Counsel for the Debtors and Debtors
in Possession*