# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Case No.: 24-70418-JAD |
| POTTSVILLE OPERATIONS, LLC, *et al.*,[1] | Chapter 11 |
| Debtors. | *Jointly Administered* |
| POTTSVILLE OPERATIONS, LLC, *et al.* | Doc. No. |
| Movants, | Related to Document No.: 121 |
| -vs- | Hearing Date: November 12, 2024 at 11:00 a.m. |
| NO RESPONDENTS, | |
| Respondents. | Response Deadline: November 8, 2024 at 4:00 p.m. |

**OBJECTION AND RESERVATION OF RIGHTS OF THE UNITED STATES TRUSTEE TO DEBTORS' MOTION FOR ENTRY OF ORDERS (A) APPROVING SAE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, OTHER THAN ACCOUNTS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS (B) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, OTHER THAN ACCOUNTS, (C) APPROVING STALKING HORSE BID PROTECTIONS, (D) SCHEDULING AUCTION FOR AND HEARING TO APPROVE THE SALE OF THE DEBTORS' ASSETS, (E) APPROVING FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE ORDER HEARING (F) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (G) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES, AND (H) GRANTING RELATED RELIEF</u>**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Pottsville Operations, LLC (9467); Pottsville Propco, LLC (8685); Hampton House Operations, LLC (8969); Hampton House Propco, LLC (7258); Kingston Operations, LLC (1787); Kingston Propco, LLC (8562); Williamsport North Operations, LLC (9927); Williamsport Propco, LLC (2039); Williamsport South Operations, LLC (0298); Yeadon Operations, LLC (9296); and Yeadon Propco, LLC (5785).

1

Andrew R. Vara, the United States Trustee for Regions 3 and 9 (the "United States Trustee"), by and through his undersigned counsel, files the following Objection and Reservation of Rights (the ("Objection") to *Debtors' Motion for Entry of Orders (A) Approving Sale of Substantially All of the Debtors' Assets, Other than Accounts, Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, Other Than Accounts, (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* (the "Motion") (ECF No. 121), stating as follows:

## I.     JURISDICTION AND VENUE

1.     Under 28 U.S.C. § 586, the United States Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc.* (*In re Columbia Gas Sys., Inc.*), 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that United States Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc.* (*In re Revco D.S., Inc.*), 898 F.2d 498, 500 (6th Cir. 1990) (describing the United States Trustee as a "watchdog").

2.     Under § 307 of title 11 of the United States Code (the "Bankruptcy Code" or "Code"), the United States Trustee has standing to be heard on the Motion and the issues raised in this Objection.

## II.     RELEVANT FACTUAL BACKGROUND

3.     On October 15, 2024 (the "Petition Date"), the Debtors filed chapter 11 petitions in

2

the Western District of Pennsylvania.  *See* ECF No.1.

4. To date, the Debtors have not filed their schedules of assets and liabilities or statements of financial affairs, and the section 341 meeting of creditors has not been conducted. *See* Dockets.

5. Debtors own and operate six skilled nursing facilities, with 925 beds and approximately 759 residents and 818 employees as of the Petition Date.  ECF No. 4.

6. Debtors state they are indebted to primary secured lender Oxford Finance in the amount of approximately $49.3 million and to secondary secured lender Eden Senior Health Care in the amount of $281,191.50.  ECF No. 4.  Debtors unsecured debt is approximately $56.5 million dollars.  ECF Nos. 1 and 4.

7. On October 17, 2024, the Court entered an Interim Order granting Debtors' motion for $7.782 million dollars of financing from postpetition financing from lender Eden Senior Care, LLC.  ECF Nos. 21 and 71.

8. Debtors operating entities (the OpCos as defined in the First Day Declaration at ECF No. 4) contract with Eden East Healthcare Management, LLC ("Eden Management") to provide administrative services to the Debtors' six skilled nursing facilities, including assistance with the general management of those facilities.  ECF No. 4, ¶ 17.  Eden Management is an affiliate of Eden Senior, Care, LLC, the proposed DIP Lender and the Stalking Horse, Eden Health Care LLC.

9. On October 30, 2024, Debtors filed the instant Motion seeking bidding procedures for a sale of substantially all assets and approval of a Stalking Horse Agreement with Eden Health Care, LLC (the "Stalking Horse").  ECF No. 121.

### III. OBJECTION

**A.    The Stalking Horse Bid Protections**

10.    The Stalking Horse Asset Purchase Agreement (the "APA") contemplates a purchase price for Debtors' nursing facility assets of $63 million, exclusive of Assumed Liabilities and Cure.  However, only $53 million of the purchase price is to be paid as cash on closing, with a $10 million dollar Holdback Note. The Holdback Note has a term of two (2) years, payable to Debtors at zero percent interest, and with $3 million of the note liability payable on the first anniversary of the sale closing date.  Motion, p. 12.

11.    The APA contemplates, *inter alia*, a Termination Fee of $1.89 million, plus an Expense Reimbursement of up to $300,000 in actual legal and diligence expenses, for a total of $2.19 million (collectively referred to herein as the "Break-Up Fee"), along with a cap on the Stalking Horse's monetary Bid Protections at 3.5% of the Purchase Price, excluding Assumed Liabilities and Cure costs.  Motion, pp. 13 and 15.

