# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: | **Case No.: 24-70418-JAD** |
| **POTTSVILLE OPERATIONS, LLC,** *et al.,*[1] | **Chapter 11** |
| Debtors. | *Jointly Administered* |
| | **Doc. No.:** |
| **POTTSVILLE OPERATIONS, LLC,** *et al.,*[2] | **Related to Document No.** |
| Movants, | **Hearing Date:** |
| v. | **Hearing Time:** |
| NO RESPONDENTS, | **Response Deadline:** |
| Respondents. | |

**CARE PAVILION DEBTORS' MOTION FOR ENTRY OF ORDERS (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE CARE PAVILION DEBTORS' ASSETS, OTHER THAN ACCOUNTS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE CARE PAVILION DEBTORS' ASSETS, OTHER THAN ACCOUNTS, (C) APPROVING STALKING HORSE BID PROTECTIONS, (D) SCHEDULING AUCTION FOR AND HEARING TO APPROVE THE SALE OF THE CARE PAVILION DEBTORS' ASSETS, (E) APPROVING FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE ORDER HEARING, (F) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (G) AUTHORIZING**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Pottsville Operations, LLC (9467); Pottsville Propco, LLC (8685); Hampton House Operations, LLC (8969); Hampton House Propco, LLC (7258); Kingston Operations, LLC (1787); Kingston Propco, LLC (8562); Williamsport North Operations, LLC (9927); Williamsport Propco, LLC (2039); Williamsport South Operations, LLC (0298); Yeadon Operations, LLC (9296); and Yeadon Propco, LLC (5785) (collectively, the "Pottsville Debtors" and the Pottsville Debtors' chapter 11 cases are collectively referred to as the "Pottsville Cases") and Bedrock Care, LLC (9115); Care Pavilion Operating, LLC (7149); Cliveden Operating, LLC (6546); MAPA Operating, LLC (3750); Maplewood Operating, LLC (0850); Milton Operating, LLC (5523); Parkhouse Operating, LLC (0140); Tucker Operating, LLC (4305); Watsontown Operating, LLC (0236); and York Operating, LLC (2571) (collectively the "Care Pavilion Debtors" and the Care Pavilion Debtors' chapter 11 cases are collectively referred to as the "Care Pavilion Cases"). The Debtors' mailing address is 425 West New England Avenue, Suite 300, Winter Park, Florida 32789.

[2] The applicable Debtors in the Motion are the Care Pavilion Debtors.

### ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (H) GRANTING RELATED RELIEF

Care Pavilion Operating LLC, Cliveden Operating LLC, Maplewood Operating LLC, Milton Operating LLC, Parkhouse Operating LLC, Tucker Operating LLC, Watsontown Operating LLC, and York Operating LLC (collectively, the "Care Pavilion Debtors"), by and through their proposed undersigned co-counsel, hereby file the *Care Pavilion Debtors' Motion for Entry of Orders (A) Approving Sale of Substantially All of the Care Pavilion Debtors' Assets, Other than Accounts, Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of Substantially All of the Care Pavilion Debtors' Assets, Other Than Accounts, (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Care Pavilion Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* (the "Motion"),[3] pursuant to sections 105(a), 363, 364, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and Bankruptcy Rules 2002, 4001, 6004, 6006, 9007, 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), requesting approval of the following:

    a.    following entry of, and compliance with, the Bidding Procedures Order (as defined herein), entry of an order (the "Sale Order") authorizing and approving, the following, as applicable: (A) the sale of substantially all of the assets of the Care Pavilion Debtors (as defined herein) (as more particularly defined in the governing sale agreements, the "Transferred Assets") free and clear of all liens, interests, Claims, and Encumbrances (other than any specifically assumed liabilities and Permitted Encumbrances) to the fullest extent permitted by section 363(f) of the Bankruptcy Code (the "Sale Transaction"); (B) the assumption and assignment of

---

[3] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the OTAs (as defined herein).

the Assumed Contracts in connection with the Sale Transaction to the fullest extent permitted under section 365 of the Bankruptcy Code; and (C) granting related relief;

b.　　establishing the below dates and deadlines for the sale process, subject to the Court's approval and availability:

| Proposed Date | Milestone |
|---|---|
| **On or before December 18, 2024** | Bidding Procedures Hearing (subject to Court availability) |
| **On or before December 18, 2024** | Entry of Bidding Procedures Order (subject to Court availability) |
| **Within 5 business days following entry of the Bidding Procedures Order** | Deadline to serve Sale Notice |
| **December 27, 2024, at 5:00 p.m. (ET)** | Deadline to serve the Contract Assumption and Assignment Notice |
| **January 9, 2025, at 5:00 p.m. (ET)** | Sale Objection Deadline and Contract Objection Deadline[4] |
| **January 16, 2025, at 12:00 p.m. (ET)** | Bid Deadline |
| **On or before January 16, 2025** | Deadline for Care Pavilion Debtors to Designate qualifying bids and opening bid |
| **January 21, 2025, at 10:00 a.m. (ET)** | Auction |
| **As soon as practicable after completion of the Auction** | File and Serve Post-Auction Notice |
| **January 23, 2025, at 5:00 p.m. (ET)** | Deadline for Supplemental Objections[5] |
| **January 24, 2025, at 10:00 (ET) (subject to Court availability)** | Sale Order Hearing |
| **On or before January 24, 2025** | Entry of the Sale Order |
| **On or before February 15, 2025** | Sale Closing |

c.　　entry of an order substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Bidding Procedures Order</u>") authorizing and approving, among other things, the bidding, auction, and sale procedures for the Transferred Assets (including the bid protections afforded to the Stalking Horse Bidders (as defined herein)) substantially

---

[4] The Sale Objection Deadline and Contract Objection Deadline apply to all objections to the sale of the Transferred Assets and the assumption and assignment of the Assumed Contracts (including adequate assurance of future performance by the Stalking Horse Bidder), with the exception of objections related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder.

[5] Supplemental Objections are objections related to adequate assurance of future performance if the Successful Bidder is not the Stalking Horse Bidders.

in the form attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures");

d.    scheduling an auction for the sale of the Transferred Assets (the "Auction") in accordance with the Bidding Procedures;

e.    scheduling a hearing to consider approval of a Sale Transaction (the "Sale Order Hearing") and entry of the proposed Sale Order;

f.    authorizing and approving the form and manner of notice of the Sale Transaction, the Auction, and the Sale Order Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Auction and Sale Notice");

g.    authorizing and approving the form and manner of notice of the Sale Transaction, the Auction, and the Sale Order Hearing that will be provided to residents and patients of the Facilities, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Resident Notice");

h.    authorizing and approving, as applicable, the form and manner of notice to each non-Care Pavilion Debtor counterparty (each a "Counterparty" and collectively, the "Counterparties") to a relevant executory contract or unexpired lease relating to the Transferred Assets (collectively, the "Executory Contracts") regarding the potential assumption and assignment of such Executory Contracts and the Care Pavilion Debtors' calculation of the amount necessary to cure any monetary defaults under such Assumed Contracts (the "Cure Costs"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 4** (the "Contract Assumption and Assignment Notice");

i.    authorizing and approving the form and manner of notice following the Auction, which shall include (A) the applicable Successful Bid and Backup Bid (as such terms are defined below), and (B) the identity of the Successful Bidder and Backup Bidder (as such terms are defined below), substantially in the form attached to the Bidding Procedures Order as **Exhibit 5** (the "Post-Auction Notice"); and

j.    granting related relief.

In support of this Motion, the Care Pavilion Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.    The United States Bankruptcy Court for the Western District of Pennsylvania (the "Court") has jurisdiction over the Care Pavilion Cases and this Motion pursuant to 28 U.S.C. §§

157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Care Pavilion

Debtors consent to entry of a final order under Article III of the United States Constitution.

2.      Venue of the Care Pavilion Cases and this Motion in this District is proper under

28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested in this Motion are section 105(a), 363(b),

364, 365, 503, and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6004, 6006,

9007, 9014.

## BACKGROUND

4.      On November 18, 2024 (the "Petition Date"), each of the Care Pavilion Debtors

filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. The

Care Pavilion Debtors continue to operate their business and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested

the appointment of a trustee or examiner in the Care Pavilion Cases.  On December 4, 2024, the

United States Trustee filed its Second Amended Notice of Appointment of Official Committee of

Unsecured Creditors which appointed Reliant Pro Rehab, LLC, Trans-Med Ambulance, Inc., and

Dedicated Nursing Associates, Inc. (collectively, the "Committee") to serve as the Official

Committee of Unsecured Creditors in connection with the above referenced jointly administered

cases.

