# **EXHIBIT B**

OTAs

OPERATIONS TRANSFER AGREEMENT

by and among


Milton Operating LLC, Parkhouse Operating LLC, Watsontown Operating LLC,

each a Pennsylvania limited liability company,


collectively, "Old Operator"

and

MI Operating LLC, PA Operating LLC, WA Operating LLC,

each a Pennsylvania limited liability company,


collectively, "New Operator"

Dated as of: December 9, 2024

## OPERATIONS TRANSFER AGREEMENT

This OPERATIONS TRANSFER AGREEMENT (this "Agreement") is entered into this 9th day of December, 2024 (the "Effective Date") by and between the parties undersigned as Old Operator ("collectively, "Old Operator") and the parties undersigned as New Operator ("collectively "New Operator").

## WITNESSETH:

WHEREAS, those entities listed on **Exhibit A**, attached hereto, as Seller (collectively, "Seller") own that certain land, building, furniture, fixtures and equipment comprising the nursing facility listed by such Seller's name in **Exhibit A** (each a "Facility" and collectively the "Facilities"), and all of the furniture, fixtures and equipment and other items of personal property located therein (the "Personal Property" and collectively with the Facility, the "Property");

WHEREAS, each respective Facility is licensed to and operated by an entity listed in **Exhibit A** as such Facility's operator, (each operator, is an "Old Operator" and collectively the "Old Operators") to operate the number of skilled nursing beds set forth next to the name of each Facility as listed in **Exhibit A**;

WHEREAS, those entities listed on **Exhibit A**, attached hereto, as Purchaser (collectively, "Purchaser") are acquiring the Property from Seller, under that certain Purchase and Sale Agreement, dated effective as of August 14, 2024, by and between Seller and Purchaser (the "Purchase Agreement");

WHEREAS, as of the date hereof, (a) each respective Seller and MAPA Operating, LLC, an affiliate of Old Operator ("MAPA") are parties to those certain master lease agreements (collectively, the "Master Lease") providing for the lease of the Facility by respective Seller to MAPA and (b) MAPA, as landlord, and respective Old Operator listed next to such Facility in Exhibit A are parties to certain subleases (collectively with the Master Lease, the "Old Lease") providing for the sublease of the Facility by MAPA to the respective Old Operator, which Old Lease will either be (i) terminated as of the Closing (as defined below) and replaced in its entirety by a new lease agreement to be entered into by and among respective Purchaser and respective New Operator listed next to such Facility in **Exhibit A** at the Closing, or (ii) assigned and assumed by each respective New Operator listed next to such Facility in **Exhibit A** at the Closing, in each case, providing for the lease of the Facility by Purchaser to New Operator;

WHEREAS, on November 18, 2024, each Old Operator (in their capacity as chapter 11 debtors, each, a "Debtor" and, collectively, the "Debtors"), filed voluntary petitions (collectively, the "Chapter 11 Petitions") for relief under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") commencing chapter 11 cases (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases");

WHEREAS, on November 18, 2024, Neil Luria was appointed the Chief Restructuring

Officer of the Debtors ("CRO").

**WHEREAS,** the Old Operators will continue to own and operate their respective Facilities and businesses as ***debtors-in-possession*** under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

**WHEREAS,** subject to approval of the Bankruptcy Court, Old Operator and New Operator are entering into this Agreement in order to provide for an orderly transition of the operations of the Facilities, and the sale and transfer of certain Personal Property and certain contracts, licenses, and permits, and in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 363 and 365 and other applicable provisions of the Bankruptcy Code;

**WHEREAS,** in furtherance of a desire by the parties hereto to ensure a smooth transition of operations of the Facility, the parties hereto desire to enter into this Agreement.

**NOW, THEREFORE,** for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged by the parties hereto, the parties hereto agree as follows:

1.  **BANKRUPTCY PROVISIONS; CLOSING.**

a.  The parties hereto agree to the terms and conditions regarding the Debtors' filing of the Sale Motion (as defined herein) with the Bankruptcy Court to, among other things, seek (a) entry of the Bidding Procedures Order (as defined herein) (i) approving this Agreement as the stalking horse purchase agreement, (ii) approving New Operator as the stalking horse bidder pursuant to this Agreement, and (iii) approving the Bidding Procedures (as defined herein), including the bid protections, that shall govern the Debtors' solicitation of competing bids for the Debtors' assets, and, (b) following an Auction (as defined herein) to be held after the Bidding Solicitation Period (as defined herein) expires should there be other Qualifying Bidders (as defined herein), the Debtors' pursuit of the Sale Order approving the Successful Bidder's (as defined herein) operations transfer agreement, all in accordance with the provisions set forth on **Exhibit B** attached hereto (which **Exhibit B** also includes certain additional related defined terms used in this Agreement).  To the extent of any inconsistencies in the Debtors' Sale Motion and the provisions set forth on **Exhibit B** attached hereto, the provisions in Exhibit B shall control, except as otherwise ordered by the Bankruptcy Court.

b.  The closing of the transactions contemplated hereby (the "Closing") shall take place concurrently with the closing of the transactions contemplated under the Purchase Agreement, subject to the satisfaction or waiver of each of the closing conditions set forth in Section 2 hereof (other than those conditions which can only be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). The Closing shall be effective as of 12:01 a.m. (Eastern Time) on the Closing Date (the "Effective Time"), and will occur with respect to all Facilities simultaneously.

**2.    CONDITIONS PRECEDENT.** New Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the reasonable satisfaction of New Operator or the waiver thereof by New Operator of the following conditions precedent on or prior to the Closing Date, which waiver shall be binding upon New Operator only to the extent made in writing and dated as of the Closing Date:

a.  Old Operator shall have duly and timely performed and fulfilled in all respects all of its duties, obligations, promises, covenants and agreements hereunder;

b.  Each of the representations and warranties of Old Operator contained in this Agreement shall have been, to the best of CRO's Knowledge, true, correct complete and not misleading in all respects as of the Effective Date and the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true, correct, and complete as of that date) except where the failure of such representations and warranties to be, to the best of the CRO's Knowledge, true, correct, and complete would not have a material adverse effect on the business and operations of the Facilities.

c.  Old Operator shall have delivered to New Operator on or before the Closing Date the following, each of which shall be in form and substance satisfactory to New Operator in its commercially reasonable discretion:

1.    A bill of sale, in substantially the form annexed hereto as **Exhibit C** (the "Bill of Sale"), containing a warranty of title, duly executed and acknowledged by each Old Operator, sufficient to convey to New Operator good and indefeasible title, free of all Liens (other than Permitted Encumbrances), in and to the Transferred Assets and Assumed Liabilities, duly executed and acknowledged by each Old Operator, sufficient to convey to New Operator the personal properties included in the Transferred Assets;

2.    An assignment by each Old Operator, in substantially the form annexed hereto as **Exhibit D** (the "General Assignment"), of all of Old Operator's right, title and interest in, to and under:

i.    The Assumed Contracts (as defined herein);

ii.    The Patient Trust Funds and Property (as defined herein);

iii.    The Provider Agreements (as defined herein);

iv.    The Resident Agreements (as defined herein); and

v.    The Telephone Numbers and Website Material (as defined herein).

3.    A duly executed certificate of the CRO dated as of the Closing Date, to the effect and stating that, to the best of CRO's Knowledge: (A) this Agreement and the Other Documents to which Old Operator is a party have been duly authorized, executed and delivered by Old Operator or approved by the Bankruptcy Court, and (B) the CRO has been employed by the Old Operator and such employment has been approved by the Bankruptcy Court, and (C) conditions specified in Section 2(a), Section 2(b), Section 2(e), Section 2(f), Section 2(g), Section 2(h), Section 2(i) and

3

Section 2(m) have been satisfied;

      4.     All Permits, if any, issued by any Governmental Authority relating to the operating of the Facility by Old Operator running to, or in favor of, Old Operator, to the extent legally assignable;

      5.     Old Operator shall execute and deliver a Confirmation of Sale;

      6.     Counterparts to the Other Documents duly executed by all parties thereto (other than New Operator); and

      7.     Either (a) A duly executed termination agreement, between Seller and Old Operator, terminating the Old Lease, or (b) a duly executed assignment and assumption agreement between Purchaser, MAPA, Old Operator and New Operator assigning the Old Lease to respective New Operator, together with Consent of Seller..

d.  New Operator shall have received a copy of the Organizational Documents of Old Operator, together with amendments and supplements thereto, certified as of the most recent practicable date by the secretary of state of Old Operator's jurisdiction of incorporation or organization.

e.  Old Operator shall have transferred (or shall transfer as soon as reasonably practicable following the Closing) to New Operator the Patient Trust Funds and Property in compliance with all Applicable Laws with respect to the transfer of such Patient Trust Funds and Property and in accordance with the provisions of Section 5 below;

f.  Other than as disclosed in Schedule 2.f., on the Closing Date there shall not be any lawsuits filed or threatened against Old Operator which are not covered by insurance and being defended, subject to policy limits and any reservation of rights; nor shall there be any actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against Old Operator, to restrain or prohibit the consummation of any of the transactions contemplated under this Agreement and the Other Documents;

g.  New Operator shall have received DOH approval of the Licensure and all other Regulatory Approvals required by New Operator in order to operate the Facility in the manner presently operated by Old Operator, subject to conditions acceptable to New Operator in its reasonable discretion, and such approvals shall not have been revoked or modified; provided that the receipt of tie-in letters or other similar documentation permitting New Operator to bill and collect for services rendered to Medicare and Medicaid beneficiaries after the Closing shall not be a condition to Closing;

h.  The closing conditions described in the Purchase Agreement shall have been met in accordance with the terms of the Purchase Agreement and the closing under the Purchase Agreement shall occur concurrently herewith,

i.  The Bankruptcy Court shall have entered the Sale Order approving the sale of the Debtors' assets to New Operators under this Agreement free and clear of all Claims and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), and such Sale Order shall be a Final Order.

Old Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the commercially reasonable satisfaction of Old Operator or the waiver thereof

4

by Old Operator of the following conditions precedent on and as of the Closing Date, which waiver shall be binding upon Old Operator only to the extent made in writing and dated as of the Closing Date:

a.      New Operator shall have duly and timely performed and fulfilled all of its duties, obligations, promises, covenants and agreements hereunder;

b.      Each of the representations and warranties of New Operator contained in this Agreement shall be true, correct, complete and not misleading in all respects as of the Effective Date and the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that date);

c.      New Operator shall have executed and delivered to Old Operator the Other Documents to which it is a party; and

d.      The closing conditions described in the Purchase Agreement shall have been met in accordance with the terms of the Purchase Agreement and the closing under the Purchase Agreement shall occur concurrently herewith.

e.      The Bankruptcy Court shall have entered the Sale Order approving the sale of the Debtors' assets to the New Operators under this Agreement free and clear of all Claims and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), and such Sale Order shall be a Final Order.

In the event that either of the parties hereto (a "Waiving Party") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies at law or equity with respect thereto.

3.      **LIABILITIES OF OLD OPERATOR.**

a.      New Operator shall not be the successor to Old Operator, and Old Operator hereby acknowledges and agrees that pursuant to the terms of this Agreement, neither New Operator nor any of its Affiliates shall assume or become liable to pay, perform or discharge any Liability of Old Operator (other than Assumed Liabilities (as defined below)) of any kind or nature, at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, arising out of this or any other transaction or event and whether or not relating to Old Operator any of the Business, regardless of any disclosure made or exceptions noted with respect to the representations and warranties, covenants or agreements contained in this Agreement or any other document executed or delivered by Old Operator in connection with the transactions contemplated hereby, including the following specifically enumerated Liabilities (collectively, the "Excluded Liabilities"):

i.      All Liabilities for Indebtedness of Old Operator;

5

ii.    All Liabilities of Old Operator that relate to any of the Excluded Assets (as defined herein);

iii.    All Liabilities of Old Operator or for which Old Operator could be liable relating to Taxes (including with respect to the Transferred Assets or otherwise) including any Taxes that will arise as a result of the transfer of any of the Transferred Assets pursuant to this Agreement and any Liability related to Taxes of Old Operator imposed upon New Operator by reason of New Operator's status as transferee of the Business or any of the Transferred Assets (including under any bulk sales law);

iv.    All Transaction Expenses of Old Operator;

v.    All Pre-Closing Accrued Salary and PTO Benefits (as defined below);

vi.    All Liabilities of Old Operator that relate to the Recapture Claims (as defined herein);

vii.    Any Liability arising out of any Action commenced against Old Operator or with respect to any of the Transferred Assets after the Closing, the facts of which arise out of, or relate to any occurrence or event happening or existing prior to the Effective Time;

viii.    Any Liability of Old Operator relating to any Action for malpractice, professional liability, resident rights violations or violations of employee rights or contracts or otherwise constitute or are alleged to constitute a tort, breach of contract or violation of any law, rule, regulation, treaty or other similar authority;

ix.    Any Liability under any Assumed Contract which accrues or arises after the Closing, but which accrues or arises out of or relates solely to any breach or violation or alleged breach or violation that occurred prior to the Closing.

x.    Any Liability with respect to the Current Employees (as defined herein) or former employees, or both (or their personal representatives) of Old Operator (including any Liabilities arising under any Benefits Plan of Old Operator, other Liabilities described in Section 9 and Liabilities relating to any employer-paid portion of any employment and payroll Taxes that become payable in connection therewith), except for Liabilities expressly assumed by New Operator under Section 8(c);

xi.    Any Liability pursuant to the WARN Act relating to any action or inaction of Old Operator on or prior to the Effective Time, including any liabilities under WARN Act as a result of New Operator failing to hire any Employee as of the Closing; and

xii.    Any Liability of Old Operator under this Agreement or any Other Document.

xiii.    Any Liability under any contract, agreement, lease, mortgage, indenture or other instrument of Old Operator, except for the Assumed Contract;

6

xiv.   Any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Old Operator;

xv.   Any Liability arising out of or resulting from non-compliance with any Applicable Law by Old Operator;

xvi.   Any Liability of Old Operator resulting from overpayments or inappropriate billings; and

xvii.   Any other Liabilities of Old Operator which are not Assumed Liabilities.

b. Without limiting the foregoing, the parties intend that, to the fullest extent permitted by law (including under Section 363 of the Bankruptcy Code), upon the Closing, New Operators shall not be deemed to: (i) be the successors of the Old Operator, (ii) have, de facto, or otherwise, merged with or into the Old Operator, (iii) be mere continuations or substantial continuations of the Old Operator, or the business, enterprise(s), or operations of the Old Operator, or (iv) be liable for any acts or omissions of the Old Operator, in the conduct of their business or arising under or related to the Facilities or any other Debtors' assets other than as expressly set forth in the Transaction Documents and the Sale Order. Without limiting the generality of the foregoing, and except as otherwise provided in the Transaction Documents, the parties intend that New Operator shall not be liable for any Claims or Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) against Old Operator, or any of Old Operator's predecessors or affiliates, and New Operator shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, including without limitation any liabilities for nursing assessments owed to the Commonwealth of Pennsylvania or DOH, and any taxes of any kind whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Facilities or the Debtors' assets, or any liabilities of Old Operator arising prior to the Closing Date. The parties agree that the provisions substantially in the form of this Section 3, as well as any other provisions reasonably requested by New Operators to ensure "free and clear" transfer of the Transferred Assets shall be reflected in the Sale Order.

Notwithstanding anything to the contrary herein, no terms of this Agreement, the Sale Order, or any other Transaction Documents will require New Operator to execute any application, agreement, or other document in favor of DOH or any other Governmental Authority that expressly or impliedly provides that New Operator or any other party shall assume or have assumed any Claims, Encumbrances, or other liabilities of the Old Operator except for Assumed Liabilities and Permitted Encumbrances.

c.   New Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and

operation of the Facility prior to the Closing, including, but not limited to, any matters relating to Contracts, cost reports, collections, audits, hearing, or legal action arising therefrom.

      d.    The parties hereto agree and acknowledge that, notwithstanding anything to the contrary in this Agreement, Old Operator shall retain, and New Operator shall not accept, any of Old Operator's rights, title and interest in and to any assets of Old Operator other than the Transferred Assets (collectively, the "Excluded Assets").

      e.    The parties hereto acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement or any Other Document shall not create an Assumed Liability or other Liability of New Operator, except where such disclosed obligation has been expressly assumed by New Operator as an Assumed Liability in accordance with the terms of this Agreement.

      f.    For the avoidance of doubt, nothing contained in this Agreement shall omit any claim or defenses New Operator may have against any Third Party. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Old Operator or New Operator as compared to the rights and remedies which such Third Party would have had against Old Operator had New Operator not assumed such Assumed Liabilities.

      g.    <u>Closing Prorations</u>.  All costs and expenses relating to operation of the Facility, including without limitation bed taxes, provider taxes, gross receipts taxes, and quality assessment taxes, and all other taxes and utility charges, shall be prorated between Old Operator and New Operator as of the Effective Time.  In the event the amount of any cost or expense has not been determined as of the Effective Time, the proration shall be made on the basis of one hundred and five percent (105%) of the last available bill for the applicable period and shall be re-prorated upon receipt of statements therefor. For purposes of clarification, in no event shall Old Operator be responsible for any of the amounts above that are attributable to any period on or following the Closing, and in no event shall New Operator be responsible for any of the amounts above that are attributable to any period prior to the Closing.

    **4.**    **CONVEYANCE OF SUPPLIES**.  On the Closing Date, Old Operator shall transfer to New Operator all food, central supplies, linens and housekeeping supplies, other consumable and non-consumable inventory maintained in the ordinary course consistent with past practice with respect to the Facility and any other personal property of Old Operator (the "Supplies"). Old Operator shall have no obligation to deliver the Supplies to any location other than that at which each item of Supplies is currently located, and New Operator agrees that the presence of the Supplies at the Facility on the Closing Date shall constitute delivery thereof.

    **5.**    **TRANSFER OF PATIENT TRUST FUNDS.**

a.    Prior to the Closing, Old Operator shall provide to New Operator a true, correct and complete accounting of any patient trust funds and an inventory of all residents' property held by Old Operator on the Closing Date for patients at the Facility, a copy of which shall be attached hereto as <u>Schedule 5.a.</u> ("Patient Trust Funds and Property").

b.    Old Operator will indemnify, defend and hold New Operator harmless from any and all liabilities, claims, demands and causes of action of any nature whatsoever: i) in the event the amount of funds or any property, if any, transferred to New Operator did not represent the full amount of the funds and/or property delivered to Old Operator as of the Closing Date, ii) with respect to any Patient Trust Funds and Property delivered, or claimed to have

8

been delivered, to Old Operator, but which were not delivered by Old Operator to New Operator, or iii) for claims which arise from actions or omissions of Old Operator with respect to the Patient Trust Funds prior to the Closing Date.

c.   New Operator will indemnify, defend and hold Old Operator harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Old Operator with respect to the Patient Trust Funds and Property where said funds were transferred to New Operator pursuant to the terms hereof, or for claims which arise from actions or omissions of New Operator after the Closing Date with respect to Patient Trust Funds transferred to New Operator.

**6.    COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES.**

a.   Prior to Closing, Old Operator and New Operator shall enter into a Transition Services Agreement ("TSA") governing the process whereby timely final cost reports will be prepared and filed with respect to the Facilities operations through the date of Closing.

b.   Each party hereto agrees to notify the other within five (5) Business Days after receipt of any notice of any claim, audits, assessment inquires, proceedings, disputes, examinations, determination or denials or similar events by DOH, CMS, OIG or any other Governmental Authority with respect to any of the following, relating to periods prior to the Effective Time: (i) an alleged Medicare, Medicaid, and/or Managed Care overpayment, or any other recoupment or adjustment to reimbursement, (ii) an alleged underpayment of any Tax or assessment or iii) any other governmental or third-party payor claims (each, a "Recapture Claim"). For avoidance of doubt, the failure to provide notification of a Recapture Claim within the foregoing timeframe shall in no way effect a party's rights to indemnification with respect thereto.

c.   In the event DOH, CMS, OIG, or any other Governmental Authority making payments to New Operator for services performed at the Facility after the Closing or any other third-party payor makes any Recapture Claim, then Old Operator hereby agrees to save, indemnify, defend and hold New Operator harmless from and against any Loss incurred or suffered by New Operator relating to such claim. In connection with the foregoing indemnification obligation, in the event that DOH, CMS, OIG or any other Governmental Authority or other third-party payor source withholds amounts from New Operator's reimbursement checks as a result of such Recapture Claim, Old Operator shall pay such amounts to New Operator within ten (10) Business Days following New Operator's demand therefor, unless Old Operator in good faith asserts defenses and/or appeals of such Recapture Claim with supporting documentation to substantiate its defenses and/or claims. In the event Old Operator fails to pursue any issue or issues relating to appeal of a Recapture Claim within ten (10) Business Days following the making of the Recapture Claim, New Operator may pursue an appeal of such issue or issues and Old Operator will cooperate fully with New Operator in such appeal, including by providing copies of any documentation required to substantiate costs reported on the cost reports.

d.   Old Operator shall pay, prior to the Closing, all outstanding Recapture Claims and any

9

other fees and taxes due with respect to the Facility for periods prior to the Closing, and shall provide to New Operator, on or before the Closing, evidence reasonably satisfactory to New Operator of the foregoing payments.  .

### 7.   CONTRACTS.

a.   As soon as practicable after the date hereof, the Old Operator shall deliver to the New Operator true, accurate and complete copies of all Existing Contracts which are available to Old Operator and/or in Old Operator's custody or control, a schedule of which is attached hereto as Schedule 7.a.  In accordance with the terms of the General Assignment and this Agreement, Old Operator shall assign and transfer to New Operator all of Old Operator's rights, title and interest in, to and under the Existing Contracts chosen by New Operator in its sole discretion and set forth in Schedule 7.b. hereto (collectively, the "Assumed Contracts," and the Exiting Contracts not assigned to New Operator shall hereinafter be referred to as the "Rejected Contracts"), and New Operator shall assume all of the Liabilities of Old Operator under the Assumed Contracts that accrue after the Effective Time and that do not arise from occurrences, circumstances or events occurring or existing, or breaches existing at or prior to the Effective Time (collectively, the "Assumed Liabilities") (it being understood that any interest, penalty or other amounts required to be paid under any Assumed Contract as a result of any non-payment or other breach by Old Operator thereunder shall not be an Assumed Liability).

b.   To the extent any third party consent is required in connection with the assignment and assumption of the Assumed Contracts, Old Operator hereby covenants and agrees to use its best efforts to obtain such third party consent prior to the Closing Date. To the extent Old Operator shall be unable to obtain such third party consent, Old Operator and New Operator shall cooperate and take such steps as may be necessary in order for New Operator to receive the benefits under such Assumed Contracts, provided that New Operator agrees to fulfill any obligations of Old Operator that shall arise with respect to such Assumed Contracts on and after the Closing Date.

c.   Old Operator shall also transfer, convey and assign to New Operator on the Closing Date all customer lists, prospect lists, and existing agreements with residents and any guarantors thereof (the "Resident Agreements"), to the extent assignable by Old Operator.

### 8.   EMPLOYEES.

8.1     Employees.

(a)     Within 60 days prior to the Closing, Old Operator shall provide the New Operator with reasonable access to the Facility so that the New Operator may discuss potential employment of any Old Operator employee providing services at the Facility. Upon prior notice to Old Operator, New Operator may deliver any written communications to, or hold any group meetings with, any individual or group of New Operator employees for the purpose of addressing or discussing employment with the New Operator following the Closing.

(b)     New Operator shall, to the extent required by Section 8.5(c) below, offer

4918-8184-1668.3

employment, upon terms and conditions to be set by the New Operator as described herein, to employees of Old Operator who meet its requirements for employment and, as of the Closing Date, are actively working at the Facility (which shall include employees of Old Operator who, as of the Closing Date, are on a leave of absence pursuant to Old Operator's Family and Medical Leave of Absence Policy or due to work-related injury or illness, upon any return from such leave). All pre-Closing employees of Old Operator who, pursuant to the foregoing, become employees of the New Operator as of the Closing, are herein referred to as the "Hired Employees". It is understood that New Operator shall not be responsible for any disability or workers' compensation benefits for any employees on leave of absence pursuant to Old Operator's Family and Medical Leave of Absence Policy or due to a work-related injury or illness that are receiving such benefits as of the Closing Date; provided, that New Operator will be responsible after the Closing Date for such disability or workers' compensation benefits arising on and after the Closing Date (to the extent relating to periods on and after the Closing Date and excluding any pre-existing condition) for any Hired Employees. It is understood that all Hired Employees shall be subject to such initial or new terms and conditions of employment as may be determined and established by New Operator, in its discretion. The parties agree that, New Operator: (i) shall have no obligation to recognize any union or to assume any of the collective bargaining agreements currently in place; (ii) shall have the right to, and be deemed to have the intention not to, assume any such collective bargaining agreement; and (iii) shall have the right, and be deemed to have the intention, to set its own initial terms and conditions of employment for any employees of Old Operator that New Operator may choose, in its sole discretion, to hire.

(c)     New Operator shall offer to employ all of Old Operator's employees employed at the Facility upon such terms and conditions and otherwise take any and all necessary steps so that Old Operator is not required to give notice to the employees of the Facility (including employees who are on medical disability or leaves of absence and who worked at the Facility immediately prior to such disability or leave who are able to perform the essential functions of the position with or without a reasonable accommodation and who are qualified for the position) of the "closure" thereof under the Worker Adjustment and Retraining Notification Act of 1988, as amended (the "WARN Act") or under any comparable state law. In addition to the foregoing, all Facility employees who are actively employed by Old Operator as of the Closing Date shall be offered employment by and, if such employment is accepted by them, become employed with New Operator, effective immediately after the Closing.  If New Operator fails to comply with its obligations in the preceding sentences, New Operator shall indemnify, defend and hold harmless Old Operator for any and all losses, costs, claims, fines, penalties, damages and expenses (including court costs and reasonable attorneys' fees) arising under or relating to the WARN Act and any similar local or State plant closing laws as applied to the transactions contemplated hereby. Nothing in this Section shall create any rights in favor of any person not a party hereto, including the employees of the Facility, or constitute an employment agreement or condition of employment for any employee of Old Operator or any affiliate thereof who is a Hired Employee.