**(i)    The Break-Up Fee is Not Necessary, or Alternatively, is Excessive**

12.    In considering requests for breakup fees and expense reimbursements, the Third Circuit has held that "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (quoting *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999).  A break-up fee must be structured to encourage, not discourage competing bids. *See In re O'Brien*, 181 F.3d at 535 ("the assurance of a break-up fee may serve to induce an initial bid (a permissible purpose), it may also serve to advantage a favored purchaser over other bidders by increasing the cost of acquisition to the other bidders (an impermissible purpose)."

4

13. Bid protections such as break-up fees and expense reimbursements must be sought and analyzed under Section 503(b). *Reliant Energy Channelview LP*, *Id.* at. 206 (3d Cir. 2010) ("[A] bidder must seek a break-up fee under 11 U.S.C. § 503(b)[.]") (citing *In re O'Brien, Id.*)), and affirming district court and bankruptcy court decisions to deny authority to pay a break-up fee of 3.2% because of the risk of chilling bid process); *see also In re JW Resources, Inc.*, 536 B.R. 193, 195 (Bankr. E.D.K.Y.2015) ("[Break-up] Fees in the range of 1% to 2% of the purchase price are often approved.")

14. Here, the Break-Up Fee is not necessary to preserve the value of the Debtors' estate under 11 U.S.C. § 503(b). The Stalking Horse is an affiliate of the DIP Lender and the Debtors' prepetition and postpetition manager of its daily operations. The Stalking Horse is aware of Debtors' financial and operational circumstances and already performed significant due diligence in providing the DIP Loan to Debtor, as evidenced by Debtors' request for postpetition financing and the roll-up of prepetition debt and diligence expenses and fees under the interim postpetition financing order. Given the Stalking Horse's status as an affiliate of the DIP Lender and manager, it has strategic reasons for bidding and had significantly less need for due diligence in submitting its bid. As the Third Circuit noted in *O'Brien*, entities that have a strategic incentive to bid do not need bid protections. *Id.* at 535. Further, to the extent that the Break-Up Fee is permitted, it should be decreased, as there is no justification under the the facts and circumstances of the case for a 3-3.5% Break Up Fee.

15. Additionally, the Break-Up Fee is excessive in that it is calculated inclusive of the $10 million non-cash Holdback Note. Any Break-Up Fee should be tied only to the cash component bid by the Stalking Horse. Non-cash components of the purchase price should not be considered in a break-up fee. *See In re Sea Island Co.*, 2010 WL 4393269 (Bankr. S.D. Ga) (break-

5

up fee of 3% held not to chill bidding when based on cash consideration and not total consideration*)*.

### (ii) The Minimum Initial Topping Bid May Chill Bidding

16. The purpose and goal of any asset sale is to maximize the recovery of value for the benefit of the bankruptcy estate. To that end, the bidding procedures that are proposed through a sale process must establish a framework for competitive bidding to ensure the maximization of such value. *See In re Jon J. Peterson, Inc.*, 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009). For those reasons, the court will not approve bidding procedures that undermine principles of fair play."); *In re Cormier*, 382 B.R. 377, 388 (Bankr. W.D. Mich. 2008) (quotations omitted) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.")

17. Debtors' Motion contemplates the Stalking Horse delivering a $10 million Holdback Note as a portion of its consideration for the Purchase Price. However, similar terms do not appear to be offered to potential competing bidders. The Minimum Initial Topping bid of at least $65,690,000 is comprised of the full purchase price of $63 million, plus the proposed Break-Up Fee and an additional incremental bid of $500,000. The Stalking Horse has a significant advantage over any qualified bidder in the disparate application of cash considerations necessary to bid on and close the transaction. Debtors must offer the same terms of Holdback to any potential bidder or reduce the Minimum Initial Topping bid to its cash component. *See, e.g., In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (noting that bid procedures must not "give an advantage to a favored purchaser over other bidders by increasing the cost of acquisition"). As the bid procedures are drafted, there is an unfair advantage to the Stalking Horse and significant concern regarding the chilling of qualified bids.

6

**B.      The Super-Priority Administrative Expense Claim is not Appropriate**

18.     Under the APA, the obligations of the Debtor to pay the Termination Fee and Expense Reimbursement will be treated as super-priority administrative expense claims. *See* APA, Exhibit "B," Section 1.7.

19.     The Break-Up Fee (collectively the Termination Fee and Expense Reimbursement) are not entitled to super-priority administrative claim status. The Break-Up Fee is not entitled to super-priority treatment because it does not fall under either of the two situations in which the Bankruptcy Code allows such treatment: (a) to a party providing post-petition financing, and (b) to a secured party for the purposes of providing adequate protection for any diminution in value of their collateral caused by the use of such collateral during the course of the Chapter 11 cases. *See* 11 U.S.C. §§ 361(2), 364(c)(1) and 507 (b). "[C]ourts do not have the authority to create a right to recover from [a] bankruptcy estate where no such right exists under the Bankruptcy Code." *See Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018) (*quoting O'Brien*, 181 F.3d at 532) (quotation marks omitted).