5.      A detailed description of the Care Pavilion Debtors, their businesses, and the facts

and circumstances surrounding the Care Pavilion Debtors' filing of these bankruptcy cases are set

forth in greater detail in the *Declaration of Neil Luria, Chief Restructuring Officer of the Debtors,*

*in Support of Chapter 11 Petitions and Various First Day Applications and Motions* [Doc. No. 3]

(the "<u>First Day Declaration</u>").[6]

## PREPETITION MARKETING AND SALE PROCESS

6.      Like many other healthcare facilities and specifically skilled nursing facilities, the COVID-19 pandemic had a severe negative effect on the Care Pavilion Debtors. *See* First Day Declaration at ¶ 35. Over the last five years, costs have increased dramatically for the Care Pavilion Debtors. *Id.* Additionally, due to the pandemic, skilled labor shortages resulted in increased staff wages and greater reliance on overtime pay and staffing agency needs. *Id.* During the same period, resident headcounts at the facilities fluctuated and the reimbursement rates paid by the Commonwealth of Pennsylvania for many of the residents were not enough to keep up with the increased costs. *Id.* Many residents of the Care Pavilion Debtors are covered through Medicaid, and the reimbursement rate for Medicaid patients has reduced. *Id.*

7.      As of the Petition Date, the Care Pavilion Debtors were faced with significant creditor claims, including (i) secured debt of more than $18 million, (ii) approximately $90 million in unsecured debt owed by all the Care Pavilion Debtors, (iii) significant claims against the Care Pavilion Debtors for wrongful death, negligence, and related professional liability claims, and (iv) potential obligations for nursing facility assessments to the Commonwealth of Pennsylvania's Department of Human Services for approximately $34 million through the quarter ending June 30, 2024. *Id.* at ¶¶ 22-31.

---

[6] This docket entry number relates to the Care Pavilion Cases docket number 24-70473-JAD, which was a separate docket prior to the entry of the Court's order jointly administering the Pottsville Cases and the Care Pavilion Cases.

8. The Care Pavilion Debtors lease the facilities under certain Master Leases administered by Ventas Inc. ("Ventas"), publicly traded third party landlord. *Id.* at ¶ 12. As of the Petition Date, the Care Pavilion Debtors were delinquent in the rent due under the Master Leases and the Master Leases were accelerated. *Id.* at ¶ 27.

9. In addition to operational difficulties, recently, the BankFinancial Revolver Loan (as defined in the First Day Declaration) matured, and BankFinancial obtained the Care Pavilion Debtors' receivables to pay down the BankFinancial Revolver loan to a balance of zero. *Id.* at ¶ 36. This caused significant cash flow issues for the Care Pavilion Debtors. *Id.*

10. Given the Care Pavilion Debtors' significant financial distress, including but not limited to, the inability to pay the rent on a go forward basis and mounting unsecured claims and nursing facility assessments, the Care Pavilion Debtors began exploring strategic options, including a potential going concern sale.

11. In June 2024, Eastern Union Healthcare Group ("Eastern Union") conducted an expedited marketing process attempting to locate a buyer for the Care Pavilion Debtors' property and operations. *See* First Day Declaration at ¶ 41. Despite Eastern Union's efforts in contacting potential buyers in the Commonwealth of Pennsylvania, it was unable to identify any potential buyers. *Id.*

12. The Care Pavilion Debtors have retained Meridian Capital Group ("Meridian") as broker to market and sell the Transferred Assets pursuant to an agreement dated November 18, 2024. The Care Pavilion Debtors have filed an application to approve Meridian as their exclusive broker to continue marketing the Transferred Assets in an effort to find competing bids to the Stalking Horse Bid [Doc. No. 319].

13.     As part of the lease relationship with Ventas, Care Pavilion Debtor MAPA Operating, LLC ("MAPA") had a right of first refusal to buyout the real property on which the Care Pavilion Debtors' facilities (the "Facilities") operate. *Id.* at ¶ 39. The Property Purchasers (as defined in the First Day Declaration) offered to purchase the real property from Ventas for $150 million and provided a $10 million deposit. *Id.* The Care Pavilion Debtors were unable to exercise their right of first refusal within the 30 days provided in the Master Leases (as defined in the First Day Declaration) due to cash flow constraints and the distressed nature of the Care Pavilion Debtors' operations. *Id.* The Landlords (as defined in the First Day Declaration) are moving forward with the sale of the real property to the Property Purchasers. *Id.*[7]

14.     The Property Purchasers identified new operators for the Facilities (the "New Operators" or "Stalking Horse Bidders") and the Care Pavilion Debtors and the New Operators negotiated operations transfer agreements to handle the transition of the operations to the New Operators (the "OTAs"). *Id.* at ¶ 40. Copies of the executed OTAs are attached hereto as **Exhibit B.** The OTAs contemplate orderly transfer of the Care Pavilions' operations to the New Operators and the transfer of the Care Pavilion Debtors' assets (the "Transferred Assets") (excluding accounts receivable through the closing date) with the New Operators serving as the stalking horse bidders subject a Court-approved sale process designed to allow competitive bidding for the Care Pavilion Debtors' limited assets.

15.     The Care Pavilion Debtors believe that completing the operations transfer and sale of the Transferred Assets through chapter 11 and on an expedited basis is the best option for the

---

[7] For the avoidance of doubt, because the Care Pavilion Debtors do not own the real property that the Property Purchasers are purchasing, this Motion does not seek authority and approval of that sale and none of the bidding procedures described herein relate to that real property purchase.

patients and residents of the Facilities, as well as the creditors and stakeholders of the Care Pavilion Debtors. *Id.* at ¶ 44. The Care Pavilion Debtors are not profitable, and have limited assets outside of their respective accounts receivable generated from providing services at the facilities. Minimal disruption to the Care Pavilion Debtors' operations is necessary to maintain their patients' and residents' loyalty and ensure seamless care. Accordingly, during this process, the Care Pavilion Debtors must ensure that they continue to maintain the standard of care their patients and residents deserve. Such requires that the Care Pavilion Debtors continue to provide exceptional food and medical care and that their facilities remain clean and well-maintained. The Care Pavilion Debtors also must maintain sufficient staff to provide high-quality service to the patients and residents. Given the Care Pavilion Debtors' current financial difficulties, an expedited sales process is required to ensure that the Care Pavilion Debtors can continue to provide these essential services and appropriate care for the residents during the transfer and sale process.

16.     As the Care Pavilion Debtors implement the procedures outlined in this Motion, Meridian, on the Care Pavilion Debtors' behalf, will continue to market and solicit offers for the Transferred Assets to a wide range of potential purchasers and will work diligently with all parties that have expressed an interest in some or all of the Transferred Assets. This will allow the Care Pavilion Debtors to expand the number of participants in the sale process and maximize the consideration received by the Care Pavilion Debtors' estates for the Transferred Assets.

17.     Due to the Care Pavilion Debtors' historically poor operational results, current financial distress, and limited assets, the Care Pavilion Debtors believe the market for potentially interested bidders to overbid the OTAs is limited. Nevertheless, the Care Pavilion Debtors, and

Meridian as the Care Pavilion Debtors' proposed broker, are committed to marketing the assets to determine if higher or better offers are possible.

## OTA TRANSACTION TERMS

18.     There are two OTAs—one that relates to Facilities within Philadelphia (the "Philadelphia OTA") and one that relates to Facilities outside of Philadelphia (the "Non-Philadelphia OTA"). Both OTAs are virtually identical with one exception: the Facilities that operate in Philadelphia are subject to certain laws or regulations that do not affect the non-Philadelphia Facilities relating to the retention of employees for at least ninety days. Accordingly, the Philadelphia OTA has certain provisions that addresses those additional laws or regulations. Aside from that exception, the Philadelphia OTA and Non-Philadelphia OTA are substantively identical.

19.     Under the terms of the OTAs, each of the Care Pavilion Debtors agrees to (i) transfer to the respective New Operator substantially all assets used in connection with its Facility, except for accounts receivables accrued based on pre-closing dates of services, and (ii) cooperate with the New Operator to effectuate an orderly transfer of the operation of the Facility on the Closing Date. Generally, the Transferred Assets include website materials, the respective telephone numbers of each Care Pavilion Debtor, employee records, books and records of the Facility, supplies, resident agreements, Assumed Contracts (defined below), provider agreements, and other assets owned by the Care Pavilion Debtors and held at or used in connection with the operation of the Facility.

20.     The OTAs provide significant value to the Care Pavilion Debtors. Under the OTAs, the New Operators are obligated to, among other things, (i) hire all or substantially all of the Care

10

Pavilion Debtors current employees, (ii) assume certain employee benefit and COBRA-related liabilities, (iii) assume the Care Pavilion Debtors' respective Medicare provider numbers and Medicare provider reimbursement programs, (iv) pay cure costs for any assumed contracts, (v) cooperate with the Care Pavilion Debtors on transition issues, (vi) maintain certain records and provide information access to the Care Pavilion Debtors, and (vii) indemnify the Care Pavilion Debtors from certain costs arising post-closing. *See* OTAs §§ 8, 9, 11, 14, 15, Ex. B at 1.5(e)). There is no cash purchase price for the Transferred Assets (which exclude the Care Pavilion Debtors' accounts receivables). The terms of the OTA are structured to ensure that, from a patient care standpoint, residents and patients will have a relatively seamless transition from each Care Pavilion Debtor to each respective New Operator.