(d)     At or before the Closing, New Operator shall provide Old Operator with a schedule listing each Hired Employee. Between the Closing and the two year anniversary date thereof, neither Old Operator nor any affiliate of Old Operator shall, directly or indirectly, alone or in conjunction with any other party, solicit, induce or attempt to solicit or induce for employment

11

or consulting or similar services or otherwise engage or employ any Hired Employee; provided, however, that (i) the foregoing restrictions shall not apply to those individuals listed on <u>Schedule 8.5(d)</u> of the Old Operator Disclosure Schedules (as such schedule shall be mutually agreed to by Old Operator and New Operator), it being understood and agreed that Old Operator shall require the services of those individuals following the Closing for a period of no more than 30 days, and (ii) nothing set forth in this subparagraph (d) shall restrict Old Operator from soliciting, inducing, or otherwise engaging or employing an employee who is not a Hired Employee, or a Hired Employee who has been terminated for any reason by New Operator. Between the Execution Date and the Closing or the termination of this Agreement, as the case may be, and, if this Agreement is terminated, for a period of one year thereafter, neither New Operator nor any affiliate of New Operator shall employ any Old Operator employee or solicit or induce any Old Operator employee to leave the employment of Old Operator (except as contemplated by this Section 1.5 hereof). Nothing set forth in this subparagraph (d) shall restrict a party from conducting general public solicitations (including through advertisements and/or search firms) not directly targeted to prohibited individuals or from hiring any prohibited individual who has not been employed by the other party for a period of at least six months.

(e)        Old Operator shall pay to each Hired Employee, no later than the date required by applicable law, an amount equal to any and all accrued salary and wages earned by such employee through and including the Closing Date ("Pre-Closing Accrued Salary"). No later than five (5) days prior to the Closing, Old Operator shall provide New Operator with a true, correct and complete schedule setting forth for each employee employed at the Facility (including employees who are on medical disability or leaves of absence and who worked at the Facility immediately prior to such disability or leave who are able to perform the essential functions of the position with or without a reasonable accommodation and who are qualified for the position) the number and corresponding dollar amount of all vacation, sick and personal days accrued as of the Effective Time (including all taxes incident or associated therewith, collectively, the "PTO Benefits") together with supporting documentation. Old Operator and New Operator shall discuss and negotiate in good faith any discrepancies New Operator may have with respect to the PTO Benefits and the liabilities and obligations associated therewith. As of the Effective Time, the New Operator shall be obligated to pay the PTO Benefits to all Hired Employees (such amount being referred to herein as the "Assumed Benefits"). For clarity, Assumed Benefits does not include any Pre-Closing Accrued Salary. Except for the Assumed Benefits, the New Operator does not assume any liability or obligation for any and all wages, salary, compensation (including Pre-Closing Accrued Salary), employee benefits, including any pension, healthcare, childcare or other employee benefits, whether under any collective bargaining agreement or other agreement, for any employee employed at the Facility (including employees who are on medical disability or leaves of absence and who worked at the Facility immediately prior to such disability or leave who are able to perform the essential functions of the position with or without a reasonable accommodation and who are qualified for the position) prior to the Effective Time, whether or not such individual is a Hired Employee, and Old Operator shall remain primarily liable therefor and shall indemnify and hold New Operator harmless from and against any claim or demand relating thereto or arising thereunder. New Operator shall indemnify and hold Old Operator harmless from and against any claim or demand relating to the Assumed Benefits (for which Old Operator paid New Operator or

12

provided a credit under the Purchase Agreement as contemplated hereby).

(f)        Except for all Hired Employees, Old Operator shall remain liable for all group health plan continuation coverage pursuant to the requirements of Section 601, et seq. of ERISA and Section 4980B of the Code ("COBRA"), for all of its employees to whom it is required to offer the same under applicable law. Notwithstanding the foregoing, the New Operator agrees that it will provide COBRA coverage for any non-Hired Employees and that such employees will make COBRA premium payments directly to the New Operator.

(g)        As of the Closing and subject to applicable law, all active employees of Old Operator employed at the Facility who are eligible to participate in group health insurance coverage sponsored by Old Operator and who become Hired Employees shall be eligible for participation in a group health plan (as defined for purposes of Internal Revenue Code Section 4980B) of New Operator for the general benefit of employees and their dependents, and all such employees shall be covered without a waiting period and without regard to any pre-existing condition unless (1) they are under a waiting period with Old Operator at the Closing, in which case they shall be required to complete their waiting period while under the group plan of New Operator or (2) they were subject to a pre-existing condition exclusion while under Old Operator's group-health plan, in which case they shall remain subject to the same exclusion, which exclusion shall, if applicable, be subject to the same time limitation while employed by the New Operator as was applicable thereto while said employees were employed by Old Operator, with the time limit calculated from the date the same commenced while employed by such New Operator. The New Operator and Old Operator acknowledge and agree that it is the intent of this provision that neither Old Operator nor its affiliates shall be required to provide continued health coverage under ERISA or Section 4980B of the Internal Revenue Code to any Hired Employees or to any qualified beneficiary (as defined for purposes of Section 4980B of the Internal Revenue Code) with respect to any such employees. Without limitation of the foregoing, Old Operator shall be responsible for providing welfare benefits (including, without limitation, medical, hospital, dental, accidental death and dismemberment, life, disability and other similar benefits) to all of Old Operator's employees, including, without limitation, Hired Employees, for all claims incurred and benefits earned prior to the Closing under and subject to the generally applicable terms and conditions of the employee benefit plans, programs and policies in which such employees were entitled to participate prior to the Closing, as amended from time to time. New Operator shall be responsible for providing such benefits for claims incurred and benefits earned on or after the Closing under and subject to the generally applicable terms and conditions of New Operator's employee benefit plans, programs and arrangements as amended from time to time. For purposes of this paragraph, a claim is "incurred" on the date the applicable medical or dental services are rendered, drugs or other medical equipment are purchased or used, as the case may be, or, in the case of a confinement, the related expenses are deemed incurred per diem. Notwithstanding the foregoing, at New Operator's request, Old Operator will offer to provide COBRA benefits to the Hired Employees for a period of up to thirty (30) days following the Closing Date, in which event, (i) New Operator shall pay all COBRA premiums on behalf of Hired Employees who elect COBRA coverage, and shall reimburse Old Operator for all costs and expenses incurred by Old Operator in providing such benefits, including unrecovered premium expense and administrative costs, and (ii) New Operator shall provide the benefits described above no later than thirty (30) days

13

following the Closing Date.

(h)        As of the Closing Date, all Hired Employees shall cease to accrue benefits under the employee benefit plans, programs and policies of Old Operator, and Old Operator shall take all such action as may be necessary to affect such cessation. There shall be no assumption by New Operator of or transfer of assets or liabilities of such plans, programs and policies from Old Operator to New Operator or to any employee benefit plans of the New Operator with regard to any employees of Old Operator, including, without limitation, Hired Employees, except as otherwise expressly provided herein. Old Operator shall retain all responsibility for, and New Operator shall have no obligation or responsibility for, any of such benefits, except as provided herein.

(i)        Except for COBRA obligations as stated in Subsections 8.5(f) and (g), New Operator shall have no obligation or responsibility for any liabilities or obligations of Transferor relating to (1) any Old Operator employee who is not a Hired Employee and (2) any Hired Employee for any period prior to such Hired Employee becoming an employee of the New Operator (including, without limitation, liabilities or obligations of Old Operator relating to PTO Benefits or Union Benefits (except to the extent included in the Assumed Benefits and for which Old Operator paid New Operator or provided a credit under the Purchase Agreement as contemplated hereby). Except as expressly set forth in this Agreement, Old Operator shall have no obligation or responsibility for any liabilities or obligations of New Operator relating to Hired Employees in respect of matters arising from and after the Closing. Old Operator shall indemnify and defend and hold New Operator harmless from any claim asserted against New Operator by any (1) Old Operator employee who is not a Hired Employee and (2) Hired Employee in respect of, or arising during, any period prior to such Hired Employee becoming an employee of the New Operator, including for Pre-Closing Accrued Salary and Assumed Benefits. New Operator shall indemnify and defend and hold Old Operator harmless from any claim asserted against Old Operator by any Hired Employee in respect of matters arising from and after such Hired Employee became an employee of the New Operator.  New Operator does not hereby assume or agree to discharge or perform any liabilities or obligations of Old Operator under any collective bargaining agreement and Old Operator agrees to indemnify, defend and hold New Operator and its affiliates harmless from and against and in respect of any claim or demand for any withdrawal liability asserted against New Operator or its affiliates under, or in respect of, any collective bargaining agreement or multiemployer plan to which Old Operator was obligated to contribute prior to the Closing, including any withdrawal liability arising from the transfer of the Facility to New Operator hereunder. New Operator does not hereby assume or agree to discharge or perform any liabilities or obligations of Old Operator under any pension plan to which any Hired Employees may participate.

8.2 Old Operator shall terminate the employment of all employees providing services at the Facility, a listing of which as of the Effective Date is attached hereto as Schedule 8.2. (such listing, to include the current base salaries of all such employees) (the "Current Employees"), and to be updated as of the Closing Date. New Operator shall not be bound by or assume any employment contracts (whether oral or in writing) to which Old Operator may be a party. Other than consistent with past practice, Old Operator shall not make any changes in the

14

compensation or benefits of the employees at the Facility prior to the Closing Date other than with the prior written consent of New Operator.

## 9.    **ACCOUNTS RECEIVABLE.**

a.    All unpaid Accounts Receivable of Old Operator with respect to periods prior to Closing shall remain owned by Old Operator, and New Operator and Old Operator shall enter into a TSA on mutually agreeable terms prior to Closing addressing the terms under which New Operator will collect such amounts for Old Operator subject to a contingency fee for New Operator for amounts collected on behalf of Old Operator. If the parties are unable to agree on the terms of New Operator collecting such accounts receivable, the Old Operator may retain a third party to collect such accounts receivable, and the TSA shall provide for appropriate information sharing and cooperation from New Operator to allow such collections to occur. If at any time after the Closing Date, New Operator shall receive any payment from any federal or state agency, which payment includes any reimbursement with respect to payments or underpayments made to Old Operator for services rendered prior to the Closing Date, then New Operator shall remit such payments to Old Operator within three (3) business days. New Operator and Old Operator shall send copies of all Medicaid remittance advices to the other party for purposes of recording and pursuing Accounts Receivable for the period of twelve (12) months following the Closing Date and thereafter as reasonably requested by each party. If at any time after the Closing Date, Old Operator shall receive any payment from any federal or state agency, which payment represents reimbursement with respect to payments or underpayments made to New Operator for services rendered on or after the Closing Date, then Old Operator shall remit such payments to New Operator. Any such remittances pursuant to this Section shall occur within three (3) Business Days from the date the party required to make such remittance receives payment thereof.

b.    Any non-designated payments received by New Operator or Old Operator from non-governmental payment sources during a period of sixty (60) days following the Closing shall first be applied to any pre-Closing balances due to Old Operator for services provided prior to the Closing (with the excess, if any, applied to any post-Closing balances due for services rendered by New Operator following the Closing), and any such payments received following such period of sixty (60) days shall first be applied to any post-Closing balances due New Operator for services provided after the Closing (with the excess, if any, applied to any pre-Closing balances due for services rendered by Old Operator prior to the Closing). Notwithstanding the foregoing, the parties agree and acknowledge that Social Security payments received by residents at the Facility, and provided as payment for services at the Facility, shall be applied towards payment for services rendered during the month with respect to which the Social Security payment was received by the resident.

c.    For avoidance of doubt, any Medicare bad debt payments received by Old Operator following the Closing (prior to such time as assignment of the Medicare Provider Agreement to New Operator has been fully processed) that relate to periods following the Closing, shall be remitted to New Operator within three (3) Business Days of receipt

15

thereof.

**10.** **EMPLOYMENT RECORDS**. Old Operator shall deliver to New Operator, prior to the Closing Date, either the originals or full and complete copies of all employee records for all Hired Employees in its possession (including, without limitation, all employee employment applications, W-4's, I-9's and any disciplinary reports) (collectively, the "Employee Records"). Old Operator represents and warrants to New Operator that the Employee Records delivered to New Operator represent all employee records in Old Operator's possession or control as of the Closing Date.

**11.** **ACCESS TO RECORDS**.

a.    On or before the Closing Date, Old Operator shall, at its sole cost and expense, deliver to New Operator or leave at the applicable Facility the Books and Records of the Facility, including resident medical records with respect to residents at the Facility at Closing, and financial records. Provided, however, that nothing herein shall be construed as precluding Old Operator from removing from the Facility on the Closing Date its corporate financial records which relate to its operations at the Facility or to its overall corporate operations and provided, further, that Old Operator shall give New Operator access to any information in any such removed records as is necessary for the efficient and lawful operation of the Facility by New Operator or is otherwise required by law to be maintained at the Facility.

b.    Subsequent to the Closing Date, New Operator shall allow Old Operator and its Representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at its own expense, to the extent reasonably necessary to enable Old Operator (i) to investigate and defend malpractice, employee or other claims, (ii) to file or defend cost reports and tax returns, (iii) investigate or conduct due diligence regarding the existence or prosecution of any cause of action owned by Old Operator that arose prior to Closing, or (iv) to otherwise fulfill any reasonable request for information or gather information related to transactions contemplated by the TSA.

c.    Old Operator shall, if allowed by applicable law and subject to the terms of such applicable law, be entitled to remove any records delivered to New Operator, for purposes of litigation involving a resident or employee to whom such record relates, as certified to New Operator in writing prior to removal by an officer of or counsel for Old Operator in connection with such threatened or actual litigation. Any record so removed shall promptly be returned to New Operator following its use.

d.    New Operator agrees to maintain such books, records and other material comprising records of the Facility's operations prior to the Closing Date that have been received by New Operator from Old Operator or otherwise, including resident records and records of patient funds, to the extent required by law, but in no event less than seven (7) years.

e.    Prior to Closing, Old Operator shall retain and shall not remove any resident medical or financial records from the Facility and shall transfer such resident records to

16

New Operator under the Bill of Sale referenced in Section 2 of this Agreement.

**12.    USE OF TELEPHONE NUMBER AND WEBSITE; POLICY AND PROCEDURE MANUALS**.

       a.    New Operator may use the present telephone numbers ("Telephone Numbers") as well as any websites or internet domain names ("Website Materials") of the Facility. Old Operator shall as of the Closing Date transfer or cause to be transferred the telephone numbers used by the Facility.

       b.    Old Operator agrees to leave its policy and procedure manuals (to the extent such materials exist and are available to Old Operator) at the Facility and to transfer all of its right, title and interest in and to such policy and procedure manuals to New Operator under the Bill of Sale referenced in Section 2 of this Agreement.

**13.    PROVIDER AGREEMENTS**. For any periods following the Closing that New Operator is not yet able to bill under its Medicaid, Medicare, and/or Managed Care provider agreements (the "Provider Agreements"), Old Operator shall allow New Operator to bill under Old Operator's Provider Agreements, to the extent permitted by applicable law, and Old Operator shall promptly forward to New Operator any payments received with respect thereto within three (3) Business Days of receipt thereof.

**14.    COOPERATION; INTERIM OPERATIONS OF THE FACILITY**. Old Operator agrees to cooperate with New Operator, and New Operator agrees to cooperate with Old Operator to affect an orderly transfer of the operation of the Facility. Old Operator shall fully cooperate with New Operator in connection with submitting an application to DOH with respect to the Licensure, as well as any applications with respect to the Provider Agreements, and shall also fully cooperate with regard to any additional actions or information required with respect to approval of the Licensure and/or New Operator's Provider Agreements, or otherwise requested in connection with the transactions contemplated herein.

From the date of this Agreement until the Closing, Old Operator shall operate the Facility in substantially the same manner as it has heretofore operated, use commercially reasonable and diligent efforts to preserve intact the business operations and relationships of the Facility with Third Parties and use best efforts to keep available the services of all of the Facility's employees. Without limiting the generality of the preceding sentences, until the earlier of (i) the Closing Date, or (ii) the termination of this Agreement, Old Operator shall:

      a.    Operate the Facility in the normal Ordinary Course of Business and in compliance with all laws, ordinances, orders, rules, regulations and requirements of any federal, state or municipal governmental agency or authority;

      b.    Maintain the Facility's licensure status in compliance with all applicable laws, rules and regulations;

      c.    Not sell, transfer or otherwise dispose of any of the Supplies except in the Ordinary Course of Business consistent with the prior practices of Old Operator, in which event Old Operator shall replace the same with similar property of equal quality, value and usefulness;

17

d.  Not enter into any contract which shall become the obligation of New Operator nor modify, cancel, accept the surrender of or renew (except when any such acceptance of surrender or renewal is non-discretionary) any material Contract which exists at present without New Operator's prior written consent;

e.  Not decrease the private pay rates of the residents of the Facility without the prior written consent of New Operator;

f.  Maintain records in accordance with all applicable federal and state laws and in such manner so that all records will be prepared in a consistent manner and will be current, complete, accurate and true;

g.  Not increase or promise to increase any wages or benefits of, or grant or promise to grant any bonuses to, any of the employees of the Facility without the prior written consent of New Operator;

h.  Not take any action which will or would cause any of the representations or warranties in this Agreement to become untrue, breached, or be violated;

i.  Perform all of its obligations in respect of the Facility whether pursuant to any contracts, or other requirements, including payment before the same shall become due of all taxes, duties and other governmental charges that accrue prior to the Closing Date;

j.  Not transfer residents from the Facility to any other skilled nursing facility, other than as requested by such resident or as required for the care of such resident; and

k.  Promptly inform New Operator in writing of any material event adversely affecting the ownership, use, occupancy, operation, management or maintenance of the Facility, whether or not insured against.

New Operator and Old Operator agree and acknowledge that the employees at the Facility provide valuable services that are crucial for the success of the Facility, and New Operator's decision to serve as certified operator of the Facility is based upon the skills and qualifications of such employees. As such, during the period beginning on the Effective Date and ending upon the date that is one (1) year following the Closing, neither Old Operator nor any of its members, managers, shareholders, officers, directors or Affiliates shall, directly or indirectly, solicit or hire for employment any Current Employee or Hired Employee. In the event of any breach of the foregoing, Old Operator shall pay to New Operator an amount equal to the greater of (i) One Hundred Thousand Dollars ($100,000.00) or (ii) the annual salary for any such Current Employee as liquidated damages, for each such Current Employee that is solicited or hired in violation of this section. The parties agree and acknowledge that actual damages with respect to the foregoing would be difficult to ascertain and that at least One Hundred Thousand Dollars ($100,000.00) is a fair and reasonable approximation of such actual damages.

15.  **INDEMNIFICATION.**

a.  <u>By Old Operator</u>. Old Operator shall indemnify, save, protect, defend and hold harmless, New Operator, its Affiliates, and their respective members, managers, employees, shareholders, officers, directors and agents (collectively, the "New Operator Indemnitees"), from and against any and all Losses incurred or suffered by any such New Operator Indemnitee arising from, by reason of, or, in connection with (i) any misrepresentation or breach of any representation or warranty of Old

18

Operator contained in this Agreement, (ii) any breach by Old Operator of any covenant or agreement made by Old Operator in this Agreement, (iii) operation of the Facility prior to the Effective Time, (iv) any fraud or intentional misrepresentation on the part of any Old Operator or its Representatives, (v) any Recapture Claim, or (vi) the Excluded Liabilities, Pre-Closing Accrued Salary and/or Assumed Benefits.

b. <u>By New Operator</u>. New Operator shall indemnify, save, protect, defend and hold harmless Old Operator, their employees, members, managers, shareholders, officers, directors and agents (collectively, the "<u>Old Operator Indemnitees</u>"), from and against any and all applicable Losses incurred or suffered by any such Old Operator Indemnitee arising from, by reason of or, in connection with (i) any breach by New Operator of its obligations, representations, warranties, agreements or covenants hereunder, (ii) New Operator's operation of the Facility following the Effective Time, or (iii) the Assumed Contracts and/or Assumed Liabilities.

c. In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Agreement is made against or received by any indemnified party (hereinafter "<u>Indemnitee</u>") hereunder or upon an Indemnitee becoming aware of a fact, condition or event that otherwise constitutes a basis for a claim for indemnification against the Indemnitor (an "<u>Indemnitee's Claim</u>"), said Indemnitee shall notify the indemnifying party (hereinafter "<u>Indemnitor</u>") in writing within twenty one (21) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim, provided, however, that Indemnitee's failure to timely notify Indemnitor of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitor's indemnity obligations hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend or indemnify the Indemnitee's Claim. Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the final, unappealable resolution of said Indemnitee's Claim. Upon the receipt of the written request of Indemnitee, Indemnitor shall within two (2) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of said Indemnitee's Claim. Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent. Failure to obtain such consent shall be deemed a forfeiture by Indemnitee of its indemnification rights hereunder. In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim (or in the event sufficient funds are not available for such indemnification) and/or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days prior

19

written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law and/or rule of Court, intervene in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand for the same Indemnitor shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or compromise said Indemnitee's Claims.

d.  For avoidance of doubt, parties agree that each party's rights to indemnification pursuant to this Agreement shall not be affected or waived by virtue of any investigations or due diligence performed by such party.

e.  Except for Section(a)(i), the parties' obligations under this Section 15 shall survive the Closing; provided that New Operator may not setoff or recoup against any collections of accounts receivable on behalf of Old Operator or any amounts incorrectly paid to New Operator that were intended for Old Operator.

16.  **REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR**.  As an inducement to Old Operator to enter into this Agreement, New Operator covenants and makes the following representations and warranties set forth below, which are true and correct as of the date hereof and which shall be true and correct on the Closing Date:

a.  Organization and Authority.  New Operators are limited liability companies duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and as of the Closing Date will have, all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by New Operator and is enforceable against New Operator in accordance with its terms.

b.  No Violations.  Neither the execution and delivery of this Agreement, or any agreement referred to or contemplated hereby, by New Operator will:

   i.    Violate any provision of its Operating Agreement; or

   ii.   Be in conflict with constitute a default or create a right of termination or cancellation under any agreement or commitment to which New Operator is a party.

c.  No Broker. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Other Document based upon arrangements made by or on behalf of New Operator.

d.  Accuracy of Representations and Warranties of New Operator.  No representation or warranty by or on behalf of New Operator contained in this Agreement and no

20

statement by or on behalf of New Operator in any certificate, list, exhibit, schedule or other instrument furnished or to be furnished to Old Operator by or on behalf of New Operator pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

e. Survival of Representations and Warranties of New Operator. Each representation and warranty of New Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date, and all representations and warranties shall survive the Closing.

**17. REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR.** Except as set forth in the Old Operator Disclosure Schedules, and as an inducement to New Operator to enter into this Agreement, Old Operator covenants and makes the following representations and warranties, which are true and correct as of the date hereof and the Closing Date (for the avoidance of doubt, all representations and warranties set forth in this Agreement are (i) made to the best of CRO's Knowledge, (ii) shall not apply to any matter as could not reasonably be expected to have a Material Adverse Effect, and (iii) shall not apply to any matter to the extend the New Operator or its agents or affiliates had knowledge of different or contradictory facts or conclusions that constitute the representation or warranty):

a. Organization and Authority. Old Operators are limited liability companies that validly exists under the laws of the Commonwealth of Pennsylvania. Old Operator has full power and right to enter into and perform its obligations under this Agreement and the Other Documents. The execution and delivery of this Agreement and the Other documents to which Old Operator is a party and the consummation of the transactions contemplated hereby and thereby (1) have been duly authorized by all necessary action on the part of Old Operator, (2) do not require any governmental or other consent and (3) will not result in the breach of any agreement, indenture or other instrument to which Old Operator is a party or is otherwise bound.

b. Condition of the Transferred Assets. The Transferred Assets shall be delivered at the time of the Closing. Except in the ordinary course of business and consistent with past practices, and then only in the event the same is replaced, nothing individually or in the aggregate comprising a material portion of the Transferred Assets shall be sold, transferred, leased to others or wasted and Old Operator shall not otherwise dispose of any of the Transferred Assets or anything constituting a portion of the Transferred Assets, or cancel or compromise any debt or claim, or waive or release any right of substantial value constituting a part of or relating to all or any material part of the Transferred Assets. Subject to the representations and warranties in this Agreement, the Transferred Assets shall be transferred "AS IS, WHERE IS, WITH ALL FAULTS."

c. Environmental Condition. Old Operator (i) has no Knowledge of and has not

21

received any written notice from any Governmental Entity asserting that any of the operations or activities upon, or any use of occupancy of the Facility are not in compliance with any laws relating to Hazardous Substances, including the discharge and removal of Hazardous Substances, and (ii) has not received any written notice of any potential liability under any Environmental Laws. To Old Operator's Knowledge, at all times that Transferor has operated the Facility in compliance in all respects with all Environmental Laws, and there are no Hazardous Substances present on, under or in the Facility that violate any Environmental Laws. Old Operator has no Knowledge of, or has not received any written notice of, any alleged, actual or potential responsibility for, or any inquiry or investigation regarding, the presence or release of any Hazardous Materials at the Facility in violation of Environmental Laws or any other violation of Environmental Laws. Old Operator has not received any written notice of any other claim, demand or action by any Person alleging any actual or threatened injury or damage to any person or entity, property, natural resource or the environment arising from or relating to the presence or release of any Hazardous Materials in violation of Environmental Laws at, on, under, in, to or from the Facility or in connection with any operations or activities of the Old Operator.  To Old Operator's Knowledge, the Facility and/or the property contains no underground storage tanks, and any such tanks that have been removed from have been properly certified by the Department of Environmental Protection.

d.  Leases.  Other than the Old Lease, which shall be terminated as of the Closing Date, there are currently, and as of the Closing Date there shall be, no occupancy rights (written or oral), leases or tenancies presently affecting the Property or the Facility and the portion of the Property which it is located, other than any occupancy rights of any residents of the Facility.

e.  Permits.  The Permits as listed on Schedule 17(j) hereto are all of the material certificates, licenses and permits from governmental authorities held by Old Operator in connection with the ownership, use, occupancy, operation and maintenance of the Facility, and are all of the certificates, licenses, accreditations and permits necessary in connection with the current ownership, use, occupancy, operation and maintenance thereof.

f.  Required Consents.  Old Operator has no knowledge of any consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority that is required in connection with the execution or delivery by Old Operator of this Agreement, or the performance of the transactions contemplated thereunder, except (1) approval by DOH of the Licensure, and (2) such consents, certifications or licenses from the DOH, United States Department of Health and Human Services, CMS or any other governmental agency with jurisdiction over the Facility as are necessary to permit Old Operator to operate the Facility prior to the Closing Date.