**C.      The Expense Reimbursement Should be Subject to Further Review**

20.     The Bid Protections include, along with the Break-Up Fee, the Expense Reimbursement up to $300,000. Upon certain triggering events, the Debtors shall reimburse the Stalking Horse for actual, reasonable, documented out-of-pocket expenses (including professional fees) incurred in connection with the transaction. Nothing in the proposed Bidding Procedures, however, contemplates the review of any such expenses being awarded to the Stalking Horse by the Court or parties in interest, leaving the discretion to pay for such expenses solely to the Debtors.

21.      The United States Trustee requests that to the extent the Court is inclined to approve the Expense Reimbursement, a mechanism is established whereby such expenses are

7

further subject to the review of parties in interest as well as the Court through a transparent process. This is particularly important because the Stalking Horse (in its capacity as DIP Lender) already is entitled to reimbursement of fees under the DIP Agreement.

22.     In similar cases, the Court has approved a passive notice provision that the actual time entries and expense detail be filed with the Court with a 14-day notice to the Notice Parties to raise objections if applicable.  *See e.g.*, *In re Toys "R" Us, Inc., et al.*, No. 17-34665 (KLP) (Bankr. E.D. Va. March 23, 2018) ("that the Debtors will provide Expense Reimbursements only to the Stalking Horse Bidder and such expenses must be reasonable, documented, and subject to review by the Debtors and the parties listed in Paragraph 21, who shall have the right to review upon 14-days' notice and shall have the right to raise objections during that time to be heard at the Sale Hearing") (ECF Doc No. 2351).

23.     Further, the expense reimbursement, if any, is inappropriate under any circumstance other than the closing of an alternative transaction.

**D.     The Bidding Deadline, Auction Date and Supplemental Objection Deadline**

24.     The Debtors are seeking to obtain approval of the sale process on a compressed time frame, with a bid submission deadline of December 16, 2024, an auction on December 17, 2024, and a sale hearing on December 19, 2024.

25.     While the United States Trustee understands the need for an expeditious sale given the Debtors' projected operating losses and the need for continuity of care to the residents,  concerns remain about whether potentially interested parties will have sufficient time to satisfy their due diligence requirements and prepare any competing bids.

26.     The Stalking Horse (in its capacity as DIP Lender) set the milestone dates that govern the sale process.  The United States Trustee is concerned that the compressed time frame

8

could operate to protect the Stalking Horse from potential bidders that may have higher and better offers but will be unable to complete their due diligence or arrange financing over the shortened period.

27. The Sale Motion does not disclose the scope, breadth, and thoroughness of marketing in any detail. Without more information regarding such marketing efforts, the record does not currently demonstrate that the proposed truncated process is sufficient. The United States Trustee is further concerned by allegations made by the Committee's in its objection to the Bid Procedures; notably the failure of the Debtors to establish a virtual data room that contains adequate information for competing bidders to conduct due diligence.

28. Additionally, Debtors' proposed Bid Procedures severely limit the rights of parties to object to the auction process and any modification to terms of the APA which might be objectionable. Under the Bid Procedures, Debtors propose only a one-day objection deadline following the auction, limited to adequate assurance of future performance. Given the realm of objections that could arise related to bidding, the auction process and modification of terms of the sale, the supplemental objection deadline must be broadened and extended so that all parties may have objections heard.

E.   **The Resident Notice**

29. The proposed Resident Notice attached to the Motion would provide notice to facility residents that "[t]he proposed sales of the Facilities to an approved buyer(s) will be free and clear of all liens, claims, encumbrances, or interests that you or someone you represent may have against the Facilities….. the approved buyer(s) will assume no liabilities of the current owners or operators under such contracts but will continue to provide services to current residents

9

and patients at the Facilities under any contract after the closing of an approved sale." *See* Motion, Resident Notice, Exhibit "3."

30. At the time of sale, the Stalking Horse would be purchasing, and Debtors would be assuming and assigning, active resident contracts, with any cure obligations borne by the purchaser. The Resident Notice language is confusing in its rejection of liabilities, and should be revised accordingly as the purchaser would be assuming an existing resident contract and the obligations therein, along with any cure which might be applicable.

### IV. RESERVATION OF RIGHTS

31. The United States Trustee reserves all rights and objections to all sale objections, including without limitation, any terms contained in the APA and modifications thereto (including the indemnification and successor liability provisions), release and exculpation provisions, and binding findings of fact, including the Stalking Horse as a good faith purchaser under section 363(m)

WHEREFORE the United States Trustee requests that the Motion be denied as stated, and that the Court enter relief in accordance with the instant Objection.

Respectfully submitted,

ANDREW R. VARA
UNITED STATES TRUSTEE
Regions 3 and 9

Dated: November 8, 2024

*/s/ William M. Buchanan*
William Buchanan, Trial Attorney
PA I.D. No. 202843
Office of the United States Trustee
1000 Liberty Avenue, Suite 1316
Pittsburgh, PA 15222
T: (412) 644-4779
Email: william.buchanan@usdoj.gov