21.    The bid submitted by the Stalking Horse Bidders (the "Stalking Horse Bid") is subject to higher and better offers made in accordance with the Bidding Procedures Order requested herein. The OTAs include various representations, warranties, and covenants by the Care Pavilion Debtors and the Stalking Horse Bidders that are customary in operations transfer agreements, as well as certain conditions to Closing and rights of termination related to the Sale Transaction and the Care Pavilion Cases generally. Additionally, subject to the Court's approval, the OTAs provide the Stalking Horse Bidders with certain bid protections as the sale process continues in bankruptcy, including a Termination Fee and Expense Reimbursement (as defined below) if the Stalking Horse Bidders ultimately are not the successful purchasers of the Transferred Assets. The Care Pavilion Debtors believe that the Stalking Horse Bids are competitive offers that merit granting these bid protections to the Stalking Horse Bidders.

### STALKING HORSE PROTECTIONS

22.     By this Motion, the Care Pavilion Debtors request approval of the OTAs and the Stalking Horse Bidders to serve as the stalking horses for the Transferred Assets and authority to, among other things, provide the Stalking Horse Bidders with certain bid protections as a component of the OTAs. The Care Pavilion Debtors seek approval to provide the Stalking Horse Bidders with a termination fee of $50,000.00 (the "Termination Fee"), actual legal and diligence expense reimbursement in an amount not to exceed $50,000.00 (the "Expense Reimbursement"), and other buyer protections provided for in the Bidding Procedures and in the OTAs (collectively, the "Bid Protections"). These Bid Protections are reasonable in light of, among other things, the Stalking Horse Bidders' considerable efforts to establish a structure and minimum bid threshold for the auction of the Transferred Assets.

23.     In addition, the Bidding Procedures and the OTAs provide for an initial overbid amount of cash consideration equal to or exceeding $100,000.00 (the "Minimum Initial Topping Bid"). Subsequent incremental bids at any Auction must be in the amount of $25,000.00 or more, which may thereafter be modified in the Care Pavilion Debtors' discretion (the "Minimum Bid Amount").

**NEED FOR AN EXPEDITIOUS SALE PROCESS**

24.     As noted above and as set forth in the First Day Declaration, the Care Pavilion Debtors' financial condition continues to deteriorate rapidly. They are not operating profitably and cannot operate without outside funding. Pursuant to the DIP budget filed at the time the Care Pavilion Debtors filed the bankruptcy cases, it was anticipated that there would be a loss of approximately $9.7 million during the first 13-weeks of these Care Pavilion Cases. A prompt sale

is the only path to keeping the Facilities operational, maintaining quality care for residents, and maximizing value for all creditors and parties in interest.

25.     The auction process and time periods set forth in the Bidding Procedures are reasonable under these circumstances and will provide parties with sufficient time and information necessary to formulate a bid to purchase some or all of the Transferred Assets. The proposed Sale Transaction timeline is the result of consensus reached through arms-length, good faith negotiations between the Care Pavilion Debtors and the Stalking Horse Bidders. Given that the Care Pavilion Debtors started a marketing process months before filing for bankruptcy that targeted potential interested parties and have sought Court approval of a qualified broker with significant healthcare experience to further market the Care Pavilion Debtors' assets, the Care Pavilion Debtors assert that the proposed timeline allows ample opportunity to engage with and promote active bidding from interested parties. This ensures a fair and transparent sale process that maximizes the value obtained for the Transferred Assets and reduces the losses associated with continued operations of the facilities in the bankruptcy context.

**THE SALE MUST BE FREE AND CLEAR OF
ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

26.     The Stalking Horse Bidders will only close on the Transferred Assets if the Sale Order expressly provides that the Transferred Assets are being acquired free and clear of all liens, interests, Claims and Encumbrances (other than Assumed Liabilities and Permitted Encumbrances) and free from any successor liability claims, including, without limitation, any identified Medicaid overpayments and potential nursing facility assessments (the "Department Assessments") due to the Pennsylvania Department of Human Services ("DHS") in connection with the Facilities and any amounts owed to, or required to be paid to, the Pennsylvania

Department of Health ("DOH") in connection with the Facilities.

## BIDDING PROCEDURES

### A.    Overview

27.    The Bidding Procedures are designed to promote a competitive and expedient sale process. If approved, the Bidding Procedures will allow the Care Pavilion Debtors to solicit and identify bids from potential buyers that constitute the highest and/or best offer(s) for the Transferred Assets in an efficient manner and on a reasonable timeline.

28.    The Care Pavilion Debtors believe the proposed Bidding Procedures summarized below are fair and appropriate. Because the Bidding Procedures are attached as **Exhibit 1** to the Bidding Procedures Order, they are not restated in their entirety herein. Among other things, the Bidding Procedures provide the following:[8]

- a.    Minimum Initial Topping Bid: $100,000.00.

- b.    Minimum Bid Increments Thereafter: $25,000.00, which may thereafter be modified in the Care Pavilion Debtors' discretion.

- c.    The Care Pavilion Debtors may select one or more bids for the purchase of all or a portion of the Transferred Assets.

- d.    The Care Pavilion Debtors will solicit binding bids other than the Stalking Horse Bid by January 16, 2025, at 12:00 p.m. (prevailing Eastern Time) (the "Bid Deadline");

- e.    To be eligible to participate in the Auction, each bid and bidder submitting such a bid ("Potential Bidder") must conform to the following requirements (collectively, the "Participation Requirements"):

  - i.    Except in the case of a bid for less than all of the Transferred Assets, an offer to consummate the Sale Transaction on terms no less favorable to the Care Pavilion Debtors than those set forth in the OTAs, taking into

---

[8] To the extent there is any inconsistency between this summary and the Bidding Procedures, the Bidding Procedures will govern.

account the Bid Protections, including the Minimum Initial Topping Bid;

ii. Include (a) a redlined copy of the respective OTA to show any proposed amendments thereto (the "Modified OTA"), and (b) clean, executed copy of the Modified OTA;

iii. Include a statement that there are no conditions precedent to the Potential Bidder's ability to enter into the definitive Modified OTA, including that (a) there are no financing contingencies to the bid, (b) there are no due diligence contingencies to the bid, and (c) all necessary internal and shareholder approvals have been obtained prior to submitting the bid;

iv. State that such offer is binding and irrevocable until the approval of the Successful Bid by the Court, unless designated as the Back-Up Bid (as defined below);

v. Accompanied by an executed letter stating that the Potential Bidder's offer is irrevocable until consummation of a Sale Transaction involving the assets identified in such bid and that such bidder agrees to serve as a Backup Bidder (as defined herein) in accordance with these Bid Procedures;

vi. Disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation;

vii. Include the names and contact information of members of the Potential Bidder who will be available to answer questions regarding the offer, including any advisors and related parties;

viii. Not be conditioned on the receipt of any third-party approvals or consents (excluding required Court approval and required governmental, licensing, or regulatory approvals or consents, if any), including, without limitation, board of director approval. With respect to any governmental, licensing, or regulatory approvals or consents, each bid must include a description of all such approvals or consents that are required to consummate the proposed Sale Transaction, together with evidence satisfactory to the Care Pavilion Debtors, of the ability of the Potential Bidder to obtain such approvals or consents in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents;

ix.  Include sufficient financial or other information (the "Adequate Assurance Information") to establish adequate assurance of future performance with respect to any lease or contract to be assigned to the Potential Bidder in connection with the proposed Sale Transaction. The bid shall also identify a contact person (with relevant contact information) of the Potential Bidder that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information;

x.  Include a cash deposit in the amount of $50,000;

xi.  Provide satisfactory written evidence of available funds or a firm commitment for financing sufficient to consummate the Sale Transaction;

xii.  Provide adequate information on the Potential Bidder's ability to continue to operate the Care Pavilion Debtors' Facilities upon closing;

xiii.  Represent and warrant that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Care Pavilion Debtors' business and the Transferred Assets prior to submitting its bid and a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Transferred Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Care Pavilion Debtors' business or the Transferred Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Modified OTA, if ultimately accepted and executed by the Care Pavilion Debtors;

xiv.  Acknowledge that the Potential Bidder is not entitled to any of the Bid Protections.

f.  Potential Bidders will have a due diligence period that expires at the conclusion of the Bidding Solicitation Period (as defined in the OTAs), which shall occur simultaneously with the Bid Deadline;

g.  The Care Pavilion Debtors will provide each Potential Bidder who has executed a confidentiality agreement with reasonable access to Care Pavilion Debtors' confidential electronic data room concerning the Transferred Assets (the "Data Room") and any other additional information