g.  Sufficiency of Assets.  The Transferred Assets constitute all of the assets,

22

tangible and intangible, real and personal of any nature whatsoever, necessary and sufficient for operation of the Facility for the number of skilled nursing dually certified beds in the manner presently operated by Old Operator. The Facility has a number of beds equal to the maximum bed capacity as permitted under the Facility license. Each bed is in good repair (ordinary wear and tear excepted) and conforms with the minimum standards set forth under the regulations adopted by DOH. For each such bed, there also exists the minimum furnishings, fixtures and other accessories required by DOH.

h.  Litigation. Except as set forth in Schedule 17(m), there are no pending or threatened litigation, investigations, claims, lawsuits, governmental actions or other proceedings, including without limitation, any desk audit or full audit, involving the Transferred Assets, or the operation thereof before any court, agency or other judicial, administrative or other governmental or quasi-governmental body or arbitrator.

i.  Compliance with Applicable Laws. To Old Operator's knowledge, the Transferred Assets have been and are presently used and operated in compliance with, and in no way violate any Applicable Law of any kind whatsoever affecting the Transferred Assets or any part thereof.

j.  Taxes. Except as disclosed in filings to the Bankruptcy Court, Old Operator has timely filed all Tax Returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns, including for sums due to the Commonwealth of Pennsylvania or its agencies. Notwithstanding anything herein to the contrary, should Old Operator have any outstanding Tax Returns or payments due with regard to taxes or governmental charges, Old Operator shall have 90 days from the Effective Date to cure any such default. Any late charges or penalties arising therefrom shall be the responsibility of Old Operator.

k.  Sprinklers. To the extent required by applicable law, there is a sprinkler system at the Facility that is in full operational compliance with all applicable requirements.

l.  Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Other Document based upon arrangements made by or on behalf of Old Operator except as approved by the Bankruptcy Court in the Bankruptcy Case.

m.  No Defaults. The execution, delivery and performance of this Agreement and any of the Other Documents by Old Operator does not and will not:

    i.   Conflict with or result in any breach of the provisions of, or constitute a default under any Old Operator's certificate of formation or operating agreement;

    ii.  Violate any restriction to which Old Operator is subject or, with or without the giving of notice, the passage of time, or both, violate any mortgage, deed of trust, license, material lease, indenture or other material agreement or instrument, whether oral or written, to which Old Operator or the Facility is a party, or by which it or its property

23

is bound, which will not be satisfied or terminated on or prior to the Closing as a result of the transactions contemplated in this Agreement, or result in the termination of any such instrument or termination of any provisions in such instruments that will have a material adverse effect upon or result in the creation or imposition of any Lien upon the Transferred Assets.

 iii. Constitute a violation of any applicable law by which Old Operator or the Facility is subject, the violation of which will have a material adverse effect upon the Facility.

n. <u>Health Care Matters.</u>

 i. All Medicare and Medicaid provider agreements, certificates of need, if applicable, certifications, governmental licenses, permits, regulatory agreements or other agreements and approvals, including certificates of operation, completion and occupancy, and state nursing facility licenses or other licenses required by DOH or any other health care authorities for the legal use, occupancy and operation of the Facility (collectively, "<u>Health Care Licenses</u>") have been obtained by the party required to hold such Health Care Licenses and are in full force and effect. Old Operator will own and operate the Facility in such a manner that the Health Care Licenses shall remain in full force and effect. Old Operator will own and operate the Facility in such a manner that the Health Care Licenses shall remain in full force and effect. Set forth on <u>Schedule 17(n)</u> attached hereto is a list of the Facility's Medicare and Medicaid provider numbers and a list of all Health Care Licenses.

 ii. The Facility is duly licensed as a skilled nursing facility as required under the applicable laws of the Commonwealth of Pennsylvania. All licensed beds at the Facility are certified for both Medicare and Medicaid. The licensed bed capacity of the Facility is as set forth on <u>Schedule 17(k)</u> attached hereto, the actual bed count operated at the Facility is as set forth on <u>Schedule 17(k)</u> and all such beds are certified for participation in the Medicare and Medicaid reimbursement programs. Except as disclosed in <u>Schedule 17(n)</u>, Old Operator has not applied to reduce the number of licensed or certified beds of the Facility or to move or transfer the right to any and all of the licensed or certified beds of the Facility to any other location or to amend or otherwise change the Facility and/or the number of beds approved by DOH (or any subdivision) or other applicable state licensing agency, and except as disclosed in <u>Schedule 17(n)</u>, there are no proceedings or actions pending or contemplated to reduce the number of licensed or certified beds of the Facility.

 iii. The Health Care Licenses (i) have not been (A) transferred to any location other than the location for which issued or (B) pledged as

collateral security or unless such pledge will be released at Closing, (ii) are held free from restrictions or known conflicts that would materially impair the use or operation of the Facility as intended, and (iii) are not provisional or probationary or restricted in any way.

iv.   Except as disclosed in <u>Schedule 17(n)</u>, Old Operator has not taken any action to rescind, withdraw, revoke, amend, modify, supplement or otherwise alter the nature, tenor or scope of any Health Care License or applicable provider payment program other than non-material alterations effected in the Ordinary Course of Business.

v.    Except as disclosed in <u>Schedule 17(n)</u>, Old Operator is in material compliance with the requirements for participation in the Medicare and Medicaid programs with respect to the Facility and Old Operator has a current provider agreement under Title XVIII and/or XIX of the Social Security Act which is in full force and effect. During the period of three (3) years prior to Closing Date neither Old Operator nor the Facility has received any of the following with respect to the Facility:

    1.  A notice of "immediate jeopardy" violations;

    2.  A notice of termination of the license issued by DOH to operate the Facility for the number of skilled beds listed in Exhibit A;

    3.  A notice of termination of the certification issued by DOH or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

    4.  A notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs;

    5.  A notice that the Facility has been placed, or will be placed, on the special focus facilities list;

    6.  A notice that the Facility will be prohibited from admitting, or will not be reimbursed for, new residents; and

    7.  A notice of imposition of civil monetary penalties or other intermediate sanctions in accordance with 42 CFR § 488.430 et seq.

vi.   Except as disclosed in <u>Schedule 17(k)</u>, neither Old Operator nor the Facility is a participant in or party to, nor to Old Operator's knowledge a target of, any action, proceeding, suit, audit, investigation or sanction by any Governmental Authority or any other administrative or investigative body or entity or any other third

party payor or any resident which would reasonably be expected to result, directly or indirectly or with the passage of time, in the imposition of a material fine, penalty, alternative, interim or final sanction, a lower rate certification, recoupment, recovery, suspension or discontinuance of all or part of reimbursement from any Governmental Authority, third-party payor, insurance carrier or private payor, a lower reimbursement rate for services rendered to eligible residents, or any other civil or criminal remedy, or which could reasonably be expected to have a material adverse effect on Old Operator, or the operation of the Facility, including, without limitation, the Facility's ability to accept or retain residents, or which could result in the appointment of a receiver or manager, or in the modification, limitation, annulment, revocation, transfer, surrender, suspension or other impairment of a Health Care License, or affect Old Operator's and the Facility's participation in the Medicare, Medicaid, or third-party payor program, as applicable, or any successor program thereto, at current rate certification, nor to the knowledge of Old Operator has any such action, proceeding, suit, investigation or audit been threatened.

vii.   There are no agreements with residents of the Facility or with any other persons or organizations that deviate in any material adverse respect from or that conflict with any statutory or regulatory requirements.

viii.   Other than the Medicare and Medicaid programs, to Old Operator's knowledge neither Old Operator nor the Facility is a participant in any federal, state or local program whereby any federal, state or local government or quasi-governmental body, or any intermediary, agency, board or other authority or entity may have the right to recover funds with respect to the Facility by reason of the advance of federal, state or local funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291 *et seq.*). Neither Old Operator nor the Facility has received notice of, and there is no violation of, applicable antitrust laws by Old Operator in connection with the Facility.

ix.   Old Operator has instituted, and the Facility is operated in material compliance with, a compliance plan which is consistent with best industry practices.

x.   Except as disclosed in <u>Schedule 17(n)</u>, Old Operator is in material compliance with the Health Care Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act, as incorporated in the American Recovery and Reinvestment Act of 2009, and the regulations promulgated under each.

xi.   Except as disclosed in <u>Schedule 17(k)</u>, there is no pending or, to Old Operator's knowledge, threatened revocation, suspension,

26

xii. termination, probation, restriction, limitation or non-renewal affecting Old Operator or the Facility or any provider agreement with any third-party payor, Medicare or Medicaid.

xii. To Old Operator's knowledge, all Medicare, Medicaid, and private insurance cost reports and financial reports submitted by or on behalf of the Facility are materially accurate and complete and are not misleading in any material respects.

xiii. To Old Operator's knowledge, all Medicare, Medicaid, and private insurance cost reports and financial reports submitted by or on behalf of the Facility are materially accurate and complete and are not misleading in any material respects. Except as disclosed in Schedule 17(n), to Old Operator's knowledge, there are no current, pending or outstanding Medicare, Medicaid or other third-party payor program reimbursement audits or appeals pending at the Facility. Except in the normal course of business, there are no cost report years that are subject to audits and no cost reports remain "open" or unsettled. To Old Operator's knowledge, except in the normal course of business, there are no current or pending Medicare, Medicaid or third-party payor program recoupment efforts at the Facility.

xiv. Except as disclosed in Schedule 17(n), there have been no clawback or overpayment claims made or, to the knowledge of Old Operator, threatened, against Old Operator or with respect to operations at the Facility by Medicare, Medicaid or any third-party payor during the previous three (3) years. Old Operator has provided, or will provide upon request, to New Operator a complete and accurate list of all rate adjustments made by Medicare or Medicaid with respect to Old Operators and the Facility during the previous three (3) years, and shall provide New Operator an updated list as of the Closing Date.

xv. To the extent requested by New Operator at any time, Old Operator has delivered, or caused to be delivered, to New Operator true, correct and complete in all material respects resident census information for the Facility's last three (3) fiscal years and current year-to-date broken out by month.

o. Except as disclosed in Schedule 17(n), neither Old Operator nor the Facility has any contract or agreement with the Department of Veterans Affairs or any division thereof for the provision of services to patients or residents at the Facility.

p. Financial Materials. All materials and/or documents relating to the financial condition and/or census of the Facility provided to New Operator, are true and complete in all material respects, and are not misleading in any material respect. Except as set forth in this Agreement and subject to the terms hereof, the Old Operator shall not be deemed to have made verbal or written representations, warranties, promises, or guarantees (whether express, implied, or otherwise) to New Operator with respect to such materials and/or documents relating to

27

financial condition.

q.  COVID Funds.  A description of all COVID Funds received with respect to the Facility is set forth on Schedule 17(q) hereof.  To Old Operator's knowledge, Old Operator has applied for and utilized, as applicable, all COVID Funds in accordance with applicable law.  For purposes of this Agreement, "COVID Funds" shall mean all grants, funds or payments from state or federal sources (including, without limitation, pursuant to the Coronavirus Aid, Relief and Economic Security (CARES) Act and the Economic Injury Disaster Loan program, Medicare advance payments, loans in connection with Paycheck Protection Program, deferral of payroll taxes or other governmental economic benefits) in each case received with respect to or pertaining to the Facility as a result of the COVID-19 pandemic.  All COVID Funds received by Old Operator are set forth on Schedule 17(q) attached hereto.

r.  Truth and Accuracy of Representations and Warranties.  No representation or warranty by or on behalf of Old Operator contained in this Agreement and no statement by or on behalf of Old Operator in any certificate, list, exhibit or other instrument furnished or to be furnished to New Operator by or on behalf of Old Operator pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect. Except as expressly provided herein, Old Operator does not make any other representations or warranties regarding compliance with applicable law.

s.  Non-Survival of Representations and Warranties.  The representations and warranties of Old Operator contained herein shall not survive the Closing and shall be deemed satisfied as of Closing.

**18.**    **NO JOINT VENTURE**.  Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof. The parties hereto do not intend that any third party shall have any rights under this Agreement.

**19.**    **RESERVED.**

**20.**    **EVENTS OF DEFAULT; REMEDIES**.  Except as to those specific notices and cure periods, if any, particularly set forth elsewhere herein, the breach by either party ("Defaulting Party") hereto of any term, provision, condition, promise, covenant, agreement, representation, warranty, guaranty, indemnity, duty or obligation if not cured within ten (10) Business Days of the earlier of said Defaulting Party's receipt or refusal of written notice of the same from the other party ("Non-Defaulting Party") hereto shall automatically and without further notice hereunder be an immediate event of default ("Event of Default") entitling the Non-Defaulting Party to exercise any and all remedies available to it. The Non-Defaulting Party's rights and remedies hereunder shall be cumulative and not mutually exclusive and the exercise by the Non-Defaulting Party of one or more rights or remedies granted it hereunder or in law or equity shall not be deemed, interpreted or construed as an election of the same or to bar, prevent or preclude the simultaneous or consecutive exercise of any other right or remedy granted to the Non-Defaulting Party hereunder or in law or equity, including but not limited to the simultaneous or successive pursuit of money damages and injunctive relief.  The Non-Defaulting Party shall not be required to post any bond,

28

surety or security of any nature whatsoever to pursue injunctive relief, the necessity or requirement for the same being hereby waived by the Defaulting Party. In the event of a termination of the Purchase Agreement (or failure of the transactions contemplated thereby to close), this Agreement shall automatically terminate and neither party hereto shall have any rights or obligations hereunder.

**21.** **CHOICE OF LAW. THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS.**

**22.** **NON-COMPETE.** For a period of two (2) years following the Closing, neither Old Operator nor any Affiliate of Old Operator shall, directly or indirectly, have any involvement, whether as a member, partner, owner, consultant, employee, or otherwise, in the operation of any elder care facility within a radius of 30 miles of any Facility.

**23.** **DISPUTE RESOLUTION.** The parties hereto agree that with respect to all disputes, problems or claims arising out of or in connection with this Agreement and all other agreements or other instruments executed in connection herewith (which for clarity does not include the Purchase Agreement) (collectively "Disputes"), the parties hereto shall, in good faith, use their reasonable best efforts to resolve the Dispute. If after such efforts the parties hereto are unable within ten (10) days of the arising of the Dispute to resolve the Dispute in good faith, any party may file a motion or proceeding with the Bankruptcy Court seeking relief. The Bankruptcy Court shall have exclusive jurisdiction over all Disputes and any disagreement arising from or related to this Agreement.

**24.** **PERSONAL SERVICE.** EACH OF THE PARTIES HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED. **THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION.**

**25.** **MEDICARE ADVANCE.** In the event that Old Operator has received any advance on Medicare payments with regard to the Facility ("Advances") at any time prior to the Closing Date that have not been re-paid prior to Closing, Old Operator shall pay to New Operator at Closing an amount equal to 100% of all such Advances. New Operator shall be responsible solely for any losses or liabilities from such Advances received following the Closing including any demands for repayment of such Advances.

**26.** **GENERAL PROVISIONS.**

a.    Each party hereto agrees to use commercially reasonable efforts to cause the conditions to its obligations and to the other party's obligations herein set forth to be satisfied at or prior to the Closing Date. Each of the parties hereto agrees to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transactions

referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder. Each party shall promptly notify the other party of any information delivered to or obtained by such party which would prevent the consummation of the transactions contemplated hereby, or which would indicate a breach of the representations or warranties of any other party hereto.

    b.    All notices to be given by either party to this Agreement to the other party hereto shall be in writing, and shall be: (i) given in person; (ii) deposited in the United States mail, certified or registered, postage prepaid, return receipt requested; (iii) sent by national overnight courier service, priority next business day service; or (iv) sent by facsimile or e-mail (followed by delivery by one of the other means identified in (i)-(iii)) each addressed as follows:

| if to Old Operator: | Care Pavillion Debtors<br>C/O SOLIC Capital (Attn: Neil Luria)<br>425 W. New England Ave, Suite 450<br>Winter Park, Florda 32789<br>nluria@soliccapital.com |
|---|---|
| with a copy to: | Baker Hostetler LLP<br>Attn: Elizabeth Green, Andrew Layden<br>200 S. Orange Avenue, Suite 2300<br>Orlando, Florida 32801<br>egreen@bakerlaw.com; alayden@bakerlaw.com |
| if to New Operator: | Focus Health Network C/O Harry Epstein, Chief Financial Officer<br>hepstein@focushealthnet.com |
| with a copy to: | Capozzi Adler, P.C.<br>2933 North Front Street<br>Harrisburg, PA 17110<br>bruceb@capozziadler.com |

Any such notice personally delivered shall be deemed delivered when actually received; any such notice deposited in, the United States mail, registered or certified, return receipt requested, with all postage prepaid, shall be deemed to have been given on the earlier of the date received or the date when delivery is first refused; any notice deposited with an overnight courier service for delivery shall be deemed delivered on the next business day following such deposit; and any such notice delivered via facsimile shall be deemed delivered upon the notifying party's receipt of facsimile confirmation provided that the notifying party follows up such facsimile transmission with one of the other means identified above. Any party to whom notices are to be sent pursuant to this Agreement may from time to time change its address for further

30

communications thereunder by giving notice in the manner prescribed herein to all other parties hereto.

     c.     Each party hereto shall bear its own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

     d.     This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.

     e.     This Agreement may not be modified or amended except in writing signed by the parties hereto.

     f.     No waiver of any term, provision or condition of this Agreement, if any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

     g.     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. Captions of paragraphs are for convenience only and are not part of this Agreement and do not affect, change or modify the paragraphs they precede.

     h.     All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

     i.     This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement.

     j.     All of the provisions of this Agreement shall be deemed and construed to be "conditions" and "covenants" as though the words specifically expressing or importing covenants and conditions were used in each separate provision hereof.

     k.     Each party hereto agrees to use such party's reasonable best efforts to cause the conditions to such party's obligations herein set forth to be satisfied at or prior to the Closing. Each of the parties agrees to execute and/or deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by any other party to assist with consummation of the transactions contemplated herein, or to evidence its rights hereunder.

     l.     The recitals set forth at the beginning of this Agreement constitute an integral part of this Agreement and are hereby incorporated by reference herein and made apart hereof as if

fully set forth herein.

m.    All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "or" "including" shall mean "including without limitation.

n.    If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but each term and provision shall be valid and be enforced to the fullest extent permitted by law.

o.    Except as otherwise specifically set forth in this Agreement, Old Operator agrees to look solely to New Operator for the satisfaction of any liability or obligation of New Operator arising under this Agreement or the transactions contemplated hereby, or for the performance by New Operator of any of the covenants, representations, warranties or other agreements contained herein.

p.    The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

q.    Certain Definitions.    Capitalized terms used in this Agreement, but not defined in this Agreement shall have the meanings ascribed to them in **Exhibit E**.  All terms used in this Agreement which are not defined in **Exhibit E** shall have the meanings set forth elsewhere in this Agreement.

r.    Exhibits and Schedules. If any exhibits or schedules are not attached hereto, the parties agree to use good faith efforts to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date.

[SIGNATURE PAGE FOLLOWS ON NEXT PAGE]

**IN WITNESS WHEREOF**, the parties hereby execute this Agreement as of the day and year first above written.

OLD OPERATOR:

Milton Operating LLC

Signature_____

By: _____

Title: _____

Date: _____

Parkhouse Operating LLC

Signature_____

By: _____

Title: _____

Date: _____

Watsontown Operating LLC

Signature_____

By: _____

Title: _____

Date: _____

NEW OPERATOR:

MI Operating LLC

Signature_____

By: _____

Title: _____

Date: _____

PA Operating LLC

Signature_____

By: _____

Title: _____

Date: _____

WA Operating LLC

Signature_____

By: _____

Title: _____

Date: _____

**IN WITNESS WHEREOF**, the parties hereby execute this Agreement as of the day and year first above written.

OLD OPERATOR:                                NEW OPERATOR:

Milton Operating LLC                         MI Operating LLC

Signature_____                   Signature _Vince Liaguno_

By: _____                        By: _Vince Liaguno_

Title: _____                     Title: _Director of Operations_

Date: _____                      Date: _12-9-24_

Parkhouse Operating LLC                      PA Operating LLC

Signature_____                   Signature _Vince Liaguno_

By: _____                        By: _Vince Liaguno_

Title: _____                     Title: _Director of Operations_

Date: _____                      Date: _12-9-24_

Watsontown Operating LLC                     WA Operating LLC

Signature_____                   Signature _Vince Liaguno_

By: _____                        By: _Vince Liaguno_

Title: _____                     Title: _Director of Operations_

Date: _____                      Date: _12-9-24_

EXHIBIT A

| Facility Name and Address | Licensed Beds | Seller | Old Operator | Purchaser | New Operator |
|---|---|---|---|---|---|
| Care Pavilion Nursing and Rehabilitation Center 6212 Walnut Street Philadelphia, PA 19139 | 396 | 6212 Walnut Realty LLC | Care Pavilion Operating LLC | G&E HC REIT II Care Pavilion SNF, L.P. | CP Operating LLC |
| Cliveden Nursing and Rehabilitation Center 6400 Greene Street Philadelphia, PA 19119 | 180 | 6400 Greene Realty LLC | Cliveden Operating LLC | G&E HC REIT II Cliveden SNF, L.P. | CL Operating LLC |
| Maplewood Nursing and Rehabilitation Center 125 W. Schoolhouse Ln Philadelphia, PA 17847 | 180 | Maplewood Manor Propco LLC | Maplewood Operating LLC | G&E HC REIT II Maplewood Manor SNF, L.P. | MA Operating LLC |
| Milton Nursing and Rehabilitation Center | 138 | 743 Mahoning Realty LLC | Milton Operating LLC | | MI Operating LLC |

| | | | | | |
|---|---|---|---|---|---|
| 743 Mahoning St. Milton, PA 17847 | | | | | |
| Parkhouse Nursing and Rehabilitation Center 1600 Black Rock Rd Royersford, PA 19468 | 467 | 1600 Black Rock Realty LLC | Parkhouse Operating LLC | GA HC REIT II Royersford SNF LLC | PA Operating LLC |
| Tucker House Nursing and Rehabilitation Center 1001 Wallace Street Philadelphia, PA 19123 | 180 | 1001-11 Wallace Realty LLC | Tucker Operating LLC | G&E HC REIT II Tucker House SNF, L.P. | TH Operating LLC |
| Watsontown Nursing and Rehabilitation Center 245 E. 8th Street Watsontown, PA 17777 | 125 | 245 East Eight Realty LLC | Watsontown Operating LLC | GA HC REIT II Watsontown SNF, LLC | WA Operating LLC |
| York Nursing and Rehabilitation Center 7101 Old York | 240 | 7107 York Realty LLC | York Operating LLC | G&E HC REIT II Cheltenham York SNF, L.P. | YO Operating LLC |

2

4918-8184-1888.3

Rd
Philadelphia, PA
19126

3

4916-8164-1668.3

EXHIBIT B

TERMS OF THE SALE MOTION AND SALE ORDER; BIDDING PROCEDURES

1.1    Sale Motion. On or before December 9, 2024 (unless otherwise agreed), the Debtors shall file with the Bankruptcy Court the Sale Motion, which shall include, among other things, a proposed form of the Bidding Procedures Order. The Debtors shall promptly serve true and correct copies of the Sale Motion and all related pleadings, or notice thereof in form satisfactory to New Operator, to all creditors of the Debtors and other parties in interest in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the Western District of Pennsylvania and any other applicable order of the Bankruptcy Court. The Debtors shall also promptly serve the Sale Motion to any other party designated in writing by New Operators in their sole discretion. The Debtors and their bankruptcy estates shall be responsible for all costs of service of the Sale Motion and any other motions or notices related to the Sale Motion, Bidding Procedures, or Transactions.

1.2    Reserved.

1.3    Bidding Procedures and Auction. New Operators acknowledge that Debtors are seeking to find other parties that would be willing to pay more for the Transferred Assets. In connection with this effort, the parties acknowledge that the Debtors will request the Bankruptcy Court, in the Sale Motion, to approve certain procedures related to this effort, including the procedures for soliciting competing bids for the Transferred Assets and selling the Transferred Assets at a sale auction (the "Auction") should there be other Qualifying Bidders, and certain bidding protections to New Operator as consideration for serving as the stalking horse. In that regard, the Debtors shall take such actions as are reasonably necessary to obtain (on an expedited basis following the filing of the Sale Motion) the Bidding Procedures Order from the Bankruptcy Court approving, among other things, payment of the Expense Reimbursement and Termination Fee and procedures for the marketing, competitive bidding, auction, and sale of the Transferred Assets that include, without limitation, the following (collectively, and as more fully set forth in the Bidding Procedures Order, the "Bidding Procedures"):

    a.    Minimum Initial Topping Bid: $100,000;

    b.    Minimum Bid Increments Thereafter: $25,000, which may thereafter be modified in the debtors' discretion;

    c.    Other bidders to provide to Debtors, among other things, a blackline comparison of the OTA, and satisfactory proof of financing or financial ability to close prior to the expiration of the Bid Deadline in order to qualify as a bidder for the Auction (such other bidders meeting such qualifying criteria shall be referred to herein as "Qualifying Bidders"). For the avoidance of doubt, the OTA and the other Transaction Documents shall constitute a qualifying bid.

    d.    Qualifying Bidders will have a due diligence period that expires at

the conclusion of the Bidding Solicitation Period;

e.   If there are other Qualifying Bidders, an Auction to be held no more than three (3) days after the Bid Deadline (unless such different date is established by the Bankruptcy Court in the Bidding Procedures Order), at which the Debtors will select the winning bidder (the "Successful Bidder");

f.   New Operators shall be entitled to credit bid the amount of the Termination Fee and Expense Reimbursement towards any subsequent bid at the Auction;

g.   If there are no other Qualifying Bidders as of the Bid Deadline, then New Operators shall be deemed the Successful Bidder. New Operators shall not be required to serve as the Backup Bidder upon the Debtors' selection of another party or parties as the Successful Bidder(s); and

h.   No extension of the Bidding Solicitation Period, the Bid Deadline, or date of the Auction unless ordered by the Bankruptcy Court or approved by New Operators in writing. Without limiting the foregoing, Debtors shall not file any motion or otherwise seek to change, modify or amend the Transaction Documents, the Bidding Procedures Order, or the Sale Order without prior written approval of the New Operators.