16

that the Care Pavilion Debtors believe to be reasonable and appropriate under the circumstances; provided, however, that the Care Pavilion Debtors may withhold or limit access by any Potential Bidder to the Data Room or other diligence materials if the Potential Bidder does not become or, the Care Pavilion Debtors determine that the Potential Bidder is not likely to become, a Qualified Bidder;

h.      Potential Bidders who have satisfied the Participation Requirements in the Care Pavilion Debtors' judgment, will be deemed "Qualified Bidders" and each a "Qualified Bidder" and Bids that satisfy all bid requirements, as determined by the Care Pavilion Debtors, will be deemed "Qualified Bids." The Care Pavilion Debtors will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether their bid is a Qualified Bid before the Auction.

i.      The Stalking Horse Bidders are deemed Qualified Bidders and the Stalking Horse Bids are Qualified Bids in all respects. At the Auction, the Stalking Horse Bidders shall be entitled to credit bid the amount of the Termination Fee and the maximum amount of the Expense Reimbursement (*i.e.*, a total of $100,000.00). The Stalking Horse Bidders shall be required to serve as the Backup Bidder if they are not the Successful Bidder but are selected as the Backup Bidder.

j.      All Qualified Bidders shall be deemed to have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to due diligence, the submission of its bid, the Bid Procedures, the Auction, and the Sale Transaction, provided that the Stalking Horse Bidders are entitled to the Bid Protections.

k.      If there are other Qualified Bidders, an Auction will be held no more than three (3) days after the Bid Deadline (unless such different date is established by the Bankruptcy Court in the Bidding Procedures Order);

l.      At the Auction, the Care Pavilion Debtors shall determine, in their reasonable judgment, which of the Qualified Bids is the highest and/or best bid for the Purchased Assets (the "Successful Bid," and the bidder submitting such Successful Bid, the "Successful Bidder"), and the second highest and/or best bid for the Purchased Assets (the "Backup Bid," and the bidder submitting the Backup Bid, the "Backup Bidder");

m.      Successful Bid(s) and Backup Bid(s) will be subject to approval by the Court at the Sale Order Hearing. At the Sale Order Hearing, the Care Pavilion Debtors will seek the entry of the Sale Order approving the Sale Transaction to the Successful Bidder on the terms and conditions of the

Successful Bid, as well as approval of the Backup Bid;

n.      Following the Sale Order Hearing and entry of the Sale Order, if the Successful Bidder fails to consummate an approved Sale Transaction, the Backup Bidder will be deemed to be the new Successful Bidder, and the Care Pavilion Debtors will be authorized to consummate the Sale Transaction with the Backup Bidder without further order of the Court and the Backup Bidder and Backup Bid shall thereupon be deemed the Successful Bidder and Successful Bid.

o.      If there are no other Qualified Bidders as of the Bid Deadline, then Stalking Horse Bidders shall be deemed the Successful Bidder. Additionally, the Stalking Horse Bidders shall be required to serve as the Backup Bidder upon the Care Pavilion Debtors' selection of another party or parties as the Successful Bidder(s); provided that Stalking Horse Bidders shall not be required to serve as Backup Bidder for longer than sixty (60) days following such selection of another party as the Successful Bidder; and

p.      There will be no extension of the Bidding Solicitation Period, the Bid Deadline, or date of the Auction unless ordered by the Court or approved by Stalking Horse Bidders. Without limiting the foregoing, Care Pavilion Debtors shall not file any motion or otherwise seek to change, modify or amend: (1) the OTAs, without prior written approval of the Stalking Horse Bidders, or (2) the Sale Order, without prior consultation with Stalking Horse Bidders.

**B.      The Assumption and Assignment Procedures**

29.      The Care Pavilion Debtors also request that the Court approve the form of the Contract Assumption and Assignment Notice attached to the Bidding Procedures Order as **Exhibit 3** and the assumption and assignment procedures described below (the "Assumption and Assignment Procedures"). The Care Pavilion Debtors submit that service of the Contract Assumption and Assignment Notice on the applicable Counterparties is proper and sufficient to provide notice to the Counterparties of the Assumption and Assignment Procedures.

30.    To facilitate the Sale Transaction, the Care Pavilion Debtors seek authority to assume and assign the Assumed Contracts to the Successful Bidder(s) in accordance with the following procedures Assumption and Assignment Procedures:

i.    By no later than December 27, 2024, the Care Pavilion Debtors shall serve an initial notice on all counterparties to each Existing Contract on the list of Existing Contracts available for assuming and assigning (the Available Contracts List") specifically stating that the Care Pavilion Debtors are or may be seeking the assumption and assignment of such Existing Contracts, the Care Pavilion Debtors' calculation of the associated Cure Costs, and the deadline for objecting to the Cure Costs or any other aspect of the proposed assumption and assignment of their Contracts to the New Operators, or any other Successful Bidder (the "Initial Assumption and Assignment Notice"). The Care Pavilion Debtors will not serve any such notice to a current resident or patient of any Facility without the New Operators' prior approval of the form of such notice.

ii.    Pursuant to the Bidding Procedures Order, the counterparties to the Existing Contracts shall have an opportunity to file any objections to the assumption and/or assignment of any Existing Contracts on the Available Contracts List. Upon any such objection, such Existing Contract shall become a "Disputed Contract" and, unless the Disputed Contract is rejected (each, a "Rejected Contract"), the Care Pavilion Debtors, with the New Operators' consent to be provided or withheld in their sole discretion, shall either settle the objection of such counterparty or shall litigate such objection under such procedures as the Court shall approve as part of the Bidding Procedures Order. The Care Pavilion Debtors shall not settle a disputed Cure Cost for any amount with regard to any Existing Contract that has been designated as an assumed contract (each, an "Assumed Contract") pursuant to a Designation Notice without the express written consent of the New Operators. Upon a final order or settlement determining any Cure Costs regarding any Disputed Contract after the Closing or at any time prior to such final order or settlement, the New Operators shall have the option to (x) pay the Cure Cost with respect to such Disputed Contract and assume the Disputed Contract as an Assumed Contract or (y) designate the Disputed Contract as an Rejected Contract and not be responsible for the Cure Cost.

iii.    At the Sale Order Hearing, the Care Pavilion Debtors will seek Court approval of the assumption and assignment to the applicable Successful Bidder of the Assumed Contracts that have been selected by such Successful Bidder to be assumed and assigned and request authority to assume and assign to the Successful Bidder any additional Assumed Contracts selected

by the Successful Bidder prior to Closing of the Sale Transaction upon payment by the Successful Bidder of the necessary Cure Cost. If additional Assumed Contracts are selected by the Successful Bidder after the Sale Order Hearing, but before Closing of the Sale Transaction, the Care Pavilion Debtors will file with the Court and serve on the applicable Counterparties, a notice identifying the Assumed Contracts and the Cure Costs, if any, that the Care Pavilion Debtors believe are required to be paid. If the parties are unable to consensually agree to the required Cure Cost, the Care Pavilion Debtors will seek a hearing with the Court.

iv.  If no Contract Objection is timely filed with respect to an Assumed Contract in accordance with the foregoing procedures: (i) the Counterparty to such Assumed Contract shall be deemed to have consented to the assumption by the Care Pavilion Debtors and assignment to the applicable Successful Bidder of the Assumed Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Assumed Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Cost set forth in the Contract Assumption and Assignment Notice (and any Amended Assumption and Assignment Notice); and (iii) the Counterparty shall be forever barred from asserting any other claims related to such Assumed Contract against the Care Pavilion Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Contract Objections and Adequate Assurance Objections, as applicable, and the Sale Order.

v.  To the extent that the parties are unable to consensually resolve any dispute with respect to the Cure Cost required to be paid to the applicable Counterparty under sections 365(b)(a)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), the Care Pavilion Debtors may (i) assume the applicable Executory Contract prior to the resolution of the Cure Dispute; provided that the applicable Successful Bidder(s) shall (A) pay to the applicable Counterparty the undisputed portion of the Cure Cost within five (5) business days of the Closing of the Sale Transaction and (B) reserve cash in an amount sufficient to pay the disputed portion of the Cure Cost reasonably asserted by the applicable Counterparty (or such lesser amount as may be fixed or estimated by the Court or otherwise agreed to by the Counterparty and the Care Pavilion Debtors), or (ii) adjourn their request to assume the Assumed Contract pending resolution of the Cure Dispute (an "Adjourned Cure Dispute"); provided further that, to the extent the Adjourned Cure Dispute is resolved or determined unfavorably to the

Care Pavilion Debtors' and/or Successful Bidder's interests, the Care Pavilion Debtors (with the consent of the Successful Bidder(s)) may withdraw the proposed assumption of the applicable Assumed Contract after such determination by filing a notice of withdrawal, which, in the case of a lease, shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under section 365(d)(4) of the Bankruptcy Code.

vi.  Nothing herein or in the Bidding Procedures will obligate the Stalking Horse Bidders to satisfy the Cure Cost related to any Executory Contract unless the Stalking Horse Bidders expressly designate such Executory Contract for assumption and agree to pay the Cure Cost as a condition to assumption and assignment.

vii. At Closing, the New Operators shall pay all Cure Costs in connection with the assumption and assignment of the Assumed Contracts.