1.4    Sale Order Hearing and Sale Order. Within three (3) business days following the Auction, if there are other Qualifying Bidders, Debtors shall file with the Bankruptcy Court the results of the bidding solicitation process and the Auction, and all documents to be filed on behalf of the Debtors with the Bankruptcy Court for approval of the sale to the Successful Bidder and entry of the Sale Order. If there are no additional Qualifying Bidders as of the Bid Deadline, Debtors shall file a notice with the Bankruptcy Court within three (3) days of the Bid Deadline that New Operator was the Successful Bidder and seeking the Court's entry of the Sale Order approving the OTA and other Transaction Documents. New Operators agree that they will promptly take such actions as are reasonably requested by the Debtors to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that New Operators are a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

1.5    Contracts.

(a)    Old Operators shall provide to New Operators a list of Contracts relating to the operations and leasing of the Facilities (the "Available Contracts List"). Old Operators will use best efforts to insure that the Available Contracts List contains all Contracts which the New Operator may seek to assume. At any time prior to the Sale Hearing, the New Operators, in their sole and absolute discretion, and subject to the their right to subsequently amend their designations

2

until the Closing, may deliver one or more written notices to the Old Operators (each such notice, a "Designation Notice"), pursuant to which New Operators shall designate in writing any Available Contracts that New Operators wish to assume at Closing. Any Available Contracts so designated shall be deemed the Assumed Contracts.

(b)     Any Contracts that New Operators do not indicate they desire to assume and continue shall be deemed rejected by New Operators (the "Rejected Contracts"), and Old Operators may reject and terminate such Rejected Contracts pursuant to the Bankruptcy Code. Any Contract not expressly designated by New Operators as an Assumed Contract pursuant to a Designation Notice, including any Contract discovered after the Closing, shall be deemed a Rejected Contract.

(c)     The Sale Motion and Bidding Procedures Order shall include the procedures for the assumption and assignment of the Assumed Contracts to the New Operators on the terms set forth herein.

(d)     Pursuant to the Bidding Procedures Order, the counterparties to the Contracts shall have an opportunity to file any objections to the assumption and/or assignment of any Contracts on the Available Contracts List. Upon any such objection, such Contract shall become a "Disputed Contract" and, unless the Disputed Contract is a Rejected Contract, the Debtors, with New Operators' consent to be provided or withheld in their sole discretion, shall either settle the objection of such counterparty or shall litigate such objection under such procedures as the Bankruptcy Court shall approve as part of the Bidding Procedures Order. The Debtors shall not settle a disputed Cure Cost for any amount with regard to any Contract that has been designated as an Assumed Contract pursuant to a Designation Notice without the express written consent of New Operators, as applicable. Upon a Final Order or settlement determining any Cure Costs regarding any Disputed Contract after the Closing or at any time prior to such Final Order or settlement, New Operators shall have the option to (x) pay the Cure Cost with respect to such Disputed Contract and assume the Disputed Contract as an Assumed Contract or (y) designate the Disputed Contract as an Rejected Contract and not be responsible for the Cure Cost.

(e)     At Closing, New Operators shall pay all Cure Costs in connection with the assumption and assignment of the Assumed Contracts.

1.6     Good Faith Efforts. The Debtors agree to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order. In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, the Debtors shall use their best efforts to defend such appeal. The Debtors shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or (ii) imposed by the Bidding Procedures Order or the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

1.7     Sale Free and Clear. The Debtors acknowledge and agree, and the Sale Order shall provide, that on the Closing Date and concurrently with the Closing, the Transferred Assets shall be transferred to New Operators free and clear of all then existing or thereafter arising Claims and

3

Encumbrances to the fullest extent permitted by Section 363(f) of the Bankruptcy Code, including without, limitation, any amounts owed by any of the Debtors to DHS or DOH, including, without limitation, for nursing facility assessments (the "Provider Assessments"). The Debtors acknowledge and agree that this requirement is a precondition to New Operators' obligation to close the Transactions.

     1.8    Definitions. For purposes of this Exhibit and the Transaction Documents, the following terms shall have the meaning ascribed to them below:

"Alternative Transaction" means (a) the approval by the Bankruptcy Court of a sale or sales of all or any portion of the Transferred Assets to a Successful Bidder other than New Operators, or (b) the filing of a plan of reorganization that does not contemplate the sale of the Transferred Assets to New Operators in accordance with the terms hereof.

"Assumed Contracts" means any Contracts of Old Operators which New Operators designate in writing to be assumed and assigned to New Operators, as applicable, as pursuant to section 365 of the Bankruptcy Code and the terms of the OTA and Sale Order, including, without limitation, the Resident Agreements and Provider Agreements (each as defined in the OTA).

"Bid Deadline" means 5:00 p.m. E.S.T. on January 16, 2025, or such other date that is set by the Bankruptcy Court.

"Bidding Procedures Order" means an Order of the Bankruptcy Court, the proposed form of which shall be included with the Sale Motion following approval by Debtors and New Operators, that contains at least the following: (i) the approval of the OTA as the stalking horse contract and New Operators as the stalking horse bidders, (ii) the approval of the Bidding Procedures governing the sale and solicitation process and the Auction, the deadlines and dates relating thereto, and the bid protections included therein (including, without limitation, the Termination Fee and the Expense Reimbursement), and (iii) setting a date for the Sale Hearing as soon as possible following the Auction, if there are other Qualifying Bidders, or following the end of the Bidding Solicitation Period, if there are no other Qualifying bidders, to confirm the Auction results, if applicable, and enter the Sale Order.

"Bidding Solicitation Period" means the time period running from the date of the filing of the Sale Motion to the Bid Deadline.

"Claim" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, inter alia, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and Liabilities of any kind, description, or nature under contract, at law or in equity, whether direct or indirect, known or unknown, contingent or matured, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and all rights, remedies, costs, or expenses with respect thereto.

"Contracts" shall mean all executory contracts, agreements, leases, commitments and arrangements (whether written or oral), including all service contracts, maintenance contracts and consulting agreements, and all of any Old Operator's duties, obligations, covenants, promises,

4

rights and privileges therein or thereunder to which any Old Operator or its respective predecessors or agents is a party and which relate to the Facilities (or any one of the Facilities) and the operations thereof.

"Cure Costs" shall mean all costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts including the cost of obtaining consents in respect of the Assumed Contracts.

"Encumbrance" means any lien (including a "lien" as defined in Section 101(37) of the Bankruptcy Code), encumbrance, Claim, right, demand, charge, mortgage, deed of trust, lease, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, proxy, voting trust or agreement, transfer restriction under any shareholder agreement or similar agreement, judgment, conditional sale or other title retention agreement, or other imposition, imperfection or defect of title or restriction on transfer or use of any nature whatsoever.

"Expense Reimbursement" means all reasonable fees and expenses incurred by New Operator, including, without limitation, professional fees and out-of-pocket fees, costs and expenses incurred in connection with the due diligence, preparation, negotiation, execution, delivery and performance of the Transaction Documents; provided the total Expense Reimbursement shall be capped at $50,000.00. The obligations of the Debtors to pay the Expense Reimbursement shall survive the termination of any Transaction Documents.

"Final Order" means an Order that is unstayed and in effect and as to which (i) the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought, such Order shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

"Governmental Authority" means any U.S. federal, state or local or any supra-national, territorial or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral (public or private) body.

"Liabilities" means any liability, debt, guarantee, claim, demand, expense, commitment, damages, assurances or obligation (whether direct or indirect, fixed, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of every kind and description, including all costs and expenses related thereto.

"Order" means any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination, settlement or award entered by or with any Governmental Authority.

"OTA" means the Operations Transfer Agreement entered into by Old Operator and New

5

Operator dated December 9, 2024, as may be amended by the parties pursuant to the terms therein, and pursuant to which the Old Operators will transfer the operations of and certain assets related to the Facilities to the New Operators.

"Sale Motion" means the motion or motions of the Debtors, in form and substance approved by Old Operators and New Operators seeking (i) approval and entry of the Bidding Procedures Order on an expedited basis, (ii) the scheduling of the Auction (if there are other qualifying bidders) and the Sale Hearing, (iii) the entry of the Sale Order following the Auction, if there are other qualifying bidders, or following the end of the Bidding Solicitation Period, if there are no other qualifying bidders, and (iv) any other relief necessary to consummate the Transactions.

"Sale Order" means an Order of the Bankruptcy Court, the proposed form of which shall be included with the Sale Motion following approval by Old Operators and New Operators, that contains at least the following: (i) authorization and approval of (a) the OTA and the other Transaction Documents, and the consummation of the Transactions on the terms and conditions set forth therein, and (b) the assumption and assignment of the Assumed Contracts to the New Operators, and (ii) findings of fact, conclusions of law and ordering provisions that (a) the consummation of the Transactions contemplated by the Transaction Documents, on the terms and conditions set forth therein are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 363(n), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Transactions, (b) pursuant to section 105(a) and 363(f) of the Bankruptcy Code, the sale of the Transferred Assets to New Operators, or their designee(s) shall be free and clear of any Claims or Encumbrances other than the Permitted Encumbrances and Assumed Liabilities (as defined in the OTA), (c) New Operators and any designee(s) of New Operators are purchasers of the Transferred Assets in "good faith" pursuant to section 363(m) of the Bankruptcy Code, (d) the Debtors, the New Operators, any affiliates of New Operators, and any designee of New Operators, did not engage in any conduct which would allow any Transaction Documents or Transactions to be set aside pursuant to section 363(m) of the Bankruptcy Code, (e) none of the Debtors, or the New Operators, any affiliates of New Operators, nor any designee of New Operators, engaged in any conduct that would cause or permit the Transaction Documents or Transactions to be avoided or costs and damages to be imposed against New Operators, their affiliates, or designees under section 363(n) of the Bankruptcy Code; (f) none of the the New Operators, any affiliates of New Operators, nor any designee of New Operators are a successor to Seller, Old Operators, or the bankruptcy estate(s) of Debtors by reason of any theory of law or equity, and none of the New Operators, any affiliates of New Operators, nor any designee of New Operators shall assume or in any way be responsible for any liability of the Debtors, except as otherwise expressly provided in the Transaction Documents, (g) the form of notice of the Sale Motion and any hearing thereon was proper, adequate, and reasonable under the circumstances and no further notice to any party, including any creditors of the Debtors, is necessary for purposes of authorizing the free and clear sale of the Transferred Assets to New Operators pursuant to the Bankruptcy Code or other applicable law, (h) the form of notice to counterparties of any Assumed Contracts was proper, adequate, and reasonable under the circumstances and no further notice to any such contract counterparty is necessary, (i) each of the counterparties to the Assumed

6

Contracts was given adequate notice of the Old Operators and New Operators proposed assumption thereof and the terms of such assumption, and (j) the final amount of Cure Costs under the Bankruptcy Code and applicable law for each of the Assumed Contracts other than with respect to any Disputed Contract that may be resolved pursuant to the procedures set forth in the Transaction Documents or Bidding Procedures Order.

"Sale Order Hearing" means the hearing following the Auction, if there are other qualifying bidders, or following the end of the Bidding Solicitation Period, if there are no other qualifying bidders, seeking approval of the Successful Bidder and entry of the Sale Order.

"Termination Fee" means the amount of $50,000.00 to be paid to New Operators upon the closing of an Alternative Transaction as a bid protection and in consideration of New Operators' willingness to enter into the OTA and serve as the stalking horse for the Debtors pursuant to the terms and conditions herein and the significant efforts expended by New Operators in connection with the possible acquisition of the Transferred Assets that will be marketed to other competing bidders despite the Agreement. The obligations of the Debtors to pay the Termination Fee shall survive the termination of any Transaction Documents.

"Transactions" means the transactions contemplated by the OTA and the other Transaction Documents.

"Transaction Documents" means the OTA, the Bill of Sale, and any other agreements, instruments or documents required to be delivered at the Closing or pursuant to the OTA, in each case, including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

7

EXHIBIT C

FORM OF BILL OF SALE

**BILL OF SALE**

**Effective as of [_____ __], 2024**

[_____], a [_____] [_____] ("Old Operator"), in consideration of Ten and No/100 Dollars ($10.00), receipt of which is hereby acknowledged, does hereby sell, assign, transfer and set over to [_____], a [_____] limited liability company ("New Operator"), all of its right, title and interest in and to the following described personal property, to-wit:

All of the "Transferred Assets", as defined in that certain Operations Transfer Agreement ("OTA"), dated as of [_____ __], 2024, by and among Old Operator, New Operator and certain other parties thereto.

Old Operator warrants to New Operator it has good and marketable title to said Transferred Assets, full authority to sell and transfer said property, and that said Transferred Assets are sold free of all liens, incumbrances, liabilities and adverse claims of every nature and description whatsoever.

This Instrument shall be subject to the terms, conditions, and covenants set forth in the OTA. Nothing in this Instrument supersedes, expands, or extinguishes any of the obligations, agreements, covenants, or warranties of Old Operator or New Operator contained in the OTA. If any conflict exists between this Instrument and the OTA, then the terms of the OTA shall control. This Instrument shall in all respects be governed by and construed in accordance with the internal laws of the State of Pennsylvania, without regard to the principles of conflicts of laws thereof. This Instrument may be executed in any number of counterparts, whether original or by facsimile or portable document format (.pdf), each of which shall deemed an original, but all of which shall together constitute one and the same instrument.

(Signatures on following page)

8

4918-8184-1668.3

**IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale to be signed as of the day and year first above written.


OLD OPERATOR:


[_____],

a [_____][_____]


By:

Name: _____

Its: _____


NEW OPERATOR:


[_____],

a [_____] limited liability company


By: *Vince Laguna*
Name: *Vince Laguna*

Its: *Director of Operations*

EXHIBIT D

FORM OF GENERAL ASSIGNMENT

GENERAL ASSIGNMENT

**THIS ASSIGNMENT**, is made as of the [＿] day of [＿＿＿＿＿＿], 2024, by [＿＿＿＿＿＿], a [＿＿＿＿＿＿] [＿＿＿＿＿＿] ("Assignor"), to [＿＿＿＿＿＿], a [＿＿＿＿＿＿] limited liability company ("Assignee").

W I T N E S S E T H:

**WHEREAS**, by Operations Transfer Agreement (the "OTA"), dated as of [＿＿＿＿＿＿], 2024, by and among Assignor, Assignee and certain other parties thereto, Assignor agreed to sell to Assignee certain personal property and such other assets, as more fully described in the OTA (the "Transferred Assets") (capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the OTA); and

**WHEREAS**, the OTA provides, inter alia, that Assignor shall assign to Assignee, the Assumed Contracts, the Patient Trust Funds and Property, the Provider Agreements, the Resident Agreements, the Telephone Numbers, and the Website Material and certain other items applicable to the Transferred Assets, as more fully provided in the OTA;

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.     **Transfer of Assumed Contracts**.  Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under the transferable Assumed Contracts.

2.     **Transfer of Patient Trust Funds and Property**.  Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to and under the Patient Trust Funds and Property.

a.        **Transfer of Provider Agreements**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Provider Agreements.

b.        **Transfer of Resident Agreements**.  Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Resident Agreements.

3.     **Transfer of Telephone Numbers**.    Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Telephone Numbers.

4.    **Transfer of Website Material**.    Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Website Material.

5.    **Assumption**.    Assignee hereby accepts the foregoing assignments set forth in Sections 1, 2, 3, 4, 5 and 6 hereof, provided, that said assignment and assumption shall in all respects be subject to the terms of the OTA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Assignment shall contradict the OTA, the OTA shall control.

6.    **Miscellaneous**.    This Assignment and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions referred to in the OTA shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of Pennsylvania and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.  This Assignment may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument.

(Signatures on following page)

**IN WITNESS WHEREOF**, Assignor has duly executed this Assignment as of the day and year first above written.

ASSIGNOR:

[_____],

a [_____] [_____],


By:

Name: _____

Its: _____


ASSIGNEE:

[_____], a [_____] limited liability company


By: *Vince Diaguro*
Name: *Vince Diaguro*

Its: *Director of Operations*

# EXHIBIT E

## DEFINITIONS

The terms defined in this <u>Exhibit E</u>, whenever and wherever used in this Agreement (including in all Exhibits and Schedules, unless otherwise defined therein), shall have the respective meanings ascribed to them below for all purposes of this Agreement (each such meaning to be equally applicable to the singular and the plural forms of the respective terms defined). All reference herein to a Section, Exhibit or Schedule are to a Section, Schedule or Exhibit of or to this Agreement, unless otherwise indicated. The words "hereby", "herein", "hereof", "hereunder" and words of similar import refer to this Agreement as a whole (including all Exhibits and Schedules hereto) and not merely to the specific section, paragraph or clause in which such word appears. The words "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation." Unless the context requires otherwise, the word "or" shall not be interpreted as an expression of either state of possibility but shall be construed to mean "and/or." Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

"<u>Accounts Receivable</u>" means all accounts and notes receivables (whether current or non-current) of Old Operator, including trade account receivables outstanding as of the Effective Time and any other rights to receive payment as of the Effective Time in respect of services rendered prior to the Effective Time.

"<u>Action</u>" means any claim, controversy, action, cause of action, suit, litigation, arbitration, investigation, opposition, interference, audit, assessment, hearing, compliant, demand or other legal proceeding (whether based in contract, tort or otherwise, whether civil or criminal and whether brought at law or in equity) that is commenced, brought, conducted, tried or heard by or before, or otherwise involving, any Governmental Authority.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such specified Person. For purposes of the foregoing, (a) a Person shall be deemed to control a specified Person if such person (or a Family Member of such Person) possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such specified Person or (b) if such other person is at such time a direct or indirect beneficial holder of at least 25% of any class of equity interests of such specified Person.

"<u>Applicable Law</u>" means, with respect to any Person, any federal, state or local statue, law, ordinance, rule, regulation, writ, Order or other requirement of any Governmental Authority applicable to such Person or any of its Affiliates or any of their respective properties, assets, officers, directors, members, partners or employees (in connection with such officer's, director's member's, partner's or employee's activities on behalf of such person or any of its Affiliates).

"<u>Benefits Plan</u>" means any "employee pension benefit plan" (as defined in Section 3(2) of ERISA, "employee welfare benefit plan (as defined in Section 3(1) of ERISA) and all other bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, phantom stock, equity-based retirement, vacation, severance, employment

agreement, change in control agreement, disability, death benefit, hospitalization, medical or other plan, arrangement or understanding (whether or not legally binding) providing benefits to any current or former Employee of Old Operator or with respect to which Old Operator has any Liability to contribute.

"Books and Records" means all books, records, resident records, employee records, and other materials pertaining to the Old Operator or the Business of any and every kind, including lists (e.g., business contacts of Old Operator), programs, correspondence, compact disks, compact disk lists, ledgers, files, reports, plans, drawings and operating records of every kind, held or maintained by Old Operator or any of Affiliate of Old Operator, disk or tape files, printouts, runs or other computer-prepared information pertaining to the Transferred Assets or the Business.

"Business" means the business conducted by Old Operator and proposed to be conducted by Old Operator as of the Effective Date.

"Business Day" means any day other than a Saturday, Sunday or a weekday on which banks in Pennsylvania are authorized or required to be closed.

"CMS" means the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"CRO's Knowledge" means the CRO's actual knowledge as of the date of this Agreement, without any duty or obligation of the CRO to do any investigation or diligence of any nature whatsoever.

"Environmental Laws" means all federal, state and local statutes, regulations, ordinances, directives and other provisions having the force or effect of law, all judicial and administrative Orders and determinations, all contractual obligations and all common law, in each case concerning public   health and safety, worker health and safety, pollution or protect of the environment, including all those relating to the presence, use, production, generation, handling, transportation, storage, disposal, distribution, labeling, testing, processing, discharging, release, threatened release, control or cleanup of any Hazardous Substances, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, *et seq.*), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, *et seq.*), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6921, *et seq.*) and regulations adopted thereunder.

"Existing Contracts" means all of Old Operator's contracts, leases, subleases, licenses, Permits, purchase and sale orders and any other agreement, commitments or binding arrangements or understandings, whether written or oral, to which Old Operator is a party, including each amendment, modification, renewal or extension or other ancillary document pertaining thereto.

"Governmental Authority" means any federal, state local or municipal government or any subdivision thereof, any regulatory or administrative authority, or any agency or commission or any court, tribunal or judicial or arbitral body.

"has provided," "made available" and similar formulation means such information in question that was delivered or provided by Old Operator or its Representatives to New Operator by way of online file sharing, cloud file sharing, email attachments, written correspondences, compact disks, disk or tape files, printouts, compressed file containers or other electronic or physical delivery means.

"Hazardous Substances" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes regulated under any Environmental Laws.

"Indebtedness" means, with respect to any Person, and without duplication, (i) any indebtedness or other obligation for borrowed money; (ii) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the Ordinary Course of Business; (iii) the face amount of all letters of credit issued for the account of such Person; (iv) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens; (v) capitalized lease obligations; (vi) unfunded obligations for pension, retirement, severance benefits for any officer, director or employee of such Person; (vii) unfunded obligations for deferred compensation for any officer, director or employee of such Person; (viii) all guarantees and similar obligations of such Person; (ix) all bankers acceptances and overdrafts; (x) all interest, prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness; (xi) under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (xii) issued or assumed as the deferred purchase price of property or services (other than trade accounts payable or accounts payable to independent contractors), and (xiii) for all accrued interest on, and arising from any breach of, any of the foregoing.

"Liability" means any liability, obligation, claim, Indebtedness, penalty, cost or expenses (including costs of investigation, collection, defense, and environmental remediation or investigation), deficiency, guaranty or endorsement of or by any Person of any type, secured or unsecured, whether accrued, fixed, absolute, or contingent, asserted or unasserted, due or to become due, whether or however arising (including contract, tort, negligence or strict liability), liquidated or unliquidated, known or unknown and whether or not current or long term.

"Lien" means any claim, lien (statutory or otherwise), encumbrance, pledge, Liability, restriction, charge, instrument, license, preference, priority, security agreement, covenant, right of recovery, option, charge, hypothecation, easement, security interest, interest, right of way, encroachment, mortgage, deed of trust, imperfection of title, prior assignments, Tax (including federal, state and local Tax), Order or other encumbrance or charge of any kind or nature whatsoever including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing; (ii) any assignment or deposit arrangement in the nature of a security device; and (iii) any leasehold interest, license or other right, in favor of a Third Party or Old Operator, to use any portion of the Transferred Assets, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Loss" means, in respect of an indemnifying party's indemnification obligations, all direct and indirect Liabilities, judgments, claims, suits, proceedings, settlements, losses, damages, fees, Liens, Taxes, penalties, interest obligations, expenses (including out of pocket costs of investigation and defense and reasonable attorney fees and expenses), and any diminution in value of the Transferred Assets resulting therefrom that are or have been incurred or suffered by an indemnified party.

"DOH" means the Pennsylvania Department of Health.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Ordinary Course of Business" means the ordinary course of business of Old Operator consistent with past custom and practice.

"Other Documents" means Bill of Sale, General Assignment, Old Operator Disclosure Schedule, and any certificates, instruments, agreements and other documents contemplated under this Agreement.

"Permits" means all municipal, state, federal and local consents, Orders, filings, franchises, permits, approvals, certificates, licenses, agreements, waivers, and authorizations issued by, or otherwise granted by, any Governmental Authority that are held by, or used in connection with, or required for, the Business or the Transferred Assets (including all modifications thereto or renewals thereof).

"Person" means any person, firm, corporation, partnership, joint venture, limited liability company, association or other entity (governmental or private).

"Regulatory Approval" means any consent, approval, authorization, waiver, permission, concession, agreement, license, exemption or Order of, or declaration of any Governmental Authority.

"Representative" means, with respect to any Peron, any of its attorneys, accountants, agents, consultants or other representatives.

"OIG" means the United States Department of Health and Human Services, Office of Inspector General.

"Old Operator Disclosure Schedules" means the schedules of exceptions to the representations and warranties of Old Operator in this Agreement (which shall be delivered to New Operator by Old Operator prior to the execution and delivery of this Agreement by the parties hereto).

"Organizational Documents" means certificate of incorporation, articles of incorporation, charter, bylaws, articles of formation, certificate of formation, operating agreement, certificate of limited partnership, partnership agreement and all other similar documents, instruments or certificates adopted or filed in connection with the creation, formation or organization of a Person, including any amendments, restatements and supplements thereto.

4918-8184-1668.3

"Tax" and, with correlative meaning, "Taxes" means with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, ad valorem, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not; (ii) liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person; or (iii) liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any affiliated group as defined in Section 1504 of the Code, or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax law (or being included (or required to be included) in any Tax Return relating thereto).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by Old Operator relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Third Party" means any Person other than Old Operator, New Operator or any of their respective Affiliates.

"Transaction Expenses" shall mean (i) the aggregate attorneys', accountants' and brokers' fees and expenses incurred or to be incurred by Old Operator that remain unpaid as of the Effective Time, (ii) the amount of real estate transfer tax imposed by Applicable Law and consistent with payment customs of the location in which the relevant real estate property is located in connection with the transactions contemplated by this Agreement, (iii) payment of all special and betterment assessments, water rates and sewer charges, in each case on a prorated basis and adjusted as of the Effective Time, (iv) Pre-Closing Accrued Salary and PTO Benefits, and (v) all other fees and expenses relating to the transfer of Property in accordance with this Agreement (including, without limitation, cost of recording, preparing the Deed and applicable brokerage commissions), in each case of (i), (ii), (iii) and (iv), to the extent not paid in full prior to or at the Closing or taken in to account on a dollar-for-dollar basis in the reduction of the Purchase Price (as defined in the Purchase Agreement).

"Transferred Assets" means collectively, the Website Materials, telephone number of Old Operator, the Employee Records, the Books and Records of the Facility, the Supplies, the Resident Agreements, the Assumed Contracts, Provider Agreements, and other assets owned by Old Operators and held at or used in connection with the operation of the Facility.

"WARN Act" means the Worker Adjustment and Retaining Notification Act of 1988, as amended.

4918-8184-1668.3

OPERATIONS TRANSFER AGREEMENT

by and among

Care Pavilion Operating LLC, Cliveden Operating LLC, Maplewood Operating LLC,
Tucker Operating LLC, York Operating LLC,

each a Pennsylvania limited liability company,

collectively, "Old Operator"

and

CP Operating LLC, CL Operating LLC, MA Operating LLC, TH Operating LLC, YO
Operating LLC,

each a Pennsylvania limited liability company,

collectively, "New Operator"

Dated as of: December 9, 2024

## OPERATIONS TRANSFER AGREEMENT

This OPERATIONS TRANSFER AGREEMENT (this "Agreement") is entered into this 9th day of December, 2024 (the "Effective Date") by and between the parties undersigned as Old Operator ("collectively, "Old Operator") and the parties undersigned as New Operator ("collectively "New Operator").