## C.    The Notice Procedures

31.    The Care Pavilion Debtors request that the Court approve the form of the Auction and Sale Notice, the Resident Notice, the Contract Assumption and Assignment Notice, and the Post-Auction Notice (collectively, the "Notices"), each attached to the proposed Bidding Procedures Order as **Exhibits 2**, **3**, **4** and **5**, respectively. The Care Pavilion Debtors submit that service of the Notices as set forth below (the "Notice Procedures") is proper and sufficient to provide notice of this Motion and the deadlines that will be set in the Bidding Procedures Order.

32.    Bidding Procedures Hearing Notice. This Motion and notice of the Bidding Procedures Hearing, as set by the Court, will initially be served on the Master Service List in accordance with the case management order entered in these Chapter 11 Cases.

33.    Auction and Sale Notice. After entry of the Bidding Procedures Order, the Care Pavilion Debtors will comply with Bankruptcy Rule 2002(a), which provides that all creditors of a bankruptcy estate are entitled to receive at least 21 days' notice by mail of a proposed sale or property of the estate other than in the ordinary course of business, unless the bankruptcy court for

21

cause shown shortens the time or directs another method of giving notice. To satisfy this requirement, the Care Pavilion Debtors propose to serve notice of the filing of this Motion and the Bidding Procedures Hearing (the "Auction and Sale Notice") by first-class mail, postage prepaid, or electronic mail to counsel who has filed an appearance in the Care Pavilion Debtors' cases on behalf of any party, and on the following parties (collectively, the "Sale Notice Parties"): (a) all of the Care Pavilion Debtors' creditors; (b) all entities that have, to the best knowledge of the Care Pavilion Debtors' management and advisors, expressed written interest in purchasing any of the Facilities or Transferred Assets within the past one (1) year; (c) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Facilities and/or Transferred Assets; (d) counsel to Argnt Holdings, LLC; (e) DOH; (f) DHS; (g) counsel to the Official Committee of Unsecured Creditors; (h) the U.S. Trustee; (i) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (j) all federal, state, and local regulatory or taxing authorities, including any applicable taxing bodies or recording offices which have a reasonably known interest in the relief granted herein; (k) the Internal Revenue Service; (l) any other governmental authority known or reasonably believed by the Care Pavilion Debtors to have or assert a claim against any of the Care Pavilion Debtors in the Care Pavilion Cases, including the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services; (m) the Office of the Attorney General and Office of the Secretary of State for the Commonwealth of Pennsylvania; (n) the counterparties to the Executory Contracts; (o) all patients and residents at the Facilities at any point in time dating back to two (2) years prior to the Petition Date or any of such persons' present legal representatives to the extent known by the Care Pavilion Debtors, (p) all persons or entities that have asserted, or threatened to assert, any tort claims against any of the Care Pavilion Debtors

22

at any point in time dating back to two (2) years prior to the Petition Date.

34.    <u>The Resident Notice</u>. In addition to the Auction and Sale Notice, the Care Pavilion Debtors shall send the Resident Notice to all patients and residents at the Facilities at any point in time dating back to two (2) years prior to the Petition Date or any of such persons' present legal representatives to the extent known by the Care Pavilion Debtors. The Resident Notice is intended to provide further information to the patients and residents regarding the sale process and intention of the Care Pavilion Debtors and Successful Bidder(s) to continue operations at the Facilities.

35.    <u>Contract Assumption and Assignment Notice</u>. By no later than December 28, 2024 or such other date as may be set in the Bidding Procedures Order, the Care Pavilion Debtors shall file the Contract Assumption and Assignment Notice with the Court, post such notice on the Case Website, and serve such notice by first class mail, postage prepaid, on the following parties (collectively, the "<u>Contract Notice Parties</u>"):

   a.    each Counterparty to an Executory Contract;

   b.    counsel to the Official Committee of Unsecured Creditors;

   c.    counsel to Argnt Holdings, LLC;

   d.    counsel to the Stalking Horse Bidders;

   e.    counsel to other potential bidders;

   f.    the U.S. Trustee; and

   g.    all parties that have requested notice pursuant to Bankruptcy Rule 2002.

If applicable, and as soon as practicable, the Care Pavilion Debtors shall file any Amended Assumption and Assignment Notice with the Court, post such notice on the Case Website, and serve such notice, by overnight delivery, on the Contract Notice Parties.

36.    <u>Post-Auction Notice</u>. As soon as practicable following the Auction, the Care Pavilion Debtors shall file the Post-Auction Notice with the Court, post such notice on the case information website at https://cases.stretto.com/pottsville, and serve such notice by overnight delivery on the Sale Notice Parties.

37.    The Care Pavilion Debtors believe the Notice Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the Contract Objection Deadline, the Sale Objection Deadline, the applicable Bid Deadlines, and the date, time, and location of the Auction and Sale Order Hearing. Accordingly, the Care Pavilion Debtors request that the Court find that the Notice Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002, 6004 and 6006.

## **BASIS FOR RELIEF**

**I.    APPROVAL OF THE SALE TRANSACTION IS APPROPRIATE AND IN THE BEST INTERESTS OF THE CARE PAVILION DEBTORS' ESTATES.**

### ***A.    The Sale Transaction Should Be Approved as an Exercise of the Care Pavilion Debtors' Sound Business Judgment.***

38.    Ample authority exists for approval of the Sale Transaction contemplated by this Motion. Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts have required that such use, sale, or lease be based upon the debtor's sound business judgment. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.*, 788

F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (same).

39.     The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

40.     The Care Pavilion Debtors submit that their decision to consummate the sale of the Transferred Assets represents a reasonable exercise of the Care Pavilion Debtors' business judgment and, accordingly, the Sale Transaction should be approved under sections 105(a) and 363(b) of the Bankruptcy Code. The Care Pavilion Debtors will continue to conduct an extensive and fulsome process to market the Transferred Assets. The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Care Pavilion Debtors' estates receive the highest or otherwise best value available for the Transferred Assets and will provide a greater recovery than would be provided by any other available alternative. Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Bidders or other Successful Bidder and establish that the Care Pavilion Debtors and such bidder have proceeded in good faith.

41.     The Care Pavilion Debtors have a sound business justification for selling the Transferred Assets pursuant to a competitive-bidding process consistent with the Bidding Procedures. Based on an analysis of the Care Pavilion Debtors' ongoing and future business prospects, the Care Pavilion Debtors concluded that a sale of the Transferred Assets pursuant to a competitive-bidding process would likely be the best way to maximize recoveries for creditors in these Care Pavilion Cases. The Care Pavilion Debtors believe that the proposed sale process will produce a fair and reasonable purchase price for the Transferred Assets. The Stalking Horse Bid is an offer to purchase the Transferred Assets for a price that the Care Pavilion Debtors, with the advice of the Care Pavilion Debtors' advisors, already have determined to be fair and reasonable. Given the prepetition marketing process and that the Stalking Horse Bid will serve as a floor for qualifying bids for the Transferred Assets, the Care Pavilion Debtors are confident that the post-petition sale process will culminate in the Care Pavilion Debtors obtaining the highest or otherwise best offer for such assets, while minimizing on-going operational losses at the facilities.

42.     As such, the Care Pavilion Debtors' determination to sell the Transferred Assets pursuant to a competitive bidding process as provided for in the Bid Procedures is a valid and sound exercise of the Care Pavilion Debtors' business judgment. The Care Pavilion Debtors believe that they have proposed a fair process for obtaining the highest and/or best offer and sale of the Transferred Assets for the benefit of the Care Pavilion Debtors' estates and their creditors. The fairness and reasonableness of the consideration to be received by the Care Pavilion Debtors will be demonstrated by a "market check" through the process outlined in the Bid Procedures.

**B.      The Sale Transaction Should be Approved "Free and Clear" Under Section
         363(f) of the Bankruptcy Code.**

26

43.    Section 363(f) of the Bankruptcy Code permits a debtor to sell assets free and clear of all liens, claims, interests, and encumbrances (with any such liens, claims, interests, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets) if any one of the following conditions is satisfied:

    i.    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    ii.    such entity consents;

    iii.    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

    iv.    such interest is in bona fide dispute; or

    v.    such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). As section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f). *In Messina*, 687 F.3d 74, 77 n.4 (3d Cir. 2012); *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007); *see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code § 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code § 363(f) is met).