### WITNESSETH:

WHEREAS, those entities listed on **Exhibit A**, attached hereto, as Seller (collectively, "Seller") own that certain land, building, furniture, fixtures and equipment comprising the nursing facility listed by such Seller's name in **Exhibit A** (each a "Facility" and collectively the "Facilities"), and all of the furniture, fixtures and equipment and other items of personal property located therein (the "Personal Property" and collectively with the Facility, the "Property");

WHEREAS, each respective Facility is licensed to and operated by an entity listed in **Exhibit A** as such Facility's operator, (each operator, is an "Old Operator" and collectively the "Old Operators") to operate the number of skilled nursing beds set forth next to the name of each Facility as listed in **Exhibit A**;

WHEREAS, those entities listed on **Exhibit A**, attached hereto, as Purchaser (collectively, "Purchaser") are acquiring the Property from Seller, under that certain Purchase and Sale Agreement, dated effective as of August 14, 2024, by and between Seller and Purchaser (the "Purchase Agreement");

WHEREAS, as of the date hereof, (a) each respective Seller and MAPA Operating, LLC, an affiliate of Old Operator ("MAPA") are parties to those certain master lease agreements (collectively, the "Master Lease") providing for the lease of the Facility by respective Seller to MAPA and (b) MAPA, as landlord, and  respective Old Operator listed next to such Facility in Exhibit A are parties to certain subleases (collectively with the Master Lease, the "Old Lease") providing for the sublease of the Facility by MAPA to the respective Old Operator, which Old Lease will either be (i) terminated as of the Closing (as defined below) and replaced in its entirety by a new lease agreement to be entered into by and among respective Purchaser and respective New Operator listed next to such Facility in **Exhibit A** at the Closing, or (ii) assigned and assumed by each respective New Operator listed next to such Facility in **Exhibit A** at the Closing, in each case, providing for the lease of the Facility by Purchaser to New Operator;

WHEREAS, on November 18, 2024, each Old Operator (in their capacity as chapter 11 debtors, each, a "Debtor" and, collectively, the "Debtors"), filed voluntary petitions (collectively, the "Chapter 11 Petitions") for relief under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") commencing chapter 11 cases (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases");

WHEREAS, on November 18, 2024, Neil Luria was appointed the Chief Restructuring

Officer of the Debtors ("CRO").

**WHEREAS,** the Old Operators will continue to own and operate their respective Facilities and businesses as "*debtors-in-possession*" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

**WHEREAS,** subject to approval of the Bankruptcy Court, Old Operator and New Operator are entering into this Agreement in order to provide for an orderly transition of the operations of the Facilities, and the sale and transfer of certain Personal Property and certain contracts, licenses, and permits, and in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 363 and 365 and other applicable provisions of the Bankruptcy Code;

**WHEREAS,** in furtherance of a desire by the parties hereto to ensure a smooth transition of operations of the Facility, the parties hereto desire to enter into this Agreement.

**NOW, THEREFORE,** for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged by the parties hereto, the parties hereto agree as follows:

1.  **BANKRUPTCY PROVISIONS; CLOSING.**

a.  The parties hereto agree to the terms and conditions regarding the Debtors' filing of the Sale Motion (as defined herein) with the Bankruptcy Court to, among other things, seek (a) entry of the Bidding Procedures Order (as defined herein) (i) approving this Agreement as the stalking horse purchase agreement, (ii) approving New Operator as the stalking horse bidder pursuant to this Agreement, and (iii) approving the Bidding Procedures (as defined herein), including the bid protections, that shall govern the Debtors' solicitation of competing bids for the Debtors' assets, and, (b) following an Auction (as defined herein) to be held after the Bidding Solicitation Period (as defined herein) expires should there be other Qualifying Bidders (as defined herein), the Debtors' pursuit of the Sale Order approving the Successful Bidder's (as defined herein) operations transfer agreement, all in accordance with the provisions set forth on **Exhibit B** attached hereto (which **Exhibit B** also includes certain additional related defined terms used in this Agreement). To the extent of any inconsistencies in the Debtors' Sale Motion and the provisions set forth on **Exhibit B** attached hereto, the provisions in Exhibit B shall control, except as otherwise ordered by the Bankruptcy Court.

b.  The closing of the transactions contemplated hereby (the "Closing") shall take place concurrently with the closing of the transactions contemplated under the Purchase Agreement, subject to the satisfaction or waiver of each of the closing conditions set forth in Section 2 hereof (other than those conditions which can only be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). The Closing shall be effective as of 12:01 a.m. (Eastern Time) on the Closing Date (the "Effective Time"), and will occur with respect to all Facilities simultaneously.

2.     **CONDITIONS PRECEDENT.** New Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the reasonable satisfaction of New Operator or the waiver thereof by New Operator of the following conditions precedent on or prior to the Closing Date, which waiver shall be binding upon New Operator only to the extent made in writing and dated as of the Closing Date:

a.  Old Operator shall have duly and timely performed and fulfilled in all respects all of its duties, obligations, promises, covenants and agreements hereunder;

b.  Each of the representations and warranties of Old Operator contained in this Agreement shall have been, to the best of CRO's Knowledge, true, correct complete and not misleading in all respects as of the Effective Date and the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true, correct, and complete as of that date) except where the failure of such representations and warranties to be, to the best of the CRO's Knowledge, true, correct, and complete would not have a material adverse effect on the business and operations of the Facilities.

c.  Old Operator shall have delivered to New Operator on or before the Closing Date the following, each of which shall be in form and substance satisfactory to New Operator in its commercially reasonable discretion:

1.     A bill of sale, in substantially the form annexed hereto as **Exhibit C** (the "Bill of Sale"), containing a warranty of title, duly executed and acknowledged by each Old Operator, sufficient to convey to New Operator good and indefeasible title, free of all Liens (other than Permitted Encumbrances), in and to the Transferred Assets and Assumed Liabilities, duly executed and acknowledged by each Old Operator, sufficient to convey to New Operator the personal properties included in the Transferred Assets;

2.     An assignment by each Old Operator, in substantially the form annexed hereto as **Exhibit D** (the "General Assignment"), of all of Old Operator's right, title and interest in, to and under:

i.      The Assumed Contracts (as defined herein);

ii.     The Patient Trust Funds and Property (as defined herein);

iii.    The Provider Agreements (as defined herein);

iv.     The Resident Agreements (as defined herein); and

v.      The Telephone Numbers and Website Material (as defined herein).

3.     A duly executed certificate of the CRO dated as of the Closing Date, to the effect and stating that, to the best of CRO's Knowledge: (A) this Agreement and the Other Documents to which Old Operator is a party have been duly authorized, executed and delivered by Old Operator or approved by the Bankruptcy Court, and (B) the CRO has been employed by the Old Operator and such employment has been approved by the Bankruptcy Court, and (C) conditions specified in Section 2(a), Section 2(b), Section 2(e), Section 2(f), Section 2(g), Section 2(h), Section 2(i) and

3

Section 2(m) have been satisfied;

      4.     All Permits, if any, issued by any Governmental Authority relating to the operating of the Facility by Old Operator running to, or in favor of, Old Operator, to the extent legally assignable;

      5.     Old Operator shall execute and deliver a Confirmation of Sale;

      6.     Counterparts to the Other Documents duly executed by all parties thereto (other than New Operator); and

      7.     Either (a) A duly executed termination agreement, between Seller and Old Operator, terminating the Old Lease, or (b) a duly executed assignment and assumption agreement between Purchaser, MAPA, Old Operator and New Operator assigning the Old Lease to respective New Operator, together with Consent of Seller..

d.  New Operator shall have received a copy of the Organizational Documents of Old Operator, together with amendments and supplements thereto, certified as of the most recent practicable date by the secretary of state of Old Operator's jurisdiction of incorporation or organization.

e.  Old Operator shall have transferred (or shall transfer as soon as reasonably practicable following the Closing) to New Operator the Patient Trust Funds and Property in compliance with all Applicable Laws with respect to the transfer of such Patient Trust Funds and Property and in accordance with the provisions of Section 5 below;

f.  Other than as disclosed in Schedule 2.f., on the Closing Date there shall not be any lawsuits filed or threatened against Old Operator which are not covered by insurance and being defended, subject to policy limits and any reservation of rights; nor shall there be any actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against Old Operator, to restrain or prohibit the consummation of any of the transactions contemplated under this Agreement and the Other Documents;

g.  New Operator shall have received DOH approval of the Licensure and all other Regulatory Approvals required by New Operator in order to operate the Facility in the manner presently operated by Old Operator, subject to conditions acceptable to New Operator in its reasonable discretion, and such approvals shall not have been revoked or modified; provided that the receipt of tie-in letters or other similar documentation permitting New Operator to bill and collect for services rendered to Medicare and Medicaid beneficiaries after the Closing shall not be a condition to Closing;

h.  The closing conditions described in the Purchase Agreement shall have been met in accordance with the terms of the Purchase Agreement and the closing under the Purchase Agreement shall occur concurrently herewith.

i.  The Bankruptcy Court shall have entered the Sale Order approving the sale of the Debtors' assets to New Operators under this Agreement free and clear of all Claims and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), and such Sale Order shall be a Final Order.

Old Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the commercially reasonable satisfaction of Old Operator or the waiver thereof

by Old Operator of the following conditions precedent on and as of the Closing Date, which waiver shall be binding upon Old Operator only to the extent made in writing and dated as of the Closing Date:

a.    New Operator shall have duly and timely performed and fulfilled all of its duties, obligations, promises, covenants and agreements hereunder;

b.    Each of the representations and warranties of New Operator contained in this Agreement shall be true, correct, complete and not misleading in all respects as of the Effective Date and the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that date);

c.    New Operator shall have executed and delivered to Old Operator the Other Documents to which it is a party; and

d.    The closing conditions described in the Purchase Agreement shall have been met in accordance with the terms of the Purchase Agreement and the closing under the Purchase Agreement shall occur concurrently herewith.

e.    The Bankruptcy Court shall have entered the Sale Order approving the sale of the Debtors' assets to the New Operators under this Agreement free and clear of all Claims and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), and such Sale Order shall be a Final Order.

In the event that either of the parties hereto (a "Waiving Party") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies at law or equity with respect thereto.

**3.    LIABILITIES OF OLD OPERATOR.**

a.    New Operator shall not be the successor to Old Operator, and Old Operator hereby acknowledges and agrees that pursuant to the terms of this Agreement, neither New Operator nor any of its Affiliates shall assume or become liable to pay, perform or discharge any Liability of Old Operator (other than Assumed Liabilities (as defined below)) of any kind or nature, at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, arising out of this or any other transaction or event and whether or not relating to Old Operator any of the Business, regardless of any disclosure made or exceptions noted with respect to the representations and warranties, covenants or agreements contained in this Agreement or any other document executed or delivered by Old Operator in connection with the transactions contemplated hereby, including the following specifically enumerated Liabilities (collectively, the "Excluded Liabilities"):

i.    All Liabilities for Indebtedness of Old Operator;

5

ii.    All Liabilities of Old Operator that relate to any of the Excluded Assets (as defined herein);

iii.    All Liabilities of Old Operator or for which Old Operator could be liable relating to Taxes (including with respect to the Transferred Assets or otherwise) including any Taxes that will arise as a result of the transfer of any of the Transferred Assets pursuant to this Agreement and any Liability related to Taxes of Old Operator imposed upon New Operator by reason of New Operator's status as transferee of the Business or any of the Transferred Assets (including under any bulk sales law);

iv.    All Transaction Expenses of Old Operator;

v.    All Pre-Closing Accrued Salary and PTO Benefits (as defined below);

vi.    All Liabilities of Old Operator that relate to the Recapture Claims (as defined herein);

vii.    Any Liability arising out of any Action commenced against Old Operator or with respect to any of the Transferred Assets after the Closing, the facts of which arise out of, or relate to any occurrence or event happening or existing prior to the Effective Time;

viii.    Any Liability of Old Operator relating to any Action for malpractice, professional liability, resident rights violations or violations of employee rights or contracts or otherwise constitute or are alleged to constitute a tort, breach of contract or violation of any law, rule, regulation, treaty or other similar authority;

ix.    Any Liability under any Assumed Contract which accrues or arises after the Closing, but which accrues or arises out of or relates solely to any breach or violation or alleged breach or violation that occurred prior to the Closing.

x.    Any Liability with respect to the Current Employees (as defined herein) or former employees, or both (or their personal representatives) of Old Operator (including any Liabilities arising under any Benefits Plan of Old Operator, other Liabilities described in Section 9 and Liabilities relating to any employer-paid portion of any employment and payroll Taxes that become payable in connection therewith), except for Liabilities expressly assumed by New Operator under Section 8(c);

xi.    Any Liability pursuant to the WARN Act relating to any action or inaction of Old Operator on or prior to the Effective Time, including any liabilities under WARN Act as a result of New Operator failing to hire any Employee as of the Closing; and

xii.    Any Liability of Old Operator under this Agreement or any Other Document.

xiii.    Any Liability under any contract, agreement, lease, mortgage, indenture or other instrument of Old Operator, except for the Assumed Contract;

xiv.    Any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Old Operator;

xv.    Any Liability arising out of or resulting from non-compliance with any Applicable Law by Old Operator;

xvi.    Any Liability of Old Operator resulting from overpayments or inappropriate billings; and

xvii.    Any other Liabilities of Old Operator which are not Assumed Liabilities.

b.    Without limiting the foregoing, the parties intend that, to the fullest extent permitted by law (including under Section 363 of the Bankruptcy Code), upon the Closing, New Operators shall not be deemed to: (i) be the successors of the Old Operator, (ii) have, de facto, or otherwise, merged with or into the Old Operator, (iii) be mere continuations or substantial continuations of the Old Operator, or the business, enterprise(s), or operations of the Old Operator, or (iv) be liable for any acts or omissions of the Old Operator, in the conduct of their business or arising under or related to the Facilities or any other Debtors' assets other than as expressly set forth in the Transaction Documents and the Sale Order. Without limiting the generality of the foregoing, and except as otherwise provided in the Transaction Documents, the parties intend that New Operator shall not be liable for any Claims or Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) against Old Operator, or any of Old Operator's predecessors or affiliates, and New Operator shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, including without limitation any liabilities for nursing assessments owed to the Commonwealth of Pennsylvania or DOH, and any taxes of any kind whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Facilities or the Debtors' assets, or any liabilities of Old Operator arising prior to the Closing Date. The parties agree that the provisions substantially in the form of this Section 3, as well as any other provisions reasonably requested by New Operators to ensure "free and clear" transfer of the Transferred Assets shall be reflected in the Sale Order.

Notwithstanding anything to the contrary herein, no terms of this Agreement, the Sale Order, or any other Transaction Documents will require New Operator to execute any application, agreement, or other document in favor of DOH or any other Governmental Authority that expressly or impliedly provides that New Operator or any other party shall assume or have assumed any Claims, Encumbrances, or other liabilities of the Old Operator except for Assumed Liabilities and Permitted Encumbrances.

c.    New Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and

7

operation of the Facility prior to the Closing, including, but not limited to, any matters relating to Contracts, cost reports, collections, audits, hearing, or legal action arising therefrom.

      d.     The parties hereto agree and acknowledge that, notwithstanding anything to the contrary in this Agreement, Old Operator shall retain, and New Operator shall not accept, any of Old Operator's rights, title and interest in and to any assets of Old Operator other than the Transferred Assets (collectively, the "Excluded Assets").

      e.     The parties hereto acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement or any Other Document shall not create an Assumed Liability or other Liability of New Operator, except where such disclosed obligation has been expressly assumed by New Operator as an Assumed Liability in accordance with the terms of this Agreement.

      f.     For the avoidance of doubt, nothing contained in this Agreement shall omit any claim or defenses New Operator may have against any Third Party. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Old Operator or New Operator as compared to the rights and remedies which such Third Party would have had against Old Operator had New Operator not assumed such Assumed Liabilities.

      g.     Closing Prorations. All costs and expenses relating to operation of the Facility, including without limitation bed taxes, provider taxes, gross receipts taxes, and quality assessment taxes, and all other taxes and utility charges, shall be prorated between Old Operator and New Operator as of the Effective Time. In the event the amount of any cost or expense has not been determined as of the Effective Time, the proration shall be made on the basis of one hundred and five percent (105%) of the last available bill for the applicable period and shall be re-prorated upon receipt of statements therefor. For purposes of clarification, in no event shall Old Operator be responsible for any of the amounts above that are attributable to any period on or following the Closing, and in no event shall New Operator be responsible for any of the amounts above that are attributable to any period prior to the Closing.

    **4.**    **CONVEYANCE OF SUPPLIES**. On the Closing Date, Old Operator shall transfer to New Operator all food, central supplies, linens and housekeeping supplies, other consumable and non-consumable inventory maintained in the ordinary course consistent with past practice with respect to the Facility and any other personal property of Old Operator (the "Supplies"). Old Operator shall have no obligation to deliver the Supplies to any location other than that at which each item of Supplies is currently located, and New Operator agrees that the presence of the Supplies at the Facility on the Closing Date shall constitute delivery thereof.

    **5.**    **TRANSFER OF PATIENT TRUST FUNDS.**

a.   Prior to the Closing, Old Operator shall provide to New Operator a true, correct and complete accounting of any patient trust funds and an inventory of all residents' property held by Old Operator on the Closing Date for patients at the Facility, a copy of which shall be attached hereto as Schedule 5.a. ("Patient Trust Funds and Property").

b.   Old Operator will indemnify, defend and hold New Operator harmless from any and all liabilities, claims, demands and causes of action of any nature whatsoever: i) in the event the amount of funds or any property, if any, transferred to New Operator did not represent the full amount of the funds and/or property delivered to Old Operator as of the Closing Date, ii) with respect to any Patient Trust Funds and Property delivered, or claimed to have

been delivered, to Old Operator, but which were not delivered by Old Operator to New Operator, or iii) for claims which arise from actions or omissions of Old Operator with respect to the Patient Trust Funds prior to the Closing Date.

c.  New Operator will indemnify, defend and hold Old Operator harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Old Operator with respect to the Patient Trust Funds and Property where said funds were transferred to New Operator pursuant to the terms hereof, or for claims which arise from actions or omissions of New Operator after the Closing Date with respect to Patient Trust Funds transferred to New Operator.

**6.     COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES.**

a.  Prior to Closing, Old Operator and New Operator shall enter into a Transition Services Agreement ("TSA") governing the process whereby timely final cost reports will be prepared and filed with respect to the Facilities operations through the date of Closing.

b.  Each party hereto agrees to notify the other within five (5) Business Days after receipt of any notice of any claim, audits, assessment inquires, proceedings, disputes, examinations, determination or denials or similar events by DOH, CMS, OIG or any other Governmental Authority with respect to any of the following, relating to periods prior to the Effective Time: (i) an alleged Medicare, Medicaid, and/or Managed Care overpayment, or any other recoupment or adjustment to reimbursement, (ii) an alleged underpayment of any Tax or assessment or iii) any other governmental or third-party payor claims (each, a "Recapture Claim").  For avoidance of doubt, the failure to provide notification of a Recapture Claim within the foregoing timeframe shall in no way effect a party's rights to indemnification with respect thereto.

c.  In the event DOH, CMS, OIG, or any other Governmental Authority making payments to New Operator for services performed at the Facility after the Closing or any other third-party payor makes any Recapture Claim, then Old Operator hereby agrees to save, indemnify, defend and hold New Operator harmless from and against any Loss incurred or suffered by New Operator relating to such claim. In connection with the foregoing indemnification obligation, in the event that DOH, CMS, OIG or any other Governmental Authority or other third-party payor source withholds amounts from New Operator's reimbursement checks as a result of such Recapture Claim, Old Operator shall pay such amounts to New Operator within ten (10) Business Days following New Operator's demand therefor, unless Old Operator in good faith asserts defenses and/or appeals of such Recapture Claim with supporting documentation to substantiate its defenses and/or claims. In the event Old Operator fails to pursue any issue or issues relating to appeal of a Recapture Claim within ten (10) Business Days following the making of the Recapture Claim, New Operator may pursue an appeal of such issue or issues and Old Operator will cooperate fully with New Operator in such appeal, including by providing copies of any documentation required to substantiate costs reported on the cost reports.

d.  Old Operator shall pay, prior to the Closing, all outstanding Recapture Claims and any

9

other fees and taxes due with respect to the Facility for periods prior to the Closing, and shall provide to New Operator, on or before the Closing, evidence reasonably satisfactory to New Operator of the foregoing payments. .

### 7.    CONTRACTS.

a.  As soon as practicable after the date hereof, the Old Operator shall deliver to the New Operator true, accurate and complete copies of all Existing Contracts which are available to Old Operator and/or in Old Operator's custody or control, a schedule of which is attached hereto as Schedule 7.a.  In accordance with the terms of the General Assignment and this Agreement, Old Operator shall assign and transfer to New Operator all of Old Operator's rights, title and interest in, to and under the Existing Contracts chosen by New Operator in its sole discretion and set forth in Schedule 7.b. hereto (collectively, the "Assumed Contracts," and the Exiting Contracts not assigned to New Operator shall hereinafter be referred to as the "Rejected Contracts"), and New Operator shall assume all of the Liabilities of Old Operator under the Assumed Contracts that accrue after the Effective Time and that do not arise from occurrences, circumstances or events occurring or existing, or breaches existing at or prior to the Effective Time (collectively, the "Assumed Liabilities") (it being understood that any interest, penalty or other amounts required to be paid under any Assumed Contract as a result of any non-payment or other breach by Old Operator thereunder shall not be an Assumed Liability).

b.  To the extent any third party consent is required in connection with the assignment and assumption of the Assumed Contracts, Old Operator hereby covenants and agrees to use its best efforts to obtain such third party consent prior to the Closing Date. To the extent Old Operator shall be unable to obtain such third party consent, Old Operator and New Operator shall cooperate and take such steps as may be necessary in order for New Operator to receive the benefits under such Assumed Contracts, provided that New Operator agrees to fulfill any obligations of Old Operator that shall arise with respect to such Assumed Contracts on and after the Closing Date.

c.  Old Operator shall also transfer, convey and assign to New Operator on the Closing Date all customer lists, prospect lists, and existing agreements with residents and any guarantors thereof (the "Resident Agreements"), to the extent assignable by Old Operator.

### 8.    EMPLOYEES.

8.1    Employees.

(a)    Within 60 days prior to the Closing, Old Operator shall provide the New Operator with reasonable access to the Facility so that the New Operator may discuss potential employment of any Old Operator employee providing services at the Facility. Upon prior notice to Old Operator, New Operator may deliver any written communications to, or hold any group meetings with, any individual or group of New Operator employees for the purpose of addressing or discussing employment with the New Operator following the Closing.

(b)    New Operator shall, to the extent required by Section 8.5(c) below, offer

10

employment, upon terms and conditions to be set by the New Operator as described herein, to employees of Old Operator who meet its requirements for employment and, as of the Closing Date, are actively working at the Facility (which shall include employees of Old Operator who, as of the Closing Date, are on a leave of absence pursuant to Old Operator's Family and Medical Leave of Absence Policy or due to work-related injury or illness, upon any return from such leave). All pre-Closing employees of Old Operator who, pursuant to the foregoing, become employees of the New Operator as of the Closing, are herein referred to as the "Hired Employees". It is understood that New Operator shall not be responsible for any disability or workers' compensation benefits for any employees on leave of absence pursuant to Old Operator's Family and Medical Leave of Absence Policy or due to a work-related injury or illness that are receiving such benefits as of the Closing Date; provided, that New Operator will be responsible after the Closing Date for such disability or workers' compensation benefits arising on and after the Closing Date (to the extent relating to periods on and after the Closing Date and excluding any pre-existing condition) for any Hired Employees. It is understood that, in accordance with the LTC Transfer Law (defined below), all Hired Employees shall be retained for a period of no less than ninety (90) days from the Closing Date at the same rates of pay and benefits that they received from Old Operator prior to the Closing Date and subject to dismissal only for good cause, but all Hired Employees shall otherwise be subject to such initial or new terms and conditions of employment as may be determined and established by New Operator, in its discretion. The parties agree that, New Operator: (i) shall have no obligation to recognize any union or to assume any of the collective bargaining agreements currently in place; (ii) shall have the right to, and be deemed to have the intention not to, assume any such collective bargaining agreement; and (iii) shall have the right, and be deemed to have the intention, to set its own initial terms and conditions of employment for any employees of Old Operator that New Operator may choose, in its sole discretion, to hire.

(c)     New Operator shall offer to employ all of Old Operator's employees employed at the Facility upon such terms and conditions and otherwise take any and all necessary steps so that Old Operator is not required to give notice to the employees of the Facility (including employees who are on medical disability or leaves of absence and who worked at the Facility immediately prior to such disability or leave who are able to perform the essential functions of the position with or without a reasonable accommodation and who are qualified for the position) of the "closure" thereof under the Worker Adjustment and Retraining Notification Act of 1988, as amended (the "WARN Act") or under any comparable state law. In addition to the foregoing, all Facility employees who are actively employed by Old Operator as of the Closing Date shall be offered employment by and, if such employment is accepted by them, become employed with New Operator, effective immediately after the Closing. In accordance with applicable law, New Operator shall retain all Facility employees for a period of no less than ninety (90) days from the Closing (the "Transition Period") at the same rate of pay and benefits that the Facility employees received from Transferor immediately before the Effective Time in accordance with all applicable laws as specifically required by Philadelphia's Changes in Ownership of Long-Term Care Facilities and Hospitals law (Section 6-409) (the "LTC Transfer Law"). If New Operator fails to comply with its obligations in the preceding sentences, New Operator shall indemnify, defend and hold harmless Old Operator for any and all losses, costs, claims, fines, penalties, damages and expenses (including court costs and reasonable attorneys' fees) arising under or relating to the WARN Act, the LTC Transfer Law, and any similar local or State plant closing laws as applied to

11

the transactions contemplated hereby. Nothing in this Section shall create any rights in favor of any person not a party hereto, including the employees of the Facility, or constitute an employment agreement or condition of employment for any employee of Old Operator or any affiliate thereof who is a Hired Employee.