44.    The Court may also authorize the sale of a debtors' assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) of the Bankruptcy Code does not apply. *See In re Ditech Holding Corp.*, 606 B.R. 544, 591 (Bankr. S.D.N.Y. 2019) ("[P]lan sales can be free and clear of claims without invoking section 363(f)."); *In re Trans World*

*Airlines, Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("[B]ankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of section 363(f)."); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11."); *see also In re White Motor Credit Corp.*, 75 B.R. 944 (Bankr. N.D. Ohio 1987) (holding that section 363(f) precluded tort claims against asset purchaser); *In re Appalachia Fuels, LLC*, 503 F.3d 538 (6th Cir. 2007) (approving a sale free and clear of "claims" arising as coal commission sales). The Care Pavilion Debtors submit, and to the extent necessary will demonstrate at the Sale Order Hearing, that the sale of the Transferred Assets free and clear of all liens, Claims, interests, and Encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.[9] Accordingly, the Care Pavilion Debtors request that the Court authorize the sale of the Transferred Assets free and clear of any liens, claims, interests and Encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests and Encumbrances attaching to the proceeds thereof in the same order of relative priority, with the same validity, force and effect as prior to such transfer.

---

[9] Moreover, the Care Pavilion Debtors will send the Auction and Sale Notice to purported creditors and lienholders. If such creditors and lienholders do not object to the proposed Sale Transaction, then their consent should be presumed. Accordingly, the Care Pavilion Debtors request that, unless a party asserting a prepetition lien, Claim or Encumbrance on any of the Transferred Assets timely objects to this Motion, such party shall be deemed to have consented to any Sale Transaction approved at the Sale Order Hearing. *See, e.g., FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent"); *Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

45.     The Care Pavilion Debtors may also be subject to unpaid Department Assessments owed to DHS, and DHS may assert a statutory lien pursuant to 62 P.S. 811-A[10] related to those assessments. DHS has not recorded any liens against the Debtors, and, any such liens would be subject to "mortgage or other liens existing and duly recorded at the time the tax lien is recorded…"[11] Also, because Section 1404.1 of the Fiscal Code provides that a tax lien must be

---

[10] Any assessments implemented and interest and penalties assessed against a nursing facility pursuant to this article shall be a lien on the real and personal property of the nursing facility in the manner provided by section 1401 of [72 Pa. Stat. Ann. §§ 1 *et seq.* (the "Fiscal Code")] and may be entered by the department in the manner provided by section 1404 of 'The Fiscal Code' and shall continue and retain priority in the manner provided in section 1404.1 of 'The Fiscal Code.'

62 Pa. Stat. Ann. § 811-A.

Section 1404.1 of the Fiscal Code provides, in pertinent part,

> "All tax liens shall have priority to and be fully paid before any other obligation, judgment, claim, lien or estate paid and satisfied out of the judicial sale of the real and personal property with which that property may subsequently become charged or for which that property may subsequently become liable, ***subject, however, to mortgage or other liens existing and duly recorded at the time the tax lien is recorded***."

72 Pa. Stat. Ann. § 1404.1 (emphasis added).

[11] Section 1404 of the Fiscal Code provides, in pertinent part,

> "All State taxes imposed under the authority of any law of this Commonwealth, now existing or that may hereafter be enacted, and unpaid bonus, penalties, and all public accounts settled, assessed or determined against any corporation, association, or person, including interest thereupon, shall be a first lien upon the franchises and property, both real and personal, of such corporation, association, or person, ***from the date of settlement, assessment or determination***, except as otherwise expressly provided by law under which the claim of the Commonwealth arises…"

72 Pa. Stat. Ann. §1401 (emphasis added).

29

recorded in order to establish its priority, any DHS statutory lien is subject to avoidance under section 544(a)(1) of the Bankruptcy Code.

46.     The existence of any purported statutory lien rights for unpaid Department Assessments makes clear that the amounts owed to DHS for Department Assessments are no different than any other purported lien right. As such, the claim for payment of these Department Assessments constitutes an interest in the Care Pavilion Debtors' property that is subject to section 363(f)(5) of the Bankruptcy Code. Because this interest may be satisfied by a payment of money, this Court may approve the sale of the Transferred Assets free and clear of any lien, interest, Claim, or Encumbrance asserted by DHS.

47.     The Nursing Facility Assessments would also constitute an "interest in property even if the Department at no statutory lien right. The leading case in this Circuit regarding what constitutes an "interest in property" under section 363(f) of the Bankruptcy Code is *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003) (concluding that the purchaser could not be held liable for federal employment discrimination claims). In *Trans World*, the Court adopted the Airlines' argument that "while Congress did not expressly define 'interest in property,' the phrase should be broadly read to authorize a bankruptcy court to bar any interest that could potentially travel with the property being sold, even if the asserted interest is unsecured." *Id.* at 288. In support of its conclusion, the Court noted that the definition of interests in section 363(f) is broader than simply liens or *in rem* interests, and quoted a portion of *Collier's* treatise providing that "[o]bviously there must be situations in which the interest is something other than a lien; otherwise section 363(f)(3) would not need to deal explicitly with the case in which the interest is a lien." *Id.* at 290 (citing 3 *Collier on Bankruptcy* ¶ 363.06[1]).

30

48.    Another case cited by the *Trans World* court in support of its holding was *In re P.K.R. Convalescent Centers, Inc.*, 189 B. R. 90 (Bankr. E.D. Va. 1995). In the *P.K.R. Convalescent* case, the court expressly enjoined the Virginia Department of Medical Assistance Service from pursuing collections against the prospective purchaser for amounts owed under a Virginia statute relating to depreciation recapture realized upon a transfer of the debtors' property. *Id*. at 96. The Court found that Virginia's right to repayment was an interest as defined in section 363(f) of the Bankruptcy Code and that the nursing facility could be sold free and clear of that interest because the amount owed could be satisfied by a payment of money. *Id.*

### C.    The Sale Order Must Provide that the Stalking Horse Bidders Do Not Have Successor Liability for the Care Pavilion Debtors' Debts.

49.    The Care Pavilion Debtors further request that the Sale Order specifically provide that the Stalking Horse Bidders or any other Successful Bidder shall have no successor liability of any kind, including, without limitation, for any Department Assessments or any other fines/penalties owed by the Care Pavilion Debtors to DHS or DOH for periods prior to the Closing of the Sale Transaction.

50.    The analysis in the *Trans World* case shows that the concepts of what constitutes an "interest in property" and a debtor's ability to sell free and clear of liabilities are closely related. If a potential liability arises from the debtor's operation of an integral part of its business, then section 363 of the Bankruptcy Code authorizes a sale of the assets comprising that business free and clear of the liability. *In re Trans World Airlines, Inc.*, 322 F.3d at 290. *See also In re WBQ Partnership*, 189 B.R. 98, 105 (Bankr. E.D. Va. 1995) (enjoining state from pursuing recovery of depreciation recapture from purchaser) ("DMAS's right of recapture falls with the category of 'any interest' that is subject to §363(f)."). In these Care Pavilion Cases, any amounts owed to DHS or

DOH arise exclusively from the operation of the nursing facilities being sold; therefore, the Court may approve a sale of the Transferred Assets free and clear from these claims or any other claims that could be asserted based on a theory of successor liability.

51.     In *Trans World*, the Court reasoned that the claims asserted qualified as interests subject to section 363(f) of the Bankruptcy Code because "it was the assets of the debtor which gave rise to the claims. Had TWA not invested in airline assets, which required the employment of the EEOC claimants, those successor liability claims would not have arisen." *Id.* (citing *In re Leckie*, 99 F.3d 573, 585 (4th Cir. 1996) (Sale of debtor's assets pursuant to section 363 of the Bankruptcy Code was free and clear of any liability imposed upon successors under the federal Coal Act.))[12]

52.     Like the EEOC claims in the *Trans World* case, any of the DHS's and DOH's claims in this bankruptcy clearly arise from the Care Pavilion Debtors' operation of their skilled nursing facilities—the property being sold. The Care Pavilion Debtors' "investment in [their nursing facilities] is inextricably linked to its employment of [the staff who were allegedly underpaid]". *Cf In re Trans World Airlines, Inc.*, 322 F.3d at 290 ("TWA's investment in commercial aviation is inextricably linked to its employment of the Knox-Schillinger claimants as flight attendants, . . ."). Clearly, the Department Assessments and any other amounts owed to DHS

---

[12] In *Leckie*, the Court reasoned that "[b]ecause there is therefore a relationship between (1) the Fund's and Plan's rights to demand premium payments from [the debtors] and (2) the use to which [the debtors] put their assets, we find that the Fund and Plan have interests in those assets within the meaning of section 363(f) [of the Bankruptcy Code]." *See In re Leckie*, 99 F.3d at 582. The court explained that "[t]hose rights are grounded, at least in part, in the fact that [the debtors'] assets have been employed for coal-mining purposes: if [the debtors] had never elected to put their assets to use in the coal-mining industry, and had taken up business in an altogether different area, the [claimants] would have no right to seek premium payments from them." *Id.* at 582.

or DOH would not exist but for the fact that the Care Pavilion Debtors operate nursing facilities within the meaning of the Pennsylvania Nursing Facility Assessment Program. Because any liability owed to these entities is "inextricably linked" to the Transferred Assets, this Court may approve a sale free and clear of those claims and any other claims based on successor liability.