(d)     At or before the Closing, New Operator shall provide Old Operator with a schedule listing each Hired Employee. Between the Closing and the two year anniversary date thereof, neither Old Operator nor any affiliate of Old Operator shall, directly or indirectly, alone or in conjunction with any other party, solicit, induce or attempt to solicit or induce for employment or consulting or similar services or otherwise engage or employ any Hired Employee; provided, however, that (i) the foregoing restrictions shall not apply to those individuals listed on Schedule 8.5(d) of the Old Operator Disclosure Schedules (as such schedule shall be mutually agreed to by Old Operator and New Operator), it being understood and agreed that Old Operator shall require the services of those individuals following the Closing for a period of no more than 30 days, and (ii) nothing set forth in this subparagraph (d) shall restrict Old Operator from soliciting, inducing, or otherwise engaging or employing an employee who is not a Hired Employee, or a Hired Employee who has been terminated for any reason by New Operator. Between the Execution Date and the Closing or the termination of this Agreement, as the case may be, and, if this Agreement is terminated, for a period of one year thereafter, neither New Operator nor any affiliate of New Operator shall employ any Old Operator employee or solicit or induce any Old Operator employee to leave the employment of Old Operator (except as contemplated by this Section 1.5 hereof). Nothing set forth in this subparagraph (d) shall restrict a party from conducting general public solicitations (including through advertisements and/or search firms) not directly targeted to prohibited individuals or from hiring any prohibited individual who has not been employed by the other party for a period of at least six months.

(e)     Old Operator shall pay to each Hired Employee, no later than the date required by applicable law, an amount equal to any and all accrued salary and wages earned by such employee through and including the Closing Date ("Pre-Closing Accrued Salary"). No later than five (5) days prior to the Closing, Old Operator shall provide New Operator with a true, correct and complete schedule setting forth for each employee employed at the Facility (including employees who are on medical disability or leaves of absence and who worked at the Facility immediately prior to such disability or leave who are able to perform the essential functions of the position with or without a reasonable accommodation and who are qualified for the position) the number and corresponding dollar amount of all vacation, sick and personal days accrued as of the Effective Time (including all taxes incident or associated therewith, collectively, the "PTO Benefits") together with supporting documentation. Old Operator and New Operator shall discuss and negotiate in good faith any discrepancies New Operator may have with respect to the PTO Benefits and the liabilities and obligations associated therewith. As of the Effective Time, the New Operator shall be obligated to pay the PTO Benefits to all Hired Employees (such amount being referred to herein as the "Assumed Benefits"). For clarity, Assumed Benefits does not include any Pre-Closing Accrued Salary. Except for the Assumed Benefits, the New Operator does not assume any liability or obligation for any and all wages, salary, compensation (including Pre-Closing Accrued Salary), employee benefits, including any pension, healthcare, childcare or other employee benefits, whether under any collective bargaining agreement or other agreement, for any

12

employee employed at the Facility (including employees who are on medical disability or leaves of absence and who worked at the Facility immediately prior to such disability or leave who are able to perform the essential functions of the position with or without a reasonable accommodation and who are qualified for the position) prior to the Effective Time, whether or not such individual is a Hired Employee, and Old Operator shall remain primarily liable therefor and shall indemnify and hold New Operator harmless from and against any claim or demand relating thereto or arising thereunder. New Operator shall indemnify and hold Old Operator harmless from and against any claim or demand relating to the Assumed Benefits (for which Old Operator paid New Operator or provided a credit under the Purchase Agreement as contemplated hereby).

(f)        Except for all Hired Employees, Old Operator shall remain liable for all group health plan continuation coverage pursuant to the requirements of Section 601, et seq. of ERISA and Section 4980B of the Code ("COBRA"), for all of its employees to whom it is required to offer the same under applicable law. Notwithstanding the foregoing, the New Operator agrees that it will provide COBRA coverage for any non-Hired Employees and that such employees will make COBRA premium payments directly to the New Operator.

(g)        As of the Closing and subject to applicable law, all active employees of Old Operator employed at the Facility who are eligible to participate in group health insurance coverage sponsored by Old Operator and who become Hired Employees shall be eligible for participation in a group health plan (as defined for purposes of Internal Revenue Code Section 4980B) of New Operator for the general benefit of employees and their dependents, and all such employees shall be covered without a waiting period and without regard to any pre-existing condition unless (1) they are under a waiting period with Old Operator at the Closing, in which case they shall be required to complete their waiting period while under the group plan of New Operator or (2) they were subject to a pre-existing condition exclusion while under Old Operator's group-health plan, in which case they shall remain subject to the same exclusion, which exclusion shall, if applicable, be subject to the same time limitation while employed by the New Operator as was applicable thereto while said employees were employed by Old Operator, with the time limit calculated from the date the same commenced while employed by such New Operator.  The New Operator and Old Operator acknowledge and agree that it is the intent of this provision that neither Old Operator nor its affiliates shall be required to provide continued health coverage under ERISA or Section 4980B of the Internal Revenue Code to any Hired Employees or to any qualified beneficiary (as defined for purposes of Section 4980B of the Internal Revenue Code) with respect to any such employees. Without limitation of the foregoing, Old Operator shall be responsible for providing welfare benefits (including, without limitation, medical, hospital, dental, accidental death and dismemberment, life, disability and other similar benefits) to all of Old Operator's employees, including, without limitation, Hired Employees, for all claims incurred and benefits earned prior to the Closing under and subject to the generally applicable terms and conditions of the employee benefit plans, programs and policies in which such employees were entitled to participate prior to the Closing, as amended from time to time. New Operator shall be responsible for providing such benefits for claims incurred and benefits earned on or after the Closing under and subject to the generally applicable terms and conditions of New Operator's employee benefit plans, programs and arrangements as amended from time to time.  For purposes of this paragraph, a claim is "incurred" on the date the applicable medical or dental services are rendered, drugs or

13

other medical equipment are purchased or used, as the case may be, or, in the case of a confinement, the related expenses are deemed incurred per diem. Notwithstanding the foregoing, at New Operator's request, Old Operator will offer to provide COBRA benefits to the Hired Employees for a period of up to thirty (30) days following the Closing Date, in which event, (i) New Operator shall pay all COBRA premiums on behalf of Hired Employees who elect COBRA coverage, and shall reimburse Old Operator for all costs and expenses incurred by Old Operator in providing such benefits, including unrecovered premium expense and administrative costs, and (ii) New Operator shall provide the benefits described above no later than thirty (30) days following the Closing Date.

(h)     As of the Closing Date, all Hired Employees shall cease to accrue benefits under the employee benefit plans, programs and policies of Old Operator, and Old Operator shall take all such action as may be necessary to affect cessation. There shall be no assumption by New Operator of or transfer of assets or liabilities of such plans, programs and policies from Old Operator to New Operator or to any employee benefit plans of the New Operator with regard to any employees of Old Operator, including, without limitation, Hired Employees, except as otherwise expressly provided herein. Old Operator shall retain all responsibility for, and New Operator shall have no obligation or responsibility for, any of such benefits, except as provided herein.

(i)     Except for COBRA obligations as stated in Subsections 8.5(f) and (g), New Operator shall have no obligation or responsibility for any liabilities or obligations of Transferor relating to (1) any Old Operator employee who is not a Hired Employee and (2) any Hired Employee for any period prior to such Hired Employee becoming an employee of the New Operator (including, without limitation, liabilities or obligations of Old Operator relating to PTO Benefits or Union Benefits (except to the extent included in the Assumed Benefits and for which Old Operator paid New Operator or provided a credit under the Purchase Agreement as contemplated hereby). Except as expressly set forth in this Agreement, Old Operator shall have no obligation or responsibility for any liabilities or obligations of New Operator relating to Hired Employees in respect of matters arising from and after the Closing. Old Operator shall indemnify and defend and hold New Operator harmless from any claim asserted against New Operator by any (1) Old Operator employee who is not a Hired Employee and (2) Hired Employee in respect of, or arising during, any period prior to such Hired Employee becoming an employee of the New Operator, including for Pre-Closing Accrued Salary and Assumed Benefits. New Operator shall indemnify and defend and hold Old Operator harmless from any claim asserted against Old Operator by any Hired Employee in respect of matters arising from and after such Hired Employee became an employee of the New Operator. New Operator does not hereby assume or agree to discharge or perform any liabilities or obligations of Old Operator under any collective bargaining agreement and Old Operator agrees to indemnify, defend and hold New Operator and its affiliates harmless from and against and in respect of any claim or demand for any withdrawal liability asserted against New Operator or its affiliates under, or in respect of, any collective bargaining agreement or multiemployer plan to which Old Operator was obligated to contribute prior to the Closing, including any withdrawal liability arising from the transfer of the Facility to New Operator hereunder. New Operator does not hereby assume or agree to discharge or perform any liabilities or obligations of Old Operator under any pension plan to which any Hired Employees

14

may participate.

8.2 Old Operator shall terminate the employment of all employees providing services at the Facility, a listing of which as of the Effective Date is attached hereto as <u>Schedule 8.2.</u> (such listing, to include the current base salaries of all such employees) (the "<u>Current Employees</u>"), and to be updated as of the Closing Date. New Operator shall not be bound by or assume any employment contracts (whether oral or in writing) to which Old Operator may be a party. Other than consistent with past practice, Old Operator shall not make any changes in the compensation or benefits of the employees at the Facility prior to the Closing Date other than with the prior written consent of New Operator.

### 9.    <u>ACCOUNTS RECEIVABLE.</u>

a.    All unpaid Accounts Receivable of Old Operator with respect to periods prior to Closing shall remain owned by Old Operator, and New Operator and Old Operator shall enter into a TSA on mutually agreeable terms prior to Closing addressing the terms under which New Operator will collect such amounts for Old Operator subject to a contingency fee for New Operator for amounts collected on behalf of Old Operator. If the parties are unable to agree on the terms of New Operator collecting such accounts receivable, the Old Operator may retain a third party to collect such accounts receivable, and the TSA shall provide for appropriate information sharing and cooperation from New Operator to allow such collections to occur. If at any time after the Closing Date, New Operator shall receive any payment from any federal or state agency, which payment includes any reimbursement with respect to payments or underpayments made to Old Operator for services rendered prior to the Closing Date, then New Operator shall remit such payments to Old Operator within three (3) business days. New Operator and Old Operator shall send copies of all Medicaid remittance advices to the other party for purposes of recording and pursuing Accounts Receivable for the period of twelve (12) months following the Closing Date and thereafter as reasonably requested by each party. If at any time after the Closing Date, Old Operator shall receive any payment from any federal or state agency, which payment represents reimbursement with respect to payments or underpayments made to New Operator for services rendered on or after the Closing Date, then Old Operator shall remit such payments to New Operator. Any such remittances pursuant to this Section shall occur within three (3) Business Days from the date the party required to make such remittance receives payment thereof.

b.    Any non-designated payments received by New Operator or Old Operator from non-governmental payment sources during a period of sixty (60) days following the Closing shall first be applied to any pre-Closing balances due to Old Operator for services provided prior to the Closing (with the excess, if any, applied to any post-Closing balances due for services rendered by New Operator following the Closing), and any such payments received following such period of sixty (60) days shall first be applied to any post-Closing balances due New Operator for services provided after the Closing (with the excess, if any, applied to any pre-Closing balances due for services rendered by Old Operator prior to the Closing). Notwithstanding the foregoing, the parties agree and acknowledge that Social

15

Security payments received by residents at the Facility, and provided as payment for services at the Facility, shall be applied towards payment for services rendered during the month with respect to which the Social Security payment was received by the resident.

c.    For avoidance of doubt, any Medicare bad debt payments received by Old Operator following the Closing (prior to such time as assignment of the Medicare Provider Agreement to New Operator has been fully processed) that relate to periods following the Closing, shall be remitted to New Operator within three (3) Business Days of receipt thereof.

**10.    EMPLOYMENT RECORDS**.  Old Operator shall deliver to New Operator, prior to the Closing Date, either the originals or full and complete copies of all employee records for all Hired Employees in its possession (including, without limitation, all employee employment applications, W-4's, I-9's and any disciplinary reports) (collectively, the "Employee Records"). Old Operator represents and warrants to New Operator that the Employee Records delivered to New Operator represent all employee records in Old Operator's possession or control as of the Closing Date.

**11.    ACCESS TO RECORDS**.

a.    On or before the Closing Date, Old Operator shall, at its sole cost and expense, deliver to New Operator or leave at the applicable Facility the Books and Records of the Facility, including resident medical records with respect to residents at the Facility at Closing, and financial records. Provided, however, that nothing herein shall be construed as precluding Old Operator from removing from the Facility on the Closing Date its corporate financial records which relate to its operations at the Facility or to its overall corporate operations and provided, further, that Old Operator shall give New Operator access to any information in any such removed records as is necessary for the efficient and lawful operation of the Facility by New Operator or is otherwise required by law to be maintained at the Facility.

b.    Subsequent to the Closing Date, New Operator shall allow Old Operator and its Representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at its own expense, to the extent reasonably necessary to enable Old Operator (i) to investigate and defend malpractice, employee or other claims, (ii) to file or defend cost reports and tax returns, (iii) investigate or conduct due diligence regarding the existence or prosecution of any cause of action owned by Old Operator that arose prior to Closing, or (iv) to otherwise fulfill any reasonable request for information or gather information related to transactions contemplated by the TSA.

c.    Old Operator shall, if allowed by applicable law and subject to the terms of such applicable law, be entitled to remove any records delivered to New Operator, for purposes of litigation involving a resident or employee to whom such record relates, as certified to New Operator in writing prior to removal by an officer of or counsel for Old Operator in connection with such threatened or actual litigation.  Any record so removed

16

shall promptly be returned to New Operator following its use.

  d. New Operator agrees to maintain such books, records and other material comprising records of the Facility's operations prior to the Closing Date that have been received by New Operator from Old Operator or otherwise, including resident records and records of patient funds, to the extent required by law, but in no event less than seven (7) years.

  e. Prior to Closing, Old Operator shall retain and shall not remove any resident medical or financial records from the Facility and shall transfer such resident records to New Operator under the Bill of Sale referenced in Section 2 of this Agreement.

  **12. USE OF TELEPHONE NUMBER AND WEBSITE; POLICY AND PROCEDURE MANUALS**.

  a. New Operator may use the present telephone numbers ("Telephone Numbers") as well as any websites or internet domain names ("Website Materials") of the Facility. Old Operator shall as of the Closing Date transfer or cause to be transferred the telephone numbers used by the Facility.

  b. Old Operator agrees to leave its policy and procedure manuals (to the extent such materials exist and are available to Old Operator) at the Facility and to transfer all of its right, title and interest in and to such policy and procedure manuals to New Operator under the Bill of Sale referenced in Section 2 of this Agreement.

  **13. PROVIDER AGREEMENTS**. For any periods following the Closing that New Operator is not yet able to bill under its Medicaid, Medicare, and/or Managed Care provider agreements (the "Provider Agreements"), Old Operator shall allow New Operator to bill under Old Operator's Provider Agreements, to the extent permitted by applicable law, and Old Operator shall promptly forward to New Operator any payments received with respect thereto within three (3) Business Days of receipt thereof.

  **14. COOPERATION; INTERIM OPERATIONS OF THE FACILITY**. Old Operator agrees to cooperate with New Operator, and New Operator agrees to cooperate with Old Operator to affect an orderly transfer of the operation of the Facility. Old Operator shall fully cooperate with New Operator in connection with submitting an application to DOH with respect to the Licensure, as well as any applications with respect to the Provider Agreements, and shall also fully cooperate with regard to any additional actions or information required with respect to approval of the Licensure and/or New Operator's Provider Agreements, or otherwise requested in connection with the transactions contemplated herein.

  From the date of this Agreement until the Closing, Old Operator shall operate the Facility in substantially the same manner as it has heretofore operated, use commercially reasonable and diligent efforts to preserve intact the business operations and relationships of the Facility with Third Parties and use best efforts to keep available the services of all of the Facility's employees. Without limiting the generality of the preceding sentences, until the earlier of (i) the Closing Date, or (ii) the termination of this Agreement, Old Operator shall:

  a. Operate the Facility in the normal Ordinary Course of Business and in compliance

with all laws, ordinances, orders, rules, regulations and requirements of any federal, state or municipal governmental agency or authority;

b. Maintain the Facility's licensure status in compliance with all applicable laws, rules and regulations;

c. Not sell, transfer or otherwise dispose of any of the Supplies except in the Ordinary Course of Business consistent with the prior practices of Old Operator, in which event Old Operator shall replace the same with similar property of equal quality, value and usefulness;

d. Not enter into any contract which shall become the obligation of New Operator nor modify, cancel, accept the surrender of or renew (except when any such acceptance of surrender or renewal is non-discretionary) any material Contract which exists at present without New Operator's prior written consent;

e. Not decrease the private pay rates of the residents of the Facility without the prior written consent of New Operator;

f. Maintain records in accordance with all applicable federal and state laws and in such manner so that all records will be prepared in a consistent manner and will be current, complete, accurate and true;

g. Not increase or promise to increase any wages or benefits of, or grant or promise to grant any bonuses to, any of the employees of the Facility without the prior written consent of New Operator;

h. Not take any action which will or would cause any of the representations or warranties in this Agreement to become untrue, breached, or be violated;

i. Perform all of its obligations in respect of the Facility whether pursuant to any contracts, or other requirements, including payment before the same shall become due of all taxes, duties and other governmental charges that accrue prior to the Closing Date;

j. Not transfer residents from the Facility to any other skilled nursing facility, other than as requested by such resident or as required for the care of such resident; and

k. Promptly inform New Operator in writing of any material event adversely affecting the ownership, use, occupancy, operation, management or maintenance of the Facility, whether or not insured against.

New Operator and Old Operator agree and acknowledge that the employees at the Facility provide valuable services that are crucial for the success of the Facility, and New Operator's decision to serve as certified operator of the Facility is based upon the skills and qualifications of such employees. As such, during the period beginning on the Effective Date and ending upon the date that is one (1) year following the Closing, neither Old Operator nor any of its members, managers, shareholders, officers, directors or Affiliates shall, directly or indirectly, solicit or hire for employment any Current Employee or Hired Employee. In the event of any breach of the foregoing, Old Operator shall pay to New Operator an amount equal to the greater of (i) One Hundred Thousand Dollars ($100,000.00) or (ii) the annual salary for any such Current Employee as liquidated damages, for each such Current Employee that is solicited or hired in violation of this section. The parties agree and acknowledge that actual damages with respect to the foregoing would be difficult to ascertain and that at least One Hundred Thousand Dollars ($100,000.00) is a fair and reasonable approximation of such actual damages.

18

**15.** **INDEMNIFICATION.**

    a.  <u>By Old Operator</u>. Old Operator shall indemnify, save, protect, defend and hold harmless, New Operator, its Affiliates, and their respective members, managers, employees, shareholders, officers, directors and agents (collectively, the "<u>New Operator Indemnitees</u>"), from and against any and all Losses incurred or suffered by any such New Operator Indemnitee arising from, by reason of or, in connection with (i) any misrepresentation or breach of any representation or warranty of Old Operator contained in this Agreement, (ii) any breach by Old Operator of any covenant or agreement made by Old Operator in this Agreement, (iii) operation of the Facility prior to the Effective Time, (iv) any fraud or intentional misrepresentation on the part of any Old Operator or its Representatives, (v) any Recapture Claim, or (vi) the Excluded Liabilities, Pre-Closing Accrued Salary and/or Assumed Benefits.

    b.  <u>By New Operator</u>. New Operator shall indemnify, save, protect, defend and hold harmless Old Operator, their employees, members, managers, shareholders, officers, directors and agents (collectively, the "<u>Old Operator Indemnitees</u>"), from and against any and all applicable Losses incurred or suffered by any such Old Operator Indemnitee arising from, by reason of or, in connection with (i) any breach by New Operator of its obligations, representations, warranties, agreements or covenants hereunder, (ii) New Operator's operation of the Facility following the Effective Time, or (iii) the Assumed Contracts and/or Assumed Liabilities.

    c.  In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Agreement is made against or received by any indemnified party (hereinafter "<u>Indemnitee</u>") hereunder or upon an Indemnitee becoming aware of a fact, condition or event that otherwise constitutes a basis for a claim for indemnification against the Indemnitor (an "<u>Indemnitee's Claim</u>"), said Indemnitee shall notify the indemnifying party (hereinafter "<u>Indemnitor</u>") in writing within twenty one (21) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim, provided, however, that Indemnitee's failure to timely notify Indemnitor of an Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitor's indemnity obligations hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend or indemnify the Indemnitee's Claim. Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the final, unappealable resolution of said Indemnitee's Claim. Upon the receipt of the written request of Indemnitee, Indemnitor shall within two (2) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of said Indemnitee's Claim. Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent.

Failure to obtain such consent shall be deemed a forfeiture by Indemnitee of its indemnification rights hereunder.  In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim (or in the event sufficient funds are not available for such indemnification) and/or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law and/or rule of Court, intervene in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand for the same Indemnitor shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or compromise said Indemnitee's Claims.

d.  For avoidance of doubt, parties agree that each party's rights to indemnification pursuant to this Agreement shall not be affected or waived by virtue of any investigations or due diligence performed by such party.

e.  Except for Section(a)(i), the parties' obligations under this Section 15 shall survive the Closing; provided that New Operator may not setoff or recoup against any collections of accounts receivable on behalf of Old Operator or any amounts incorrectly paid to New Operator that were intended for Old Operator.

16.  **REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR**.  As an inducement to Old Operator to enter into this Agreement, New Operator covenants and makes the following representations and warranties set forth below, which are true and correct as of the date hereof and which shall be true and correct on the Closing Date:

a.  Organization and Authority.  New Operators are limited liability companies duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and as of the Closing Date will have, all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by New Operator and is enforceable against New Operator in accordance with its terms.

b.  No Violations.  Neither the execution and delivery of this Agreement, or any agreement referred to or contemplated hereby, by New Operator will:

i.  Violate any provision of its Operating Agreement; or

ii.  Be in conflict with constitute a default or create a right of termination or cancellation under any agreement or commitment to which New Operator is a party.

20

   c.  <u>No Broker</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Other Document based upon arrangements made by or on behalf of New Operator.

   d.  <u>Accuracy of Representations and Warranties of New Operator</u>.  No representation or warranty by or on behalf of New Operator contained in this Agreement and no statement by or on behalf of New Operator in any certificate, list, exhibit, schedule or other instrument furnished or to be furnished to Old Operator by or on behalf of New Operator pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

   e.  <u>Survival of Representations and Warranties of New Operator</u>.  Each representation and warranty of New Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date, and all representations and warranties shall survive the Closing.

**17.**   **REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR**. Except as set forth in the Old Operator Disclosure Schedules, and as an inducement to New Operator to enter into this Agreement, Old Operator covenants and makes the following representations and warranties, which are true and correct as of the date hereof and the Closing Date (for the avoidance of doubt, all representations and warranties set forth in this Agreement are (i) made to the best of CRO's Knowledge, (ii) shall not apply to any matter as could not reasonably be expected to have a Material Adverse Effect, and (iii) shall not apply to any matter to the extend the New Operator or its agents or affiliates had knowledge of different or contradictory facts or conclusions that constitute the representation or warranty):

   a.  <u>Organization and Authority</u>.  Old Operators are limited liability companies that validly exists under the laws of the Commonwealth of Pennsylvania.  Old Operator has full power and right to enter into and perform its obligations under this Agreement and the Other Documents.  The execution and delivery of this Agreement and the Other documents to which Old Operator is a party and the consummation of the transactions contemplated hereby and thereby (1) have been duly authorized by all necessary action on the part of Old Operator, (2) do not require any governmental or other consent and (3) will not result in the breach of any agreement, indenture or other instrument to which Old Operator is a party or is otherwise bound.

   b.  <u>Condition of the Transferred Assets</u>.  The Transferred Assets shall be delivered at the time of the Closing. Except in the ordinary course of business and consistent with past practices, and then only in the event the same is replaced, nothing individually or in the aggregate comprising a material portion of the Transferred Assets shall be sold, transferred, leased to others or wasted and Old Operator shall not otherwise dispose of any of the Transferred Assets or

anything constituting a portion of the Transferred Assets, or cancel or compromise any debt or claim, or waive or release any right of substantial value constituting a part of or relating to all or any material part of the Transferred Assets. Subject to the representations and warranties in this Agreement, the Transferred Assets shall be transferred "AS IS, WHERE IS, WITH ALL FAULTS."

c.  <u>Environmental Condition</u>. Old Operator (i) has no Knowledge of and has not received any written notice from any Governmental Entity asserting that any of the operations or activities upon, or any use of occupancy of the Facility are not in compliance with any laws relating to Hazardous Substances, including the discharge and removal of Hazardous Substances, and (ii) has not received any written notice of any potential liability under any Environmental Laws. To Old Operator's Knowledge, at all times that Transferor has operated the Facility in compliance in all respects with all Environmental Laws, and there are no Hazardous Substances present on, under or in the Facility that violate any Environmental Laws. Old Operator has no Knowledge of, or has not received any written notice of, any alleged, actual or potential responsibility for, or any inquiry or investigation regarding, the presence or release of any Hazardous Materials at the Facility in violation of Environmental Laws or any other violation of Environmental Laws. Old Operator has not received any written notice of any other claim, demand or action by any Person alleging any actual or threatened injury or damage to any person or entity, property, natural resource or the environment arising from or relating to the presence or release of any Hazardous Materials in violation of Environmental Laws at, on, under, in, to or from the Facility or in connection with any operations or activities of the Old Operator. To Old Operator's Knowledge, the Facility and/or the property contains no underground storage tanks, and any such tanks that have been removed from have been properly certified by the Department of Environmental Protection.

d.  <u>Leases</u>. Other than the Old Lease, which shall be terminated as of the Closing Date, there are currently, and as of the Closing Date there shall be, no occupancy rights (written or oral), leases or tenancies presently affecting the Property or the Facility and the portion of the Property which it is located, other than any occupancy rights of any residents of the Facility.

e.  <u>Permits</u>. The Permits as listed on <u>Schedule 17(j)</u> hereto are all of the material certificates, licenses and permits from governmental authorities held by Old Operator in connection with the ownership, use, occupancy, operation and maintenance of the Facility, and are all of the certificates, licenses, accreditations and permits necessary in connection with the current ownership, use, occupancy, operation and maintenance thereof.

f.  <u>Required Consents</u>. Old Operator has no knowledge of any consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority that is required in connection with the