53.     The Care Pavilion Debtors are actively seeking to maximize the Transferred Assets' value. The Care Pavilion Debtors retained Meridian to market and sell the Transferred Assets, and the Care Pavilion Debtors are prepared to sell the Transferred Assets to any competing bidder that makes an offer that will generate a higher return for their bankruptcy estates than the OTAs provide. Under these circumstances, this Court and all others routinely include in orders approving sales of assets pursuant to section 363 of the Bankruptcy Code a finding that a purchaser is not a successor to the debtor and is not liable for payment of amounts the debtors owe. *See, e.g., In re Leckie*, 99 F.3d at 576 ("even if [buyers] would be a successor in interest, the Bankruptcy Court may extinguish Coal Act successor liability pursuant to 11 U.S.C. § 363(f)(5)"); *In re Rockdale Marcellus Holdings, LLC*, Case No. 21-bk-22080 (Bankr. W.D. Pa. 2021) (Docket No. 617, ¶AA. "No Successor Liability"); *In re. Claim Jumper Acquisition Company, LLC*, Case No. 22-bk-21941 (Bankr. W.D. Pa.) (Docket No. 330, ¶¶ U, 11 and 13).

54.     Thus, this Court should hold that the sale of the Transferred Assets will be free and clear of any claim held by the DHS or DOH and to enjoin those entities (and all other creditors holding claims against the Care Pavilion Debtors) from attempting to collect any liability of the Care Pavilion Debtors from the Stalking Horse Bidders or any other Successful Bidder.

**D.     *Liens and Other Interests will Attach to the Proceeds in Accordance with their Existing Priority.***

55.     As provided by the Bankruptcy Code, all valid liens or other interests against the Transferred Assets being sold will attach against the sale proceeds in the order of their existing priority. The Care Pavilion Debtors request authority to pay the net sale proceeds, subject to carve-outs for any Bidding Protections afforded the Stalking Horse Bidders, to the Prepetition Secured Lenders for application to their debt in the order of their priority. Any proceeds in excess of the amounts required to pay the Prepetition Secured Lenders in full will be paid to Argnt Holdings, LLC in satisfaction of the obligations under the Court-approved DIP loan. Any proceeds in excess of the amounts required to pay the Prepetition Secured Lenders and the DIP Obligations in full will be held by the Care Pavilion Debtors pending further order of this Court. Furthermore, the Care Pavilion Debtors reserve for further determination by this Court the issue of the proper allocation of any excess proceeds among the Care Pavilion Debtors.

### E.     The Sale Transaction Has Been Proposed in Good Faith and Without Collusion, and Each Successful Bidder Will Be a "Good Faith Purchaser."

56.     Pursuant to section 363(m) of the Bankruptcy Code,[13] a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *O'Dwyer v. O'Dwyer (In re O'Dwyer)*, 611 Fed. App'x. 195, 200 (5th Cir. 2015); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007); see also *In re Abbotts Dairies*, 788 F.2d at 147 (to constitute lack of good faith, a

---

[13] Section 363(m) of the Bankruptcy Code provides: The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

party's conduct in connection with the sale must usually amount to fraud, collusion between the

buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders);

*In re Made In Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir. 2005) (following the *Abbotts Dairies* standard).

57.     Courts in this Circuit have upheld section 363 purchase agreements "negotiated,

proposed, and entered into . . . in good faith, without collusion . . . [resulting from] arm's-length

bargaining with . . . parties represented by independent counsel." *In re THQ Inc.*, No. 12-13398

(MFW), 2013 Bankr. LEXIS 781 (Bankr. D. Del. Jan. 24, 2013); *In re Rockdale Marcellus, LLC*,

Case No. 21-22080 (Bankr. W.D. Pa. Dec. 29, 2021); *In re Gottschalks Inc.*, Case Nos. 09-10157

2009 Bankr. LEXIS 4880 (Bankr. D. Del. June 10, 2009); *In re Against All Odds USA, Inc.*, Case

Nos. 09-10117 (DHS), 2009 Bankr. LEXIS 5234, at *1 (Bankr. D.N.J. May 28, 2009); *In re

Allegheny Health, Educ. & Research Found.*, Case Nos. 98-25773, 98- 25774, 98-25775, 98-

25776, 98-25777, 1998 Bankr. LEXIS 1684, at *31 (Bankr. W.D. Pa. Oct. 30, 1998).

58.     In other words, a party would have to show fraud or collusion between the

successful bidder and the debtor-in-possession or trustee or other bidders to demonstrate a lack

of good faith. An appropriate characterization of good faith in a bankruptcy sale is a lack of

"fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take

grossly unfair advantage of other bidders." *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7

(5th Cir.1981) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

Due to the absence of a bright-line test for good faith, the determination is based on the facts of

each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale

proceedings." *Made In Detroit, Inc.*, 414 F.3d at 581 (6th Cir. 2005) (quoting *In re Rock Indus.*,

572 F.2d at 1998).

59.     The Care Pavilion Debtors submit that the Stalking Horse Bidders are "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code. The Care Pavilion Debtors and the Stalking Horse Bidders, and their respective advisors, have entered into the OTAs without collusion, in good faith and after extensive arms'-length negotiations. To the best of the Care Pavilion Debtors' knowledge, information and belief, no party has engaged in any conduct that would cause or permit the OTAs to be set aside under section 363(m) of the Bankruptcy Code.

60.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Transferred Assets. Any agreement with a Successful Bidder executed by the Care Pavilion Debtors will be negotiated at arm's-length and in good faith. Accordingly, the Care Pavilion Debtors seek a finding that any Successful Bidder (including the Stalking Horse Bidders) are good faith purchasers and entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

61.     The Care Pavilion Debtors submit, and the testimony presented at the Sale Order Hearing will demonstrate, that the terms and conditions of the Sale Transaction were negotiated by the Care Pavilion Debtors and the Stalking Horse Bidders or Successful Bidder, as applicable, at arm's-length and in good faith, with the assistance of the Care Pavilion Debtors' professional advisors, and that the parties did not engage in any conduct that would cause or permit the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.

62.     Based on the foregoing, the Care Pavilion Debtors submit that they have demonstrated that the proposed sale of the Transferred Assets is a sound exercise of the Care

Pavilion Debtors' business judgment and should be approved as a good faith Sale Transaction.

### F.    The Court Should Waive the Stay of Bankruptcy Rules 6004 and 6006.

63.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

64.    The Care Pavilion Debtors believe that any sale should be consummated as soon as practicable to preserve and maximize value. Accordingly, the Care Pavilion Debtors request that any Sale Order approving the sale of the Transferred Assets and the assumption and assignment of the Assumed Contracts be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## II.    THE BID PROCEDURES, INCLUDING THE BID PROTECTIONS, SHOULD BE APPROVED.

65.    The Bid Procedures are appropriate and in the best interests of the Care Pavilion Debtors, their estates, and the creditors. The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same).

66.    Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value

of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Integrated Res.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

67.     The Care Pavilion Debtors have designed the Bid Procedures to promote a competitive and fair bidding process and, thus, maximize value for the Care Pavilion Debtors' estates and creditors. The Bid Procedures will allow the Care Pavilion Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Care Pavilion Debtors will receive the highest or best possible consideration for the Transferred Assets. Furthermore, the Bid Procedures provide an appropriate framework for the Care Pavilion Debtors to review, analyze, and compare any bids received to determine which bids are in the best interests of the Care Pavilion Debtors' estates and their creditors.

68.     The Care Pavilion Debtors submit that the Bid Procedures are fair and transparent and will derive the highest or best bids for the Transferred Assets. Therefore, the Care Pavilion Debtors request the Court approve the Bid Procedures.

A.     ***The Stalking Horse Bidders and Stalking Horse Bid Protections Should be Approved.***

69.     The Stalking Horse Agreements provide for the Bid Protections discussed above, including a Termination Fee in an amount of $50,000 and an Expense Reimbursement of up to $50,000 to be paid to the Stalking Horse Bidders on the terms set forth in the OTAs. The Bid Protections are the result of active and arm's-length negotiations, and the Bid Protections,

including the Termination Fee and Expense Reimbursement, were an essential prerequisite for the

Stalking Horse Bidders to enter into the OTAs. Stalking horse bidders virtually always require

termination fees and, in many cases, other forms of bidding protections as an inducement for

"setting the floor at auction, exposing its bid to competing bidders, and providing other bidders

with access to the due diligence necessary to enter into an asset purchase agreement." *Official

Comm. of Unsecured Creditors v. Interforum Holding, LLC*, No. 11-CV-219, 2011 U.S. Dist.