22

execution or delivery by Old Operator of this Agreement, or the performance of the transactions contemplated thereunder, except (1) approval by DOH of the Licensure, and (2) such consents, certifications or licenses from the DOH, United States Department of Health and Human Services, CMS or any other governmental agency with jurisdiction over the Facility as are necessary to permit Old Operator to operate the Facility prior to the Closing Date.

g.  Sufficiency of Assets.  The Transferred Assets constitute all of the assets, tangible and intangible, real and personal of any nature whatsoever, necessary and sufficient for operation of the Facility for the number of skilled nursing dually certified beds in the manner presently operated by Old Operator.  The Facility has a number of beds equal to the maximum bed capacity as permitted under the Facility license.  Each bed is in good repair (ordinary wear and tear excepted) and conforms with the minimum standards set forth under the regulations adopted by DOH. For each such bed, there also exists the minimum furnishings, fixtures and other accessories required by DOH.

h.  Litigation.  Except as set forth in Schedule 17(m), there are no pending or threatened litigation, investigations, claims, lawsuits, governmental actions or other proceedings, including without limitation, any desk audit or full audit, involving the Transferred Assets, or the operation thereof before any court, agency or other judicial, administrative or other governmental or quasi-governmental body or arbitrator.

i.  Compliance with Applicable Laws.  To Old Operator's knowledge, the Transferred Assets have been and are presently used and operated in compliance with, and in no way violate any Applicable Law of any kind whatsoever affecting the Transferred Assets or any part thereof.

j.  Taxes.    Except as disclosed in filings to the Bankruptcy Court, Old Operator has timely filed all Tax Returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns, including for sums due to the Commonwealth of Pennsylvania or its agencies. Notwithstanding anything herein to the contrary, should Old Operator have any outstanding Tax Returns or payments due with regard to taxes or governmental charges, Old Operator shall have 90 days from the Effective Date to cure any such default.  Any late charges or penalties arising therefrom shall be the responsibility of Old Operator.

k.  Sprinklers. To the extent required by applicable law, there is a sprinkler system at the Facility that is in full operational compliance with all applicable requirements.

l.  Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Other Document based upon arrangements made by or on behalf of Old Operator except as approved by the Bankruptcy Court in the Bankruptcy Case.

m.  No Defaults. The execution, delivery and performance of this Agreement and any of the Other Documents by Old Operator does not and will not:

   i.    Conflict with or result in any breach of the provisions of, or

23

constitute a default under any Old Operator's certificate of formation or operating agreement;

ii. Violate any restriction to which Old Operator is subject or, with or without the giving of notice, the passage of time, or both, violate any mortgage, deed of trust, license, material lease, indenture or other material agreement or instrument, whether oral or written, to which Old Operator or the Facility is a party, or by which it or its property is bound, which will not be satisfied or terminated on or prior to the Closing as a result of the transactions contemplated in this Agreement, or result in the termination of any such instrument or termination of any provisions in such instruments that will have a material adverse effect upon or result in the creation or imposition of any Lien upon the Transferred Assets.

iii. Constitute a violation of any applicable law by which Old Operator or the Facility is subject, the violation of which will have a material adverse effect upon the Facility.

n. Health Care Matters.

i. All Medicare and Medicaid provider agreements, certificates of need, if applicable, certifications, governmental licenses, permits, regulatory agreements or other agreements and approvals, including certificates of operation, completion and occupancy, and state nursing facility licenses or other licenses required by DOH or any other health care authorities for the legal use, occupancy and operation of the Facility (collectively, "Health Care Licenses") have been obtained by the party required to hold such Health Care Licenses and are in full force and effect. Old Operator will own and operate the Facility in such a manner that the Health Care Licenses shall remain in full force and effect. Old Operator will own and operate the Facility in such a manner that the Health Care Licenses shall remain in full force and effect. Set forth on Schedule 17(n) attached hereto is a list of the Facility's Medicare and Medicaid provider numbers and a list of all Health Care Licenses.

ii. The Facility is duly licensed as a skilled nursing facility as required under the applicable laws of the Commonwealth of Pennsylvania. All licensed beds at the Facility are certified for both Medicare and Medicaid. The licensed bed capacity of the Facility is as set forth on Schedule 17(k) attached hereto, the actual bed count operated at the Facility is as set forth on Schedule 17(k) and all such beds are certified for participation in the Medicare and Medicaid reimbursement programs. Except as disclosed in Schedule 17(n), Old Operator has not applied to reduce the number of licensed or certified beds of the Facility or to move or transfer the right to any and all of the licensed or certified beds of the Facility to any other location or to amend or otherwise change the Facility and/or the

24

number of beds approved by DOH (or any subdivision) or other applicable state licensing agency, and except as disclosed in Schedule 17(n), there are no proceedings or actions pending or contemplated to reduce the number of licensed or certified beds of the Facility.

iii.  The Health Care Licenses (i) have not been (A) transferred to any location other than the location for which issued or (B) pledged as collateral security or unless such pledge will be released at Closing, (ii) are held free from restrictions or known conflicts that would materially impair the use or operation of the Facility as intended, and (iii) are not provisional or probationary or restricted in any way.

iv.  Except as disclosed in Schedule 17(n), Old Operator has not taken any action to rescind, withdraw, revoke, amend, modify, supplement or otherwise alter the nature, tenor or scope of any Health Care License or applicable provider payment program other than non-material alterations effected in the Ordinary Course of Business.

v.  Except as disclosed in Schedule 17(n), Old Operator is in material compliance with the requirements for participation in the Medicare and Medicaid programs with respect to the Facility and Old Operator has a current provider agreement under Title XVIII and/or XIX of the Social Security Act which is in full force and effect. During the period of three (3) years prior to Closing Date neither Old Operator nor the Facility has received any of the following with respect to the Facility:

1.  A notice of "immediate jeopardy" violations;

2.  A notice of termination of the license issued by DOH to operate the Facility for the number of skilled beds listed in Exhibit A;

3.  A notice of termination of the certification issued by DOH or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

4.  A notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs;

5.  A notice that the Facility has been placed, or will be placed, on the special focus facilities list;

6.  A notice that the Facility will be prohibited from admitting, or will not be reimbursed for, new residents; and

7.  A notice of imposition of civil monetary penalties or other intermediate sanctions in

25

accordance with 42 CFR § 488.430 et seq.

vi. Except as disclosed in <u>Schedule 17(k)</u>, neither Old Operator nor the Facility is a participant in or party to, nor to Old Operator's knowledge a target of, any action, proceeding, suit, audit, investigation or sanction by any Governmental Authority or any other administrative or investigative body or entity or any other third party payor or any resident which would reasonably be expected to result, directly or indirectly or with the passage of time, in the imposition of a material fine, penalty, alternative, interim or final sanction, a lower rate certification, recoupment, recovery, suspension or discontinuance of all or part of reimbursement from any Governmental Authority, third-party payor, insurance carrier or private payor, a lower reimbursement rate for services rendered to eligible residents, or any other civil or criminal remedy, or which could reasonably be expected to have a material adverse effect on Old Operator, or the operation of the Facility, including, without limitation, the Facility's ability to accept or retain residents, or which could result in the appointment of a receiver or manager, or in the modification, limitation, annulment, revocation, transfer, surrender, suspension or other impairment of a Health Care License, or affect Old Operator's and the Facility's participation in the Medicare, Medicaid, or third-party payor program, as applicable, or any successor program thereto, at current rate certification, nor to the knowledge of Old Operator has any such action, proceeding, suit, investigation or audit been threatened.

vii. There are no agreements with residents of the Facility or with any other persons or organizations that deviate in any material adverse respect from or that conflict with any statutory or regulatory requirements.

viii. Other than the Medicare and Medicaid programs, to Old Operator's knowledge neither Old Operator nor the Facility is a participant in any federal, state or local program whereby any federal, state or local government or quasi-governmental body, or any intermediary, agency, board or other authority or entity may have the right to recover funds with respect to the Facility by reason of the advance of federal, state or local funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291 *et seq.*). Neither Old Operator nor the Facility has received notice of, and there is no violation of, applicable antitrust laws by Old Operator in connection with the Facility.

ix. Old Operator has instituted, and the Facility is operated in material compliance with, a compliance plan which is consistent with best industry practices.

x. Except as disclosed in <u>Schedule 17(n)</u>, Old Operator is in material

26

compliance with the Health Care Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act, as incorporated in the American Recovery and Reinvestment Act of 2009, and the regulations promulgated under each.

xi.   Except as disclosed in <u>Schedule 17(k)</u>, there is no pending or, to Old Operator's knowledge, threatened revocation, suspension, termination, probation, restriction, limitation or non-renewal affecting Old Operator or the Facility or any provider agreement with any third-party payor, Medicare or Medicaid.

xii.   To Old Operator's knowledge, all Medicare, Medicaid, and private insurance cost reports and financial reports submitted by or on behalf of the Facility are materially accurate and complete and are not misleading in any material respects.

xiii.   To Old Operator's knowledge, all Medicare, Medicaid, and private insurance cost reports and financial reports submitted by or on behalf of the Facility are materially accurate and complete and are not misleading in any material respects.  Except as disclosed in <u>Schedule 17(n)</u>, to Old Operator's knowledge, there are no current, pending or outstanding Medicare, Medicaid or other third-party payor program reimbursement audits or appeals pending at the Facility.  Except in the normal course of business, there are no cost report years that are subject to audits and no cost reports remain "open" or unsettled.  To Old Operator's knowledge, except in the normal course of business, there are no current or pending Medicare, Medicaid or third-party payor program recoupment efforts at the Facility.

xiv.   Except as disclosed in <u>Schedule 17(n)</u>, there have been no clawback or overpayment claims made or, to the knowledge of Old Operator, threatened, against Old Operator or with respect to operations at the Facility by Medicare, Medicaid or any third-party payor during the previous three (3) years. Old Operator has provided, or will provide upon request, to New Operator a complete and accurate list of all rate adjustments made by Medicare or Medicaid with respect to Old Operators and the Facility during the previous three (3) years, and shall provide New Operator an updated list as of the Closing Date.

xv.   To the extent requested by New Operator at any time, Old Operator has delivered, or caused to be delivered, to New Operator true, correct and complete in all material respects resident census information for the Facility's last three (3) fiscal years and current year-to-date broken out by month.

o.  Except as disclosed in <u>Schedule 17(n)</u>, neither Old Operator nor the Facility has any contract or agreement with the Department of Veterans Affairs or any division thereof for the provision of services to patients or residents at the Facility.

27

p. <u>Financial Materials</u>.  All materials and/or documents relating to the financial condition and/or census of the Facility provided to New Operator, are true and complete in all material respects, and are not misleading in any material respect. Except as set forth in this Agreement and subject to the terms hereof, the Old Operator shall not be deemed to have made verbal or written representations, warranties, promises, or guarantees (whether express, implied, or otherwise) to New Operator with respect to such materials and/or documents relating to financial condition.

q. <u>COVID Funds</u>.  A description of all COVID Funds received with respect to the Facility is set forth on <u>Schedule 17(q)</u> hereof.  To Old Operator's knowledge, Old Operator has applied for and utilized, as applicable, all COVID Funds in accordance with applicable law.  For purposes of this Agreement, "COVID Funds" shall mean all grants, funds or payments from state or federal sources (including, without limitation, pursuant to the Coronavirus Aid, Relief and Economic Security (CARES) Act and the Economic Injury Disaster Loan program, Medicare advance payments, loans in connection with Paycheck Protection Program, deferral of payroll taxes or other governmental economic benefits) in each case received with respect to or pertaining to the Facility as a result of the COVID-19 pandemic.  All COVID Funds received by Old Operator are set forth on <u>Schedule 17(q)</u> attached hereto.

r. <u>Truth and Accuracy of Representations and Warranties</u>.  No representation or warranty by or on behalf of Old Operator contained in this Agreement and no statement by or on behalf of Old Operator in any certificate, list, exhibit or other instrument furnished or to be furnished to New Operator by or on behalf of Old Operator pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect. Except as expressly provided herein, Old Operator does not make any other representations or warranties regarding compliance with applicable law.

s. <u>Non-Survival of Representations and Warranties</u>.  The representations and warranties of Old Operator contained herein shall not survive the Closing and shall be deemed satisfied as of Closing.

**18.**    **NO JOINT VENTURE**.  Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof. The parties hereto do not intend that any third party shall have any rights under this Agreement.

**19.**    **RESERVED.**

**20.**    **EVENTS OF DEFAULT; REMEDIES**.  Except as to those specific notices and cure periods, if any, particularly set forth elsewhere herein, the breach by either party ("<u>Defaulting Party</u>") hereto of any term, provision, condition, promise, covenant, agreement, representation, warranty, guaranty, indemnity, duty or obligation if not cured within ten (10) Business Days of the earlier of said Defaulting Party's receipt or refusal of written notice of the same from the other party ("<u>Non-Defaulting Party</u>") hereto shall automatically and without further notice hereunder be an immediate event of default ("<u>Event of Default</u>") entitling the Non-Defaulting Party to exercise

28

any and all remedies available to it. The Non-Defaulting Party's rights and remedies hereunder shall be cumulative and not mutually exclusive and the exercise by the Non-Defaulting Party of one or more rights or remedies granted it hereunder or in law or equity shall not be deemed, interpreted or construed as an election of the same or to bar, prevent or preclude the simultaneous or consecutive exercise of any other right or remedy granted to the Non-Defaulting Party hereunder or in law or equity, including but not limited to the simultaneous or successive pursuit of money damages and injunctive relief. The Non-Defaulting Party shall not be required to post any bond, surety or security of any nature whatsoever to pursue injunctive relief, the necessity or requirement for the same being hereby waived by the Defaulting Party. In the event of a termination of the Purchase Agreement (or failure of the transactions contemplated thereby to close), this Agreement shall automatically terminate and neither party hereto shall have any rights or obligations hereunder.

  **21.** **CHOICE OF LAW.** **THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS.**

  **22.** **NON-COMPETE**. For a period of two (2) years following the Closing, neither Old Operator nor any Affiliate of Old Operator shall, directly or indirectly, have any involvement, whether as a member, partner, owner, consultant, employee, or otherwise, in the operation of any elder care facility within a radius of 30 miles of any Facility.

  **23.** **DISPUTE RESOLUTION**. The parties hereto agree that with respect to all disputes, problems or claims arising out of or in connection with this Agreement and all other agreements or other instruments executed in connection herewith (which for clarity does not include the Purchase Agreement) (collectively "Disputes"), the parties hereto shall, in good faith, use their reasonable best efforts to resolve the Dispute. If after such efforts the parties hereto are unable within ten (10) days of the arising of the Dispute to resolve the Dispute in good faith, any party may file a motion or proceeding with the Bankruptcy Court seeking relief. The Bankruptcy Court shall have exclusive jurisdiction over all Disputes and any disagreement arising from or related to this Agreement.

  **24.** **PERSONAL SERVICE**. EACH OF THE PARTIES HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED. **THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION.**

  **25.** **MEDICARE ADVANCE**. In the event that Old Operator has received any advance on Medicare payments with regard to the Facility ("Advances") at any time prior to the Closing Date that have not been re-paid prior to Closing, Old Operator shall pay to New Operator at Closing an amount equal to 100% of all such Advances. New Operator shall be responsible solely for any losses or liabilities from such Advances received following the Closing including any demands for repayment of such Advances.

26.    **GENERAL PROVISIONS**.

a.    Each party hereto agrees to use commercially reasonable efforts to cause the conditions to its obligations and to the other party's obligations herein set forth to be satisfied at or prior to the Closing Date.  Each of the parties hereto agrees to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.  Each party shall promptly notify the other party of any information delivered to or obtained by such party which would prevent the consummation of the transactions contemplated hereby, or which would indicate a breach of the representations or warranties of any other party hereto.

b.    All notices to be given by either party to this Agreement to the other party hereto shall be in writing, and shall be: (i) given in person; (ii) deposited in the United States mail, certified or registered, postage prepaid, return receipt requested; (iii) sent by national overnight courier service, priority next business day service; or (iv) sent by facsimile or e-mail (followed by delivery by one of the other means identified in (i)-(iii)) each addressed as follows:

if to Old Operator:

Care Pavillion Debtors
C/O SOLIC Capital (Attn: Neil Luria)
425 W. New England Ave, Suite 450
Winter Park, Florda 32789
nluria@soliccapital.com

with a copy to:

Baker Hostetler LLP
Attn: Elizabeth Green, Andrew Layden
200 S. Orange Avenue, Suite 2300
Orlando, Florida 32801
egreen@bakerlaw.com; alayden@bakerlaw.com

if to New Operator:

Focus Health NetworkC/O Harry Epstein, Chief Financial Officer
hepstein@focushealthnet.com

with a copy to:

Capozzi Adler, P.C.
2933 North Front Street
Harrisburg, PA 17110
bruceb@capozziadler.com

Any such notice personally delivered shall be deemed delivered when actually received; any such notice deposited in, the United States mail, registered or certified, return receipt

requested, with all postage prepaid, shall be deemed to have been given on the earlier of the date received or the date when delivery is first refused; any notice deposited with an overnight courier service for delivery shall be deemed delivered on the next business day following such deposit; and any such notice delivered via facsimile shall be deemed delivered upon the notifying party's receipt of facsimile confirmation provided that the notifying party follows up such facsimile transmission with one of the other means identified above. Any party to whom notices are to be sent pursuant to this Agreement may from time to time change its address for further communications thereunder by giving notice in the manner prescribed herein to all other parties hereto.

c. Each party hereto shall bear its own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

d. This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.

e. This Agreement may not be modified or amended except in writing signed by the parties hereto.

f. No waiver of any term, provision or condition of this Agreement, if any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

g. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. Captions of paragraphs are for convenience only and are not part of this Agreement and do not affect, change or modify the paragraphs they precede.

h. All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

i. This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement.

j. All of the provisions of this Agreement shall be deemed and construed to be "conditions" and "covenants" as though the words specifically expressing or importing covenants and conditions were used in each separate provision hereof.

k. Each party hereto agrees to use such party's reasonable best efforts to cause the conditions to such party's obligations herein set forth to be satisfied at or prior to the Closing. Each

31

of the parties agrees to execute and/or deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by any other party to assist with consummation of the transactions contemplated herein, or to evidence its rights hereunder.

l.      The recitals set forth at the beginning of this Agreement constitute an integral part of this Agreement and are hereby incorporated by reference herein and made apart hereof as if fully set forth herein.

m.      All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "or" "including" shall mean "including without limitation.

n.      If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but each term and provision shall be valid and be enforced to the fullest extent permitted by law.

o.      Except as otherwise specifically set forth in this Agreement, Old Operator agrees to look solely to New Operator for the satisfaction of any liability or obligation of New Operator arising under this Agreement or the transactions contemplated hereby, or for the performance by New Operator of any of the covenants, representations, warranties or other agreements contained herein.

p.      The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

q.      Certain Definitions.   Capitalized terms used in this Agreement, but not defined in this Agreement shall have the meanings ascribed to them in **Exhibit E**.  All terms used in this Agreement which are not defined in **Exhibit E** shall have the meanings set forth elsewhere in this Agreement.

r.      Exhibits and Schedules. If any exhibits or schedules are not attached hereto, the parties agree to use good faith efforts to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date.

[SIGNATURE PAGE FOLLOWS ON NEXT PAGE]

**IN WITNESS WHEREOF**, the parties hereby execute this Agreement as of the day and year first above written.

OLD OPERATOR:

NEW OPERATOR:

Care Pavilion Operating LLC

Signature _____

By: _____

Title: _____

Date: _____

CP Operating LLC

Signature _____

By: _____

Title: _____

Date: _____

Cliveden Operating LLC

Signature _____

By: _____

Title: _____

Date: _____

CL Operating LLC

Signature _____

By: _____

Title: _____

Date: _____

Maplewood Operating LLC

Signature _____

By: _____

Title: _____

Date: _____

MA Operating LLC

Signature _____

By: _____

Title: _____

Date: _____

Tucker Operating LLC

Signature _____

By: _____

Title: _____

Date: _____

TH Operating LLC

Signature _____

By: _____

Title: _____

Date: _____

York Operating LLC

Signature_____

By: _____Neil Lu_____

Title: _____CFO_____

Date: ___12/9/2024___

YO Operating LLC

Signature_____

By: _____

Title: _____

Date: _____

2

**IN WITNESS WHEREOF**, the parties hereby execute this Agreement as of the day and year first above written.

OLD OPERATOR:                                      NEW OPERATOR:

Care Pavilion Operating LLC                        CP Operating LLC

Signature_____                          Signature *Vince Liaguno*

By: _____                           By: *Vince Liaguno*

Title: _____                          Title: *Director of Operations*

Date: _____                           Date: *12-9-24*

Cliveden Operating LLC                             CL Operating LLC

Signature_____                          Signature *Vince Liaguno*

By: _____                           By: *Vince Liaguno*

Title: _____                          Title: *Director of Operations*

Date: _____                           Date: *12-9-24*

Maplewood Operating LLC                            MA Operating LLC

Signature_____                          Signature *Vince Liaguno*

By: _____                           By: *Vince Liaguno*

Title: _____                          Title: *Director of Operations*

Date: _____                           Date: *12-9-24*

Tucker Operating LLC                               TH Operating LLC

Signature_____                          Signature *Vince Liaguno*

By: _____                           By: *Vince Liaguno*

Title: _____                          Title: *Director of Operations*

Date: _____                           Date: *12-9-24*

York Operating LLC

Signature_____

By: _____

Title: _____

Date: _____


YO Operating LLC

Signature _Vince Liaguno_

By: _Vince Liaguno_

Title: _Director of Operations_

Date: _12 - 9 - 24_

2

EXHIBIT A

| Facility   Name and Address | Licensed Beds | Seller | Old Operator | Purchaser | New Operator |
|---|---|---|---|---|---|
| Care Pavilion Nursing and Rehabilitation Center 6212 Walnut Street Philadelphia, PA 19139 | 396 | 6212 Walnut Realty LLC | Care Pavilion Operating LLC | G&E HC REIT II Care Pavilion SNF, L.P. | CP Operating LLC |
| Cliveden Nursing and Rehabilitation Center 6400 Greene Street Philadelphia, PA 19119 | 180 | 6400 Greene Realty LLC | Cliveden Operating LLC | G&E HC REIT II Cliveden SNF, L.P. | CL Operating LLC |
| Maplewood Nursing and Rehabilitation Center 125 W. Schoolhouse Ln Philadelphia, PA 17847 | 180 | Maplewood Propco LLC | Maplewood Operating LLC | G&E HC REIT II Maplewood Manor SNF, L.P. | MA Operating LLC |
| Milton Nursing and Rehabilitation Center | 138 | 743 Mahoning Realty LLC | Milton Operating LLC | | MI Operating LLC |

| Facility | Beds | Realty | Operating | REIT | Operating |
|---|---|---|---|---|---|
| 743 Mahoning St. Milton, PA 17847 | | | | | |
| Parkhouse Nursing and Rehabilitation Center 1600 Black Rock Rd Royersford, PA 19468 | 467 | 1600 Black Rock Realty LLC | Parkhouse Operating LLC | GA HC REIT II Royersford SNF LLC | PA Operating LLC |
| Tucker House Nursing and Rehabilitation Center 1001 Wallace Street Philadelphia, PA 19123 | 180 | 1001-11 Wallace Realty LLC | Tucker Operating LLC | G&E HC REIT II Tucker House SNF, L.P. | TH Operating LLC |
| Watsontown Nursing and Rehabilitation Center 245 E. 8th Street Watsontown, PA 17777 | 125 | 245 East Eight Realty LLC | Watsontown Operating LLC | GA HC REIT II Watsontown SNF, LLC | WA Operating LLC |
| York Nursing and Rehabilitation Center 7101 Old York | 240 | 7107 York Realty LLC | York Operating LLC | G&E HC REIT II Cheltenham York SNF, L.P. | YO Operating LLC |

2

Rd
Philadelphia, PA
19126

3

EXHIBIT B

TERMS OF THE SALE MOTION AND SALE ORDER; BIDDING PROCEDURES

1.1    Sale Motion. On or before December 9, 2024 (unless otherwise agreed), the Debtors shall file with the Bankruptcy Court the Sale Motion, which shall include, among other things, a proposed form of the Bidding Procedures Order. The Debtors shall promptly serve true and correct copies of the Sale Motion and all related pleadings, or notice thereof in form satisfactory to New Operator, to all creditors of the Debtors and other parties in interest in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the Western District of Pennsylvania and any other applicable order of the Bankruptcy Court. The Debtors shall also promptly serve the Sale Motion to any other party designated in writing by New Operators in their sole discretion. The Debtors and their bankruptcy estates shall be responsible for all costs of service of the Sale Motion and any other motions or notices related to the Sale Motion, Bidding Procedures, or Transactions.

1.2    Reserved.

1.3    Bidding Procedures and Auction. New Operators acknowledge that Debtors are seeking to find other parties that would be willing to pay more for the Transferred Assets. In connection with this effort, the parties acknowledge that the Debtors will request the Bankruptcy Court, in the Sale Motion, to approve certain procedures related to this effort, including the procedures for soliciting competing bids for the Transferred Assets and selling the Transferred Assets at a sale auction (the "Auction") should there be other Qualifying Bidders, and certain bidding protections to New Operator as consideration for serving as the stalking horse. In that regard, the Debtors shall take such actions as are reasonably necessary to obtain (on an expedited basis following the filing of the Sale Motion) the Bidding Procedures Order from the Bankruptcy Court approving, among other things, payment of the Expense Reimbursement and Termination Fee and procedures for the marketing, competitive bidding, auction, and sale of the Transferred Assets that include, without limitation, the following (collectively, and as more fully set forth in the Bidding Procedures Order, the "Bidding Procedures"):

a.    Minimum Initial Topping Bid: $100,000;

b.    Minimum Bid Increments Thereafter: $25,000, which may thereafter be modified in the debtors' discretion;

c.    Other bidders to provide to Debtors, among other things, a blackline comparison of the OTA, and satisfactory proof of financing or financial ability to close prior to the expiration of the Bid Deadline in order to qualify as a bidder for the Auction (such other bidders meeting such qualifying criteria shall be referred to herein as "Qualifying Bidders"). For the avoidance of doubt, the OTA and the other Transaction Documents shall constitute a qualifying bid.

d.    Qualifying Bidders will have a due diligence period that expires at

the conclusion of the Bidding Solicitation Period;

e.   If there are other Qualifying Bidders, an Auction to be held no more than three (3) days after the Bid Deadline (unless such different date is established by the Bankruptcy Court in the Bidding Procedures Order), at which the Debtors will select the winning bidder (the "Successful Bidder");

f.   New Operators shall be entitled to credit bid the amount of the Termination Fee and Expense Reimbursement towards any subsequent bid at the Auction;

g.   If there are no other Qualifying Bidders as of the Bid Deadline, then New Operators shall be deemed the Successful Bidder. New Operators shall not be required to serve as the Backup Bidder upon the Debtors' selection of another party or parties as the Successful Bidder(s); and

h.   No extension of the Bidding Solicitation Period, the Bid Deadline, or date of the Auction unless ordered by the Bankruptcy Court or approved by New Operators in writing. Without limiting the foregoing, Debtors shall not file any motion or otherwise seek to change, modify or amend the Transaction Documents, the Bidding Procedures Order, or the Sale Order without prior written approval of the New Operators.