LEXIS 73421, at *4 n.2 (E.D. Wis. July 7, 2011). Thus, the use of bidding protections has become

an established practice in chapter 11 cases.

70.     In this Circuit, whether termination fees and expenses are allowable is subject to

the same standard as other general administrative expenses under section 503 of the Bankruptcy

Code. *In re O'Brien,* 191 F.3d at 532; *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121

(Bankr. D. Del. 2005) ("The Third Circuit has expressly recognized as an administrative claim a

stalking-horse bidder's claim for a break-up fee and expense reimbursement if granting such claim

provides a benefit to the estate."). These expenses are allowable if they are actually necessary to

preserve the value of the bankruptcy estates or if they benefit the debtor's estate. *Id.*

71.     In these Care Pavilion Cases, the Care Pavilion Debtors are currently not profitable,

and the Termination Fee and Expense Reimbursement included in the OTAs were necessary to

incentivize the Stalking Horse Bidders to commit to the purchase and establish a framework for

the terms and conditions governing the transfer of  the Transferred Assets. If these protections

were not offered, the Care Pavilion Debtors and their advisors believe that no entity would be

willing to act as a stalking horse bidder, and absent these protections, the Care Pavilion Debtors

would have no choice but to proceed to an expedited shut down process or an auction of their

assets with no floor or negotiated transaction framework, which could lead to a transfer the Transferred Assets at much less than the values established in the OTAs. Accordingly, the Bid Protections are necessary to preserve the value of the Care Pavilion Debtors' estates because they enable the Care Pavilion Debtors to secure an adequate floor for the Transferred Assets—a clear benefit to the Care Pavilion Debtors' estates.

72.     Moreover, there has been no self-dealing or manipulation of any kind in the negotiation of the Bid Protections; rather, the Bid Protections resulted from good faith, arm's-length negotiations between the Care Pavilion Debtors and the Stalking Horse Bidders. The Care Pavilion Debtors believe that the agreement to pay the Bid Protections is reasonable and necessary to induce the Stalking Horse Bidders to enter into the OTAs.

73.     Pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit a higher or better offer than the bid of the Stalking Horse Bidders, which would be used to fund the Bid Protections. The Stalking Horse Bidders' bid attracts additional bidders because they can save time and costs by utilizing documents the Stalking Horse Bidders heavily negotiated, including the OTAs. Ultimately, if the Transferred Assets are sold to a Successful Bidder other than the Stalking Horse Bidders, it is likely because the Stalking Horse Bidders played a crucial role in initiating interest and setting a minimum acceptable price for others to bid against.

74.     The Care Pavilion Debtors believe the dollar amount of the Bid Protections is appropriate and reasonable and consistent with other bid protections approved by courts in this Circuit. *See In re Abarta Oil & Gas Co, LLC*, Case No. 21-22406, Doc. No. 110 (Bankr. W.D. Pa. Nov. 11, 2021) (court approved Termination Fee of 3.0% in a Sale Transaction with $8,000,000

purchase price); *In re America Classic Voyages Co.,* Case No. 01-10954, Doc. No. [] (EIK) (Bankr. D. Del. March 20, 2002) (court approved breakup fee of 6.6% or $250,000 in connection with a $3.75 million sale transaction); *In re Chi-Chi's, Inc.*, Case No. 03-13063, Doc. 143 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted). The Bid Protections are a sound exercise of the Care Pavilion Debtors' business judgment and are in the best interests of the Care Pavilion Debtors, their estates, and all stakeholders. Accordingly, the Court should approve the Bid Protections.

### B.  This Court Should Approve the Assumption and Assignment Procedures, as well as the Proposed Assumption and Assignment of Contracts.

75.     The Care Pavilion Debtors respectfully submit that the proposed Assumption and Assignment Procedures set forth above are appropriate and reasonably tailored to provide all necessary notices to the Counterparties, including the deadlines for objecting to the assignment and assumption of their Executory Contracts. Without limitation, the Assumption and Assignment Procedures provide for the payment of any Cure Costs (and resolution of disputes related thereto) owed under the Assumed Contracts upon the assumption and assignment of such contracts. Accordingly, the Care Pavilion Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these Care Pavilion Cases, and that this Court should authorize the Assumption and Assignment Procedures and further authorize the Care Pavilion Debtors to assume and assign the Assumed Contracts as may be set forth in the purchase agreement with the Successful Bidder in accordance with such procedures.

76.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). "The purpose behind allowing the assumption

or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

77.    The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice). As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872). Indeed, "the sole issue is whether the rejection benefits the estate." *In re HQ Global*, 290 B.R. at 511.

78.    The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See id.*; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Generally, courts

defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42–43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424–25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

79.     Here, the Care Pavilion Debtors have exercised their sound business judgment in determining that assumption and assignment of the Assumed Contracts is in the best interests of the Care Pavilion Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See, e.g.*, *In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182–83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

80.     As set forth above, the Sale Transaction will provide significant benefits to the Care Pavilion Debtors' estates. To that end, the assumption and assignment of the Assumed Contracts is necessary for the Care Pavilion Debtors to obtain the benefits of the OTAs. In addition, under

section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or

lease "relieves the trustee and the estate from any liability for any breach of such contract or lease

occurring after such assignment." 11 U.S.C. § 365(k). Thus, following an assignment to the

Successful Bidder of any Assumed Contract, the Care Pavilion Debtors will be relieved from any

liability for any subsequent breach associated therewith.

81.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any

outstanding defaults under the Assumed Contracts must be cured or that adequate assurance be

provided that such defaults will be promptly cured. 11 U.S.C. § 365(b)(1). The Care Pavilion

Debtors propose to file with the Court, and serve on each Counterparty to an Assumed Contract,

the Contract Assumption and Assignment Notice (and, if applicable, an Amended Assumption and

Assignment Notice) that indicates the proposed Cure Cost for each such contract or lease. As such,

each Counterparty will have the opportunity to object to the proposed Cure Cost, if applicable.

Moreover, the payment or reserve of the applicable Cure Cost will be a condition to the Care

Pavilion Debtors' assumption and assignment of any Assumed Contract.

82.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may

assign an executory contract or unexpired lease of nonresidential real property if "adequate

assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C.

§ 365(f)(2). The words "adequate assurance of future performance" must be given a "practical,

pragmatic construction" in light of the facts and circumstances of the proposed assumption. *See In

re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes,

Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see

also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate

assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

83.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

84.     Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract. In order for its bid to be deemed a Qualified Bid, each Qualified Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "Adequate Assurance Information"), including: (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; and (b) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance. Furthermore, given that the Care Pavilion Debtors will submit evidence that all requirements for the assumption and assignment of such contracts have been satisfied at the Sale Order Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.

85.     Therefore, the Care Pavilion Debtors respectfully request the Court (a) approve the Assignment and Assumption Procedures, (b) approve the proposed assumption and assignment of the Assumed Contracts, and (c) find that all anti-assignment provisions of such contracts are unenforceable under section 365(f) of the Bankruptcy Code.[14]

**<u>NO PRIOR REQUEST</u>**

86.     No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Care Pavilion Debtors respectfully request that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, and, after the Sale Order Hearing, a Sale Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

*[signature page follows]*

---

[14] Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

Dated: December 10, 2024
        Pittsburgh, PA

**RAINES FELDMAN LITTRELL, LLP**

By:/s/ Daniel R. Schmizzi
Mark A. Lindsay (PA ID No. 89487)
Daniel R. Schimizzi (PA ID No. 311869)
Jordan N. Kelly (PA ID No. 328896)
Sarah E. Wenrich (PA ID No. 325834)
11 Stanwix Street, Suite 1100
Pittsburgh, PA 15222
Telephone: 412-899-6462
Email: mlindsay@raineslaw.com
dschimizzi@raineslaw.com
jkelly@raineslaw.com
swenrich@raineslaw.com

*Proposed Local Counsel to the Debtors and
Debtors in Possession*

        - and -

**BAKER & HOSTETLER LLP**

**Elizabeth A. Green, Esq.**
FL Bar No.: 0600547
Email: egreen@bakerlaw.com
**Jimmy D. Parrish, Esq.**
FL Bar No.: 0526401
E-mail: jparrish@bakerlaw.com
**Andrew V. Layden, Esq.**
FL Bar No.: 86070
E-mail: alayden@bakerlaw.com
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, Florida 32801-3432
Telephone: (407) 540-7920
Facsimile: (407) 841-0168

*Proposed Counsel for the Debtors and Debtors
in Possession*