1.4    Sale Order Hearing and Sale Order. Within three (3) business days following the Auction, if there are other Qualifying Bidders, Debtors shall file with the Bankruptcy Court the results of the bidding solicitation process and the Auction, and all documents to be filed on behalf of the Debtors with the Bankruptcy Court for approval of the sale to the Successful Bidder and entry of the Sale Order. If there are no additional Qualifying Bidders as of the Bid Deadline, Debtors shall file a notice with the Bankruptcy Court within three (3) days of the Bid Deadline that New Operator was the Successful Bidder and seeking the Court's entry of the Sale Order approving the OTA and other Transaction Documents. New Operators agree that they will promptly take such actions as are reasonably requested by the Debtors to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that New Operators are a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

1.5    Contracts.

(a)    Old Operators shall provide to New Operators a list of Contracts relating to the operations and leasing of the Facilities (the "Available Contracts List"). Old Operators will use best efforts to insure that the Available Contracts List contains all Contracts which the New Operator may seek to assume. At any time prior to the Sale Hearing, the New Operators, in their sole and absolute discretion, and subject to the their right to subsequently amend their designations

2

until the Closing, may deliver one or more written notices to the Old Operators (each such notice, a "Designation Notice"), pursuant to which New Operators shall designate in writing any Available Contracts that New Operators wish to assume at Closing. Any Available Contracts so designated shall be deemed the Assumed Contracts.

(b)  Any Contracts that New Operators do not indicate they desire to assume and continue shall be deemed rejected by New Operators (the "Rejected Contracts"), and Old Operators may reject and terminate such Rejected Contracts pursuant to the Bankruptcy Code. Any Contract not expressly designated by New Operators as an Assumed Contract pursuant to a Designation Notice, including any Contract discovered after the Closing, shall be deemed a Rejected Contract.

(c)  The Sale Motion and Bidding Procedures Order shall include the procedures for the assumption and assignment of the Assumed Contracts to the New Operators on the terms set forth herein.

(d)  Pursuant to the Bidding Procedures Order, the counterparties to the Contracts shall have an opportunity to file any objections to the assumption and/or assignment of any Contracts on the Available Contracts List. Upon any such objection, such Contract shall become a "Disputed Contract" and, unless the Disputed Contract is a Rejected Contract, the Debtors, with New Operators' consent to be provided or withheld in their sole discretion, shall either settle the objection of such counterparty or shall litigate such objection under such procedures as the Bankruptcy Court shall approve as part of the Bidding Procedures Order. The Debtors shall not settle a disputed Cure Cost for any amount with regard to any Contract that has been designated as an Assumed Contract pursuant to a Designation Notice without the express written consent of New Operators, as applicable. Upon a Final Order or settlement determining any Cure Costs regarding any Disputed Contract after the Closing or at any time prior to such Final Order or settlement, New Operators shall have the option to (x) pay the Cure Cost with respect to such Disputed Contract and assume the Disputed Contract as an Assumed Contract or (y) designate the Disputed Contract as an Rejected Contract and not be responsible for the Cure Cost.

(e)  At Closing, New Operators shall pay all Cure Costs in connection with the assumption and assignment of the Assumed Contracts.

1.6  Good Faith Efforts. The Debtors agree to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order. In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, the Debtors shall use their best efforts to defend such appeal. The Debtors shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or (ii) imposed by the Bidding Procedures Order or the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

1.7  Sale Free and Clear. The Debtors acknowledge and agree, and the Sale Order shall provide, that on the Closing Date and concurrently with the Closing, the Transferred Assets shall be transferred to New Operators free and clear of all then existing or thereafter arising Claims and

3

Encumbrances to the fullest extent permitted by Section 363(f) of the Bankruptcy Code, including without, limitation, any amounts owed by any of the Debtors to DHS or DOH, including, without limitation, for nursing facility assessments (the "Provider Assessments"). The Debtors acknowledge and agree that this requirement is a precondition to New Operators' obligation to close the Transactions.

    1.8    Definitions. For purposes of this Exhibit and the Transaction Documents, the following terms shall have the meaning ascribed to them below:

    "Alternative Transaction" means (a) the approval by the Bankruptcy Court of a sale or sales of all or any portion of the Transferred Assets to a Successful Bidder other than New Operators, or (b) the filing of a plan of reorganization that does not contemplate the sale of the Transferred Assets to New Operators in accordance with the terms hereof.

    "Assumed Contracts" means any Contracts of Old Operators which New Operators designate in writing to be assumed and assigned to New Operators, as applicable, as pursuant to section 365 of the Bankruptcy Code and the terms of the OTA and Sale Order, including, without limitation, the Resident Agreements and Provider Agreements (each as defined in the OTA).

    "Bid Deadline" means 5:00 p.m. E.S.T. on January 16, 2025, or such other date that is set by the Bankruptcy Court.

    "Bidding Procedures Order" means an Order of the Bankruptcy Court, the proposed form of which shall be included with the Sale Motion following approval by Debtors and New Operators, that contains at least the following: (i) the approval of the OTA as the stalking horse contract and New Operators as the stalking horse bidders, (ii) the approval of the Bidding Procedures governing the sale and solicitation process and the Auction, the deadlines and dates relating thereto, and the bid protections included therein (including, without limitation, the Termination Fee and the Expense Reimbursement), and (iii) setting a date for the Sale Hearing as soon as possible following the Auction, if there are other Qualifying Bidders, or following the end of the Bidding Solicitation Period, if there are no other Qualifying bidders, to confirm the Auction results, if applicable, and enter the Sale Order.

    "Bidding Solicitation Period" means the time period running from the date of the filing of the Sale Motion to the Bid Deadline.

    "Claim" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, inter alia, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and Liabilities of any kind, description, or nature under contract, at law or in equity, whether direct or indirect, known or unknown, contingent or matured, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and all rights, remedies, costs, or expenses with respect thereto.

    "Contracts" shall mean all executory contracts, agreements, leases, commitments and arrangements (whether written or oral), including all service contracts, maintenance contracts and consulting agreements, and all of any Old Operator's duties, obligations, covenants, promises,

rights and privileges therein or thereunder to which any Old Operator or its respective predecessors or agents is a party and which relate to the Facilities (or any one of the Facilities) and the operations thereof.

"Cure Costs" shall mean all costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts including the cost of obtaining consents in respect of the Assumed Contracts.

"Encumbrance" means any lien (including a "lien" as defined in Section 101(37) of the Bankruptcy Code), encumbrance, Claim, right, demand, charge, mortgage, deed of trust, lease, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, proxy, voting trust or agreement, transfer restriction under any shareholder agreement or similar agreement, judgment, conditional sale or other title retention agreement, or other imposition, imperfection or defect of title or restriction on transfer or use of any nature whatsoever.

"Expense Reimbursement" means all reasonable fees and expenses incurred by New Operator, including, without limitation, professional fees and out-of-pocket fees, costs and expenses incurred in connection with the due diligence, preparation, negotiation, execution, delivery and performance of the Transaction Documents; provided the total Expense Reimbursement shall be capped at $50,000.00. The obligations of the Debtors to pay the Expense Reimbursement shall survive the termination of any Transaction Documents.

"Final Order" means an Order that is unstayed and in effect and as to which (i) the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought, such Order shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

"Governmental Authority" means any U.S. federal, state or local or any supra-national, territorial or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral (public or private) body.

"Liabilities" means any liability, debt, guarantee, claim, demand, expense, commitment, damages, assurances or obligation (whether direct or indirect, fixed, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of every kind and description, including all costs and expenses related thereto.

"Order" means any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination, settlement or award entered by or with any Governmental Authority.

"OTA" means the Operations Transfer Agreement entered into by Old Operator and New

5

Operator dated December 9, 2024, as may be amended by the parties pursuant to the terms therein, and pursuant to which the Old Operators will transfer the operations of and certain assets related to the Facilities to the New Operators.

"Sale Motion" means the motion or motions of the Debtors, in form and substance approved by Old Operators and New Operators seeking (i) approval and entry of the Bidding Procedures Order on an expedited basis, (ii) the scheduling of the Auction (if there are other qualifying bidders) and the Sale Hearing, (iii) the entry of the Sale Order following the Auction, if there are other qualifying bidders, or following the end of the Bidding Solicitation Period, if there are no other qualifying bidders, and (iv) any other relief necessary to consummate the Transactions.

"Sale Order" means an Order of the Bankruptcy Court, the proposed form of which shall be included with the Sale Motion following approval by Old Operators and New Operators, that contains at least the following: (i) authorization and approval of (a) the OTA and the other Transaction Documents, and the consummation of the Transactions on the terms and conditions set forth therein, and (b) the assumption and assignment of the Assumed Contracts to the New Operators, and (ii) findings of fact, conclusions of law and ordering provisions that (a) the consummation of the Transactions contemplated by the Transaction Documents, on the terms and conditions set forth therein are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 363(n), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Transactions, (b) pursuant to section 105(a) and 363(f) of the Bankruptcy Code, the sale of the Transferred Assets to New Operators, or their designee(s) shall be free and clear of any Claims or Encumbrances other than the Permitted Encumbrances and Assumed Liabilities (as defined in the OTA), (c) New Operators and any designee(s) of New Operators are purchasers of the Transferred Assets in "good faith" pursuant to section 363(m) of the Bankruptcy Code, (d) the Debtors, the New Operators, any affiliates of New Operators, and any designee of New Operators, did not engage in any conduct which would allow any Transaction Documents or Transactions to be set aside pursuant to section 363(m) of the Bankruptcy Code, (e) none of the Debtors, or the New Operators, any affiliates of New Operators, nor any designee of New Operators, engaged in any conduct that would cause or permit the Transaction Documents or Transactions to be avoided or costs and damages to be imposed against New Operators, their affiliates, or designees under section 363(n) of the Bankruptcy Code; (f) none of the the New Operators, any affiliates of New Operators, nor any designee of New Operators are a successor to Seller, Old Operators, or the bankruptcy estate(s) of Debtors by reason of any theory of law or equity, and none of the New Operators, any affiliates of New Operators, nor any designee of New Operators shall assume or in any way be responsible for any liability of the Debtors, except as otherwise expressly provided in the Transaction Documents, (g) the form of notice of the Sale Motion and any hearing thereon was proper, adequate, and reasonable under the circumstances and no further notice to any party, including any creditors of the Debtors, is necessary for purposes of authorizing the free and clear sale of the Transferred Assets to New Operators pursuant to the Bankruptcy Code or other applicable law, (h) the form of notice to counterparties of any Assumed Contracts was proper, adequate, and reasonable under the circumstances and no further notice to any such contract counterparty is necessary, (i) each of the counterparties to the Assumed

6

Contracts was given adequate notice of the Old Operators and New Operators proposed assumption thereof and the terms of such assumption, and (j) the final amount of Cure Costs under the Bankruptcy Code and applicable law for each of the Assumed Contracts other than with respect to any Disputed Contract that may be resolved pursuant to the procedures set forth in the Transaction Documents or Bidding  Procedures Order.

"Sale Order Hearing" means the hearing following the Auction, if there are other qualifying bidders, or following the end of the Bidding Solicitation Period, if there are no other qualifying bidders, seeking approval of the Successful Bidder and entry of the Sale Order.

"Termination Fee" means the amount of $50,000.00 to be paid to New Operators upon the closing of an Alternative Transaction as a bid protection and in consideration of New Operators' willingness to enter into the OTA and serve as the stalking horse for the Debtors pursuant to the terms and conditions herein and the significant efforts expended by New Operators in connection with the possible acquisition of the Transferred Assets that will be marketed to other competing bidders despite the Agreement.  The obligations of the Debtors to pay the Termination Fee shall survive the termination of any Transaction Documents.

"Transactions" means the transactions contemplated by the OTA and the other Transaction Documents.

"Transaction Documents" means the OTA, the Bill of Sale, and any other agreements, instruments or documents required to be delivered at the Closing or pursuant to the OTA, in each case, including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

EXHIBIT C

FORM OF BILL OF SALE

**BILL OF SALE**

**Effective as of [_____], 2024**

[_____], a [_____] [_____] ("Old Operator"), in consideration of Ten and No/100 Dollars ($10.00), receipt of which is hereby acknowledged, does hereby sell, assign, transfer and set over to [_____], a [_____] limited liability company ("New Operator"), all of its right, title and interest in and to the following described personal property, to-wit:

All of the "Transferred Assets", as defined in that certain Operations Transfer Agreement ("OTA"), dated as of [_____], 2024, by and among Old Operator, New Operator and certain other parties thereto.

Old Operator warrants to New Operator it has good and marketable title to said Transferred Assets, full authority to sell and transfer said property, and that said Transferred Assets are sold free of all liens, incumbrances, liabilities and adverse claims of every nature and description whatsoever.

This Instrument shall be subject to the terms, conditions, and covenants set forth in the OTA. Nothing in this Instrument supersedes, expands, or extinguishes any of the obligations, agreements, covenants, or warranties of Old Operator or New Operator contained in the OTA. If any conflict exists between this Instrument and the OTA, then the terms of the OTA shall control. This Instrument shall in all respects be governed by and construed in accordance with the internal laws of the State of Pennsylvania, without regard to the principles of conflicts of laws thereof. This Instrument may be executed in any number of counterparts, whether original or by facsimile or portable document format (.pdf), each of which shall deemed an original, but all of which shall together constitute one and the same instrument.

(Signatures on following page)

8

**IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale to be signed as of the day and year first above written.

OLD OPERATOR:

[_____],

a [_____][_____]

By:

Name: _____

Its:   _____

NEW OPERATOR:

[_____],

a [_____] limited liability company

By: *Vince Laguno*
Name: *Vince Laguno*

Its: *Director of Operations*

EXHIBIT D

FORM OF GENERAL ASSIGNMENT

GENERAL ASSIGNMENT

**THIS ASSIGNMENT**, is made as of the [__] day of [_____], 2024, by [_____], a [_____] [_____] ("Assignor"), to [_____], a [_____] limited liability company ("Assignee").

W I T N E S S E T H:

**WHEREAS**, by Operations Transfer Agreement (the "OTA"), dated as of [_____], 2024, by and among Assignor, Assignee and certain other parties thereto, Assignor agreed to sell to Assignee certain personal property and such other assets, as more fully described in the OTA (the "Transferred Assets") (capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the OTA); and

**WHEREAS**, the OTA provides, inter alia, that Assignor shall assign to Assignee, the Assumed Contracts, the Patient Trust Funds and Property, the Provider Agreements, the Resident Agreements, the Telephone Numbers, and the Website Material and certain other items applicable to the Transferred Assets, as more fully provided in the OTA;

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.    **Transfer of Assumed Contracts**. Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under the transferable Assumed Contracts.

2.    **Transfer of Patient Trust Funds and Property**.  Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to and under the Patient Trust Funds and Property.

a.        **Transfer of Provider Agreements**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Provider Agreements.

b.        **Transfer of Resident Agreements**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Resident Agreements.

3.    **Transfer of Telephone Numbers**.    Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Telephone Numbers.

4.      **Transfer of Website Material**.    Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Website Material.

5.      **Assumption**.    Assignee hereby accepts the foregoing assignments set forth in Sections 1, 2, 3, 4, 5 and 6 hereof, provided, that said assignment and assumption shall in all respects be subject to the terms of the OTA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Assignment shall contradict the OTA, the OTA shall control.

6.      **Miscellaneous**.    This Assignment and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions referred to in the OTA shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of Pennsylvania and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.  This Assignment may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument.

(Signatures on following page)

**IN WITNESS WHEREOF**, Assignor has duly executed this Assignment as of the day and year first above written.

ASSIGNOR:

[_____],

a [_____] [_____],

By:

Name: _____

Its:  _____

ASSIGNEE:

[_____], a [_____] limited liability company

By:  *Vince Ligquno*
Name:  *Vince Ligboo*

Its:  *Director of Operations*

**EXHIBIT E**

**DEFINITIONS**

The terms defined in this Exhibit E, whenever and wherever used in this Agreement (including in all Exhibits and Schedules, unless otherwise defined therein), shall have the respective meanings ascribed to them below for all purposes of this Agreement (each such meaning to be equally applicable to the singular and the plural forms of the respective terms defined). All reference herein to a Section, Exhibit or Schedule are to a Section, Schedule or Exhibit of or to this Agreement, unless otherwise indicated. The words "hereby", "herein", "hereof", "hereunder" and words of similar import refer to this Agreement as a whole (including all Exhibits and Schedules hereto) and not merely to the specific section, paragraph or clause in which such word appears. The words "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation." Unless the context requires otherwise, the word "or" shall not be interpreted as an expression of either state of possibility but shall be construed to mean "and/or." Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

"Accounts Receivable" means all accounts and notes receivables (whether current or non-current) of Old Operator, including trade account receivables outstanding as of the Effective Time and any other rights to receive payment as of the Effective Time in respect of services rendered prior to the Effective Time.

"Action" means any claim, controversy, action, cause of action, suit, litigation, arbitration, investigation, opposition, interference, audit, assessment, hearing, compliant, demand or other legal proceeding (whether based in contract, tort or otherwise, whether civil or criminal and whether brought at law or in equity) that is commenced, brought, conducted, tried or heard by or before, or otherwise involving, any Governmental Authority.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such specified Person. For purposes of the foregoing, (a) a Person shall be deemed to control a specified Person if such person (or a Family Member of such Person) possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such specified Person or (b) if such other person is at such time a direct or indirect beneficial holder of at least 25% of any class of equity interests of such specified Person.

"Applicable Law" means, with respect to any Person, any federal, state or local statue, law, ordinance, rule, regulation, writ, Order or other requirement of any Governmental Authority applicable to such Person or any of its Affiliates or any of their respective properties, assets, officers, directors, members, partners or employees (in connection with such officer's, director's member's, partner's or employee's activities on behalf of such person or any of its Affiliates).

"Benefits Plan" means any "employee pension benefit plan" (as defined in Section 3(2) of ERISA, "employee welfare benefit plan (as defined in Section 3(1) of ERISA) and all other bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, phantom stock, equity-based retirement, vacation, severance, employment

agreement, change in control agreement, disability, death benefit, hospitalization, medical or other plan, arrangement or understanding (whether or not legally binding) providing benefits to any current or former Employee of Old Operator or with respect to which Old Operator has any Liability to contribute.

"Books and Records" means all books, records, resident records, employee records, and other materials pertaining to the Old Operator or the Business of any and every kind, including lists (e.g., business contacts of Old Operator), programs, correspondence, compact disks, compact disk lists, ledgers, files, reports, plans, drawings and operating records of every kind, held or maintained by Old Operator or any of Affiliate of Old Operator, disk or tape files, printouts, runs or other computer-prepared information pertaining to the Transferred Assets or the Business.

"Business" means the business conducted by Old Operator and proposed to be conducted by Old Operator as of the Effective Date.

"Business Day" means any day other than a Saturday, Sunday or a weekday on which banks in Pennsylvania are authorized or required to be closed.

"CMS" means the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"CRO's Knowledge" means the CRO's actual knowledge as of the date of this Agreement, without any duty or obligation of the CRO to do any investigation or diligence of any nature whatsoever.

"Environmental Laws" means all federal, state and local statutes, regulations, ordinances, directives and other provisions having the force or effect of law, all judicial and administrative Orders and determinations, all contractual obligations and all common law, in each case concerning public  health and safety, worker health and safety, pollution or protect of the environment, including all those relating to the presence, use, production, generation, handling, transportation, storage, disposal, distribution, labeling, testing, processing, discharging, release, threatened release, control or cleanup of any Hazardous Substances, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, *et seq.*), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, *et seq.*), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6921, *et seq.*) and regulations adopted thereunder.

"Existing Contracts" means all of Old Operator's contracts, leases, subleases, licenses, Permits, purchase and sale orders and any other agreement, commitments or binding arrangements or understandings, whether written or oral, to which Old Operator is a party, including each amendment, modification, renewal or extension or other ancillary document pertaining thereto.

"Governmental Authority" means any federal, state local or municipal government or any subdivision thereof, any regulatory or administrative authority, or any agency or commission or any court, tribunal or judicial or arbitral body.

"has provided," "made available" and similar formulation means such information in question that was delivered or provided by Old Operator or its Representatives to New Operator by way of online file sharing, cloud file sharing, email attachments, written correspondences, compact disks, disk or tape files, printouts, compressed file containers or other electronic or physical delivery means.

"Hazardous Substances" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes regulated under any Environmental Laws.

"Indebtedness" means, with respect to any Person, and without duplication, (i) any indebtedness or other obligation for borrowed money; (ii) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the Ordinary Course of Business; (iii) the face amount of all letters of credit issued for the account of such Person; (iv) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens; (v) capitalized lease obligations; (vi) unfunded obligations for pension, retirement, severance benefits for any officer, director or employee of such Person; (vii) unfunded obligations for deferred compensation for any officer, director or employee of such Person; (viii) all guarantees and similar obligations of such Person; (ix) all bankers acceptances and overdrafts; (x) all interest, prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness; (xi) under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (xii) issued or assumed as the deferred purchase price of property or services (other than trade accounts payable or accounts payable to independent contractors), and (xiii) for all accrued interest on, and arising from any breach of, any of the foregoing.

"Liability" means any liability, obligation, claim, Indebtedness, penalty, cost or expenses (including costs of investigation, collection, defense, and environmental remediation or investigation), deficiency, guaranty or endorsement of or by any Person of any type, secured or unsecured, whether accrued, fixed, absolute, or contingent, asserted or unasserted, due or to become due, whether or however arising (including contract, tort, negligence or strict liability), liquidated or unliquidated, known or unknown and whether or not current or long term.

"Lien" means any claim, lien (statutory or otherwise), encumbrance, pledge, Liability, restriction, charge, instrument, license, preference, priority, security agreement, covenant, right of recovery, option, charge, hypothecation, easement, security interest, interest, right of way, encroachment, mortgage, deed of trust, imperfection of title, prior assignments, Tax (including federal, state and local Tax), Order or other encumbrance or charge of any kind or nature whatsoever including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing; (ii) any assignment or deposit arrangement in the nature of a security device; and (iii) any leasehold interest, license or other right, in favor of a Third Party or Old Operator, to use any portion of the Transferred Assets, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Loss" means, in respect of an indemnifying party's indemnification obligations, all direct and indirect Liabilities, judgments, claims, suits, proceedings, settlements, losses, damages, fees, Liens, Taxes, penalties, interest obligations, expenses (including out of pocket costs of investigation and defense and reasonable attorney fees and expenses), and any diminution in value of the Transferred Assets resulting therefrom that are or have been incurred or suffered by an indemnified party.

"DOH" means the Pennsylvania Department of Health.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Ordinary Course of Business" means the ordinary course of business of Old Operator consistent with past custom and practice.

"Other Documents" means Bill of Sale, General Assignment, Old Operator Disclosure Schedule, and any certificates, instruments, agreements and other documents contemplated under this Agreement.

"Permits" means all municipal, state, federal and local consents, Orders, filings, franchises, permits, approvals, certificates, licenses, agreements, waivers, and authorizations issued by, or otherwise granted by, any Governmental Authority that are held by, or used in connection with, or required for, the Business or the Transferred Assets (including all modifications thereto or renewals thereof).

"Person" means any person, firm, corporation, partnership, joint venture, limited liability company, association or other entity (governmental or private).

"Regulatory Approval" means any consent, approval, authorization, waiver, permission, concession, agreement, license, exemption or Order of, or declaration of any Governmental Authority.

"Representative" means, with respect to any Peron, any of its attorneys, accountants, agents, consultants or other representatives.

"OIG" means the United States Department of Health and Human Services, Office of Inspector General.

"Old Operator Disclosure Schedules" means the schedules of exceptions to the representations and warranties of Old Operator in this Agreement (which shall be delivered to New Operator by Old Operator prior to the execution and delivery of this Agreement by the parties hereto).

"Organizational Documents" means certificate of incorporation, articles of incorporation, charter, bylaws, articles of formation, certificate of formation, operating agreement, certificate of limited partnership, partnership agreement and all other similar documents, instruments or certificates adopted or filed in connection with the creation, formation or organization of a Person, including any amendments, restatements and supplements thereto.

"Tax" and, with correlative meaning, "Taxes" means with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, ad valorem, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not; (ii) liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person; or (iii) liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any affiliated group as defined in Section 1504 of the Code, or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax law (or being included (or required to be included) in any Tax Return relating thereto).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by Old Operator relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Third Party" means any Person other than Old Operator, New Operator or any of their respective Affiliates.

"Transaction Expenses" shall mean (i) the aggregate attorneys', accountants' and brokers' fees and expenses incurred or to be incurred by Old Operator that remain unpaid as of the Effective Time, (ii) the amount of real estate transfer tax imposed by Applicable Law and consistent with payment customs of the location in which the relevant real estate property is located in connection with the transactions contemplated by this Agreement, (iii) payment of all special and betterment assessments, water rates and sewer charges, in each case on a prorated basis and adjusted as of the Effective Time, (iv) Pre-Closing Accrued Salary and PTO Benefits, and (v) all other fees and expenses relating to the transfer of Property in accordance with this Agreement (including, without limitation, cost of recording, preparing the Deed and applicable brokerage commissions), in each case of (i), (ii), (iii) and (iv), to the extent not paid in full prior to or at the Closing or taken in to account on a dollar-for-dollar basis in the reduction of the Purchase Price (as defined in the Purchase Agreement).

"Transferred Assets" means collectively, the Website Materials, telephone number of Old Operator, the Employee Records, the Books and Records of the Facility, the Supplies, the Resident Agreements, the Assumed Contracts, Provider Agreements, and other assets owned by Old Operators and held at or used in connection with the operation of the Facility.

"WARN Act" means the Worker Adjustment and Retaining Notification Act of 1988, as amended.