**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FILED
1/15/25 3:35 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

| | |
|---|---|
| In re | Chapter 11 |
| **POTTSVILLE OPERATIONS, LLC,** *et al.,*[1] | **Case No. 24-70418-JAD** |
| Debtors/Movants. | **Jointly Administered**<br><br>Doc. # 555<br>**Related to Document Nos. 121, 206, 391, 490, 491, 493, 498, 499, 500, and 526** |

**ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL
OF THE POTTSVILLE DEBTORS' ASSETS, OTHER THAN ACCOUNTS, FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B)
AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

Upon the motion [Doc. No. 121] (the "Motion")[2] of the above-referenced debtors and

debtors in possession (the "Debtors") for entry of an order (this "Sale Order"), (i) authorizing and

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Pottsville Operations, LLC (9467); Pottsville Propco, LLC (8685); Hampton House Operations, LLC (8969); Hampton House Propco, LLC (7258); Kingston Operations, LLC (1787); Kingston Propco, LLC (8562); Williamsport North Operations, LLC (9927); Williamsport Propco, LLC (2039); Williamsport South Operations, LLC (0298); Yeadon Operations, LLC (9296); and Yeadon Propco, LLC (5785) (collectively, the "Pottsville Debtors" and the Pottsville Debtors' chapter 11 cases are collectively referred to as the "Pottsville Cases") and Bedrock Care, LLC (9115); Care Pavilion Operating, LLC (7149); Cliveden Operating, LLC (6546); MAPA Operating, LLC (3750); Maplewood Operating, LLC (0850); Milton Operating, LLC (5523); Parkhouse Operating, LLC (0140); Tucker Operating, LLC (4305); Watsontown Operating, LLC (0236); and York Operating, LLC (2571) (collectively the "Care Pavilion Debtors" and the Care Pavilion Debtors' chapter 11 cases are collectively referred to as the "Care Pavilion Cases"). The Debtors' mailing address is 425 West New England Avenue, Suite 300, Winter Park, Florida 32789. References to the Debtors and Chapter 11 Cases shall refer to the Pottsville Debtors and Pottsville Cases.

[2] Capitalized terms used but not defined herein shall have the meanings provided in the Motion or the Stalking Horse Agreements, as applicable.

approving the sale of substantially all of the assets of the Debtors' Facilities[3] (as such assets may be more particularly defined in the governing sale agreements, the "Purchased Assets"), free and clear of all liens, interests, claims, and encumbrances (other than Assumed Liabilities and Permitted Exceptions) to the fullest extent permitted by section 363(f) of the Bankruptcy Code (the "Sale Transaction"), (ii) authorizing and approving the assumption and assignment of the Assumed Contracts (as defined herein) to the fullest extent permitted under section 365 of the Bankruptcy Code, and (iii) granting related relief; and this Court having considered the following objections to the Motion filed by Carrie Bell Williams and Marian Williams-Davison (collectively, "Williams Objection") [Doc. No. 490], the Local 262, Retail, Wholesale and Department Store Union, United Food and Commercial Workers, Retail, Wholesale and Department Store Union, United Food and Commercial Workers ("Local 262 Objections") [Doc. No. 491, 499], the Official Committee of Unsecured Creditors ("Committee Objection") [Doc. Nos. 499 and 526], Monica Hawkins, as Administratix of the estate of Clayton Hawkins ("Hawkins Objection") [Doc. No. 500], Virtair, Inc. ("Virtair Objection", and together with the Williams objection, Local 262 Objections, Committee Objection, and Hawkins Objection, the "Objections"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, residents and other parties in interest; and this

---

[3] The "Facilities" consist of Hampton Nursing and Rehabilitation Center, Kingston Rehabilitation and Nursing Center, Pottsville Rehabilitation and Nursing Center, Williamsport North Nursing and Rehabilitation Center, Williamsport South Nursing and Rehabilitation Center, and Yeadon Rehabilitation and Nursing Center.

Court having found that the Debtors' notice of the Motion and opportunity for hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and the evidence in support thereof, and having heard the statements in support of the relief requested in the Motion at a hearing before this Court, if any; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing, if any, establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND DETERMINES** as follows*:*

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      On October 15, 2024, the Debtors received a binding offer (the "Stalking Horse Bid" or the "Stalking Horse Agreements") for the Purchased Assets from Hampton SNF Realty, LLC, Kingston SNF Realty, LLC, Pottsville Realty, LLC, Williamsport North SNF Realty, LLC, Williamsport South SNF Realty, LLC, and Yeadon SNF Realty, LLC, Hampton Operations, LLC, Kingston SNF Operations, LLC, Yeadon SNF Operations, LLC, Pottsville SNF Operations, LLC, Williamsport North SNF Operations, LLC, Williamsport South SNF Operations, LLC, each a Pennsylvania limited liability company (each, a "Buyer" and, collectively, the "Buyers" or "Stalking Horse Bidders"). True and correct copy of the Stalking Horse Agreements is attached to this Order as Exhibit 1.  The Stalking Horse Bid was subject to higher and better offers made in accordance with the Bidding Procedures Order.

C.      By order dated November 14, 2024 [Docket No. 206] (the "Bid Procedures Order"), the Court, among other things, approved (i) the Bid Procedures, (ii) the procedures for notice of the proposed sale of the Purchased Assets free and clear of all claims and encumbrances (other than Assumed Liabilities and Permitted Exceptions); and (iii) procedures for the assumption and assignment of executory contracts and unexpired leases to be assumed and assigned as part of the Purchased Assets (the "Assumed Contracts"), all as more particularly set forth in the Bid Procedures Order.

D.      The Debtors solicited offers and noticed the Auction in accordance with the provisions of the Bid Procedures Order. The Auction was duly noticed, and the Debtors afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer than the Stalking Horse Bid to purchase the Purchased Assets. The Debtors received no Qualified Bids other than the Stalking Horse Bid, and accordingly, cancelled the Auction. The Stalking Horse Bidders were properly deemed the Successful Bidders (the Successful Bidders are the "Buyers").

E.      Proper, timely, adequate, and sufficient notice of the Motion, the Buyers, the Stalking Horse Agreements, the Sale Transaction proposed in the Motion, including the assumption and assignment of the Assumed Contracts and any cure amounts related thereto, and of the terms of this Sale Order has been provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006, Local Rules 6004-1 and 6006-1, and other applicable law. As demonstrated by the certificates of service and affidavits of publication filed on the docket, the Debtors have provided sufficient and appropriate notice under the circumstances, and no other or further notice of the Motion, the Sale Agreements, the Sale Hearing, or the related deadlines is required.

F.      A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

G.      Based upon certain provisions herein, the Williams Objection is voluntarily withdrawn.

H.      The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justification, and (ii) compelling circumstances for the sale of the Purchased Assets to the Buyers pursuant to section 363 of the Bankruptcy Code. Such justification and compelling circumstances include, but are not limited to, the fact that (x) the Buyers' offer under the Stalking Horse Agreements constitutes the highest and best offer available for the Purchased Assets; (y) there were no Qualified Bids by the Bid Deadline; and (z) consummation of the Sale Transaction with the Buyers presents the best opportunity to realize the highest value for the Purchased Assets and avoid potential decline and devaluation thereof, relieves the Debtors' bankruptcy estates of significant liabilities and provides a viable path for continued operations of the Facilities in the communities they serve.

I.      The consideration to be paid at Closing by the Buyers is fair and reasonable, represents the highest and/or best offer for the Purchased Assets, and is in the best interests of the Debtors, their creditors and their estates.

J.      The purchase terms as set forth in this Sale Order and the Stalking Horse Agreements, are fair and reasonable and constitute reasonably equivalent value and full, adequate, and fair consideration for the Purchased Assets under the Bankruptcy Code, or any other applicable laws of the United States, any state, territory, or possession.

K.      The Buyers are purchasers in "good faith," as that term is used in section 363(m) of the Bankruptcy Code, with respect to the Purchased Assets and the Sale Transaction. The

Stalking Horse Agreements and this Sale Order were negotiated, proposed, and entered into by the Debtors and the Buyers in good faith, from arm's-length bargaining positions, and without collusion. The Buyers are not connected to or related to the Debtors or those in control of the Debtors in any manner that could reasonably affect the marketing, bidding, negotiating, or ultimate sale of the Purchased Assets on the terms set forth herein. The sale process conducted was non-collusive, fair, and reasonable, and it was conducted openly and in good faith. The Buyers are entitled to the protections of section 363(m) of the Bankruptcy Code with respect to the Purchased Assets and the Sale Transaction.

L.      The sale of the Purchased Assets to the Buyers is a sale in good faith within the meaning of Bankruptcy Code section 363(m). The Buyers, the Debtors, and their respective representatives and affiliates, have not engaged in any conduct that would cause or permit the sale of the Purchased Assets, the Sale Transaction, or this Sale Order to be avoided. The Buyers are not "insiders" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. The findings in this paragraph of the Sale Order are not binding upon the Official Committee of Unsecured Creditors (the "Committee") if the Committee discovers facts that show that any equity holders of the Debtors are also equity holders of the Buyers.

M.      The Debtors may transfer the Purchased Assets free and clear of all Claims and Encumbrances (other than Assumed Liabilities and Permitted Exceptions) because, one or more of the standards set forth in Bankruptcy Code sections 363(f)(1)–(5) have been satisfied. Each creditor or other person or entity asserting a Claim or Encumbrance (as defined below) in the Purchased Assets (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim or Encumbrance, or

(iii) otherwise falls within the provisions of Bankruptcy Code section 363(f). Those holders of Claims or Encumbrances who did not object (or who ultimately withdrew their objections, if any) to the Motion are deemed to have consented to the Motion and the Sale Transaction pursuant to section 363(f)(2).

N.      As a condition to purchasing the Purchased Assets pursuant to the Stalking Horse Agreements, the Buyers require that the Purchased Assets be transferred free and clear of all Claims and Encumbrances (other than Assumed Liabilities and Permitted Exceptions) and free from any successor liability claims, including, without limitation, any identified Medicaid overpayments and potential nursing facility assessments (the "Department Assessments") due to the Pennsylvania Department of Human Services ("DHS") in connection with the Facilities and any amounts owed to, or required to be paid to, the Pennsylvania Department of Health ("DOH") in connection with the Facilities.

O.      The Buyers would not have entered into the Stalking Horse Agreements and will not consummate the Sale Transaction, thus adversely affecting the Debtors' estates, if the transfer of the Purchased Assets is not free and clear of all Claims and Encumbrances (other than Assumed Liabilities and Permitted Exceptions) or if the Buyers were or could be liable for any Claims or Encumbrances against the Debtors or the Purchased Assets (other than Assumed Liabilities and Permitted Exceptions).

P.      Any Assumed Contracts that the Buyers have or will designate for assumption and assignment, and which are in default at the time of the Closing, may be cured as provided in the Notice of Executory Contracts and Unexpired Leases that may be Assumed and Assigned in Connection with the Sale Transaction (the "Cure Notice") [Doc. No. 391], Stalking Horse

Agreements, and this Sale Order, or as otherwise agreed to by the Buyers and the non-debtor counterparties to such contracts.

Q.     The Debtors have full power and authority to sell and deliver the Purchased Assets and execute and perform under, the Stalking Horse Agreements and any other documents necessary or appropriate to consummate the Sale Transaction, as approved herein. All actions contemplated by the Stalking Horse Agreements have been duly and validly authorized by all necessary action of the Debtors. No further consents or approvals are required for the Debtors to consummate the Sale Transaction, except as otherwise provided in the Stalking Horse Agreements.

R.      The sale of the Purchased Assets to the Buyers under the Stalking Horse Agreements will be a valid, legal, and effective transfer of the Purchased Assets and will vest the respective Buyers with all right, title, and interests of the Debtors in and to the same, free and clear of all Claims and Encumbrances (other than Assumed Liabilities and Permitted Exceptions).

S.     The Stalking Horse Agreements and the Sale Transaction do not constitute a sub rosa chapter 11 plan. The Stalking Horse Agreements neither impermissibly restructure the rights of the Debtors' creditors nor impermissibly dictate a chapter 11 plan for the Debtors.

T.     After consideration of the circumstances described in the Motion and the evidence admitted at the Sale Hearing, including the declaration of Neil Luria [Docket No. 546], the Court has determined that the proposed Sale Transaction and transfer of the Purchased Assets to the Buyers pursuant to the Stalking Horse Agreements are in the best interests of the Debtors' estates and should be approved on the terms set forth herein.

U.     All findings of fact and conclusions of law announced by this Court at the Sale Hearing in relation to the Motion are incorporated herein by reference as though fully set forth in this Sale Order.

**IT IS HEREBY ORDERED** as follows:

1.      The Motion is granted and the Sale Transaction, including without limitation, the sale of the Purchased Assets to the Buyers pursuant to the Stalking Horse Agreements, is **APPROVED** in all respects and as set forth herein.

2.      Any objections to the Motion, including the Objections,  which have not been voluntarily withdrawn, waived, or resolved, and all reservations of rights included in such objections which have not been otherwise preserved, are hereby **OVERRULED** on the merits. Any objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

3.      The Stalking Horse Agreements are hereby **APPROVED**, and the Debtors and their professionals are authorized, empowered, and directed to perform their obligations under the Stalking Horse Agreements and to take such actions as are necessary or appropriate to effectuate the terms of the Stalking Horse Agreements and this Sale Order. The failure specifically to include any particular provision of the Stalking Horse Agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the transfer of the Purchased Assets and all other Transactions set forth in the Stalking Horse Agreements be authorized and approved in their entirety. In the event of any inconsistency between the terms of any prior pleading related to the Motion, the Stalking Horse Agreements, and this Sale Order, the terms of this Sale Order shall control.

4.      Upon the closing of the Sale Transaction (the "Closing"), the transfer of the Purchased Assets pursuant to this Sale Order and the Stalking Horse Agreements: (i) shall be a legal, valid, and effective transfer of the relevant Purchased Assets from the Debtors to the respective Buyers; (ii) shall vest in the respective Buyers all rights, titles, and interests of the

Debtors to the Purchased Assets and good and marketable title thereto; (iii) shall constitute a transfer for reasonably equivalent value and full, adequate, and fair consideration under the Bankruptcy Code and all other law applicable to such transfer; and (iv) shall be on an "as is, where is" basis without any representations or warranties, except as provided in the Stalking Horse Agreements.

5.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the Closing, the Sale Transaction and the transfer of the Purchased Assets to the Buyers shall be free and clear of, but not limited to, the following (other than Assumed Liabilities and Permitted Exceptions): (i) any mortgage, lien (as such term is defined in 11 U.S.C. § 101(37), including any mechanic's, materialman's, statutory, and any other consensual or non-consensual lien), security interest, charge, hypothecation, deed of trust, pledge, right of use, first offer or refusal, easement, servitude, restrictive covenant, lease, sublease, covenant, right of way, option, restriction (including, without limitation, any restriction on transfer or on the use, voting, receipt of income or other rights or exercise of any attributes of ownership), conditional sale or other title retention agreements, interest (including as that term is used in Bankruptcy Code section 363(f)), encroachment, "Encumbrance" (as defined in the Stalking Horse Agreements), or other encumbrance of any kind arising from or related in any way to the Debtors or the Purchased Assets (all of the foregoing collectively referred to as "Encumbrances"), and (ii) any claim, "Claim" (as defined in the Stalking Horse Agreements), debt, liability, interest, or obligation arising from or related in any way to the Debtors or the Purchased Assets (all of the foregoing collectively referred to as "Claims"). Without limitation, the sale of the Purchased Assets to the Buyers shall be free and clear of all Claims and Encumbrances (other than Assumed Liabilities and Permitted Exceptions) regardless of whether any such Claim or Encumbrance is in law or in equity, known or unknown, choate or inchoate,

filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the filing of the Debtors' bankruptcy petitions, or occurring or arising prior to the Closing Date.

6.      Without limiting the foregoing, upon the Closing, the Buyers shall not be deemed to: (i) be the successors of the Debtors, or their respective predecessors or affiliates, (ii) have, de facto, or otherwise, consolidated or merged with or into the Debtors, or their respective predecessors or affiliates, (iii) be mere continuations or substantial continuations of the Debtors, or their respective predecessors or affiliates, (iv) be mere continuations or substantial continuations of the identity, business, enterprises, or operations, of the Debtors, or their respective predecessors or affiliates, or (v) be liable for any acts or omissions of the Debtors, or their respective predecessors or affiliates, relating to or arising from the conduct of their business or arising under or related to the Purchased Assets (other than Assumed Liabilities and Permitted Exceptions).

7.      For the avoidance of doubt, the Buyers shall not be liable for any Claims or Encumbrances (other than Assumed Liabilities and Permitted Exceptions) against the Debtors, or their respective predecessors or affiliates, and the Buyers shall have no successor or vicarious liability of any kind or character, whether known or unknown, as of the Closing, including, without limitation, (i) any monetary assessments imposed against any of the Facilities, the Debtors, or their respective predecessors and affiliates, by or on behalf of any Governmental Authority, including, without limitation, the Department Assessments, (ii) union-related liabilities, (iii) Medicaid-related liabilities, (iv) any taxes of any kind, whether now existing or hereafter arising, or whether

fixed or contingent, owed by the Debtors, or their respective predecessors or affiliates, (v) any other liabilities of the Debtors, or their respective predecessors or affiliates, to the Commonwealth of Pennsylvania, DOH, DHS, DOL, or any other Governmental Authority, and (vi) any other liabilities owed by the Debtors, or their respective predecessors or affiliates.

8.      With respect to Assumed Liabilities and Permitted Exceptions, nothing within this Sale Order or the Stalking Horse Agreements shall be interpreted as providing that the Buyers are liable for any Assumed Liability or Permitted Exception that is not (i) directly related to the operations or assets of the relevant facility that Buyers shall operate or Buyers shall own following Closing, or (ii) expressly assumed pursuant to any assignment, bill of sale, deed, or other similar document at Closing.

9.      As of the Closing, all persons and entities holding Claims or Encumbrances and their respective successors and assigns, are hereby forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Claims or Encumbrances of any kind and nature against the Buyers, the Purchased Assets, or any other assets or properties of the Buyers, or commencing or continuing any action that does not comply or is inconsistent with this Sale Order. Without limiting the foregoing, no persons or entities may condition the issuance to the Buyers of new licenses, new certifications, new Medicaid provider agreements or other payor program agreements on the assumption or payment by the Buyers of any such Claims or Encumbrances, including without limitation, Department Assessments, or any liability, penalty or obligation that arose under or relate to any Debtor's Medicaid provider agreements. As of the Closing, the Court hereby reserves exclusive jurisdiction over this Sale Order and the injunctions provided herein, including, without limitation, in this paragraph.

10.     Upon the Closing, all Claims and Encumbrances shall attach to the proceeds of the
Sale Transaction (the "Proceeds") with the same validity, enforceability, priority, force and effect
that they have as against the Purchased Assets as of the Closing; provided however, that at Closing
(i) *first* the net Proceeds shall be remitted to Oxford Finance, LLC ("Oxford") for application to
its debt in an amount sufficient to pay its debt in full (which the anticipated payoff through January
31, 2025 is $49,228,644.35 plus any unpaid attorney's fees after application of cash reserves) and
(ii) *second* the net Proceeds in excess of the amounts required to pay Oxford in full will be paid to
the DIP Lender in full satisfaction of DIP Obligations. Any Proceeds in excess of the amounts
required to pay Oxford and the DIP Obligations in full will be held by the Debtors pending further
order of this Court. Furthermore, the Debtors reserve for further determination by this Court the
issue of the proper allocation and classification of any excess proceeds among the Debtors,
including any claims asserted in connection with the Williams Objection. No determination with
respect to the allocation of the excess proceeds described in this paragraph is binding upon the
estate or the Committee until the excess proceeds allocation is noticed and parties have an
opportunity to review and object.

11.     Oxford is currently holding cash reserves of approximately $397,525.88. For
avoidance of doubt, Oxford is authorized to appl these cash reserves to its outstanding debt at
Closing.

12.     Subject to the Final DIP Order, all rights and objections to priority, determination
of secured status and distribution of any Proceeds are preserved.

13.     The Court **APPROVES** the assumption and assignment of the Assumed Contracts
as set forth herein pursuant to section 365 of the Bankruptcy Code. All requirements of sections
365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors,

and the assignment by the Debtors to the relevant Buyers, of each Assumed Contract. All counterparties of the Assumed Contracts that did not timely file an objection to the Cure Notice are deemed to consent to the assumption and assignment by the Debtors of their Assumed Contract to the respective Buyers and to have waived any defaults or breaches thereunder, and the respective Buyers shall enjoy all of the rights and benefits under each such Assumed Contract as of the Closing without the necessity of obtaining such counterparty's consent to the assumption or assignment thereof.

14.     In accordance with the terms of the Stalking Horse Agreements, the Buyers may, at their discretion, add or remove any executory contract or unexpired lease from the list of Assumed Contracts that shall be assumed and assigned to the respective Buyers at Closing. Following the Closing, the Debtors shall file the final list of Assumed Contracts that have been assumed and assigned to the respective Buyers at Closing. Other than the Assumed Contracts designated in such final list of Assumed Contracts filed on the docket, no other executory contract or unexpired lease shall be deemed assumed by the Debtors and assigned to any Buyers.

15.     The cure amounts designated in the Cure Notice filed on December 13, 2024 [Doc. No. 391] are deemed the amounts necessary to "cure" all "defaults" (within the meaning of Bankruptcy Code section 365(b)) under the Assumed Contracts. Any objections to the cure amounts, to the extent not otherwise resolved, are hereby **OVERRULED**. The Court finds that with respect to all Assumed Contracts, the payment of the cure amounts, as provided herein, is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under Bankruptcy Code sections 365(b) and 365(f).

16.     To the extent the Buyers assume any executory contract or unexpired lease with Virtair, Inc. ("Virtair"), the total cure amount for Virtair across all six Facilities is increased to

14

$40,137.95. The cure amount for each specific Facility is included in Virtair's Objection to Proposed Cure Amounts [Doc. No. 493] as Exhibit C. The Buyer is only obligated to cure the defaults related to each Facility that is assumed.

17.    Pursuant to the Stalking Horse Agreements, the Buyers will pay the cure amounts under any Assumed Contracts at Closing, or as otherwise agreed by the Buyers and the counterparty to any Assumed Contract.

18.    The Buyers have demonstrated adequate assurance of future performance of each Assumed Contract within the meaning of section 365 of the Bankruptcy Code. The Buyers' payment of cure amounts in accordance with the terms of the Stalking Horse Agreements, and the Buyer's promise to perform the obligations under the Assumed Contracts after the Closing Date, constitute adequate assurance of future performance.

19.    Upon assignment of the Assumed Contracts to the Buyers in accordance with the terms of the Stalking Horse Agreements and this Sale Order, the Assumed Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, and the Debtors shall have no further liability or obligation under such Assumed Contracts. Without limiting the foregoing, each and every provision of the Assumed Contracts or applicable non-bankruptcy law that purport to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning, assignment of any Assumed Contract has been or will be satisfied or is otherwise unenforceable under Bankruptcy Code section 365. Upon the reasonable request of the Buyers, all counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, and shall not charge the Debtors or Buyers for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

20.     Other than with respect to Assumed Liabilities, the Buyers shall have no liability or obligation for any (i) defaults or breaches under any Assumed Contract that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date, or (ii) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to any Assumed Contract that relate to any acts or omissions that arose or occurred prior to the Closing Date.

21.     The failure of the Debtors or the Buyers to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' or the Buyers' respective rights to enforce every term and condition of such Assumed Contract.

22.     If any person or entity that has filed financing statements, mortgages, deeds of trust, mechanic's liens, *lis pendens*, or other documents or agreements evidencing interests with respect to the Debtors and/or the Purchased Assets shall not have delivered to the Debtors or Buyers prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of Claims and Encumbrances which the person or entity has with respect to the Debtors, the Purchased Assets, or otherwise (except Assumed Liabilities and Permitted Exceptions) then (i) the Buyers and/or the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Purchased Assets and (ii) the Buyers and/or the Debtors are hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of (but not a necessary condition to) the release of all such Claims and Encumbrances in, against, or with respect to the Debtors and/or the Purchased Assets. This Sale Order is deemed to be in

16

recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office. Notwithstanding the foregoing, the provisions of this Sale Order and the transfer of the Purchased Assets to the Buyers free and clear of all Claims and Encumbrances (other than Assumed Liabilities and Permitted Exceptions) shall be and are self-executing without the necessity of any recording or filing of any document.

23.    The Title Company (as defined in the Stalking Horse Agreements) may rely on this Sale Order as confirmation from this Court that the Debtors have all right, title, and authority and approval to transfer legal title to the Purchased Assets to the Buyers, free and clear of all Claims and Encumbrances (other than Assumed Liabilities and Permitted Exceptions).

24.    No person or entity shall take or cause to be taken any action that would interfere with the Sale Transaction, including without limitation the transfer of the Purchased Assets to the Buyers, in accordance with the terms of this Sale Order and the Stalking Horse Agreements.

25.    Any persons or entities that are presently, or as of the Closing may be, in possession of any portion of the Purchased Assets to be transferred pursuant to this Sale Order are hereby directed to surrender possession of such Purchased Assets to the Buyers on the date of the Closing.

26.    The Sale Transaction contemplated by this Sale Order and the Stalking Horse Agreements have been bargained for and undertaken by the Debtors and Buyers at arm's length, without collusion, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. The Debtors and the Buyers have not engaged in any conduct that would cause or permit this Sale Order or the Sale Transaction to be avoided.

27.    Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Sale Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or *vacatur* shall not affect the validity and

enforceability of any obligation or right granted pursuant to the terms of this Sale Order. Notwithstanding any reversal, modification, or *vacatur* of this Sale Order, any actions taken by the Buyers or the Debtors pursuant to the terms of this Sale Order prior to the effective date of any such reversal, modification, or *vacatur* shall be governed in all respects by the original provisions of this Sale Order and the Stalking Horse Agreements, as the case may be.

28.    None of the Debtors, the Buyers, any designees of the Buyers, or their respective representatives and affiliates have engaged in any conduct that would cause or permit the Sale Transaction and/or the Stalking Horse Agreements to be avoided or costs and damages to be imposed against the Buyers, their affiliates, their representatives, or designees of the Buyers pursuant to section 363(n) of the Bankruptcy Code.

29.    No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Stalking Horse Agreements, the transfer of the Purchased Assets pursuant thereto, or this Sale Order.

30.    The Debtors shall be and are hereby authorized, empowered, and directed to take such actions, including the execution and delivery of any and all instruments and documents, as may be required to effectuate the terms of the Stalking Horse Agreements and this Sale Order. The Stalking Horse Agreements and any agreements, documents, or other instruments related to this Sale Order or the transactions contemplated herein may be modified, amended, or supplemented by the parties thereto, in a writing signed by all parties, and in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on Debtors' estates.

31.     Subject to the Final DIP Order, the Debtors are authorized to pay, without further order of the Court, whether before, at, or after Closing, any expenses or costs required to be paid to perform their obligations in accordance with the Stalking Horse Agreements.

32.     Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction. No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the Sale Transaction or use of the Purchased Assets sold, transferred, or conveyed to the Buyers on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction. For the avoidance of doubt, the Sale Transaction authorized herein shall be of full force and effect, regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

33.     The provisions of this Sale Order and any actions taken pursuant hereto shall survive any conversion or dismissal of these chapter 11 cases and the entry of any other order which may be entered in these chapter 11 cases, including any order: (i) confirming any plan of reorganization; (ii) converting any of these cases from chapter 11 to chapter 7; (iii) appointing a trustee or examiner; or (iv) dismissing any of these chapter 11 cases or any successor cases. The terms and provisions of this Sale Order, as well as the rights granted under the Stalking Horse Agreements, shall continue in full force and effect and shall be binding upon the Debtors and their successors, assigns, any reorganized debtors, trustees, plan trustees, plan administrators (or similar representative), or chapter 7 trustees applicable to the Debtors and their estates, or any person acting on behalf of the Debtors, notwithstanding any such conversion, dismissal, or entry of any order.

34.     All of the transfers and other performance set forth in this Sale Order and the Stalking Horse Agreements, together with the performance under all of the agreements identified herein to be executed and performed at Closing, are part of a single transaction such that the same is not subject to being avoided, rejected, or otherwise terminated or modified by a division or separate treatment of the various agreements or component transactions. Accordingly, the provisions of this Sale Order and the Stalking Horse Agreements are non-severable and mutually dependent.

35.     The Court shall retain exclusive jurisdiction to enforce the provisions of this Sale Order and to resolve any dispute concerning this Sale Order, the Stalking Horse Agreements, and/or the rights and duties of the parties hereunder or thereunder, or any issues relating to the Sale Transaction and this Sale Order, including, but not limited to, interpretation of the terms, conditions, and provisions hereof, and the status, nature, and extent of the Purchased Assets, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of Claims and Encumbrances (other than Assumed Liabilities and Permitted Exceptions) as set forth herein.

36.     For the avoidance of doubt, the Buyers shall not acquire any interest in any Excluded Assets, as that term is defined in the Stalking Horse Agreements.

37.     The Buyers shall provide any liquidating trustee access to the Debtors' books and records so the liquidating trustee may wind down and fully administer the bankruptcy estate.

38.     Notwithstanding anything to the contrary in this Sale Order, neither the Buyers nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the Stalking Horse Agreements or other Sale Transaction documents have been satisfied or waived in accordance with the terms of the Stalking Horse Agreements.

39.     As to the Local 262 Objections, the Buyers and Local 262 have agreed to a memorandum of agreement, providing for three new CBAs as provided therein effective as of the Effective Date of the Sale, which is attached to this Order as Exhibit 2. Notwithstanding any other provisions of this Order or the Asset Purchase Agreement or related agreements, the memorandum of agreement governs the terms and conditions of employment between Local 262 and the Buyers. Based on the entry of the memorandum of agreement, Local 262 withdraws the Local 262 Objections.

40.     *As to the United States*:

i.      Notwithstanding any provision to the contrary in this Sale Order ("Order"), any Operations Transfer Agreement ("OTA"), or any other document related to the sale, nothing shall: (1) authorize the assumption, sale, assignment or other transfer to the Purchaser or any other buyer of any federal (a) grants, (b) grant funds, (c) contracts, between the Debtors and the United States or its agencies, including but not limited to (d) agreements, contracts, (e) awards, (f) task orders, (g) property, including but not limited to, any intellectual property and patents belonging to the United States or any of its agencies or components thereof, (h) leases, (i) certifications, (j) applications, (k) registrations, (l) billing numbers and other identifiers, including without limitation, national provider identifiers and provider transaction access numbers, (m) licenses, (n) permits, (o) covenants, (p) inventory, (q) guarantees, (r) indemnifications, (s) data, (t) records, (u) payment obligations, (v) Medicare agreements, or (w) any other interests belonging to the United States, including any of its agencies or components thereof (collectively, "Federal Interests") without compliance by the Debtors and the Purchaser with all terms of the Federal Interests and with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts or to require the United States to novate, approve or otherwise consent to the sale,

assumption, assignment or other transfer of any Federal Interests; (3) waive, alter or otherwise

limit the United States' Federal Interests; (4) affect the setoff or recoupment rights of any

governmental unit (as defined in 11 U.S.C. § 101(27)); (5) release, nullify, preclude or enjoin the

enforcement of any police or regulatory power or any liability to a governmental unit that any

entity would be subject to, except as allowed under Section 363(f) of the Bankruptcy Code; (6)

confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C.

§ 1334 (as limited by any other provisions of the United States Code); or (7) expand the scope

of 11 U.S.C.§ 525.

      ii.      The transfer of the Debtors' Medicare provider agreements shall be pursuant to 11

U.S.C. § 365 and otherwise applicable non-bankruptcy law, including Title XVIII of the Social

Security Act, 42 U.S.C. §§ 1395–1395 *et. seq.*, all applicable Medicare regulations, and Medicare

policies and procedures (together, "Medicare Program Law").  Within 14 days after the date of

this Order, the Debtors may file a stipulation setting forth additional agreements relating to the

transfer of the Medicare provider agreements.

      iii.      Further, for the avoidance of doubt, nothing in this Order, any OTA, or any other

document related to the sale shall limit, modify, or in any way affect the authority of the United

States Secretary (the "Secretary") of the United States Department of Health and Human

Services' authority to regulate Debtor's or the Purchaser's enrollment or participation as a

Medicare provider (to the extent the Purchaser or any other buyer of the Purchased Assets enrolls

or participates as a Medicare provider) or the right and authority of the Secretary, the Centers for

Medicare & Medicaid Services ("CMS") or its contractors to review, approve, deny, or pay

Medicare claims in the ordinary course of business in accordance Medicare Program Law.   The

United States takes no position with respect to, and nothing herein shall be construed as the

Secretary's consent to, or acceptance of, any OTA or any underlying transactions described in or supporting the OTA.

41.    Notwithstanding anything to the contrary in this Sale Order, any Patient Trust Funds and Property are and shall remain the property of the residents and are not Purchased Assets. The Owned Facilities Debtors shall transfer the Patient Trust Funds and Property to the Buyers at Closing in accordance with the Stalking Horse Agreements, and the Buyers shall ensure that Patient Trust Funds and Property are maintained and utilized for the residents according to applicable law.

42.    Notwithstanding any provision of the Bankruptcy Code or Federal Rules of Bankruptcy Procedure to the contrary, this Sale Order shall be effective and enforceable immediately upon entry, and any stays thereof, including without limitation pursuant to Fed. R. Bankr. P. 6004(h) and 6006(d), are hereby abrogated.

Dated: January 15 , 2025

_____ jsf
Honorable Jeffery A. Deller
United States Bankruptcy Judge

**EXHIBIT 1**

**Stalking Horse Agreement**

**ASSET PURCHASE AGREEMENT**

by and between

**Hampton House Propco LLC,**
**Kingston Propco LLC,**
**Yeadon Propco LLC,**
**Pottsville Propco LLC,**
**Williamsport Propco LLC,**
each a Pennsylvania limited liability company,

collectively, "Seller"
and
**Hampton SNF Realty, LLC,**
**Kingston SNF Realty, LLC,**
**Yeadon SNF Realty, LLC,**
**Pottsville Realty, LLC,**
**Williamsport North SNF Realty, LLC**,
**Williamsport South SNF Realty, LLC**,
each a Pennsylvania limited liability company,

collectively, "Purchaser"

Dated as of: October 15, 2024

# TABLE OF CONTENTS

**SECTION**                                                                                  **PAGE**

1.   **Sale and Purchase of Purchased Assets** ...........................................................................

2.   **Liabilities of Seller** ....................................................................................................

3.   **Purchase Price; Escrow** ..............................................................................................

4.   **Time and Place of Closing** .........................................................................................

5.   **Site Access; Title and Survey; and Licensure** ............................................................

6.   **Conditions to Closing** ................................................................................................

7.   **Apportionments** .........................................................................................................

8.   **Interim Operations** ....................................................................................................

9.   **Seller's Representations and Warranties** ...................................................................

10.  **Purchaser's Representations and Warranties** ............................................................

11.  **Risk of Loss** ...............................................................................................................

12.  **Indemnification** .........................................................................................................

13.  **Remedies** ...................................................................................................................

14.  **Notices** ......................................................................................................................

15.  **Closing Costs** ............................................................................................................

16.  **Choice of Law** ...........................................................................................................

17.  **Miscellaneous** ...........................................................................................................

**EXHIBITS**

A1-6.        Legal Description of Land
A7.          Facilities
B.           Allocation of Purchase Price
C.           Form of Note
D.           Form of Deed
E.           Form of Bill of Sale
F.           Form of General Assignment
G.           Form of FIRPTA Affidavit
H.           Definitions

**SCHEDULES**

9(i)         Permits
9(m)         Litigation

# ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement"), is made as of the 15th day of October 2024 (the "Effective Date"), by and between the parties undersigned as Seller (collectively, "Seller"), and the parties undersigned as Purchaser (collectively, "Purchaser").

**WHEREAS**, each Seller is currently the fee owner of the Property (as defined herein) comprising the Facility (as defined herein) listed by such Seller's name on **Exhibit A7**, attached hereto;

**WHEREAS** each respective Facility is licensed to and operated by an entity listed in **Exhibit A7** as such Facility's operator, (each operator is an "Old Operator" and collectively, the "Old Operators") to operate the number of skilled nursing beds set forth next to the name of each Facility as listed on **Exhibit A7**;

**WHEREAS**, Seller desires to sell and Purchaser desires to purchase the Purchased Assets (as defined herein) and other assets subject to the terms and conditions of this Agreement;

**WHEREAS**, as an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, simultaneous with the completion of the transactions contemplated under this Agreement, Old Operators will enter into that certain Operations Transfer Agreement of even date herewith (the "OTA") with the New Operators, which agreement will provide for the rights and obligations of the parties thereto relative to the transition of the operations of the Facilities from Old Operators to New Operators;

**WHEREAS**, it is anticipated that on or about October 15, 2024 (the "Petition Date"), Seller and each Old Operator (in their capacity as chapter 11 debtors, each, a "Debtor" and, collectively, the "Debtors"), will file voluntary petitions (collectively, the "Chapter 11 Petitions") for relief under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") commencing chapter 11 cases (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases");

**WHEREAS**, the Seller and Old Operators will continue to own and operate their respective Facilities and businesses as "***debtors-in-possession***" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

**WHEREAS**, subject to approval of the Bankruptcy Court, Purchaser desires to purchase the Property (as defined herein) from Seller, and Seller desires to sell, convey, assign and transfer to Purchaser the Property, simultaneously with the closing of the transactions between Old Operators and New Operators (as defined herein) described in the OTA, all and in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code;

**WHEREAS**, the Property, along with the assets being transferred to the New Operators under the OTA (collectively, the "Transaction Assets"), and any specified liabilities assumed hereunder and thereunder, shall be purchased and assumed by the respective Purchaser and the respective New Operators pursuant to the Sale Order approving such sale, free and clear of all Claims and Encumbrances, other than Permitted Encumbrances (as said terms are defined herein), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, which order will include the authorization for the assumption by the respective Old Operators and assignment to the respective New Operators of the Assumed Contracts (as defined herein) and the liabilities thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement, the OTA and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court (together, the "Bankruptcy Rules"); and

**WHEREAS**, the managers of each Seller and of Old Operators have determined that it is advisable and in the best interests of each entity to enter into this Agreement and the OTA, respectively, and to consummate the transactions provided for herein and in the OTA, subject to entry of the Sale Order, and have approved the same;

WHEREAS, Old Operators have engaged Eden East Healthcare Management, LLC, a Delaware limited liability company ("Service Provider") pursuant to that certain Administrative Services Agreement dated September 1, 2024 (the "Consulting Agreement") to provide certain services with respect to the Facilities.

**NOW THEREFORE**, in consideration of the mutual covenants and provisions herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1.     **Sale Motion and Sale Order; Sale and Purchase of Purchased Assets**.

    (a)     Sale Motion and Sale Order. The parties hereto agree to the terms and conditions regarding the Debtors' filing of the Sale Motion (as defined herein) with the Bankruptcy Court to, among other things, seek (a) entry of the Bidding Procedures Order (as defined herein) (i) approving this Agreement and the OTA as the stalking horse purchase agreement, (ii) approving Purchaser and New Operators as the stalking horse bidder, and (iii) approving the Bidding Procedures (as defined herein), including the bid protections, that shall govern the Sellers' solicitation of competing bids for the Transaction Assets, and, (b) following an Auction (as defined herein) to be held after the Bidding Solicitation Period (as defined herein) expires should there be other Qualifying Bidders (as defined herein), the Debtors' pursuit of the Sale Order approving the Successful Bidder's (as defined herein) purchase agreement and operations transfer agreement, all in accordance with the provisions set forth on Exhibit B attached hereto (which Exhibit B includes additional defined terms used in this Agreement). To the extent of any inconsistencies in the Debtors' Sale Motion and the provisions set forth on Exhibit B attached hereto, the provisions in Exhibit B shall control, except as otherwise ordered by the Bankruptcy Court.

(b)     Sale and Purchase of Purchased Assets.  Subject to the provisions set forth herein, Seller hereby agrees to sell, convey, assign, deliver and transfer, free and clear of all Liens except for Permitted Exceptions and any occupancy rights of any residents of the Facilities, and Purchaser hereby agrees to purchase, acquire and accept from Seller all right, title and interest of every kind and nature in and to all assets owned, licensed or leased by Seller as of the Closing (including indirect and other forms of beneficial ownership), be they real or personal, tangible or intangible, fixed or current, wherever located and by whomever possessed, including, all of the following assets, but excluding the Excluded Assets (collectively, the "Purchased Assets"):

(i)     the property consisting of those certain plots, pieces or parcels of land as more particularly described in **Exhibit A1-A6** hereto (the "Land");

(ii)     all Improvements presently or hereafter located in or on the Land (together with the Land, the "Property"), including without limitation those certain skilled nursing facilities listed on **Exhibit A7** hereto (each a "Facility", and collectively, the "Facilities");

(iii)     all right, title and interest, if any, of Seller in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof;

(iv)     all easements, licenses, rights and appurtenances relating to any of the assets identified in the foregoing clauses (i), (ii) and (iii);

(v)     all bed rights associated with the Facilities;

(vi)     the Warranties;

(vii)     all machinery, equipment (including all transportation and office equipment), tools, fixtures, trade fixtures, furniture, furnishings, computer equipment, telephone systems and furniture owned by Seller wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Seller or used or held for use in or useful for the Business or located on or used in connection with the ownership, use, operation or maintenance of the Property or the Facilities;

(viii)     all other tangible property of any kind wherever located, including all property of any kind located in any building, office or other space leased, owned or occupied by Seller other than the Supplies (as such term is defined in the OTA), which will be transferred to New Operator pursuant to the OTA (assets identified in clauses (vii) and (viii), collectively, the "Personal Property");

(ix)     all claims, deposits, prepayments, award, prepaid expenses, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent) of Seller with respect to the Purchased Assets, including all right, title and interest, if

any, of Seller to any unpaid award for (1) any taking by condemnation or (2) any damage to the Land or the Improvements by reason of a change of grade of any street or highway;

(x)     all transferable Permits from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records held by such permitting, licensing and certifying agencies;

(xi)     all rights to proceeds of or claims under any loss of income insurance or equivalent insurance maintained by Seller and any rent insurance or equivalent coverage maintained by Seller that are, in each case, required to be assigned by Seller to Purchaser pursuant to Section 11; and

(xii)     all intangible property not otherwise specified above, including all goodwill symbolized and associated with the Facilities or Seller.

Without limiting the generality of the foregoing, Purchased Assets shall include all assets, property, rights and business acquired by Seller on or after the Effective Date. If any assets, property, rights or business of the Business or relating to the Property or the Facilities that are intended to be transferred to Purchaser pursuant to the terms of this Agreement but do not appear on the Schedules or is not otherwise identified in this Section 1, such assets, property, rights and business shall nonetheless be deemed transferred to Purchaser. For the avoidance of doubt, nothing contained in this Agreement shall limit any claims or defenses Purchaser may have against any Third Party.

Notwithstanding anything in this Agreement to the contrary, Seller shall retain, and Purchaser shall not accept, any of Seller's right, title and interest in and to any of the following assets of Seller (collectively, the "Excluded Assets"):

(i)     all Seller's Cash;

(ii)     all Accounts Receivables of Seller;

(iii)     With respect to the Williamsport facilities, parcels 26-330-144.A and 26-330-144.Z; provided that the second such parcel shall only be excluded to the extent not used in the operation, and/or necessary for legal compliance, of such facilities, and also does not reduce the area reflected as parcels 26-330-144.B and 26-330-144.C on the survey attached as Schedule 1(b)(iii) hereto.

(iv)     subject to Section 1(viii), all insurance policies of Seller and all rights to proceeds under Seller's insurance policies and all proprietary computer software owned or developed by Seller (including but not limited to source code, executable code data, databases and documentation);

(v)     any and all rights, claims, or causes of action of Sellers against third parties arising out of events occurring prior to the Closing Date and any and all rights,

4

claims or cases of action of Sellers against third parties with respect to the Excluded Assets arising out of events occurring after the Closing Date;

            (vi)    the articles of incorporation, bylaws, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, company procedure manuals, equity transfer books, equity certificates, and other documents relating to the organization, maintenance and existence of Seller as a corporation;

            (vii)    all deposits or prepaid charges and expenses paid prior to the Closing Date;

            (viii)    all personnel records and other records and files that Sellers are required by law to retain in its possession;

            (ix)    all of the rights of Seller under this Agreement, any document executed in connection herewith, and any other agreement between Seller on the one hand and Purchaser on the other hand entered into on or after the Effective Time; and

        2.    **Liabilities of Seller**.  Except for the Assumed Mortgage, Purchaser shall not be the successor to Seller, and Seller hereby acknowledges and agrees that pursuant to the terms of this Agreement, neither Purchaser nor any of its Affiliates shall assume or become liable to pay, perform or discharge any Liability of Seller of any kind or nature, at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, arising out of this or any other transaction or event and whether or not relating to any of the Purchased Assets or the Business, regardless of any disclosure made or exceptions noted with respect to the representations and warranties, covenants or agreements contained in this Agreement or any other document executed or delivered by Seller in connection with the transactions contemplated hereby, including the following specifically enumerated Liabilities (collectively, the "Excluded Liabilities"):

            (i)    all Liabilities for Indebtedness of Seller;

            (ii)    all Liabilities of Seller that relate to any of the Excluded Assets;

            (iii)    except for as otherwise stated in this Agreement, all Liabilities of Seller or for which Seller could be liable relating to Taxes (including with respect to the Purchased Assets or otherwise) including any Taxes that will arise as a result of the sale or transfer of any of the Purchase Assets pursuant to this Agreement, all Liabilities for Taxes for which Seller is responsible under Section 15 and any Liability related to Taxes of Seller imposed upon Purchaser by reason of Purchaser's status as transferee of the Business or any of the Purchased Assets (including under any bulk sales law);

            (iv)    except for as otherwise stated in this Agreement, all Transaction Expenses of Seller in connection with, resulting from or attributable to the transactions contemplated by this Agreement and the Other Documents;

(v)     any Liability arising out of any Action commenced against Purchaser or with respect to any of the Purchased Assets after the Closing, the facts of which arising out of, or relating to, any occurrence, circumstance or event happening or existing prior to the Closing;

(vi)    all Liabilities of Seller relating to any Action for malpractice, professional liability, resident rights violations or violations of employee rights or contracts or otherwise constitute or are alleged to constitute a tort, breach of contract or violation of any law, rule, regulation, treaty or other similar authority; and

(vii)   all other Liabilities of Seller with respect to any acts, events or transactions whether occurred in the past, occurring at the present or occurring in the future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened.

Without limiting the foregoing, and except as expressly set forth in this Agreement and the Sale Order, to the fullest extent permitted by law (including under Section 363 of the Bankruptcy Code), upon the Closing, Purchaser shall not be deemed to: (i) be the successors of the Seller, (ii) have, de facto, or otherwise, merged with or into the Seller, (iii) be a mere continuation or substantial continuation of the Seller or the business, enterprise(s), or operations of the Seller or (iv) be liable for any acts or omissions of the Seller in the conduct of their business or arising under or related to the Property. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement and the Sale Order, Purchaser shall not be liable for any Claims or Encumbrance (other than Assumed Liabilities (as defined in the OTA) and Permitted Encumbrances) against any Seller or any of the Sellers' predecessors or affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, including, without limitation, any liabilities owed by the Seller and/or Old Operators to the Pennsylvania Department of Health ("DOH"), the Pennsylvania Department of Human Services ("DHS"), any taxes of any kind whether now existing or hereafter arising with respect to the Facilities or the Property, or any other liabilities of the Seller arising prior to the Closing Date. The parties agree that provisions substantially in the form of this Section 2, as well as any other provisions requested by Buyers to ensure "free and clear" sale of the Property, shall be reflected in the Sale Order.

Notwithstanding anything to the contrary herein or in the OTA, in the event that (i) New Operators or Purchaser must engage legal counsel or incur any other costs or expenses to enforce the terms of the Sale Order, or (ii) a Governmental Authority determines pursuant to a Final Order that New Operators, Purchaser, or the Purchased Assets are liable for any type of Claim or Encumbrance against New Operators, Purchaser, or the Purchased Assets that are not expressly assumed pursuant to the OTA, this Agreement, or the Sale Order, then then New Operators and Purchaser may recover the amount of any losses, liabilities, or damages resulting from the same, including, without limitation, costs and fees for legal counsel and related expenses, by offset against the Holdback Note.

3.      **Purchase Price; Escrow**.

     (a)   <u>Purchase Price</u>.  The purchase price (as may be adjusted pursuant to <u>Section 7</u>, the "<u>Purchase Price</u>") for the Purchased Assets shall be an amount equal to Sixty Three Million and No/00 Dollars ($63,000,000.00) which Purchase Price shall be subject to prorations as set forth herein.  Allocation of the Purchase Price among the Purchased Assets and various asset classes thereof shall be determined by Purchaser and set forth in **<u>Schedule 3(a)</u>** attached hereto.  Each party agrees (i) to complete jointly and file separately Form 8594 with its federal income tax return consistent with such allocation for the tax year in which the Closing occurs, and (b) that no party shall take a position on any income, transfer, gains or other tax return, or before any federal, state or local governmental or quasi-governmental authority or in any judicial proceeding that is in any manner inconsistent with the terms of such agreed upon allocation.

     (b)   <u>Payment of Purchase Price</u>.  At the Closing, the Purchase Price shall be paid to Seller as follows:

     (i)   The promissory note of Purchaser in the form attached as **<u>Exhibit C</u>** hereto ("<u>Holdback Note</u>") in the initial principal amount of Ten Million Dollars ($10,000,000), which shall have a term of two (2) years, bearing 0% interest, and provide for the payment of $3,000,000 on the first anniversary of the Closing Date, and the remaining balance of the note shall be paid at maturity, which shall be subordinate to and subject to all requirements of Purchaser's lender including Lender, if applicable.

     (ii)   The remainder of the Purchase Price, if any, subject to credits and prorations herein as well as under the OTA, shall be paid to Seller in cash or by wire transfer of immediately available funds.

     (iii)   Notwithstanding subsection (ii) herein, Purchaser shall have the option to credit bid any outstanding balance of that certain loan (the "<u>DIP Loan</u>") made by Eden Senior Care, LLC, an Illinois limited liability company ("<u>DIP Lender</u>") to Seller and Old Operators pursuant to section 363(k) of the Bankruptcy Code, against any amount of the Purchase Price in excess of satisfaction of any and all amounts due and owing by Seller to Oxford Finance.

     (c)   If Purchaser is the Successful Bidder at the Auction, or there are no other Qualifying Bidders as of the Bid Deadline, each as approved by the Bankruptcy Court in the Sale Order, at Closing, subject to any applicable adjustments provided herein and in the OTA to be reflected in the Closing Statement (as defined below), Buyers shall cause the delivery of the balance of the Purchase Price to Sellers by wire transfer of immediately available funds.

     (d)   <u>Closing Escrow</u>.  Prior to the Closing Date, Purchaser and Seller shall provide to the Title Company joint escrow instructions to open an escrow for the consummation of the sale of the Purchased Assets to Purchaser pursuant to the terms of this Agreement in accordance with the general provisions of the usual form of joint escrow instructions used in similar transactions by such holder with special provisions

inserted to conform with this Agreement, as shall be mutually acceptable to the parties hereto. Provided that all conditions to Closing set forth in this Agreement have been satisfied or, as to any condition not satisfied, waived by the party intended to be benefited thereby, on the Closing Date (other than those conditions which can only be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), the Title Company shall conduct the Closing by recording or distributing the following documents and funds in the following manner:

(i)    Record the Deed in the official records of the county in which the Land is located;

(ii)    Deliver to Purchaser all documents that are required to be delivered by Seller to Purchaser pursuant to Section 6(a) hereof (to the extent the same shall be delivered to the Title Company at or prior to the Closing); and

(iii)    Deliver to Seller (x) all documents that are required to be delivered by Purchaser to Seller pursuant to Section 6(b) hereof (to the extent the same shall be delivered to the Title Company at or prior to the Closing), and (y) the Purchase Price and such other funds, if any, as may be due to Seller by reason of credits under this Agreement, less all items chargeable to Seller under this Agreement.

4.    **Time and Placing of Closing**.

(a)    The closing of the transactions contemplated hereby (the "Closing") shall take place, subject to satisfaction or waiver of each of the closing conditions set forth in Section 6 hereof (other than those conditions which can only be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing), on the first day of the calendar month that is at least thirty (30) days following receipt of the (i) the Regulatory Approvals, and (ii) the Sale Order becomes a Final Order (as defined herein) (the "Closing Date"). The Closing shall be effective as of 12:01 a.m. (Central Time) on the day following Closing Date (the "Effective Time").

(b)    Except as otherwise expressly provided herein or as otherwise agreed by the parties, (i) Closing will occur with respect to all Facilities simultaneously, and (ii) this Agreement may be terminated only with respect to all Facilities.

5.    **Due Diligence; Site Access; Title and Survey; and Licensure**.

(a)    Site Access. Purchaser shall have the right, at reasonable times, to enter upon the Property to conduct such inspections, investigations, tests and studies as Purchaser shall deem necessary, including, without limitation, environmental site assessments, engineering tests and studies, physical examinations of the Property, due diligence investigations and feasibility studies. To the extent Purchaser hires any Third Party site inspectors, engineers or other parties that will invasively inspect and/or test the Property, Purchaser will first ensure that such Third Party(ies) have adequate insurance covering any potential damage done to the Property as a result of such inspection/testing.

Purchaser shall also have the right upon twenty four (24) hours prior written notice to tour the Facilities, to review the books and records related to the financial condition and the operations thereof and to observe the day-to-day operations and management thereof.

      (b)    <u>Title and Survey</u>.

      (i)    Prior to the commencement of this Agreement, Seller shall provide Purchaser its most current title insurance policy for the Property, to the extent such policy is in Seller's possession. Purchaser shall order from Madison Title Agency LLC (the "<u>Title Company</u>") a commitment (the "<u>Title Commitment</u>") for an ALTA 2006 owner's title insurance policy (the "<u>Title Policy</u>"), in an amount equal to the Purchase Price, dated or updated to the Closing Date, insuring or committing to insure, at its ordinary premium rates, Purchaser's good and marketable title in fee simple to the Property subject only to the Permitted Exceptions and shall include extended coverage over General Exceptions 1 through 5 inclusive as well as additional endorsements including (i) survey endorsement, (ii) unconditional Comprehensive Endorsement No. 1, (iii) ALTA Endorsement Form 3.1 endorsement (including compliance with parking requirements) which must specifically state that the use of the Facilities and the Land are "permitted uses" under the governing zoning ordinance, (iv) location endorsement, (v) access endorsement, (vi) one tax parcel endorsement, (vii) if the Land consists of more than one subparcel, contiguity endorsement, (viii) environmental lien endorsement, and (ix) such endorsements as Purchaser may reasonably require (items (i) through (ix) collectively referred to herein as the "<u>Title Endorsements</u>"); and

      (ii)    Prior to the commencement of this Agreement, Seller, if in its possession, shall provide to Purchaser its most current survey of the Property. Purchaser may order a currently dated ALTA survey of the Property (the "<u>Survey</u>").

      (c)    <u>Title Defects</u>.  Within fifteen (15) Business Days following Purchaser's receipt of all of the Title Commitment, Survey, zoning report, and elevation certificate (if applicable), Purchaser shall notify Seller of any matters shown on the Title Commitment, Survey, zoning report, and elevation certificate that are not acceptable to Purchaser (such exceptions referred to herein as the "<u>Title Defects</u>").  If any updates to the Title Commitment or Survey shall disclose any additional matters, Purchaser shall have five (5) Business Days from the receipt of such updates within which to notify Seller thereof, in which case any such matters for which Purchaser provides notice shall also be treated as "Title Defects" hereunder.  In the event that any Title Defects have not been cured by Seller on or before the date that is fifteen (15) Business Days prior to the Closing Date, Seller may elect in its sole discretion, by written notice to Purchaser, to either (i) undertake at its expense to cure such Title Defects prior to the Closing (the "<u>Seller's Election</u>"), or (ii) not cure such Title Defects.  In the event that Seller does not elect to cure such Title Defects pursuant to the immediately preceding sentence, Purchaser may, by notice to Seller on or prior to the Closing Date (*x*) terminate this Agreement in

accordance with <u>Section 13</u>, or (*y*) indicate to Seller that, notwithstanding the Title Defects described in this <u>Section 5(c)</u>, Purchaser elects to not terminate this Agreement as a result of such Title Defects (such Title Defects, as well as any matters shown in the Title Commitment or Survey to which Purchaser does not object as permitted herein, being thereafter deemed as "<u>Permitted Exceptions</u>" hereunder). Seller shall be required to pay off at the Closing (to the extent not otherwise removed as a function of the Sale Order): (i) all Indebtedness of Seller secured by the Property and (ii) all Indebtedness of Seller covering, relating to or secured by any other Purchased Assets or otherwise relating to the Business, and to either pay off or cause the Title Company to insure or endorse over any mechanic's or materialmen's liens for work or materials undertaken or acquired by or on behalf of Seller, any Lien against Seller, and any other exceptions or encumbrances to title that may be cleared through the payment of money (provided, however, Seller shall be entitled to utilize the Purchase Price proceeds to effectuate any or all of the foregoing).

(d) <u>Regulatory Approvals</u>. Subject to the terms of this Agreement, New Operator will be responsible for taking all steps which may be taken prior to the Closing in order to obtain on or after the Closing all Permits from Governmental Authorities that are required as a result of the transactions contemplated in this Agreement and the OTA, including without limitation: (i) the submission to the Pennsylvania Department of Health ("<u>DOH</u>") of an application for licensure ("<u>Licensure</u>") with respect to operation of the Facilities within [thirty (30)] days after the Effective Date, and ii) applications to be certified to participate in the Medicare and Medicaid reimbursement programs (the foregoing, collectively, the "<u>Regulatory Approvals</u>"). Seller agrees to use its best efforts and cooperate with New Operator in obtaining such Regulatory Approvals. Without limiting the foregoing, Seller hereby authorizes New Operator to file an advance notice of the change of ownership of the Facility not less than 30 days prior to the Closing Date. Notwithstanding anything to the contrary in this Agreement, in no event shall New Operator be required to, and Seller may not, without the prior written consent of Purchaser, and may not require, without the prior written consent of Purchaser, New Operator to, accept any condition to the Regulatory Approvals required or proposed by any Governmental Authorities, enter into any contract or commitment or take any other actions to resolve any objections or Actions of any Governmental Authorities with respect the Regulatory Approvals, unless such condition, contract, commitment or action is acceptable to Purchaser and New Operator, jointly and severally, at their sole discretion.

(e) <u>Bed Taxes</u>. The Sale Order shall provide that Purchaser and New Operator shall not have any liability to DOH and any other applicable Governmental Authorities with respect to any unpaid (whether due, or relating to periods prior to the Closing but not yet due) bed tax, provider taxes, or other similar fees or taxes due and payable by the Seller and New Operator, or relating to periods prior to the Closing but not yet due and payable, as of the Closing Date ("<u>Unpaid Bed Taxes</u>") in form and substance acceptable to Purchaser such that Purchaser and New Operator shall have no successor liability with respect to any such Unpaid Bed Taxes after the Closing.

6.      **Conditions to Closing**.

(a)      **Purchaser's Conditions**. Purchaser's obligation to consummate the transactions contemplated in this Agreement, pay the Purchase Price and accept title to the Purchased Assets shall be subject to the following conditions precedent on or prior to the Closing Date of the satisfaction of Purchaser or the waiver thereof by Purchaser, which waiver shall be binding upon Purchaser only to the extent made in writing and dated on or prior to the Closing Date.

(i)      Seller shall have duly performed and complied in all respects with all covenants and conditions required by this Agreement to be performed or complied with by Seller.

(ii)      Possession of the Property shall have been delivered to Purchaser free and clear of all tenancies and other occupancies and the Purchased Assets shall be delivered to Purchaser free and clear of all Liens except for any Permitted Exceptions, including any occupancy rights of any residents of the Facilities.

(iii)      Seller shall deliver to Purchaser or, if applicable, to the Title Company to be held in escrow in accordance with the terms of this Agreement and the escrow agreement entered into by and among the parties hereto and the Title Company, as escrow agent, on or before the Closing Date the following, each of which shall be in form and substance satisfactory to Purchaser:

(1)      a special warranty deed, in substantially the form annexed hereto as **Exhibit D** (the "Deed") and in proper statutory form for recording, duly executed and acknowledged by each Seller, sufficient to convey to each Purchaser fee simple title to the Property free of all Liens other than the Permitted Exceptions;

(2)      a bill of sale, in substantially the form annexed hereto as **Exhibit E** (the "Bill of Sale"), containing covenants of title, duly executed and acknowledged by each Seller, sufficient to convey to each Purchaser good and indefeasible title, free of all Liens, in and to the Personal Property;

(3)      an affidavit of title and such other affidavits as may be required by the Title Company in connection with the conveyance of the Property;

(4)      an assignment by each Seller, in substantially the form annexed hereto as **Exhibit F** (the "General Assignment"), of all of Seller's right, title and interest in, to and under the items described in Section 1(b) above;

11

(5)     a certified copy of the Sale Order entered by the Bankruptcy Court;

(6)     all Permits and certificates of occupancy, if any, issued by any Governmental Authority relating to the use, maintenance, occupancy or operation of the Facilities running to, or in favor of, Seller, to the extent legally assignable, except to the extent the same are required to be and are affixed at the Property, and of variances issued by any Governmental Authority relating to the ownership, use, occupancy, operation or maintenance of the Property;

(7)     counterpart copies of all guaranties or warranties then in effect, if any, with respect to the Improvements and the Personal Property (the "Warranties");

(8)     a complete set of keys for the Improvements, appropriately tagged for identification;

(9)     the Foreign Investment in Real Property Tax Act affidavit in substantially the form annexed hereto as **Exhibit G**;

(10)     a form 1099 identifying Seller's gross proceeds and Seller's tax identification number, as required by the Title Company;

(11)     the duly executed certificate of an authorized officer of Seller or its managing constituent, dated as of the Closing Date, to the effect and stating that (A) this Agreement and the Other Documents to which Seller is a party have been duly authorized, executed and delivered by Seller pursuant to all necessary resolutions or consents of the appropriate governing body of Seller, and appearing on said certificate are the true signatures of all persons who have executed this Agreement and the Other Documents to which Seller is a party on behalf of Seller, (B) the executing persons are fully authorized to act on behalf of Seller or its constituent partners or members, as applicable and (C) conditions specified in Section 6(a)(i), Section 6(a)(ii), Section 6(a)(vii), Section 6(a)(ix), Section 6(a)(xii) and Section 6(a)(xiii) have been satisfied;

(12)     such other customary closing documents required in the city and county in which the Facilities are located and/or Commonwealth of Pennsylvania; and

(13)     counterparts to the Other Documents duly executed by all parties thereto (other than Purchaser).

(iv)     Purchaser shall receive from the Title Company an ALTA 2006 owner's policy of title insurance, or a mark-up to the Title Commitment that is

customarily made to title commitments in respect of transactions effected in the Commonwealth of Pennsylvania, county and city where the Facilities are located that are comparable to the transactions contemplated under this Agreement, which commitment shall act as an irrevocable and unconditional commitment to issue the same, in an amount equal to the Purchase Price, dated, or updated to, the Closing Date, insuring, or committing to insure Purchaser's good and marketable title in fee simple to the Property subject only to the Permitted Exceptions and shall include extended coverage over General Exceptions 1 through 5 inclusive and contain the Title Endorsements.

(v)     Purchaser shall have received a copy of the Organizational Documents of Seller, together with amendments and supplements thereto, certified as of the most recent practicable date by the secretary of state of Seller's jurisdiction of incorporation or organization.

(vi)     The closing conditions described in the OTA shall have been met, to the reasonable satisfaction of Purchaser, and the closing under the OTA shall occur concurrently herewith.

(vii)     New Operator shall have received the Licensure, the terms and conditions of which shall be satisfactory to New Operator and Purchaser, jointly and severally, at their sole discretion.

(viii)     Seller shall have provided the waiver and release of the Unpaid Bed Taxes satisfactory to Purchaser in its sole discretion.

(ix)     On the Closing Date, there shall not be any lawsuits filed or threatened against Seller that are not covered by insurance and being defended, subject to policy limits and any reservation of rights; nor shall there be any actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against Seller, to restrain or prohibit the consummation of the transactions contemplated hereby.

(x)     As of the Closing Date, there shall be no material and adverse change from the date hereof in the condition of any of the Purchased Assets, or any portion thereof, or in any Facility's operations, Applicable Laws, Permitted Exceptions, contractual relations, regulatory status, or any other circumstances affecting the Purchased Assets previously approved by Purchaser, including without limitation, the operations and/or the status of each Facility as a licensed skilled nursing facility for the number of beds set forth herein.

(xi)     Purchaser shall have approved of any updates to the Schedules and/or Exhibits, pursuant to Section 17(e).

13

(xii)    There shall not have been disclosed any adverse environmental conditions, on Phase I studies ordered by Purchaser and/or its lender that would prevent Purchaser from obtaining financing.

(xiii)    The representations and warranties of Seller contained in this Agreement shall have been true, correct, complete and not misleading in all respects as of the Effective Date and as of the Closing Date.

(xiv)    The Bankruptcy Court shall have entered the Sale Order approving the sale of the Transaction Assets to Purchaser and New Operators free and clear of all Claims and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), including, without limitation, claims of DOH, and DHS, and such Sale Order shall be a Final Order

(xv)    Seller shall prepare a Bulk Sales Transfer Notice for the Transferred Assets ("Bulk Sales Transfer Notice") pursuant to the Bulk Sales Laws in effect in the Commonwealth of Pennsylvania ("Bulk Sales Laws") and file it with the Pennsylvania Department of Revenue and the Pennsylvania Department of Labor and Industry ("Filing Offices") not later than ten (10) days prior to Closing.

(b)    Seller's Conditions.  Seller's obligation to consummate the transactions contemplated in this Agreement and deliver title to the Property shall be subject to the following conditions precedent on or prior to the Closing Date of the satisfaction of Seller or the waiver thereof by Seller, which waiver shall be binding upon Seller only to the extent made in writing and dated as of the Closing Date.

(i)    Subject to the satisfaction or waiver by Purchaser of each of the conditions precedent to the obligations of Purchaser set forth in Section 6(a) (other than those conditions that by their nature can only be satisfied or waived at the Closing), Purchaser shall have delivered or caused to be delivered the balance of the Purchase Price due hereunder.

(ii)    Purchaser shall have delivered the following:

(1)    the duly executed certificate of an authorized officer of Purchaser or its managing constituent, dated as of the Closing Date, to the effect that (A)  this Agreement and all Other Documents to which Purchaser is a party have been duly authorized, executed and delivered by Purchaser pursuant to all necessary resolutions or consents of the appropriate governing body of Purchaser, and appearing on said certificate are the true signatures of all persons who have executed this Agreement and the Other Documents to which Purchaser is a party on behalf of Purchaser, (B) the executing persons are fully authorized to act on behalf of Purchaser or its constituent partners or members, as applicable and (C) conditions specified in Section 6(b)(iii) have been satisfied; and

14

        (2)     counterparts to the Other Documents to which Purchaser is a party, duly executed by Purchaser.

        (iii)     Purchaser shall have been the Successful Bidder at the Auction, or otherwise pursuant to the Bidding Procedures Order if there were no other Qualifying Bidders, and the Bankruptcy Court shall have entered the Sale Order approving the sale of the Purchased Assets to Purchaser free and clear of all Claims and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities) and such Sale Order shall be a Final Order.

        (iv)     The representations and warranties of Purchaser contained in this Agreement shall have been true, correct, and complete and not misleading as of date hereof and as of the Closing Date and Purchaser shall be in full compliance with the terms and provisions of this Agreement, in each case subject only to exceptions permitted by this Agreement.

        (c)     <u>Waiver</u>.  In the event that either of the parties hereto (a "<u>Waiving Party</u>") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies at law or equity with respect thereto.

7.     **Apportionments**.

        (a)     <u>Closing Prorations</u>.  The following items shall be apportioned at the Closing between periods prior to the Closing and periods following the Closing, as of the Effective Time, and, to the extent all applicable amounts due and payable with respect to periods following the Closing have been or will be paid in full by or on behalf of Seller on or prior to the Effective Time, the Purchase Price shall be increased in the amount of any such items that relate to periods following the Closing, and, to the extent all applicable amounts due and payable with respect to periods prior to the Closing have not been or will not be paid in full by or on behalf of Seller on or prior to the Effective Time, the Purchase Price shall be decreased in the amount of any such items that related to periods prior to the Closing, to the extent not paid in full prior to the Effective Time.

        (i)     Real estate Taxes, assessments (other than special assessments), personal property taxes, and water, vault and sewer charges, as well as any other governmental charges or Taxes assessed on the Property or the other Purchased Assets, based on the rates and assessed valuation applicable in the fiscal year for which assessed; provided that if the Closing shall occur before the real estate tax rate or personal property tax rate is fixed, the apportionment of said taxes shall be based one hundred ten percent (110%) of the most recently ascertainable real estate tax fiscal year.  Allocation of real estate taxes billed with respect to the Property to yearly periods shall be determined in accordance with local custom, as

determined by the Title Company. If, at the Closing, the Property or any part thereof is affected by an assessment which, at the option of Seller, is payable in installments and the first installment is then a charge or lien, or has been paid, then such assessment shall be deemed to relate to periods prior to the Closing and all unpaid installments of such assessments, including those which are to become due and payable after Closing, shall be deemed to be due and payable at or prior to the Closing and to be a lien upon the Property and shall be paid and discharged by Seller at Closing, or, alternatively, a credit to the Purchase Price shall be given to Purchaser of an amount equal to such unpaid installments.

(ii)     All charges and payments for utility services; provided that if there is no meter or if the current bill for any of such utilities has not been issued prior to the Closing Date, then such charges shall be adjusted at the Closing on the basis of the charges for the prior period for which bills were issued and shall be further adjusted when the bills for the current period are issued; provided further, to the extent possible, Seller shall terminate its accounts with the utility service providers and Purchaser shall establish its accounts with such utility service providers effective on the Closing Date, in which event, there shall be no proration for such utility services.

(iii)     After Closing, Seller shall file an Application For Tax Clearance Certificate (REV-181) (the "Application") with the Filing Offices, and thereafter use reasonable efforts to endeavor to obtain a Bulk Sales Clearance Certificate pursuant to the Bulk Sales Laws. If Seller fails to timely file the Bulk Sales Transfer Notice with the Filing Offices, then Buyer shall have the rights and remedies of Buyer upon a default by Seller under Section 8.1(c). Seller shall provide Buyer with evidence that it has filed the Bulk Sales Transfer Notice with the Filing Offices contemporaneously with such filings. Seller shall timely pay all taxes due to the Commonwealth of Pennsylvania or any department or instrumentality thereof (including the Department of Revenue and Department of Labor and Industry) pursuant to 72 Pa. Cons. Stat. § 1403. Seller shall indemnify, defend and hold Buyer harmless from and against any and all losses, claims, damages and liabilities, including, without limitation, penalties, interest, attorneys' fees and costs of defense resulting from Seller's late or non-payment, of any taxes imposed upon Seller by the Commonwealth of Pennsylvania or any department or instrumentality thereof (including the Pennsylvania Department of Revenue and Department of Labor and Industry) pursuant to 72 Pa. Cons. Stat. § 1403 (collectively, "Bulk Sales Taxes").

(b)     Survival. The obligations of the parties hereto under this Section 7 shall survive the Closing for a period of twelve (12) months.

8.     **Interim Operations**. From the Effective Date until Closing, or the earlier termination of this Agreement in accordance with Section 13, Seller shall: (a) maintain the Purchased Assets in substantially the same condition as they existed on the Effective Date, and not allow any deterioration of value to occur with respect to the Purchased Assets; (b) maintain

16

its current insurance policies in full force and effect through the Closing Date; (c) not create any Lien upon or affecting title to the Property or the Purchased Assets except for the Permitted Exceptions and any occupancy rights of any residents of the Facilities, without Purchaser's prior written consent; (d) not take any action which will or would cause any of the representations or warranties in this Agreement to become untrue or be violated without the prior written consent of Purchaser, which consent shall be provided or denied within ten (10) Days after request therefor; (e) perform all of their obligations in respect of the Purchased Assets whether pursuant to any contracts, or other requirements affecting the Purchased Assets; (f) promptly notify Purchaser in writing (with any such writing to include a written update to the Schedules to the extent applicable) upon Seller becoming aware: (i) that any representation or warranty in this Agreement made by Seller was when made, or has subsequently become, untrue or inaccurate, (ii) of the occurrence or the non-occurrence of any event the occurrence or the non-occurrence of which has caused or may reasonably be expected to cause any condition to the obligations of any party hereto to effect the transactions contemplated under this Agreement, any Other Document or OTA not to be satisfied, (iii) of the failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by Seller pursuant to this Agreement or any Other Document, (iv) of any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated under this Agreement, any Other Document or OTA, (v) of any notice or other communication from any Governmental Authority in connection with the transactions contemplated under this Agreement, any Other Document or OTA, (vi) of the commencement or initiation or threat of commencement or initiation of any Action regarding the transactions contemplated under this Agreement, any Other Document or OTA or otherwise involving any Purchased Assets or the Business, or (v) any material event adversely affecting the ownership, use, occupancy, operation, management or maintenance of the Purchased Assets or the Business, whether or not insured against; and (g) not solicit, accept or provide factual information or negotiate with respect to, any offer to purchase any of the Purchased Assets from any person or entity other than Purchaser. Wherever Purchaser's consent is required hereunder, such consent shall not be unreasonably withheld or delayed. For the avoidance of doubt, the closing conditions set forth in <u>Section 6(a)</u> and the indemnification provisions of <u>Section 12</u> shall be read without giving effect to any update to the Schedule or other written notices delivered pursuant to this <u>Section 8</u> or <u>Section 17(e)</u>.

9. **<u>Seller's Representations and Warranties</u>**. Except as set forth in the Seller Disclosure Schedules (it being understood that (i) nothing in Seller Disclosure Schedules shall be adequate to disclose an exception to a representation or warranty made in this <u>Section 9</u>, unless such section or subsection of the Seller Disclosure Schedules identifies the exception with reasonable particularity, (ii) the mere listing or referencing (or inclusion of a copy) of a document or other item shall not be adequate to disclose an exception to a representation or warranty, unless the representation or warranty has to do with the existence of such document or item and (iii) no exceptions to any representations or warranties disclosed in any specific section or subsection of the Seller Disclosure Schedule shall constitute an exception to any other representations or warranties made in this <u>Section 9</u>), Seller hereby makes the representations and warranties contained in this <u>Section 9</u> to Purchaser. These representations and warranties are made as of the date hereof and shall be deemed remade as of the Closing Date.

(a) <u>Organization and Authority</u>. Sellers are limited liability companies that validly exist under the laws of the Commonwealth of Pennsylvania. Seller has full power and right to enter into and perform its obligations under this Agreement and the Other Documents, including, without being limited to, conveying the Property and the other Purchased Assets. The execution and delivery of this Agreement and the Other Documents to which Seller is a party and the consummation of the transactions contemplated hereby and thereby (1) have been duly authorized by all necessary action on the part of Seller, (2) do not require any governmental or other consent and (3) will not result in the breach of any agreement, indenture or other instrument to which Seller is a party or is otherwise bound.

(b) <u>Non-Foreign Status</u>. Seller is a "non-foreign person" within the meaning of Section 1445 of the United States Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

(c) <u>Reserved</u>.

(d) <u>Environmental Condition</u>. Seller has not generated, stored or Released any Hazardous Substance on the Property, and there is not currently any Hazardous Substance on the Property.

(e) <u>Special Assessments</u>. There are no (1) pending or threatened special assessments affecting the Purchased Assets or (2) any contemplated improvements affecting the Purchased Assets that may result in special assessments affecting the Purchased Assets. There are no tax abatements, phase-ins or exemptions affecting the Purchased Assets.

(f) <u>Access to Property</u>. Seller has no knowledge of any federal, state, county, municipal or other governmental plans to change the highway or road system in the vicinity of the Property or to restrict or change access from any such highway or road to the Property.

(g) <u>Existing Mortgages</u>. There are no mortgages or deeds of trust currently encumbering the Property, recorded or otherwise that will not be removed as a function of the Sale Order. Except for the Permitted Exceptions, there are no Liens affecting the Property or the other Purchased Assets that will not be removed as a function of the Sale Order. In addition there are no mechanic's liens, materialman's liens or similar claims or liens claimed or which may be claimed against any of the Property or the other Purchased Assets for work performed or commenced prior to the Closing Date that will not be removed as a function of the Sale Order.

(h) <u>Leases</u>. Other than the existing lease between Seller and Old Operator, which shall be terminated as of the Closing Date and the new lease to be entered into by and among Purchaser and New Operation as of the Closing Date, there are currently, and as of the Closing Date there shall be, no occupancy rights (written or oral), leases or

tenancies presently affecting the Property or the Facilities and the portion of the Property which it is located, other than any occupancy rights of any residents of the Facilities.

(i)    <u>Permits</u>. The Permits as listed on <u>Schedule 9(i)</u> hereto are all of the material certificates, licenses and permits from governmental authorities held by Seller in connection with the ownership, use, occupancy, operation and maintenance of the Purchased Assets and the Facilities, and are all of the certificates, licenses, accreditations and permits necessary in connection with the current ownership, use, occupancy, operation and maintenance thereof.

(j)    <u>Intellectual Property</u>. Other than the trade name "[_____]", Seller does not own any intellectual property in connection with or applicable to the Property or the other Purchased Assets, including any registered trade names, logotypes, trademarks or copyrights.

(k)    <u>Required Consents</u>. No consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution or delivery by Seller of this Agreement, or the performance of the transactions contemplated thereunder, except (1) approval by DOH of the Licensure, and (2) such consents, certifications or licenses from the DOH, United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("<u>CMS</u>") or any other governmental agency with jurisdiction over the Facilities as are necessary to permit Seller to operate the Facilities prior to the Closing Date.

(l)    <u>Litigation</u>. Except as set forth in <u>Schedule 9(m)</u>, there are no pending or threatened litigation, investigations, claims, lawsuits, governmental actions or other proceedings, including without limitation, any desk audit or full audit, involving the Purchased Assets, or the operation thereof before any court, agency or other judicial, administrative or other governmental or quasi-governmental body or arbitrator.

(m)    <u>Taxes</u>. Seller has timely filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns.

(n)    <u>Sprinklers</u>. There is a sprinkler system at the Facilities that is in full operational compliance with all applicable requirements.

(o)    <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Other Document based upon arrangements made by or on behalf of Seller.

(p)    <u>Intentionally Omitted</u>.

(q)    <u>No Defaults</u>. The execution, delivery and performance of this Agreement, the OTA and any of the Other Documents by Seller does not and will not:

19

(i)     conflict with or result in any breach of the provisions of, or constitute a default under any Seller's certificate of formation or operating agreement;

(ii)     violate any restriction to which Seller is subject or, with or without the giving of notice, the passage of time, or both, violate (or give rise to any right of termination, cancellation or acceleration under) any mortgage, deed of trust, license, material lease, indenture or other material agreement or instrument, whether oral or written, to which Seller or the Facilities is a party, or by which it or its property is bound, which will not be satisfied or terminated on or prior to the Closing as a result of the transactions contemplated in this Agreement or the OTA, or result in the termination of any such instrument or termination of any provisions in such instruments that will have a material adverse effect upon or result in the creation or imposition of any Lien upon the Purchased Assets;

(iii)     constitute a violation of any Applicable Law by which Seller or the Facilities are subject, the violation of which will have a material adverse effect upon the Purchased Assets or Facilities; or

(iv)     create any Lien on the Purchased Assets in favor of any Third Party.

(r)     <u>Truth and Accuracy of Representations and Warranties</u>.  No representation or warranty by or on behalf of Seller contained in this Agreement and no statement by or on behalf of Seller in any certificate, list, exhibit or other instrument furnished or to be furnished to Purchaser by or on behalf of Seller pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

(s)     <u>Survival of Representations and Warranties</u>.  The representations and warranties of Seller contained herein shall survive the Closing for a period of twelve (12) months.

10.     **Purchaser's Representations and Warranties**.  Purchaser hereby makes the representations and warranties contained in this <u>Section 10</u>, to Seller.  These representations and warranties are made as of the date hereof, and shall be deemed remade as of the Closing Date.

(a)     <u>Organization and Authority</u>.  Purchaser is a limited liability company that has been duly organized and validly exists under the laws of the Commonwealth of Pennsylvania and is duly qualified to do business in the State in which the Property is located.  Purchaser has full power and right to enter into and perform its obligations under this Agreement and the Other Documents.  The execution and delivery of this Agreement and the Other Documents to which Purchaser is a party and the consummation of the transactions contemplated hereby and thereby (1) have been duly authorized by all necessary action on the part of Purchaser, (2) do not require any

20

governmental or other consent (except as otherwise provided herein), and (3) will not result in the breach of any agreement, indenture or other instrument to which Purchaser is a party or is otherwise bound.

(b) No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Other Document based upon arrangements made by or on behalf of Purchaser.

(c) Survival of Representations and Warranties. The representations and warranties of Purchaser contained herein shall survive the Closing.

11. **Risk of Loss**.

(a) Fire or Other Casualty. The risk of any loss or damage to any of the Purchased Assets by fire or other casualty prior to the Effective Time is assumed by Seller. Seller shall give Purchaser written notice of any fire or other casualty within three (3) calendar days of the occurrence of same, which notice shall include a description thereof in reasonable detail and an estimate of the cost of and time to repair. In the event that the Purchased Assets shall suffer any fire or other casualty or any injury that would require Fifty Thousand Dollars ($50,000) or more to repair, Seller agrees to repair the damage to the satisfaction of Purchaser at its sole cost and expense before the Closing Date or, in the alternative, Seller shall assign to Purchaser the proceeds of or claims in respect of any loss of income insurance or equivalent coverage maintained by them and the Purchase Price shall be credited in the amount of any damage not covered by insurance.

(b) Eminent Domain. The risk of any loss or damage to the Purchased Assets by condemnation before the Effective Time is assumed by Seller. In the event any condemnation proceeding is commenced or threatened, Seller shall give Purchaser written notice thereof within three (3) calendar days after the occurrence of same, together with such reasonable details with respect thereto as to which Seller may have knowledge. As soon as the portion or portions of the Purchased Assets to be taken are reasonably determinable, Seller shall give Purchaser written notice thereof together with Seller's estimate of the value of the portion or portions of the Purchased Assets to be so taken. In the event of any material taking of the Purchased Assets worth Fifty Thousand Dollars ($50,000) or more, Seller shall assign to Purchaser at the Closing all of Seller's right, title and interest in and to all awards made in respect of such condemnation and any claims in respect of any rent insurance or equivalent coverage maintained by it, and shall pay over to Purchaser all amounts theretofore received by Seller in connection with such taking. Purchaser shall be entitled to participate in any such condemnation proceeding, and Seller shall cooperate with Purchaser in such respect.

(c) Survival. The parties' obligations, if any, under this Section 11 shall survive the Closing for a period of twelve (12) months.

12.    **Indemnification**.

(a)    <u>By Seller</u>.  In addition to and not in lieu, place, stead and/or substitution of any other indemnity set forth elsewhere herein, Seller shall indemnify, save, protect, defend and hold harmless, Purchaser, its Affiliates, and their respective members, managers, employees, shareholders, officers, directors and agents (collectively, the "<u>Purchaser Indemnitees</u>"), from and against any and all direct and indirect Liabilities, judgments, claims, suits, proceedings, settlements, losses, damages, fees, Liens, Taxes, penalties, interest obligations, expenses (including out of pocket costs of investigation and defense and reasonable attorney fees and expenses), and any diminution in value of the Purchased Assets resulting therefrom (collectively, "<u>Losses</u>") incurred or suffered by any such Purchaser Indemnitee arising from, by reason of or, in connection with (i) any misrepresentation or inaccuracy in, or breach of any representation or warranty of Seller contained in this Agreement or any certificate delivered pursuant hereto on the part of Seller, (ii) any breach by Seller of any covenant or agreement made by Seller in this Agreement (including under this <u>Section 12</u>), (iii) ownership of the Facilities prior to the Effective Time, (iv) any fraud or intentional misrepresentation on the part of any Seller or its Representatives, (v) the Excluded Liabilities, or (vi) Bulk Sales Taxes.

(b)    <u>By Purchaser</u>.  In addition to and not in lieu, place, stead and/or substitution of any other indemnity set forth elsewhere herein, Purchaser shall indemnify, save, protect, defend and hold harmless Seller, their employees, members, managers, shareholders, officers, directors and agents (collectively, the "<u>Seller Indemnitees</u>"), from and against any and all applicable Losses incurred or suffered by any such Seller Indemnitee arising from, by reason of or, in connection with (i) any breach by Purchaser of its obligations, representations, warranties, agreements or covenants hereunder, and (ii) Purchaser's ownership of the Purchased Assets following the Effective Time.

(c)    In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Agreement is made against or received by any indemnified party (hereinafter "<u>Indemnitee</u>") hereunder or upon an Indemnitee becoming aware of a fact, condition or event that otherwise constitutes a basis for a claim for indemnification against the Indemnitor (an "<u>Indemnitee's Claim</u>"), said Indemnitee shall notify the indemnifying party (hereinafter "<u>Indemnitor</u>") in writing within twenty-one (21) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim, provided, however, that Indemnitee's failure to timely notify Indemnitor of Indemnitee's Claim shall not impair, void, vitiate or invalidate Indemnitor's indemnity obligation hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend or indemnify the Indemnified Claim.  Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall, in its sole, absolute and unreviewable discretion, diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the

final, unappealable resolution of said Indemnitee's Claim. Upon the receipt of the
written request of Indemnitee, Indemnitor shall within two (2) calendar days provide
Indemnitee a true, correct, accurate and complete written status report regarding the then
current status of said Indemnitee's Claim. Prior to an Indemnification Default (as defined
herein), Indemnitee may not settle or compromise an Indemnitee's Claim without
Indemnitor's prior written consent. Failure to obtain such consent shall be deemed a
forfeiture by Indemnitee of its indemnification rights hereunder. In the event that
Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee
harmless from and against an Indemnitee's Claim and/or to diligently pursue the same to
its conclusion, in the event that Indemnitor cannot produce documentation establishing
the availability of funds sufficient to cover its obligations with respect to Indemnitee's
Claim or in the event that Indemnitor fails to timely report to Indemnitee the status of its
efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days
prior written notice to Indemnitor during which time Indemnitor may cure any of the
foregoing conditions, the foregoing shall immediately, automatically and without further
notice be an event of default hereunder (an "Indemnification Default") and thereafter
Indemnitee may, but shall not be obligated to, immediately and without notice to
Indemnitor, except such notice as may be required by law and/or rule of Court, intervene
in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole
and exclusive cost and expense, including but not limited to attorneys' fees, and,
thereafter, within seven (7) calendar days of written demand for the same Indemnitor
shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable
costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or
compromise said Indemnitee's Claims.

(d)     No Waiver of Representations and Warranties. For avoidance of doubt,
Seller has agreed that Purchaser's rights to indemnification pursuant to this Agreement
shall not be affected or waived by virtue of any investigations or due diligence performed
by Purchaser.

(e)     Calculation of Losses. For purposes of determining whether a breach of,
or inaccuracy in a representation and warranty has occurred and for purposes of
calculating the amount of Losses pursuant to Section 12(a), each of the representations
and warranties in this Agreement shall be read without regard and without giving effect
to any materiality (including the word "material") as if such word or phrase were deleted
from such representation and warranty.

(f)     Survival. The parties' obligations under this Section 12 shall survive the
Closing.

(g)     Holdback Note. The obligations of Seller under this Section 12 and Old
Operator under Section 15 of the OTA are limited to the amount of and secured by the
Holdback Note, and the Seller hereby agrees that to the extent any amounts due to
Purchaser under this Section 12 and/or New Operator under Section 15 of the OTA are
not paid upon demand, the Purchaser may set off such amounts against any payments due
to Seller under the Holdback Note. To the extent that Service Provider has any claims for

indemnity under the Consulting Agreement, such amounts may be set off against the Holdback Note, provided that such amounts and the basis for such payments are disclosed in writing to the Seller on or before the Bid Deadline.

13.   **Termination; Remedies**.

(a)   <u>Seller's Default</u>.  If, prior to the Closing, (i) Seller shall default under any covenant or obligation or breach any representation or warranty set forth herein (which default is not waived in writing by Purchaser), or (ii) any of the conditions of Purchaser pursuant to <u>Section 6(a)</u> shall not have been satisfied or prepared to  be satisfied (any of the foregoing, a "<u>Seller Failure</u>"), then, provided that the foregoing is not the result of a breach of Purchaser hereunder, Purchaser shall have the right, at any time prior to the Effective Time to (1) terminate this Agreement by written notice to Seller,  or (2) specifically enforce this Agreement.  In all events, rights of Purchaser under this Agreement are cumulative.  It being understood that, in respect of Purchaser's right to specifically enforce the terms of this Agreement, Purchaser shall not be required to post a bond or make any other undertaking, and Seller agrees to not assert the defense that a remedy at law would be adequate.

(b)   <u>Purchaser's Default</u>.  If, prior to the Closing,  Purchaser shall default under any covenant or obligation or breach any representation or warranty set forth herein (which default is not waived in writing by Seller), or any of the conditions of Seller pursuant to <u>Section 6(b)</u> shall not have been satisfied or prepared to  be satisfied (any of the foregoing, a "<u>Purchaser Failure</u>"), then provide that the foregoing is not the result of a Seller Failure Seller shall have the right to declare this Agreement terminated by written notice to Purchaser as (other than as specifically set forth in Section 13(g) hereof) Seller's sole and exclusive remedy (whether at law, in equity, in contract, in tort or otherwise) against Purchaser, any of its Affiliates or any of their respective former, current and future holders of any equity, partnership or limited liability interest in Purchaser or such Affiliate, or any of their respective former, current and future directors, officers, employees and Representatives. For the avoidance of doubt, neither Purchaser nor any of its Affiliates shall have any liability for damages of any kind or nature or arising in any circumstances in connection with this Agreement or any Other Document.

(c)   <u>Mutual Termination</u>. This Agreement may be terminated, and the transactions contemplated under this Agreement and the Other Documents may be abandoned at any time prior to the Closing by mutual written consent of Purchaser and Seller.

(d)   <u>Additional Termination Rights</u>.  In addition to the foregoing, this Agreement may be terminated: (i) by written notice from Purchaser to Seller if the Chapter 11 Petitions have not been filed on or prior to October 15, 2024, (ii) by written notice from Purchaser to Seller if the Bankruptcy Court has not  entered the Bidding Procedures Order on or prior to the date that is forty (40) days after the Petition Date, or has not entered the Sale Order on or prior to the date that is eighty-five (85) days after the Petition Date, unless otherwise ordered by the Bankruptcy Court, (iii) by written notice

24

from Purchaser to Seller, if any of this Agreement, the OTA, the Sale Order, the Bidding Procedures or the Bidding Procedures Order is modified or amended without Purchaser's prior written consent.  This Agreement shall be terminated automatically: (i) in the event Purchaser is not chosen as the Successful Bidder at the Auction, or (ii) upon consummation of an Alternative Transaction.

(e)     Effect of Termination. In the event of the termination of this Agreement, written notice of such termination shall be delivered immediately to the other party, specifying the provision hereof pursuant to which such termination is made, and the provisions of this Agreement shall immediately become void and have no further force or effect, without any Liability to any Person in respect hereof or of the transactions contemplated hereby on the part of any party hereto or any Affiliates thereof, or any of its or their respective directors, officers, employees, agents, consultants, representatives, advisers and equity holders, except that the provisions of Section 12, this Section 13, Section 14, Section 15, Section 16 and Section 17 shall survive the termination of this Agreement and shall be enforceable against the parties hereto.

(f)     Notwithstanding anything herein or in the OTA to the contrary, if this Agreement is terminated by Purchaser because (i) the Bankruptcy Court enters an Order approving the sale of the Purchased Assets to Purchaser and New Operators, but such Order is not free and clear all Liens, Claims and Encumbrances of DHS and DOH (other than Permitted Encumbrances and Assumed Liabilities), or (ii) Closing does not otherwise occur because Purchaser and New Operators are unable to obtain the necessary licensure and/or Medicaid provider agreements from DHS and DOH as a result of the Liens, Claims and Encumbrances of DHS and DOH, and Purchaser and New Operators have complied in all material respects with all covenants and obligations required under this Agreement and the OTA to be performed by Purchaser and New Operators through the date of termination, Purchaser shall be paid the Expense Reimbursement within three (3) business days of termination.

(g)     Notwithstanding anything contained herein to the contrary, in the event this Agreement is terminated due to the breach of Purchaser hereunder, and is not otherwise terminable by Purchaser pursuant to any of Sections 5(c), 13(a) or 13(d) hereof (including, without limitation and for avoidance of doubt, automatic termination pursuant to Section 13(d) hereof), then a portion of the outstanding balance of the DIP Loan equal to One Million Five Hundred Thousand Dollars ($1,500,000) shall be forfeited and not required to be repaid to DIP Lender.

14.     **Notices**.  All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (i) upon the delivery (or refusal to accept delivery) by messenger or overnight express delivery service (or, if such date is not on a business day, on the business day next following such date), or (ii) on the third (3rd) business day next following the date of its mailing by certified mail, postage prepaid, at a post office maintained by the United States Postal Service, or (iii) upon the receipt by facsimile or email transmission as evidenced by a receipt transmission report, addressed as follows:

if to Seller:

[_____]
[_____]
[_____]
Attention: [_____]
Email: [_____]

with a copy to:

BAKER & HOSTETLER LLP
200 S. Orange Avenue, Suite 2300Orlando, Florida 32801

Attention: Elizabeth Green, Esq.; Andrew Layden, Esq.
Email: egreen@bakerlaw.com; alayden@bakerlaw.com

if to Purchaser:

c/o Eden Senior Care
8170 McCormick Blvd., Suite 112
Skokie, IL 60076
Attention: Max Stesel
Email: max@pritokcapital.com

with a copy to:

GUTNICKI LLP
4711 Golf Road, Suite 200
Skokie, Illinois 60076
Attention: Aaron Rokach, Esq.
Email: arokach@gutnicki.com

Either party may, by notice given as aforesaid, change the address or addresses, or designate an additional address or additional addresses, for its notices, provided, however, that no notice of a change of address shall be effective until actual receipt of such notice.

15.    **Closing Costs**.  Seller shall bear the cost to record any instrument to clear Seller's title except the Permitted Exceptions. Seller shall pay all costs and fees customarily paid by sellers in a real estate sale transaction in the jurisdictions in which the Facilities are located. Purchaser shall pay all costs and fees customarily paid by purchasers in a real estate sale transaction in the jurisdictions in which the Facilities are located.  Notwithstanding the foregoing, Purchaser shall pay all costs of the title search and exam and the cost of any premium of any owner's and lender's  policy of title insurance and any endorsements thereto to be obtained by Purchaser or its lenders.  Seller on one side and Purchaser on the other agree to pay their own attorneys' fees incurred in connection with the negotiation, preparation and consummation of the transactions contemplated hereby.

16.    **Choice of Law**.  THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA AS TO INTERPRETATION,

ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS.

17.  **Miscellaneous**.

(a)   <u>Entire Agreement</u>.   This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire agreement of the parties hereto and may not be modified or canceled except pursuant to the terms hereof or an instrument in writing signed by the parties hereto.  The Schedules and Exhibits annexed hereto are hereby incorporated herein by reference as fully as though set forth herein.  This Agreement may not be modified or amended except in writing signed by the parties hereto.  All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

(b)   <u>Waiver</u>.  No waiver of any term, provision or condition of this Agreement, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement.  No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

(c)   <u>Dispute Resolution</u>.  The parties hereto agree that with respect to all disputes, problems or claims arising out of or in connection with this Agreement and all other agreements or other instruments executed in connection herewith (collectively "<u>Disputes</u>"), the parties hereto shall, in good faith, use their reasonable best efforts to resolve the Dispute.  If after such efforts the parties hereto are unable within ten (10) days of the arising of the Dispute to resolve the Dispute then any party may file a motion or proceeding with the Bankruptcy Court seeking relief.  The Bankruptcy Court shall have exclusive jurisdiction over all Disputes and any other disagreement arising from or related to this Agreement..

(d)   <u>Personal Service</u>.   EACH OF THE PARTIES HERETO HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE.  EACH OF THE PARTIES HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

(e)   <u>Exhibits and Schedules.</u> If any exhibits or schedules are not attached hereto, the parties hereto agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date. Purchaser's obligations to close pursuant to this Agreement shall be conditioned upon Purchaser approving all exhibits and schedules within three (3) business days of submission thereof to Purchaser.  The parties hereto agree that the party charged with

providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date.

(f)     Payment of Expenses. Whether or not the transactions contemplated by this Agreement are consummated, each party shall pay its own expenses incident to preparing for, entering into and carrying out this Agreement and the transactions contemplated hereby; *provided, however*, should Purchaser be entitled to recover the Expense Reimbursement pursuant to the terms herein, then Seller and their respective bankruptcy estates shall be liable for the same which shall survive the termination of any Transaction Documents.

(g)     Headings.  The headings of the various Sections of this Agreement have been inserted only for the purposes of convenience, are not part of this Agreement and shall not be deemed in any manner to modify, explain, qualify or restrict any of the provisions of this Agreement.

(h)     Counterparts.  This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had executed the same document. All such counterparts shall be construed together and shall constitute one instrument.

(i)     Further Assurances.  Each of Seller and Purchaser shall provide to the other such further assurances as may reasonably be required hereunder to effectuate the purposes of this Agreement and, without limiting the foregoing, shall execute and deliver such affidavits, certificates and other instruments as may be provided for  hereunder.

(j)     Severability.  If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but, each term and provision shall be valid and be enforced to the fullest extent permitted by law.

(k)     Usage.  All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "and/or" "including" shall mean "including without limitation.

(l)     Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

(m)     Limitation of Liability.  Notwithstanding anything to the contrary contained in this Agreement, Seller agrees that it does not have and will not have any claims against any Purchaser Affiliate, member, director, officer, employee, or any other party related to Purchaser (other than Purchaser), arising out of or in connection with this Agreement or the transactions contemplated hereby.  Except as otherwise specifically set

forth in this Agreement, Seller agrees to look solely to Purchaser for the satisfaction of any liability or obligation of Purchaser arising under this Agreement or the transactions contemplated hereby, or for the performance by Purchaser of any of the covenants, representations, warranties or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of Purchaser's other assets or properties or any other Purchaser Affiliate, member, director, officer, employee, or any other party related to Purchaser (or their assets or properties) with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby.

(n)     <u>No Strict Construction</u>.   The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

(o)     <u>Certain Definitions</u>.   Capitalized terms used in this Agreement, but not defined in this Agreement shall have the meanings ascribed to them in **<u>Exhibit H</u>**.

*[Remainder of this page left intentionally blank.  Signature page follows.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be signed as of the day and year first above written.

**SELLER:**

**Hampton Propco LLC,**
**a Pennsylvania limited liability company**

By: _____
Name: Jacob Zahler
Its: Member

**Kingston Propco LLC,**
**a Pennsylvania limited liability company**

By: _____
Name: Jacob Zahler
Its: Member

**Yeadon Propco LLC,**
**a Pennsylvania limited liability company**

By: _____
Name: Jacob Zahler
Its: Member

**Pottsville Propco LLC,**
**a Pennsylvania limited liability company**

By: _____
Name: Jacob Zahler
Its: Member

**Williamsport Propco LLC,**
**a Pennsylvania limited liability company**

By: _____
Name: Jacob Zahler
Its: Member

**PURCHASER:**

**Hampton SNF Realty, LLC,**
**a Pennsylvania limited liability company**

By: _____
Name:   Maxim Stesel
Its:      Manager


**Kingston SNF Realty, LLC,**
**a Pennsylvania limited liability company**

By: _____
Name:  Maxim Stesel
Its:     Manager


**Pottsville Realty, LLC,**
**a Pennsylvania limited liability company**

By: _____
Name:  Maxim Stesel
Its:     Manager


**Williamsport North SNF Realty, LLC,**
**a Pennsylvania limited liability company**

By: _____
Name:  Maxim Stesel
Its:     Manager


**Williamsport South SNF Realty, LLC,**
**a Pennsylvania limited liability company**

By: _____
Name:  Maxim Stesel
Its:      Manager

**Yeadon SNF Realty, LLC**,
**a Pennsylvania limited liability company**

By: _M. Stesel_ _____

Name: Maxim Stesel

Its: Manager

# EXHIBIT A-1

## LEGAL DESCRIPTION –

[_____]

**EXHIBIT A-2**

**LEGAL DESCRIPTION –**

[_____]

**EXHIBIT A-3**

**LEGAL DESCRIPTION –**

[_____]

# EXHIBIT A-4

## LEGAL DESCRIPTION –

[_____]

**EXHIBIT A-5**

**LEGAL DESCRIPTION –**

[_____]

**EXHIBIT A-6**

**LEGAL DESCRIPTION –**

[_____]

**EXHIBIT A-7**

**FACILITIES**

| Facility Name and Address | Licensed Beds | Seller | Old Operator | Purchaser | New Operator |
|---|---|---|---|---|---|
| Hampton Nursing and Rehab Center 1548 Sans Souci Pkwy Wilkes-Barre, PA 18706 | | [_____], a [_____] [_____] | [_____], a [_____] [_____] | [_____], a [_____] limited liability company | [_____], a [_____] limited liability company |
| Kingston Rehab and Nursing Center 200 2nd Ave, Kingston, PA 18704 | | [_____], a [_____] [_____] | [_____], a [_____] [_____] | [_____], a [_____] limited liability company | [_____], a [_____] limited liability company |
| Pottsville Rehabilitation and Nursing Center 420 Pulaski Dr, Pottsville, PA 17901 | | [_____], a [_____] [_____] | [_____], a [_____] [_____] | [_____], a [_____] limited liability company | [_____], a [_____] limited liability company |
| Williamsport North Nursing and Rehabilitation Center 300 Leader Dr, Williamsport, PA 17701 | | [_____], a [_____] [_____] | [_____], a [_____] [_____] | [_____], a [_____] limited liability company | [_____], a [_____] limited liability company |
| Williamsport South Nursing and Rehabilitation Center 101 Leader Dr, Williamsport, PA 17701 | | [_____], a [_____] [_____] | [_____], a [_____] [_____] | [_____], a [_____] limited liability company | [_____], a [_____] limited liability company |
| Yeadon Rehabilitation and Nursing Center 14 Lincoln Ave, Yeadon, PA 19050 | | [_____], a [_____] [_____] | [_____], a [_____] [_____] | [_____], a [_____] limited liability company | [_____], a [_____] limited liability company |

**EXHIBIT B**

**TERMS OF THE SALE MOTION AND SALE ORDER; BIDDING PROCEDURES**

      1.1   <u>Sale Motion</u>. By no later than five (5) Business Days following the first day hearing in the Bankruptcy Cases (unless otherwise agreed), the Debtors shall file with the Bankruptcy Court the Sale Motion, which shall include, among other things, a proposed form of the Bidding Procedures Order. The Debtors shall promptly serve true and correct copies of the Sale Motion and all related pleadings, or notice thereof in form satisfactory to Buyers, to all creditors of the Debtors and other parties in interest in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the Western District of Pennsylvania and any other applicable order of the Bankruptcy Court. The Debtors shall also promptly serve the Sale Motion to any other party designated in writing by Buyers in their sole discretion. The Debtors and their bankruptcy estates shall be responsible for all costs of service of the Sale Motion and any other motions or notices related to the Sale Motion, Bidding Procedures, or Transactions.

      1.2   <u>Bidding Procedures and Auction</u>. Purchaser and New Operators acknowledge that Debtors are seeking to find other parties that would be willing to pay more for the Transaction Assets. In connection with this effort, the parties acknowledge that the Debtors will request the Bankruptcy Court, in the Sale Motion, to approve certain procedures related to this effort, including the procedures for soliciting competing bids for the Transaction Assets and selling the Transaction Assets at a sale auction (the "<u>Auction</u>") should there be other Qualifying Bidders, and certain bidding protections to Purchaser as consideration for serving as the stalking horse. In that regard, the Debtors shall take such actions as are reasonably necessary to obtain (on an expedited basis following the filing of the Sale Motion) the Bidding Procedures Order from the Bankruptcy Court approving, among other things, payment of the Expense Reimbursement and Termination Fee and procedures for the marketing, competitive bidding, auction, and sale of the Purchased Assets that include, without limitation, the following (collectively, and as more fully set forth in the Bidding Procedures Order, the "<u>Bidding Procedures</u>"):

      a.     Minimum Initial Topping Bid: $65,690,000.00;

      b.     Minimum Bid Increments Thereafter: $500,000.00, which may thereafter be modified in the debtor's reasonable discretion;

      c.     Other bidders to provide to Debtors, among other things, a blackline comparison of the APA and OTA, and satisfactory proof of financing or financial ability to close prior to the expiration of the Bid Deadline in order to qualify as a bidder for the Auction (such other bidders meeting such qualifying criteria shall be referred to herein as "<u>Qualifying Bidders</u>"). For the avoidance of doubt, and provided that the APA and other Transaction Documents have not been terminated prior to the Bid

Deadline, Purchaser's purchase offer pursuant to the APA and OTA and the other Transaction Documents shall constitute a qualifying bid.

    d.    Qualifying Bidders will have a due diligence period that expires at the conclusion of the Bidding Solicitation Period;

    e.    If there are other Qualifying Bidders, an Auction to be held no more than three (3) days after the Bid Deadline (unless such different date is established by the Bankruptcy Court in the Bidding Procedures Order), at which the Debtors will select the winning bidder (the "<u>Successful Bidder</u>");

    f.    Buyers shall be entitled to credit bid the amount of the Termination Fee and Expense Reimbursement towards any subsequent bid at the Auction;

    g.    If there are no other Qualifying Bidders as of the Bid Deadline, then Buyers shall be deemed the Successful Bidder. Additionally, Buyers shall be required to serve as the Backup Bidder upon the Debtors' selection of another party or parties as the Successful Bidder(s); provided that Buyers shall not be required to serve as Backup Bidder for longer than thirty (30) days following such selection of another party as the Successful Bidder; and

    h.    No extension of the Bidding Solicitation Period, the Bid Deadline, or date of the Auction unless ordered by the Bankruptcy Court or approved by Buyers in writing. Without limiting the foregoing, Debtors shall not file any motion or otherwise seek to change, modify or amend: i) the Transaction Documents, without prior written approval of the Buyers, ii) the Bidding Procedures Order, or the Sale Order, without prior consultation with Buyers; provided that any such matter that would negatively impact Buyers and/or New Operators shall not be pursued without the prior written consent of Buyers.

    1.3    <u>Sale Order Hearing and Sale Order</u>. Within three (3) days following the Auction, if there are other Qualifying Bidders, Debtors shall file with the Bankruptcy Court the results of the bidding solicitation process and the Auction, along with the purchase agreement of the Successful Bidder and all documents to be filed on behalf of the Debtors with the Bankruptcy Court for approval of the sale to the Successful Bidder and entry of the Sale Order. If there are no additional Qualifying Bidders as of the Bid Deadline, Debtors shall file a notice with the Bankruptcy Court within three (3) days of the Bid Deadline that Purchaser was the Successful Bidder and seeking the Court's entry of the Sale Order approving the APA, OTA, and other Transaction Documents. Purchaser and New Operators agree that they will promptly take such actions as are reasonably requested by the Debtors to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that Purchaser

and New Operators are a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

      1.4    <u>Contracts</u>.

      (a)    Seller and Old Operators shall provide to Purchaser and New Operators a list of Contracts relating to the operations and leasing of the Facilities (the "<u>Available Contracts List</u>"). Seller and Old Operators will use best efforts to insure that the Available Contracts List contains all Contracts which the Purchaser may seek to assume. At any time prior to the Sale Hearing, the Purchaser and New Operators, in their sole and absolute discretion, and subject to the their right to subsequently amend their designations until the Closing, may deliver one or more written notices to the Seller and Operators (each such notice, a "<u>Designation Notice</u>"), pursuant to which Purchaser and New Operators shall designate in writing any Available Contracts that Purchaser or New Operators wish to assume at Closing. Any Available Contracts so designated shall be deemed the Assumed Contracts.

      (b)    Any Contracts that Purchaser or New Operators do not indicate they desire to assume and continue shall be deemed rejected by Purchaser and New Operators (the "<u>Rejected Contracts</u>"), and Seller and Old Operators may reject and terminate such Rejected Contracts pursuant to the Bankruptcy Code. Any Contract not expressly designated by Purchaser or New Operators as an Assumed Contract pursuant to a Designation Notice, including any Contract discovered after the Closing, shall be deemed a Rejected Contract.

      (c)    The Sale Motion and Bidding Procedures Order shall include the procedures for the assumption and assignment of the Assumed Contracts to the Purchaser and New Operators on the terms set forth herein. By no later than November 20, 2024, the Debtors shall serve an initial notice on all counterparties to each Contract on the Available Contracts List specifically stating that the Debtors are or may be seeking the assumption and assignment of such Contracts, the Debtors' calculation of the associated Cure Costs, and the deadline for objecting to the Cure Costs or any other aspect of the proposed assumption and assignment of their Contracts to Purchaser, New Operators, or any other Successful Bidder (the "<u>Initial Assumption and Assignment Notice</u>"). The Debtors will not serve any such notice to a current resident or patient of any Facility without Purchaser's prior approval of the form of such notice.

      (d)    Pursuant to the Bidding Procedures Order, the counterparties to the Contracts shall have an opportunity to file any objections to the assumption and/or assignment of any Contracts on the Available Contracts List. Upon any such objection, such Contract shall become a "<u>Disputed Contract</u>" and, unless the Disputed Contract is a Rejected Contract, the Debtors, with Purchaser's and New Operators' consent to be provided or withheld in their sole discretion, shall either settle the objection of such counterparty or shall litigate such objection under such procedures as the Bankruptcy Court shall approve as part of the Bidding Procedures Order. The Debtors shall not settle a disputed Cure Cost for any amount with regard to any Contract that has been designated as an Assumed Contract pursuant to a Designation Notice without the express written consent of Purchaser or New Operators, as applicable. Upon a Final

Order or settlement determining any Cure Costs regarding any Disputed Contract after the Closing or at any time prior to such Final Order or settlement, Purchaser and New Operators shall have the option to (x) pay the Cure Cost with respect to such Disputed Contract and assume the Disputed Contract as an Assumed Contract or (y) designate the Disputed Contract as an Rejected Contract and not be responsible for the Cure Cost.

(e)     At Closing, Purchaser or New Operators, as applicable, shall pay all Cure Costs in connection with the assumption and assignment of the Assumed Contracts.

1.5     <u>Good Faith Efforts</u>. The Debtors agree to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order. In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, the Debtors shall use their best efforts to defend such appeal. The Debtors shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or (ii) imposed by the Bidding Procedures Order or the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

1.6     <u>Sale Free and Clear</u>. The Debtors acknowledge and agree, and the Sale Order shall provide, that on the Closing Date and concurrently with the Closing, the Purchased Assets shall be transferred to Buyers and New Operators free and clear of all then existing or thereafter arising Claims and Encumbrances to the fullest extent permitted by Section 363(f) of the Bankruptcy Code, including without, limitation, any amounts owed by any of the Debtors to DHS or DOH, including, without limitation, for nursing facility assessments whether due and payable, or relating to periods prior to the Closing but not yet due and payable (the "<u>Provider Assessments</u>"). The Debtors acknowledge and agree that this requirement is a precondition to Purchaser's and New Operators' obligation to close the Transactions.

1.7     <u>Definitions</u>. For purposes of this Exhibit B and the Transaction Documents, the following terms shall have the meaning ascribed to them below:

"<u>Alternative Transaction</u>" means (a) the approval by the Bankruptcy Court of a sale or sales of all or any portion of the Purchased Assets to a Successful Bidder other than Buyers, or (b) the filing of a plan of reorganization that does not contemplate the sale of the Purchased Assets to Buyers in accordance with the terms hereof.

"<u>APA</u>" means the Asset Purchase Agreement entered into by Seller and Purchaser dated October 15, 2024,as may be amended by the parties pursuant to the terms therein, pursuant to which Purchaser will purchase from Seller certain real and personal property on the terms more specifically set forth therein.

"<u>Assumed Contracts</u>" means any Contracts of Sellers or Operators which Purchaser or New Operators designate in writing to be assumed and assigned to Buyers or New Operators, as applicable, as pursuant to section 365 of the Bankruptcy Code and the terms of the PSA, OTA, and Sale Order, including, without limitation, the Resident Agreements and Provider Agreements (each as defined in the OTA).

"Avoidance Actions" means causes of action arising under Bankruptcy Code sections 502, 510, 541, 544, 545, 547, 548, 549, 550, 551, or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such causes of action.

"Bid Deadline" means 5:00 p.m. E.S.T. on the date that is 45 days after the filing of the Sale Motion or such other date as is set by Order of the Bankruptcy Court.

"Bidding Procedures Order" means an Order of the Bankruptcy Court, the proposed form of which shall be included with the Sale Motion following approval by Sellers and Buyers, that contains at least the following: (i) the approval of the APA and OTA as the stalking horse contract and the Purchaser and New Operators as the stalking horse bidders, (ii) the approval of the Bidding Procedures governing the sale and solicitation process and the Auction, the deadlines and dates relating thereto, and the bid protections included therein (including, without limitation, the Termination Fee, Minimum Overbid, and the Expense Reimbursement), and (iii) setting a date for the Sale Hearing as soon as possible following the Auction, if there are other Qualifying Bidders, or following the end of the Bidding Solicitation Period, if there are no other Qualifying bidders, to confirm the Auction results, if applicable, and enter the Sale Order.

"Bidding Solicitation Period" means the time period running from the date of the filing of the Sale Motion  to the Bid Deadline, or such other time period as is set by Order of the Bankruptcy Court.

"Claim" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, inter alia, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and Liabilities of any kind, description, or nature under contract, at law or in equity, whether direct or indirect, known or unknown, contingent or matured, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and all rights, remedies, costs, or expenses with respect thereto.

"Contracts" shall mean all executory contracts, agreements, leases, commitments and arrangements (whether written or oral), including all service contracts, maintenance contracts and consulting agreements, and all of any Seller's or Old Operator's duties, obligations, covenants, promises, rights and privileges therein or thereunder to which any Seller or Old Operator or its respective predecessors or agents is a party and which relate to the Facilities (or any one of the Facilities) and the operations thereof.

"Cure Costs" shall mean all costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts including the cost of obtaining consents in respect of the Assumed Contracts. For the avoidance of doubt, Cure Costs shall not include known liabilities due and owing under the Provider Agreements on the Closing Date. For avoidance of doubt, "Encumbrance" shall not include any Medicare or Medicaid Recoupments unknown at the time of Closing.

"Encumbrance" means any lien (including a "lien" as defined in Section 101(37) of the Bankruptcy Code), encumbrance, Claim, right, demand, charge, mortgage, deed of trust, lease, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, proxy, voting trust or agreement, transfer restriction under any shareholder agreement or similar agreement, judgment, conditional sale or other title retention agreement, or other imposition, imperfection or defect of title or restriction on transfer or use of any nature whatsoever.

"Expense Reimbursement" means all reasonable fees and expenses incurred by Purchaser, including, without limitation, professional fees and out-of-pocket fees, costs and expenses of Purchaser incurred in connection with the due diligence, preparation, negotiation, execution, delivery and performance of the Transaction Documents; provided the total Expense Reimbursement shall be capped at $300,000.00. The obligations of the Debtors to pay the Expense Reimbursement (i) shall be entitled to super-priority administrative expense claim status under Sections 503 and 507 of the Bankruptcy Code, (ii) shall not be subordinate to any other administrative expense claim against the Debtors, and (iii) shall survive the termination of any Transaction Documents.

"Final Order" means an Order that is unstayed and in effect and as to which (i) the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought, such Order shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

"Governmental Authority" means any U.S. federal, state or local or any supra-national, territorial or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral (public or private) body.

"Liabilities" means any liability, debt, guarantee, claim, demand, expense, commitment, damages, assurances or obligation (whether direct or indirect, fixed, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of every kind and description, including all costs and expenses related thereto.

"Minimum Initial Topping Bid" means an initial bid amount in the Auction by a bidder other than Purchaser, that includes consideration not less than an amount equal to the Purchase Price, plus the Termination Fee, plus the Expense Reimbursement, plus an initial bid increment of $500,000.

"Order" means any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination, settlement or award entered by or with any Governmental Authority.

"OTA" means the Operations Transfer Agreement entered into by Old Operators, and New Operators dated September __, 2024, as may be amended by the parties pursuant to the terms therein, and pursuant to which the Old Operators will transfer the operations and certain assets related to the Facilities to the New Operators.

"Sale Motion" means the motion or motions of the Debtors, in form and substance approved by Seller, Old Operators, Purchaser, and New Operators seeking (i) approval and entry of the Bidding Procedures Order on an expedited basis, (ii) the scheduling of the Auction (if there are other qualifying bidders) and the Sale Hearing, (iii) the entry of the Sale Order following the Auction, if there are other qualifying bidders, or following the end of the Bidding Solicitation Period, if there are no other qualifying bidders, and (iv) any other relief necessary to consummate the Transactions.

"Sale Order" means an Order of the Bankruptcy Court, the proposed form of which shall be included with the Sale Motion following approval by Seller, Old Operators, Purchaser, and New Operators, that contains at least the terms set forth in this **Exhibit B** as well as the following: (i) authorization and approval of (a) the APA, the OTA and the other Transaction Documents, and the consummation of the Transactions on the terms and conditions set forth therein, and (b) the assumption and assignment of the Assumed Contracts to the Purchaser or New Operators, as applicable, and (ii) findings of fact, conclusions of law and ordering provisions that (a) the consummation of the Transactions contemplated by the Transaction Documents, on the terms and conditions set forth therein are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 363(n), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Transactions, (b) pursuant to section 105(a) and 363(f) of the Bankruptcy Code, the sale of the Transaction Assets to Purchaser, New Operators, or their designee(s) shall be free and clear of any Claims or Encumbrances other than the Permitted Encumbrances and Assumed Liabilities (as defined in the OTA), (c) Purchaser, New Operators, and any designee(s) of Buyers or New Operators are purchasers of the Purchased Assets in "good faith" pursuant to section 363(m) of the Bankruptcy Code, (d) the Debtors, the Purchaser, affiliate of Purchaser, any designee of Purchaser, the New Operators, any affiliates of New Operators, and any designee of New Operators, did not engage in any conduct which would allow any Transaction Documents or Transactions to be set aside pursuant to section 363(m) of the Bankruptcy Code, (e) none of the Debtors, Purchaser, any affiliate of Purchaser, nor any designee of Purchaser, or the New Operators, any affiliates of New Operators, nor any designee of New Operators, engaged in any conduct that would cause or permit the Transaction Documents or Transactions to be avoided or costs and damages to be imposed against Purchaser, their affiliates, or designees under section 363(n) of the Bankruptcy Code; (f) none of the Purchaser, any affiliate of Purchaser, nor any designee of Purchaser, or the New Operators, any affiliates of New Operators, nor any designee of New Operators are a successor to Seller, Old Operators, or the bankruptcy estate(s) of Debtors by reason of any theory

of law or equity, and none of Purchaser, any affiliate of Purchaser, nor any designee of Purchaser, or the New Operators, any affiliates of New Operators, nor any designee of New Operators  shall assume or in any way be responsible for any liability of Seller or the bankruptcy estate(s) of the Debtors, except as otherwise expressly provided in the Transaction Documents, (g) the form of notice of the Sale Motion and any hearing thereon was proper, adequate, and reasonable under the circumstances and no further notice to any party, including any creditors of the Seller, Old Operators, or Debtors, is necessary for purposes of authorizing the free and clear sale of the Purchased Assets to Purchaser and New Operators pursuant to the Bankruptcy Code or other applicable law, (h) the form of notice to counterparties of any Assumed Contracts was proper, adequate, and reasonable under the circumstances and no further notice to any such contract counterparty is necessary, (i) each of the counterparties to the Assumed Contracts was given adequate notice of the Seller's and Old Operators' proposed assumption thereof and the terms of such assumption, and (j) the final amount of Cure Costs under the Bankruptcy Code and applicable law for each of the Assumed Contracts other than with respect to any Disputed Contract that may be resolved pursuant to the procedures set forth in the Transaction Documents or Bidding  Procedures Order.

"Sale Order Hearing" means the hearing following the Auction, if there are other qualifying bidders, or following the end of the Bidding Solicitation Period, if there are no other qualifying bidders, seeking approval of the Successful Bidder and entry of the Sale Order.

"Termination Fee" means the amount of $1,890,000.00 to be paid to Purchaser upon the closing of an Alternative Transaction as a bid protection and in consideration of Purchaser's and New Operators' willingness to enter into the APA and OTA and serve as the stalking horse for the Debtors pursuant to the terms and conditions herein and the significant efforts expended by Purchaser in connection with the possible acquisition of the Purchased Assets that will be marketed to other competing bidders despite the Agreement.  The obligations of the Debtors to pay the Termination Fee (i) shall be entitled to super-priority administrative expense claim status under Sections 503 and 507 of the Bankruptcy Code, (ii) shall not be subordinate to any other administrative expense claim against the Debtors, and (iii) shall survive the termination of any Transaction Documents.

"Transactions" means the transactions contemplated by the APA, OTA, and the other Transaction Documents.

"Transaction Documents" means the APA, the OTA, the Bill of Sale, the Deeds, and any other agreements, instruments or documents required to be delivered at the Closing or pursuant to the APA or OTA, in each case, including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

**EXHIBIT C**

**FORM OF NOTE**

## PROMISSORY NOTE

Principal Amount: $10,000,000.00          Dated: _____, 202_

**FOR VALUE RECEIVED AND INTENDING TO BE LEGALLY BOUND**, Hampton SNF Realty, LLC; Kingston SNF Realty, LLC; Pottsville Realty, LLC; Williamsport North SNF Realty, LLC; Williamsport South SNF Realty, LLC; and Yeadon SNF Realty, LLC ("**Borrowers**"), shall pay to the order of Hampton House Propco LLC, Kingston Propco LLC, Yeadon Propco LLC, Pottsville Propco LLC and Williamsport Propco LLC (herein, "**Lender**" or "**Holder**"), at its office located at [_____], or to such address as Lender may from time to time designate to the Borrowers in writing, the principal sum of **TEN MILLION and 00/100 DOLLARS ($10,000,000.00) (**the "**Principal**"). This Promissory Note ("**Note**") is subject to the following terms:

1. **No Interest.** For purposes of this Note, the Principal shall bear zero percent (0%) interest.

2. **Principal Payments; Offsets.**

   (a) Payments. Borrowers shall pay to Holder **Three Million Dollars ($3,000,000.00)** on the first anniversary of the Closing Date. The outstanding principal shall be payable in full by the end of the **two (2) year** term (the "**Maturity Date**").

   (b) Application of Payments. Prior to the occurrence of an Event of Default, all payments and prepayments on account of the indebtedness evidenced by this Note shall be applied as follows: (a) first, to fees, expenses, and costs then due and payable to Lender, including, without limitation any prepayment premium due hereunder, (b) second, to the payment of principal due in the month in which the payment or prepayment is made, and (c) last, to the unpaid principal balance of this Note in the inverse order of maturity. Any prepayment on account of the indebtedness evidenced by this Note shall not extend or postpone the due date or reduce the amount of any subsequent monthly payment of Principal due hereunder.

   (c) Method of Payments. All payments of principal hereunder shall be paid by wire transfer and shall be made at such place as Lender or the legal holder or holders of this Note may from time to time appoint in the payment invoice or otherwise in writing.

   (d) Offsets. Amounts due hereunder may be offset by Borrowers for any obligations of Lender under the Asset Purchase Agreement ("**APA**") between Borrower and Lender, dated October 14, 2024, and/or of Hampton House Operations LLC, Kingston Operations LLC, Yeadon Operations LLC, Pottsville Operations LLC, Williamsport North Operations LLC and Williamsport South Operations LLC ("**Old Operator**") under the Operations Transfer Agreement ("**OTA**"). Pursuant to the terms of the APA and OTA, in the event Seller or Old Operator under the APA and/or OTA is obligated to pay any amount to Borrowers or Hampton Operations, LLC, Kingston SNF Operations, LLC, Yeadon SNF Operations, LLC, Pottsville SNF Operations, LLC, Williamsport North SNF Operations, LLC, Williamsport South SNF Operations,

LLC ("**New Operator**"), Borrowers shall have the right to offset the foregoing against the amounts due under this Note. On March 31, June 30, September 30, and December 31 of each year following the date hereof until the Maturity Date, and within 7 days after a request by a Lender, the Borrowers shall endeavor to provide an accounting of all amounts Borrowers believe can be offset against the principal and a detailed description of the basis for the offset (the "**Offset Calculation**"). In the event Seller or Old Operator incurs any actual loss solely as a result of Buyer's delay in providing the Offset Calculation, then the foregoing offset against this Note shall be reduced by the amount of such loss.

## 3.     Waivers; Limitation of Liability of Lender.

(a)     <u>Waivers</u>.  Borrowers and all others who now or may at any time become liable for all or any part of the obligations evidenced hereby, expressly agree hereby to be jointly and severally bound, and jointly and severally: (i) waive and renounce any and all homestead, redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness evidenced by this Note or by any extension or renewal hereof; (ii) waive presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor, and notice of protest; (iii) waive any and all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default, or enforcement of the payment hereof or hereunder; (iv) waive any and all lack of diligence and delays in the enforcement of the payment hereof; (v) agree that the liability of each Borrowers, endorser or obligor shall be unconditional and subject to no defenses against the Lender, and without regard to the liability of any other person or entity for the payment hereof, and shall not in any manner be affected by any indulgence or forbearance granted or consented to by Lender to any of them with respect hereto; (vi) consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions hereof, and to the release of any security at any time given for the payment hereof, or any part thereof, with or without substitution, and to the release of any person or entity liable for the payment hereof; and (vii) consent to the addition of any and all other makers, endorsers, and other obligors for the payment hereof, and to the acceptance of any and all other security for the payment hereof, and agree that the addition of any such makers, endorsers, or other obligors, or security shall not affect the liability of Borrowers, and all others now liable for all or any part of the obligations evidenced hereby. This provision is a material inducement for Lender making the Loan to Borrowers.

(b)     <u>Limitation of Liability of Lender</u>.  The Lender and its officers, attorneys, agents and employees shall not be liable to the Borrowers for any loss or damage caused by any act of the Lender or omission to act unless such damage was caused by willful misconduct or gross negligence of the Lender or its officers, attorneys, agents and employees, and provided that such damage shall have been the direct, immediate and necessary result of the actions by Lender or its officers, attorneys, agents and employees.

**4.     Events of Default**. The occurrence of any one or more of the following events shall constitute an "**Event of Default**" under this Note:

(a) failure by Borrowers, regardless of whether any notice has been received by Borrowers of such failure, to pay any installment of principal payable pursuant to this Note or any other amount payable to Lender under this Note within 10 days after written notice; or

(b) the occurrence of the dissolution, insolvency, winding-up, death or legal incompetency, as applicable, of Borrowers; or

(c) a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt or receivership law or statute is filed against Borrowers and such proceeding is not dismissed within sixty (60) days of the date of its filing, or a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt or receivership law or statute is filed by Borrowers, or Borrowers makes an assignment for the benefit of creditors, or Borrowers takes any action to authorize any of the foregoing; or

(d) Borrowers fail to comply with the information sharing requirements in Section 2(d) herein.

(e) Borrowers is enjoined, restrained, or in any way prevented by the order of any court or any administrative or regulatory agency from conducting all or any material part of its business affairs and such order is not vacated within sixty (60) days.

**5.** **Subordination**.  [THIS NOTE WILL BE SUBJECT TO ANY SUBORDINATION TERMS REQUIRED BY THE SENIOR LENDER].

**6.** **Remedies**.  At the election of the Holder hereof, and without notice, the Principal balance remaining unpaid under this Note, and any other amounts due hereunder, shall be and become immediately due and payable in full upon the occurrence of any Event of Default.  Failure to exercise this option shall not constitute a waiver of the right to exercise same in the event of any subsequent Event of Default.  No Holder hereof shall, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by the Holder hereof, and then only to the extent specifically set forth therein.  The rights, remedies and powers of the Holder hereof as provided in this Note are cumulative and concurrent, and may be pursued singly, successively or together against Borrowers or any security given at any time to secure the repayment hereof, all at the sole discretion of the Holder hereof.  If any suit or action is instituted or attorneys are employed to collect this Note or any part hereof, Borrowers promises and agrees to pay all costs of collection, including reasonable attorneys' fees and court costs.

**7.** **Other General Agreements**.

(a) The Loan is a business loan, and Borrowers agrees that the Loan evidenced by this Note is an exempted transaction under the Truth In Lending Act, 15 U.S.C., Section 1601, et seq.  Borrowers represents and acknowledges that Borrowers: i) is a sophisticated businessperson with significant experience in the operation of business ventures and the borrowing of funds in connection therewith, ii) has substantial net worth well in excess of the indebtedness evidenced by this Note and iii) is represented by counsel with respect to the drafting and execution of this Note.

(b) This Note may not be changed or amended orally but only by an instrument in writing signed by the party against whom enforcement of the change or amendment is sought.

(c) Lender shall not be construed for any purpose to be a partner, joint venture, agent or associate of Borrowers or of any lessee, operator, concessionaire or licensee of Borrowers

in the conduct of its business, and by the execution of this Note, Borrowers agrees to indemnify, defend, and hold Lender harmless from and against any and all damages, costs, expenses and liability that may be incurred by Lender as a result of a claim that Lender is such partner, joint venture, agent or associate.

(d) If this Note is executed by more than one party, the obligations and liabilities of each Borrowers under this Note shall be joint and several and shall be binding upon and enforceable against each Borrowers and their respective successors and assigns. This Note shall inure to the benefit of and may be enforced by Lender and its successors and assigns.

(e) If any provision of this Note is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, Borrowers and Lender shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this Note, and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

(f) Borrowers may not assign its interest in this Note, or any other agreement with Lender or any portion thereof, either voluntarily or by operation of law, without the prior written consent of Lender.

(g) The Lender and its officers, attorneys, agents and employees shall not be liable to the Borrowers for any loss or damage caused by any act of the Lender or omission to act unless such damage was caused by willful misconduct or gross negligence of the Lender or its officers, attorneys, agents and employees, and provided that such damage shall have been the direct, immediate and necessary result of the actions by Lender or its officers, attorneys, agents and employees.

**8. Notices**. Any notices, communications and waivers under this Agreement shall be in writing and shall be (i) delivered in person, (ii) mailed, postage prepaid, either by registered or certified mail, return receipt requested, (iii) by overnight express carrier, or (iv) by facsimile or email transmission, addressed in each case as follows:

To Lender:          [_____]

With a copy to:     BAKER & HOSTETLER LLP
                    200 S. Orange Avenue, Suite 2300
                    Orlando, Florida 32801
                    Attn: Elizabeth Green, Esq.; Andrew Layden, Esq.
                    Email: egreen@bakerlaw.com;  alayden@bakerlaw.com

To Borrowers:       [_____]

With a copy to:       GUTNICKI LLP
                          4711 Golf Road, Suite 200
                          Skokie, IL 60076
                          Attn: Aaron Rokach, Esq.
                          Facsimile:  847-933-9285
                          Email:  arokach@gutnicki.com

or to any other address as to any of the parties hereto, as such party shall designate in a written notice to the other party hereto. All notices sent pursuant to the terms of this paragraph shall be deemed received (i) if personally delivered, then on the date of delivery, (ii) if sent by overnight express carrier, then on the next federal banking day immediately following the day sent, (iii) if sent by registered or certified mail, then on the earlier of the third federal banking day following the day sent or when actually received, or (iv) if sent by facsimile as evidenced by receipt of a successful transmission report or email (followed by delivery by one of the other means identified in (i)-(iii)).

      **9.**   **Waiver**.  Borrowers waives presentment for payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note, except for such notices, if any, as are expressly required to be delivered by Lender to Borrowers.

      **10.** **Miscellaneous**.  If any provisions of this Note shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provision hereof.  This Note shall be binding upon Borrowers and upon Borrowers' successors and assigns and shall benefit Lender and its successors and assigns.  Each party executing this Note on behalf of a Borrowers represents and warrants that they have all rights, power and authority to enter into and perform its obligations under this Note.  This Note is and will be, a valid and binding document enforceable against Borrowers in accordance with its terms, subject to bankruptcy, insolvency, reorganization, fraudulent transfer and similar laws affecting creditors' rights generally.

      **11.** **Collection/Enforcement Fees**.  If a successful suit is brought to collect this Note or any part hereof, Borrowers expressly agrees to pay all of Lender's reasonable costs and expenses of collection, including reasonable attorneys' fees.

      **12.** **JURY TRIAL WAIVER.**  **BORROWERS AND LENDER BY ITS ACCEPTANCE HEREOF WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF BORROWERS OR LENDER WITH RESPECT HERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE, BORROWERS AGREES AND CONSENTS THAT ANY SUCH CLAIM,  DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THE NOTE MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF BORROWERS TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY, BORROWERS ACKNOWLEDGES**

**THAT THEY HAVE HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS SECTION, THAT THEY FULLY UNDERSTANDS ITS TERMS, CONTENT AND EFFECT, AND THAT THEY VOLUNTARILY AND KNOWINGLY AGREE TO THE TERMS OF THIS SECTION.**

13. **Governing Law.**  This Note shall be governed by and construed in accordance with the laws of the State of Pennsylvania, without regard to the principles of conflicts of laws thereof.

14. **Jurisdiction**.

(a) Borrowers hereby irrevocably submits to the jurisdiction of any Pennsylvania State or United States Federal Court sitting in Pennsylvania over any action or proceeding arising out of or relating to this Note, and Borrowers hereby irrevocably agrees that all claims in respect of any such action or proceeding may be heard and determined in such State or Federal Court. Borrowers agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Borrowers further waives any objection to venue in such state and any objection to an action or proceeding in such state on the basis of *forum non conveniens*.  Borrowers further agrees that any action or proceeding brought against Lender shall be brought only in Pennsylvania State or United States Federal Court sitting in Pennsylvania.

(b) Nothing in this Section 13 shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any action or proceeding against Borrowers or the property of Borrowers or in the courts of any other jurisdiction.

15. **Method of Payment.**  All payments shall be made by Borrowers to Lender in lawful currency of the United States of America, without counterclaim or setoff (other than as may be specifically set forth herein), and free and clear of, and without any deduction or withholding for, any taxes or other payments.  Payments under this Note shall be made to Lender at the address set forth above.

16. **Replacement of Promissory Note.**  Upon receipt of an affidavit of an officer of the Lender as to the loss, theft, destruction or mutilation of this Note or any other security document which is not of public record and, in the case of any such loss, theft, destruction or mutilation, upon cancellation of this Note or other security document, Borrowers will issue, in lieu thereof, a replacement note or other security document in the same principal amount thereof and otherwise of like tenor.

*[Signature Page to Follow]*

**IN WITNESS WHEREOF**, Borrowers, intending to be legally bound hereby, has caused this Promissory Note to be duly executed the day and year first above written.


**BORROWERS:**


**Hampton SNF Realty, LLC,**
**a Pennsylvania limited liability company**

By: _____
Name:
Its:


**Kingston SNF Realty, LLC**
**a Pennsylvania limited liability company**


By: _____
Name:
Its:


**Pottsville Realty, LLC**
**a Pennsylvania limited liability company**

By: _____
Name:
Its:


**Williamsport North SNF Realty, LLC**
**a Pennsylvania limited liability company**

By: _____
Name:
Its:

**Williamsport South SNF Realty, LLC**
**a Pennsylvania limited liability company**


By: _____
Name:
Its:


**Yeadon SNF Realty, LLC**
**a Pennsylvania limited liability company**


By: _____
Name:
Its:

EXHIBIT D

FORM OF SPECIAL WARRANTY DEED

This instrument was prepared by:

[_____]
[_____]
[_____]
[_____]

PIN: [_____]

## SPECIAL WARRANTY DEED

**THIS INDENTURE** is made by [_____], a [_____] [_____] ("<u>Grantor</u>"), having an address of [_____], and [_____], a [_____] limited liability company ("<u>Grantee</u>"), having an address of [_____].

**WITNESSETH** that Grantor, for and in consideration of nominal value, unto it well and truly paid by Grantee, at or before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, has granted, conveyed, bargained and sold, released and confirmed, and by these presents does grant, convey, bargain and sell, release and confirm unto Grantee, all of Grantor's right, title and interest in and to certain real property located in [_____] County, Pennsylvania and more particularly described as follows (the "<u>Property</u>"):

See attached **<u>Exhibit A</u>**.

Being the same premises which [_____], a [_____] [_____], by [Deed] dated [_____], and recorded on [_____] in [_____] County at Instrument No. [_____] conveyed unto Grantor in fee.

**NOTICE: "THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHT OF SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COMPLETE LEGAL RIGHT TO REMOVE ALL OF SUCH COAL AND, IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE IN SUCH LAND." THIS NOTICE IS SET FORTH IN THE**

MANNER PROVIDED IN SECTION 1 OF THE ACT OF JULY 17, 1957, P.L. 984, AS AMENDED, AND IS NOT INTENDED AS NOTICE OF UNRECORDED INSTRUMENTS, IF ANY.

**TOGETHER** with all and singular the buildings, improvements, fixtures, ways, streets, alleys, driveways, passages, waters, water-courses, easements, rights, liberties, privileges, hereditaments and appurtenances, whatsoever unto the hereby granted premises belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever of Grantor, as well at law as in equity, of, in and to the same.

**SUBJECT TO** all matters shown on attached **Exhibit B**, which are incorporated herein.

**AND** Grantor, for itself, its successors and assigns, will forever warrant and defend title to the Property against the lawful claims of all persons claiming by, through or under Grantor, but not otherwise.

EXECUTED on _____ __, 2024 and effective as of _____ __, 2024.

*[Signatures appear on following page].*

Now therefore, Grantor has executed this Special Warranty Deed on the date stated above.

[_____],
a [_____] [_____]


By: _____
Name: _____
Title: _____


STATE OF [_____]   )
                          ) ss.
COUNTY OF [_____])

       On _____ __, 2023, before me, a Notary Public in and for the State and County aforesaid, the undersigned officer personally appeared [_____] who acknowledged [himself] to be the [_____], of [_____], a [_____] [_____], and that [he], being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the company by [himself] as such officer. This is an acknowledgment. No oath or affirmation was given.


       _____
       Notary Public
       State of _____, County of _____
       My Commission expires: _____

Certificate of Residence

I, the undersigned, do hereby certify that the precise residence
of the Grantee is:

[_____]

_____

_____


By: _____

Name: _____

Title: _____

**<u>Exhibit A</u>**
**Legal Description**

Facility Name:      [             ]
<u>Facility Address</u>:    [             ]

Legal Description     [             ]

**<u>Exhibit B</u>**
**Permitted Exceptions**

1.  [_____]

**EXHIBIT E**

**FORM OF BILL OF SALE**

<u>**BILL OF SALE**</u>

    **THIS BILL OF SALE** (the "***Bill of Sale***") is made as of the ____ day of _____, 2024, by [_____], a [state of entity] [kind of entity] ("***Seller***"), to [_____], a [state of entity] [kind of entity] ("***Purchaser***"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Asset Purchase Agreement, dated as of [_____ __]. 2024, by and among Seller, Purchaser and certain other parties thereto (the "***APA***").

    WHEREAS, pursuant to the APA, Seller agreed to sell, convey, transfer, assign and deliver to Purchaser the Purchased Assets, and Purchaser agreed to purchase the Purchased Assets, upon the terms and conditions set forth therein.

    NOW, THEREFORE, for and in consideration of the above premises, the mutual covenants contained in this Bill of Sale and in the APA and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

    1.    <u>Sale and Purchase</u>. Seller hereby sells, transfers, assigns, conveys and delivers to Purchaser, effective as of 11:59 p.m. (Central Standard Time) on the date hereof, good, valid and indefeasible title to the Purchased Assets free and clear of all liens, claims, encumbrances, charges, restrictions, rights or interests of others of any kind.

    2.    <u>Warranty</u>. Seller warrants to Purchaser it has good and marketable title to said Purchased Assets, full authority to sell and transfer said property, and that said Purchased Assets are sold free of all liens, incumbrances, liabilities and adverse claims of every nature and description whatsoever.

    3.    <u>Reference to the APA</u>. The terms of the APA, including, but not limited to Seller's and Purchaser's representations, warranties, covenants, agreements and indemnities relating to the Purchased Assets, are incorporated herein by this reference. The provisions of this Bill of Sale are subject in all respects to the terms of the APA, and all of the representations, warranties, covenants and agreements contained therein shall survive the execution and delivery of this Bill of Sale in accordance with the terms thereof. Nothing contained in this Bill of Sale shall be deemed or construed to alter, modify or waive any of the rights, obligations, terms, covenants, conditions, or other provisions contained in the APA. If there is a conflict between the terms of the APA and the terms of this Bill of Sale, the terms of the APA shall govern.

    4.    <u>Amendment</u>. This Bill of Sale shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective successors and assigns and may not be modified or amended in any manner other than by a written agreement signed by Seller and Purchaser.

     5.    <u>General</u>. This Bill of Sale shall in all respects be governed by and construed in accordance with the internal laws of the State of Pennsylvania, without regard to the principles of conflicts of laws thereof. This Bill of Sale may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall together constitute one agreement which is binding upon the parties, notwithstanding that such parties are not signatories to the same counterpart. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

[<i>Remainder of Page Intentionally Left Blank; Signature Page to Follow</i>]

SIGNATURE PAGE TO BILL OF SALE

IN WITNESS WHEREOF, Seller and Purchaser have duly executed this Bill of Sale as of the
day and year first above written.

**SELLER**:

[_____],
a [state of entity] [kind of entity]

By: _____
Name: [_____]
Its: [_____]

**PURCHASER**:

[_____],
a [state of entity] [kind of entity]

By: _____
Name: [_____]
Its: [_____]

**EXHIBIT F**

**FORM OF GENERAL ASSIGNMENT**

**GENERAL ASSIGNMENT AND ASSUMPTION**

  **THIS GENERAL ASSIGNMENT AND ASSUMPTION** (this "*Assignment*") is made as of the _____ day of _____, 2024, by and between [_____], a [state of entity] [type of entity] ("Assignor"), and [_____], a [state of entity] [type of entity] ("Assignee"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Asset Purchase Agreement, dated as of [_____ ___], 2024, by and among Assignor, Assignee, and certain other parties thereto (the "APA").

WHEREAS, pursuant to the APA, Assignor agreed to assign to Assignee any of the Purchased Assets that constitute intangible property (collectively, the "Transferred Assets"), and Assignee agreed to assume the Transferred Assets upon the terms and conditions set forth therein.

  NOW, THEREFORE, for and in consideration of the above premises, the mutual covenants contained in this Assignment and in the APA and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

  1. <u>Transferred Assets</u>.  Assignor hereby assigns, sets over and transfers to Assignee, effective as of 11:59 p.m. (Central Standard Time) on the date hereof, all of Assignor's right, title and interest in, to and under the Transferred Assets, free and clear of all liens, claims, encumbrances, charges, restrictions, rights or interests of others of any kind.

  2. <u>Assumption</u>.  Assignee hereby accepts the foregoing assignments set forth in Section 1.

  3. <u>Reference to the APA</u>.  The terms of the APA, including, but not limited to, Assignor and Assignee's representations, warranties, covenants, agreements and indemnities relating to the Transferred Assets, are incorporated herein by this reference.  The provisions of this Assignment are subject in all respects to the terms of the APA, and all of the representations, warranties, covenants and agreements contained therein shall survive the execution and delivery of this Assignment in accordance with the terms thereof.  Nothing contained in this Assignment shall be deemed or construed to alter, modify or waive any of the rights, obligations, terms, covenants, conditions, or other provisions contained in the APA.  If there is a conflict between the terms of the APA and the terms of this Assignment, the terms of the APA shall govern.

  4. <u>Amendment</u>.  This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns and may not be modified or amended in any manner other than by a written agreement signed by Assignor and Assignee.

  5. <u>General</u>.  This Assignment shall in all respects be governed by and construed in accordance with the internal laws of the State of Pennsylvania, without regard to the principles of conflicts of laws thereof.  This Assignment may be executed in any number of counterparts, each

of which shall be deemed to be an original, and all of which shall together constitute one agreement which is binding upon the parties, notwithstanding that such parties are not signatories to the same counterpart.  Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

*[Remainder of Page Intentionally Left Blank; Signature Page to Follow]*

SIGNATURE PAGE TO GENERAL ASSIGNMENT AND ASSUMPTION

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Assignment as of the day and year first above written.

**ASSIGNOR:**

[_____],
a [state of entity] [kind of entity]


By: _____
Name: [_____]
Its:    [_____]


**ASSIGNEE:**

[_____],
a [state of entity] [kind of entity]


By: _____
Name: [_____]
Its:    [_____]

# EXHIBIT G

## FORM OF NON-FOREIGN SELLER'S AFFIDAVIT

## NON-FOREIGN SELLER'S AFFIDAVIT

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform [_____], a [state of entity] [type of entity], as transferee, that withholding of tax is not required upon the disposition of a U.S. real property interest by [_____], a [state of entity] [type of entity] ("Seller"), the undersigned hereby certifies the following:

1.      Seller is not a foreign person, foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Seller's U.S. taxpayer identification number is [__-_____].

3.      Seller's address is [_____].

4.      Seller is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii).

The undersigned understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both. Under penalties of perjury, the undersigned declares that it has examined this certification and to the best of its knowledge and belief it is true, correct, and complete, and further declares that it has authority to sign this document.

Dated as of [_____ __], 2024.

*[Remainder of Page Intentionally Left Blank; Signature Page to Follow]*

FIRPTA - APA

SIGNATURE PAGE TO NON-FOREIGN SELLER'S AFFIDAVIT

**<u>SELLER</u>:**

[_____],
a [state of entity] [kind of entity]

By:   _____
Name: [_____]
Its:    [_____]

# EXHIBIT H

# DEFINITIONS

The terms defined in this <u>Exhibit G</u>, whenever and wherever used in this Agreement (including in all Exhibits and Schedules, unless otherwise defined therein), shall have the respective meanings ascribed to them below for all purposes of this Agreement (each such meaning to be equally applicable to the singular and the plural forms of the respective terms defined). All reference herein to a Section, Exhibit or Schedule are to a Section, Schedule or Exhibit of or to this Agreement, unless otherwise indicated. The words "hereby", "herein", "hereof", "hereunder" and words of similar import refer to this Agreement as a whole (including all Exhibits and Schedules hereto) and not merely to the specific section, paragraph or clause in which such word appears. The words "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation." Unless the context requires otherwise, the word "or" shall not be interpreted as an expression of either state of possibility but shall be construed to mean "and/or." Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

"<u>Accounts Receivable</u>" means all accounts and notes receivables (whether current or non-current) of Seller, including trade account receivables outstanding as of the Effective Time and any other rights to receive payment as of the Effective Time in respect of services rendered prior to the Effective Time.

"<u>Action</u>" means any claim, controversy, action, cause of action, suit, litigation, arbitration, investigation, opposition, interference, audit, assessment, hearing, compliant, demand or other legal proceeding (whether based in contract, tort or otherwise, whether civil or criminal and whether brought at law or in equity) that is commenced, brought, conducted, tried or heard by or before, or otherwise involving, any Governmental Authority.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such specified Person. For purposes of the foregoing, (a) a Person shall be deemed to control a specified Person if such person (or a Family Member of such Person) possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such specified Person or (b) if such other person is at such time a direct or indirect beneficial holder of at least 25% of any class of equity interests of such specified Person.

"<u>Applicable Law</u>" means, with respect to any Person, any federal, state or local statue, law, ordinance, rule, regulation, writ, Order or other requirement of any Governmental Authority applicable to such Person or any of its Affiliates or any of their respective properties, assets, officers, directors, members, partners or employees (in connection with such officer's, director's member's, partner's or employee's activities on behalf of such person or any of its Affiliates).

"<u>Books and Records</u>" means all books, records and other materials pertaining to the Seller or the Business of any and every kind, including lists (e.g., business contacts of Seller), programs, correspondence, compact disks, compact disk lists, ledgers, files, reports, plans,

drawings and operating records of every kind, held or maintained by Seller or any of Affiliate of Seller, disk or tape files, printouts, runs or other computer-prepared information pertaining to the Acquired Assets or the Business.

"Business" means the business conducted by Seller and proposed to be conducted by Seller as of the Effective Date.

"Business Day" means any day other than a Saturday, Sunday or a weekday on which banks in Pennsylvania are authorized or required to be closed.

"Cash" means, when used with respect to any Person, all cash, cash equivalents, certificates of deposit, bank deposits, treasury bills and other cash equivalents of such Person.

"Closing Date" means the date on which the Closing actually occurs.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Environmental Laws" means all federal, state and local statutes, regulations, ordinances, directives and other provisions having the force or effect of law, all judicial and administrative Orders and determinations, all contractual obligations and all common law, in each case concerning public  health and safety, worker health and safety, pollution or protect of the environment, including all those relating to the presence, use, production, generation, handling, transportation, storage, disposal, distribution, labeling, testing, processing, discharging, Release, threatened Release, control or cleanup of any Hazardous Substances, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, *et seq.*), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, *et seq.*), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6921, *et seq.*) and regulations adopted thereunder.

"Governmental Authority" means any federal, state local or municipal government or any subdivision thereof, any regulatory or administrative authority, or any agency or commission or any court, tribunal or judicial or arbitral body.

"has provided," "made available" and similar formulation means such information in question that was delivered or provided by Seller or its Representatives to Purchaser by way of online file sharing, cloud file sharing, email attachments, written correspondences, compact disks, disk or tape files, printouts, compressed file containers or other electronic or physical delivery means.

"Hazardous Substances" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes regulated under any Environmental Laws.

"Improvements" means, with respect to any real estate property, all buildings, improvements and fixtures, and components thereof, including the roof, foundation, load-bearing

Exhibit H-2

walls and other structural elements thereof; heating, ventilation, air conditioning, mechanical, electrical, plumbing and other building systems; environmental control, remediation and abatement systems; sewer, storm and waste water systems; irrigation and other water distribution systems; parking facilities; fire protection, security and surveillance systems; and telecommunications, computer, wiring and cable installations, included within such property.

"Indebtedness" means, with respect to any Person, and without duplication, (i) any indebtedness or other obligation for borrowed money; (ii) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the Ordinary Course of Business; (iii) the face amount of all letters of credit issued for the account of such Person; (iv) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens; (v) capitalized lease obligations; (vi) unfunded obligations for pension, retirement, severance benefits for any officer, director or employee of such Person; (vii) unfunded obligations for deferred compensation for any officer, director or employee of such Person; (viii) all guarantees and similar obligations of such Person; (ix) all bankers acceptances and overdrafts; (x) all interest, prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness; (xi) under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (xii) issued or assumed as the deferred purchase price of property or services (other than trade accounts payable or accounts payable to independent contractors), and (xiii) for all accrued interest on, and arising from any breach of, any of the foregoing.

"Liability" means any liability, obligation, claim, Indebtedness, penalty, cost or expenses (including costs of investigation, collection, defense, and environmental remediation or investigation), deficiency, guaranty or endorsement of or by any Person of any type, secured or unsecured, whether accrued, fixed, absolute, or contingent, asserted or unasserted, due or to become due, whether or however arising (including contract, tort, negligence or strict liability), liquidated or unliquidated, known or unknown and whether or not current or long term.

"Lien" means any claim, lien (statutory or otherwise), encumbrance, pledge, Liability, restriction, charge, instrument, license, preference, priority, security agreement, covenant, right of recovery, option, charge, hypothecation, easement, security interest, interest, right of way, encroachment, mortgage, deed of trust, imperfection of title, prior assignments, Tax (including federal, state and local Tax), Order or other encumbrance or charge of any kind or nature whatsoever including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing; (ii) any assignment or deposit arrangement in the nature of a security device; and (iii) any leasehold interest, license or other right, in favor of a Third Party or Seller, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Order" means any decree, order, injunction, rule, judgment, and consent of or by any Governmental Authority.

"Ordinary Course of Business" means the ordinary course of business of Seller consistent with past custom and practice.

"Organizational Documents" means certificate of incorporation, articles of incorporation, charter, bylaws, articles of formation, certificate of formation, operating agreement, certificate of limited partnership, partnership agreement and all other similar documents, instruments or certificates adopted or filed in connection with the creation, formation or organization of a Person, including any amendments, restatements and supplements thereto.

"Other Documents" means Bill of Sale, Deed, General Assignment, Seller Disclosure Schedule and any certificates, instruments, agreements and other documents contemplated under this Agreement.

"Permits" means all municipal, state, federal and local consents, Orders, filings, franchises, permits, approvals, certificates, licenses, agreements, waivers, and authorizations issued by, or otherwise granted by, any Governmental Authority that are held by, or used in connection with, or required for, the Business or the Acquired Assets (including all modifications thereto or renewals thereof).

"Person" means any person, firm, corporation, partnership, joint venture, limited liability company, association or other entity (governmental or private).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, depositing, escaping, leaching, migrating, dumping or disposing, or other release into the indoor or outdoor environment, including soil, land, surface or subsurface strata, waters (including navigable ocean, stream, pond, reservoirs, drainage basins, wetland, ground, and drinking), sediments, ambient air (including indoor), and all other environmental media or natural resources.

"Representative" means, with respect to any Peron, any of its attorneys, accountants, agents, consultants or other representatives.

"Seller Disclosure Schedules" means the schedules of exceptions to the representations and warranties of Seller in this Agreement (which shall be delivered to Purchaser by Seller prior to the execution and delivery of this Agreement by the parties hereto).

"Seller's Knowledge," "Knowledge of Seller" and similar formulations means the actual knowledge of any director, managing member, managing partner, officer or employee of Seller with respect to the relevant fact or other matters at issue or should have had actual knowledge of such relevant fact or other matter assuming the diligent exercise of such individual's duties as a director, managing member, managing partner, officer or employee of Seller, and after reasonable investigation of all employees of Seller or any Affiliate thereof reasonably expected to have actual knowledge of such fact or matter.

"Tax" and, with correlative meaning, "Taxes" means with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, ad valorem, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not; (ii) liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person; or (iii) liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any affiliated group as defined in Section 1504 of the Code, or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax law (or being included (or required to be included) in any Tax Return relating thereto).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by Seller relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Third Party" means any Person other than Seller, Purchaser or any of their respective Affiliates.

"Transaction Expenses" shall mean (i) the aggregate attorneys', accountants' and brokers' fees and expenses incurred or to be incurred by Seller that remain unpaid as of the Effective Time, (ii) the amount of real estate transfer tax imposed by Applicable Law and consistent with payment customs of the location in which the relevant real estate property is located in connection with the transactions contemplated by this Agreement, (iii) payment of all special and betterment assessments, water rates and sewer charges, in each case on a prorated basis and adjusted as of the Effective Time and (iv) all other fees and expenses relating to the transfer of Property in accordance with this Agreement (including, without limitation, cost of recording, preparing the Deed and applicable brokerage commissions), in each case of (i), (ii), (iii) and (iv), to the extent not paid in full prior to or at the Closing.

The following terms used in this Agreement shall have the meanings set forth in the corresponding Paragraphs, subparagraph, Sections or subsections of this Agreement:

| Defined Term | Section |
|---|---|
| "Agreement" | Recitals |
| "Effective Date" | Recitals |
| "Seller" | Recitals |
| "Purchaser" | Recitals |
| "Old Operator" | Recitals |
| "New Operator" | Recitals |
| "OTA" | Recitals |
| "Purchased Assets" | Section 1 |
| "Land" | Section 1 |
| "Property" | Section 1 |
| "Facility" | Section 1 |
| "Personal Property" | Section 1 |
| "Excluded Assets" | Section 1 |
| "Excluded Liabilities" | Section 2 |
| "Purchase Price" | Section 3(a) |
| "Closing" | Section 4 |
| "Effective Time" | Section 4 |
| "Title Company" | Section 5(b)(i) |
| "Title Commitment" | Section 5(b)(i) |
| "Title Policy" | Section 5(b)(i) |
| "Title Endorsements" | Section 5(b)(i) |
| "Survey" | Section 5(b)(ii) |
| "Title Defects" | Section 5(c) |
| "Seller's Election" | Section 5(c) |
| "Permitted Exceptions" | Section 5(c) |
| "DOH" | Section 5(d) |
| "Licensure" | Section 5(d) |
| "Regulatory Approvals" | Section 5(d) |
| "Deed" | Section 6(a)(iii)(1) |
| "Bill of Sale" | Section 6(a)(iii)(2) |
| "General Assignment" | Section 6(a)(iii)(4) |
| "Warranties" | Section 6(a)(iii)(6) |
| "Waiving Party" | Section 6(c) |
| "CMS" | Section 9(k) |
| "Broker" | Section 9(q) |
| "Health Care Licenses" | Section 9(t)(i) |
| "Purchaser Indemnitees" | Section 12(a) |
| "Losses" | Section 12(a) |
| "Seller Indemnities" | Section 12(b) |
| "Indemnitee" | Section 12(c) |
| "Indemnitee's Claim" | Section 12(c) |

| "Indemnitor" | Section 12(c) |
|---|---|
| "Indemnification Default" | Section 12(c) |
| "Seller Failure" | Section 13(a) |
| "Purchaser Failure" | Section 13(b) |
| "Disputes" | Section 17(c) |
| "AAA" | Section 17(c) |

Case 24-70418-JAD   Doc 121-2   Filed 10/30/24   Entered 10/30/24 15:32:24   Desc
Exhibit B - Stalking Horse Agreements   Page 82 of 145



ALTA/NSPS Land Title Survey

ManorCare Health Svcs–
Williamsport North and South

Project #20-6601–Site #012
101 and 300 Leader Drive
Williamsport, PA 17701
County of Lycoming

(330) 777–0502

CreSurveys

2016 ALTA/NSPS LAND TITLE SURVEY PLAT
CRE: 101 & 300 LEADER DRIVE

Sheet 1 of 3

PLEASE DIRECT ALL INQUIRIES FOR THIS SURVEY TO:

CRESURVEYS
EMAIL: INFO@CRESURVEYS.COM
PHONE: (330) 777–0502
24 N. High Street, Suite 103, Akron, OH 44308



Case 24-70418-JAD   Doc 121-2   Filed 10/30/24   Entered 10/30/24 15:32:24   Desc
Exhibit B - Stalking Horse Agreements   Page 84 of 145



**SCHEDULE 3(a)**
**PURCHASE PRICE ALLOCATION**

**SCHEDULE 9(i)**
**PERMITS**

- [_____]

**SCHEDULE 9(m)**
**LITIGATION**

- [_____]

**OPERATIONS TRANSFER AGREEMENT**

by and among


**Hampton House Operations LLC,**
**Kingston Operations LLC,**
**Yeadon Operations LLC,**
**Pottsville Operations LLC,**
**Williamsport North Operations LLC,**
**Williamsport South Operations LLC**,
each a Pennsylvania limited liability company,

collectively, "Old Operator"

and

**Hampton Operations, LLC,**
**Kingston SNF Operations, LLC,**
**Yeadon SNF Operations, LLC,**
**Pottsville SNF Operations, LLC,**
**Williamsport North SNF Operations, LLC,**
**Williamsport South SNF Operations, LLC**,
each a Pennsylvania limited liability company,

collectively, "New Operator"

Dated as of: October 15, 2024

TABLE OF CONTENTS

SECTION                                                                                                          PAGE

1.  CLOSING. ...................................................................................................... 2
2.  CONDITIONS PRECEDENT ........................................................................
3.  LIABILITIES OF OLD OPERATOR .............................................................
4.  CONVEYANCE OF SUPPLIES ....................................................................
5.  TRANSFER OF PATIENT TRUST FUNDS....................................................
6.  COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES.......................
7.  CONTRACTS...............................................................................................
8.  ACCOUNTS RECEIVABLE .........................................................................
9.  EMPLOYEES ..............................................................................................
10. EMPLOYMENT RECORDS ..........................................................................
11. ACCESS TO RECORDS ...............................................................................
12. USE OF TELEPHONE NUMBER..................................................................
13. PROVIDER AGREEMENTS..........................................................................
14. COOPERATION; INTERIM OPERATION OF THE FACILITY .........................................
15. INDEMNIFICATION....................................................................................
16. REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR ...................
17. REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR ....................
18. NO JOINT VENTURE ............................................................................... 17
19. EXHIBITS AND SCHEDULES.....................................................................
20. EVENTS OF DEFAULT; REMEDIES............................................................
21. CHOICE OF LAW .......................................................................................
22. DISPUTE RESOLUTION..............................................................................
23. JURISDICTION; VENUE..............................................................................
24. ATTORNEYS FEES IN THE EVENT OF DISPUTE...................................... 27
25. DEFINITIONS.............................................................................................
26. GENERAL PROVISIONS .............................................................................

## OPERATIONS TRANSFER AGREEMENT

This **OPERATIONS TRANSFER AGREEMENT** (this "Agreement") is entered into this 15th day of October, 2024 (the "Effective Date") by and between the parties undersigned as Old Operator ("collectively, "Old Operator") and the parties undersigned as New Operator ("collectively "New Operator").

WITNESSETH:

**WHEREAS**, those entities listed on **Exhibit A**, attached hereto, as Seller (collectively, "Seller") own that certain land, building, furniture, fixtures and equipment comprising the nursing facility listed by such Seller's name in **Exhibit A** (each a "Facility" and collectively the "Facilities"), and all of the furniture, fixtures and equipment and other items of personal property located therein (the "Personal Property" and collectively with the Facility, the "Property");

**WHEREAS**, each respective Facility is licensed to and operated by an entity listed in **Exhibit A** as such Facility's operator, (each operator, is an "Old Operator" and collectively the "Old Operators") to operate the number of skilled nursing beds set forth next to the name of Each Facility as listed in **Exhibit A**;

**WHEREAS**, those entities listed on **Exhibit A**, attached hereto, as Purchaser (collectively, "Purchaser") are acquiring the Property from Seller, under that certain Asset Purchase Agreement by and between Seller and Purchaser, dated as of even date herewith (the "Purchase Agreement");

**WHEREAS**, as of the date hereof, each respective Seller and respective Old Operator listed next to such Facility in **Exhibit A** are parties to those certain lease agreements (collectively, the "Old Lease") providing for the lease of the Facility by respective Seller to respective Old Operator, which lease agreement will be terminated as of the Closing (as defined below) and replaced in its entirety by a new lease agreement to be entered into by and among respective Purchaser and respective New Operator listed next to such Facility in **Exhibit A** at the Closing, providing for the lease of the Facility by Purchaser to New Operator;

**WHEREAS**, New Operator anticipates that it will enter into a "Consulting Agreement" to provide certain advisory services prior to the closing of the OTA, the commencement of the Consulting Agreement being the "Consulting Date"

**WHEREAS**, it is anticipated that on October 15, 2024, each Seller and each Old Operator (in their capacity as chapter 11 debtors, each, a "Debtor" and, collectively, the "Debtors"), will file voluntary petitions (collectively, the "Chapter 11 Petitions") for relief under Chapter 11 of the Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court") commencing chapter 11 cases (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases");

**WHEREAS,** the Seller and Old Operator will continue to own and operate their respective Facilities and businesses as "***debtors-in-possession***" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

**WHEREAS**, subject to approval of the Bankruptcy Court, Old Operator and New Operator

are entering into this Agreement in order to provide for an orderly transition of the operations of the Facilities, and the sale and transfer of certain assets related thereto, including without limitation, certain supplies, equipment, vehicles and other personal property used in connection with the operation of the Facilities (the "Personal Property") and certain contracts, licenses, and permits, and in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code;

**WHEREAS**, at the closing of the transactions contemplated under the Purchase Agreement and as a condition to Purchaser's obligations under the Purchase Agreement, and in furtherance of a desire by the parties hereto to ensure a smooth transition of operations of the Facility, the parties hereto desire to enter into this Agreement.

**NOW, THEREFORE**, for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged by the parties hereto, the parties hereto agree as follows:

1.       **BANKRUPTCY PROVISIONS; CLOSING**.

      a.       The parties hereto agree to the terms and conditions regarding the Debtors' filing of the Sale Motion (as defined herein) with the Bankruptcy Court to, among other things, seek (a) entry of the Bidding Procedures Order (as defined herein) (i) approving this Agreement and the Purchase Agreement as part of the stalking horse purchase agreement, (ii) approving Purchaser and New Operator as the stalking horse bidder pursuant to this Agreement and the Purchase Agreement, and (iii) approving the Bidding Procedures (as defined herein), including the bid protections, that shall govern the Debtors' solicitation of competing bids for the Purchased Assets, and, (b) following an Auction (as defined herein) to be held after the Bidding Solicitation Period (as defined herein) expires should there be other Qualifying Bidders (as defined herein), the Debtors' pursuit of the Sale Order approving the Successful Bidder's (as defined herein) purchase agreement and operations transfer agreement, all in accordance with the provisions set forth on **Exhibit B** attached hereto (which **Exhibit B** also includes certain additional related defined terms used in this Agreement). To the extent of any inconsistencies in the Debtors' Sale Motion and the provisions set forth on **Exhibit B** attached hereto, the provisions in Exhibit B shall control, except as otherwise ordered by the Bankruptcy Court.

      b.       The closing of the transactions contemplated hereby (the "Closing") shall take place concurrently with the closing of the transactions contemplated under the Purchase Agreement, subject to the satisfaction or waiver of each of the closing conditions set forth in Section 2 hereof (other than those conditions which can only be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). The Closing shall be effective as of 12:01 a.m. (Central Time) on the Closing Date (the "Effective Time").

      c.       Except as otherwise expressly provided herein or as otherwise agreed by the parties, (i) Closing will occur with respect to all Facilities simultaneously, and (ii) this

Agreement may be terminated only with respect to all Facilities.

**2.**     **CONDITIONS PRECEDENT.**     New Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the commercially reasonable satisfaction of New Operator or the waiver thereof by New Operator of the following conditions precedent on or prior to the Closing Date, which waiver shall be binding upon New Operator only to the extent made in writing and dated as of the Closing Date:

a.  Old Operator shall have duly and timely performed and fulfilled in all respects all of its duties, obligations, promises, covenants and agreements hereunder;

b.  Each of the representations and warranties of Old Operator contained in this Agreement shall have been true, correct complete and not misleading in all respects as of the Effective Date;

c.  Old Operator shall have delivered to New Operator on or before the Closing Date the following, each of which shall be in form and substance satisfactory to New Operator, in its commercially reasonable discretion:

1.     A bill of sale, in substantially the form annexed hereto as **Exhibit C** (the "Bill of Sale"), containing a warranty of title, duly executed and acknowledged by each Old Operator, sufficient to convey to New Operator good and indefeasible title, free of all Liens, in and to the personal properties included in the Transferred Assets;

2.     An assignment by each Old Operator, in substantially the form annexed hereto as **Exhibit D** (the "General Assignment"), of all of Old Operator's right, title and interest in, to and under:

    i. The Assumed Contracts (as defined herein);

    ii. The Patient Trust Funds and Property (as defined herein);

    iii. The Provider Agreements (as defined herein);

    iv. The Resident Agreements (as defined herein); and

    v. The Telephone Numbers and Website Material (as defined herein).

3.     A duly executed certificate of an authorized officer of Old Operator or its managing constituent, dated as of the Closing Date, to the effect and stating that (A) this Agreement and the Other Documents to which Old Operator is a party have been duly authorized, executed and delivered by Old Operator pursuant to all necessary resolutions or consents of the appropriate governing body of Old Operator, and appearing on said certificate are the true signatures of all persons who have executed this Agreement and the Other Documents to which Old Operator is a party on behalf of Old Operator, (B) the executing persons are fully authorized to act on behalf of Old Operator or its constituent partners or members,

3

as applicable and (C) conditions specified in <u>Section 2(a)</u>, <u>Section 2(b)</u>, <u>Section 2(e)</u>, <u>Section 2(f)</u>, <u>Section 2(g)</u>, <u>Section 2(h)</u>, <u>Section 2(i)</u> and <u>Section 2(m)</u> have been satisfied;

    4.    All Permits, if any, issued by any Governmental Authority relating to the operating of the Facility by Old Operator running to, or in favor of, Old Operator, to the extent legally assignable;

    5.    Old Operator shall execute and deliver a Confirmation of Sale to be provided to DOH;

    6.    Counterparts to the Other Documents duly executed by all parties thereto (other than New Operator); and

    7.    A duly executed termination agreement, between Seller and Old Operator, terminating the Old Lease.

d.   New Operator shall have received a copy of the Organizational Documents of Old Operator, together with amendments and supplements thereto, certified as of the most recent practicable date by the secretary of state of Old Operator's jurisdiction of incorporation or organization.

e.   Old Operator shall have transferred to New Operator the Patient Trust Funds and Property in compliance with all Applicable Laws with respect to the transfer of such Patient Trust Funds and Property and in accordance with the provisions of <u>Section 5</u> below;

f.   Other than as disclosed in <u>Schedule 2.f.</u>, on the Closing Date there shall not be any lawsuits filed or threatened against Old Operator which are not covered by insurance and being defended, subject to policy limits and any reservation of rights; nor shall there be any actions, suits, claims or other proceedings, pending or threatened, or injunctions or orders entered, pending or threatened against Old Operator, to restrain or prohibit the consummation of any of the transactions contemplated under this Agreement and the Other Documents;

g.   New Operator shall have received DOH approval of the Licensure and all other Regulatory Approvals required by New Operator in order to operate the Facility in the manner presently operated by Old Operator, subject to conditions acceptable to New Operator in its reasonable discretion, and such approvals shall not have been revoked or modified; provided that the receipt of tie-in letters or other similar documentation permitting New Operator to bill and collect for services rendered to Medicare and Medicaid beneficiaries after the Closing shall not be a condition to Closing.

h.   New Operator shall have approved of any updates to the Schedules and/or Exhibits, pursuant to <u>Section 19</u> hereof;

i.   The closing conditions described in the Purchase Agreement shall have been met, to the reasonable satisfaction of New Operator, and the closing under the Purchase Agreement

shall occur concurrently herewith.

j.    The Bankruptcy Court shall have entered the Sale Order approving the sale of the Purchased Assets to Purchaser and New Operators free and clear of all Claims and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), and such Sale Order shall be a Final Order.

Old Operator's obligation to consummate the transactions contemplated in this Agreement shall be subject to the commercially reasonable satisfaction of Old Operator or the waiver thereof by Old Operator of the following conditions precedent on and as of the Closing Date, which waiver shall be binding upon New Operator only to the extent made in writing and dated as of the Closing Date:

a.    New Operator shall have duly and timely performed and fulfilled all of its duties, obligations, promises, covenants and agreements hereunder;

b.    Each of the representations and warranties of New Operator contained in this Agreement shall be true, correct, complete and not misleading in all respects as of the Effective Date and the Closing Date;

c.    New Operator shall have executed and delivered to Old Operator the Other Documents to which it is a party; and

d.    The closing conditions described in the Purchase Agreement shall have been met and the closing under the Purchase Agreement shall occur concurrently herewith.

e.    The Bankruptcy Court shall have entered the Sale Order approving the sale of the Purchased Assets to Purchaser and New Operators free and clear of all Claims and Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), and such Sale Order shall be a Final Order.

In the event that either of the parties hereto (a "Waiving Party") waives a condition precedent to its performance hereunder, or otherwise elects to proceed with the Closing despite the fact that one or more conditions precedent to its performance have not been satisfied, such action by the Waiving Party shall in no way be deemed a waiver of any payment, indemnification or other rights of the Waiving Party with respect to such condition, and the Waiving Party shall be entitled, following the Closing, to pursue any and all available remedies at law or equity with respect thereto.

3.    **LIABILITIES OF OLD OPERATOR.**

a.    New Operator shall not be the successor to Old Operator, and Old Operator hereby acknowledges and agrees that pursuant to the terms of this Agreement, neither New Operator nor any of its Affiliates shall assume or become liable to pay, perform or discharge any Liability of Old Operator of any kind or nature, at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, arising out of this or any other transaction or event and whether or not relating

5

to Old Operator any of the Business, regardless of any disclosure made or exceptions noted with respect to the representations and warranties, covenants or agreements contained in this Agreement or any other document executed or delivered by Old Operator in connection with the transactions contemplated hereby, including the following specifically enumerated Liabilities (collectively, the "Excluded Liabilities"):

      i.      All Liabilities for Indebtedness of Old Operator;

      ii.      All Liabilities of Old Operator that relate to any of the Excluded Assets (as defined herein);

      iii.      All Liabilities of Old Operator or for which Old Operator could be liable relating to Taxes (including with respect to the Transferred Assets or otherwise) including any Taxes that will arise as a result of the transfer of any of the Transferred Assets pursuant to this Agreement and any Liability related to Taxes of Old Operator imposed upon New Operator by reason of New Operator's status as transferee of the Business or any of the Transferred Assets (including under any bulk sales law);

      iv.      All Transaction Expenses of Old Operator in connection with, resulting from or attributable to the transactions contemplated by this Agreement and the Other Documents;

      v.      All Liabilities of Old Operator that relate to the Recapture Claims (as defined herein);

      vi.      Any Liability arising out of any Action commenced against Old Operator or with respect to any of the Transferred Assets after the Closing, the facts of which arise out of, or relate to, any occurrence, circumstance or event happening or existing prior to the Effective Time;

      vii.      Any Liability of Old Operator relating to any Action for malpractice, professional liability, resident rights violations or violations of employee rights or contracts or otherwise constitute or are alleged to constitute a tort, breach of contract or violation of any law, rule, regulation, treaty or other similar authority;

      viii.      Any Liability under any Assumed Contract which arises after the Closing, but which arises out of or relates to any breach or alleged breach that occurred prior to the Closing.

      ix.      Any Liability of Old Operator for amounts due or which may become due or owing under the Old Lease or any Existing Contracts with respect to the period prior to the Effective Time, whether known or unknown on the Effective Date;

      x.      Any Liability with respect to the Current Employees (as defined herein) or former employees, or both (or their personal representatives) of Old Operator (including any Liabilities arising under any Benefits Plan of Old Operator,

other Liabilities described in <u>Section 9</u> and Liabilities relating to any employer-paid portion of any employment and payroll Taxes that become payable in connection therewith), except for Liabilities expressly assumed by New Operator under <u>Section 8(c)</u>;

      xi.     Any Liability pursuant to the WARN Act relating to any action or inaction of Old Operator on or prior to the Effective Time, including any liabilities under WARN Act as a result of New Operator failing to hire any Employee as of the Closing;

      xii.     Any Liability under any contract, agreement, lease, mortgage, indenture or other instrument of Old Operator, except for the Assumed Contract;

      xiii.     Any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Old Operator;

      xiv.     Any Liability arising out of or resulting from non-compliance with any Applicable Law by Old Operator;

      xv.     Any Liability of Old Operator under this Agreement or any Other Document; and

      xvi.     Any Liability of Old Operator resulting from overpayments or inappropriate billings

      xvii.     Any other Liabilities of Old Operator with respect to any acts, events or transactions whether occurred in the past, occurring at the present or occurring in the future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened.

Without limiting the foregoing, the parties intend that, to the fullest extent permitted by law (including under Section 363 of the Bankruptcy Code), upon the Closing, New Operators and Purchaser shall not be deemed to: (i) be the successors of the Old Operator or Seller, (ii) have, de facto, or otherwise, merged with or into the Old Operator or Seller, (iii) be mere continuations or substantial continuations of the Old Operator, or Seller or the business, enterprise(s), or operations of the Old Operator, or Seller or (iv) be liable for any acts or omissions of the Old Operator, or Seller in the conduct of their business or arising under or related to the Facilities or any other Purchased Assets other than as expressly set forth in the Transaction Documents and the Sale Order. Without limiting the generality of the foregoing, and except as otherwise provided in the Transaction Documents, the parties intend that New Operator and Purchaser shall not be liable for any Claims or Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) against Old Operator, or Seller, or any of Old Operator's, or Seller's predecessors or affiliates, and New Operator and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, including without limitation any liabilities for nursing assessments owed by Old Operator, or Seller to the Commonwealth of Pennsylvania and/or DOH, and any taxes of any kind whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Facilities or other Purchased Assets, or any liabilities of Old Operator, or

Seller arising prior to the Closing Date. The parties agree that the provisions substantially in the form of this <u>Section 3</u>, as well as any other provisions reasonably requested by New Operators or Sellers to ensure "free and clear" transfer of the Purchased Assets shall be reflected in the Sale Order.

Notwithstanding anything to the contrary herein or in the Purchase Agreement, in the event that (i) New Operator or Purchaser must engage legal counsel or incur any other costs or expenses to enforce the terms of the Sale Order, or (ii) a Governmental Authority determines pursuant to a Final Order that New Operators, Buyers, or the Transaction Assets are liable for any type of Claim or Encumbrance against New Operator, Purchaser or the Transaction Assets that are not expressly assumed pursuant to the Purchase Agreement, this Agreement, or the Sale Order, then then New Operator and Purchaser may recover the amount of any losses, liabilities, or damages resulting from the same, including, without limitation, costs and fees for legal counsel and related expenses, by offset against the Holdback Note.

Notwithstanding anything to the contrary herein, no terms of the Purchase Agreement, this Agreement, the Sale Order, or any other Transaction Documents will require Purchaser or New Operator to execute any application, agreement, or other document in favor of DOH or any other Governmental Authority that expressly or impliedly provides that Purchaser or New Operator shall assume or have assumed any Claims, Encumbrances, or other liabilities of the Seller or Old Operator except for Assumed Liabilities and Permitted Encumbrances.

b.      New Operator shall have no duty whatsoever to take any action or receive or make any payment or credit arising from or related to any services provided or costs arising from or related to any services provided or costs incurred in connection with the management and operation of the Facility prior to the Closing, including, but not limited to, any matters relating to Contracts, cost reports, collections, audits, hearing, or legal action arising therefrom.

c.      The parties hereto agree and acknowledge that, notwithstanding anything to the contrary in this Agreement, Old Operator shall retain, and New Operator shall not accept, any of Old Operator's rights, title and interest in and to any assets of Old Operator other than the Transferred Assets (collectively, the "<u>Excluded Assets</u>").

d.      The parties hereto acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement or any Other Document shall not create an Assume Liability or other Liability of New Operator, except where such disclosed obligation has been expressly assumed by New Operator as an Assumed Liability in accordance with the terms of this Agreement.

e.      For the avoidance of doubt, nothing contained in this Agreement shall omit any claim or defenses New Operator may have against any Third Party. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Old Operator or New Operator as compared to the rights and remedies which such Third Party would have had against Old Operator had New Operator not assumed such Assumed Liabilities.

8

     f.    <u>Closing Prorations</u>.  All costs and expenses relating to operation of the Facility, including without limitation bed taxes, provider taxes, gross receipts taxes, and quality assessment taxes, and all other taxes and utility charges, shall be prorated between Old Operator and New Operator as of the Effective Time.  In the event the amount of any cost or expense has not been determined as of the Effective Time, the proration shall be made on the basis of one hundred percent (100%) of the last available bill for the applicable period and shall be re-prorated upon receipt of statements therefor. For purposes of clarification, in no event shall Old Operator be responsible for any of the amounts above that are attributable to any period on or following the Closing, and in no event shall New Operator be responsible for any of the amounts above that are attributable to any period prior to the Closing.

**4.**    **<u>CONVEYANCE OF SUPPLIES</u>**.    On the Closing Date, Old Operator shall transfer to New Operator all food, central supplies, linens and housekeeping supplies, other consumable and non-consumable inventory maintained with respect to the Facility and any other personal property of Old Operator (the "<u>Supplies</u>"). Old Operator shall transfer an adequate amount of Supplies as regularly on hand in ordinary course of business. Old Operator shall have no obligation to deliver the Supplies to any location other than that at which each item of Supplies is currently located, and New Operator agrees that the presence of the Supplies at the Facility on the Closing Date shall constitute delivery thereof.

**5.**    **<u>TRANSFER OF PATIENT TRUST FUNDS</u>**.

     a.    Prior to the Closing, Old Operator shall provide to New Operator a true, correct and complete accounting (properly reconciled) certified as being true, correct and complete by Old Operator of any patient trust funds and an inventory of all residents' property held by Old Operator on the Closing Date for patients at the Facility, a copy of which shall be attached hereto as <u>Schedule 5.a.</u> ("<u>Patient Trust Funds and Property</u>").

     b.    Old Operator will indemnify, defend and hold New Operator harmless from any and all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees: i) in the event the amount of funds or any property, if any, transferred to New Operator did not represent the full amount of the funds and/or property delivered to Old Operator as of the Closing Date, ii) with respect to any Patient Trust Funds and Property delivered, or claimed to have been delivered, to Old Operator, but which were not delivered by Old Operator to New Operator, or iii) for claims which arise from actions or omissions of Old Operator with respect to the Patient Trust Funds and Property prior to the Closing Date.

     c.    New Operator will indemnify, defend and hold Old Operator harmless from all liabilities, claims, demands and causes of action of any nature whatsoever, including reasonable attorneys' fees, in the event a claim is made against Old Operator with respect to the Patient Trust Funds and Property where said funds were transferred to New Operator pursuant to the terms hereof, or for claims which arise from actions or omissions of New Operator after the Closing Date with respect to Patient Trust Funds and Property actually received by New Operator.

6.  **COST REPORTS; OVERPAYMENTS, CIVIL MONETARY PENALTIES.**

a.      Old Operator shall timely prepare and file with the appropriate Medicare and Medicaid agencies, its final cost reports in respect to its operation of the Facility as soon as practicable after the Closing Date, but in any event prior to the expiration of the period of time as may be required by Applicable Law for the filing of each such final cost report under the applicable third-party payor program, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to New Operator for the period beginning on the Closing Date is not delayed, reduced or offset in any manner as a result of Old Operator's failure to timely file such final cost reports.

b.      Each party hereto agrees to notify the other within five (5) Business Days after receipt of any notice of any claim, audits, assessment inquires, proceedings, disputes, examinations, determination or denials or similar events by DOH, CMS, OIG or any other Governmental Authority with respect to any of the following, relating to periods prior to the Effective Time: (i) an alleged Medicare, Medicaid, and/or Managed Care overpayment, or any other recoupment or adjustment to reimbursement, (ii) an alleged underpayment of any Tax or assessment or iii) any other governmental or third-party payor claims (each, a "Recapture Claim").  For avoidance of doubt, the failure to provide notification of a Recapture Claim within the foregoing timeframe shall in no way effect a party's rights to indemnification with respect thereto.

c.      In the event DOH, CMS, OIG, any other Governmental Authority making payments to New Operator for services performed at the Facility after the Closing or any other third-party payor makes any Recapture Claim, then Old Operator hereby agrees to save, indemnify, defend and hold New Operator harmless from and against any Loss incurred or suffered by New Operator relating to, arising from, by reason of or in connection with  any such claim.  In connection with the foregoing indemnification obligation, in the event that DOH, CMS, OIG or any other Governmental Authority or other third-party payor source withholds amounts from New Operator's reimbursement checks as a result of such Recapture Claim, Old Operator shall pay such amounts to New Operator within three (3) Business Days following New Operator's demand therefor.  In the event Old Operator fails to pursue any issue or issues relating to appeal of a Recapture Claim, New Operator may, at Old Operator's expense, pursue an appeal of such issue or issues and Old Operator will cooperate fully with New Operator in such appeal, including by providing copies of any documentation required to substantiate costs reported on the cost reports.

d.      Old Operator shall pay, prior to the Closing, all outstanding Recapture Claims and any other fees and taxes due with respect to the Facility for periods prior to the Closing, and shall provide to New Operator, on or before the Closing, evidence reasonably satisfactory to New Operator of the foregoing payments.  Old Operator shall also remain liable and responsible for the correction of all violations cited by DOH or any other Governmental Authority in any survey prior to or after the Closing, that result from a condition that existed at the Facility prior to the Closing Date or as a result of an action or inaction of Old Operator prior to the Closing Date.

10

e.      Old Operator shall deliver to New Operator copies of any Medicare and Medicaid cost reports for the Facility that have not been filed as of the Effective Date, for New Operator's review, at least ten (10) days prior to filing of such reports, and provide New Operator with reasonable access to the underlying documentation for such reports.

**7.      CONTRACTS**.

a.      As soon as practicable after the date hereof, the Old Operator shall deliver to the New Operator true, accurate and complete copies of all Existing Contracts, a schedule of which is attached hereto as Schedule 7.a.  In accordance with the terms of the General Assignment and this Agreement, Old Operator shall assign and transfer to New Operator all of Old Operator's rights, title and interest in, to and under the Existing Contracts chosen by New Operator in its sole discretion and set forth in Schedule 7.b. hereto (collectively, the "Assumed Contracts," and the Exiting Contracts not assigned to New Operator shall hereinafter be referred to as the "Rejected Contracts"), and New Operator shall assume all of the Liabilities of Old Operator under the Assumed Contracts that accrue after the Effective Time and that do not arise from occurrences, circumstances or events occurring or existing , or breaches existing at or prior to the Effective Time (it being understood that any interest, penalty or other amounts required to be paid under any Assume Contract as a result of any non-payment or other breach by Old Operator thereunder shall not be an Assumed Liability).

b.      To the extent any third party consent is required in connection with the assignment and assumption of the Assumed Contracts, Old Operator hereby covenants and agrees to use its best efforts to obtain such third party consent prior to the Closing Date. To the extent Old Operator shall be unable to obtain such third party consent, Old Operator and New Operator shall cooperate and take such steps as may be necessary in order for New Operator to receive the benefits under such Assumed Contracts, provided that New Operator agrees to fulfill any obligations of Old Operator that shall arise with respect to such Assumed Contracts on and after the Closing Date.

c.      Old Operator shall also transfer, convey and assign to New Operator on the Closing Date all customer lists, prospect lists, and existing agreements with residents and any guarantors thereof (the "Resident Agreements"), to the extent assignable by Old Operator.

**8.      EMPLOYEES**.

a.      Old Operator shall terminate the employment of all employees providing services at the Facility, a listing of which as of the Effective Date is attached hereto as Schedule 8.a. (such listing, to include the current base salaries of all such employees) (the "Current Employees"), and to be updated as of the Closing Date.  New Operator shall not be bound by or assume any employment contracts to which Old Operator may be a party. Other than consistent with past practice, Old Operator shall not make any material changes in the compensation or benefits of the employees at the Facility prior to the Closing Date.

b.      New Operator shall determine, in its sole discretion, which of the Current

11

Employees shall be offered employment with New Operator, pursuant to employment terms acceptable to New Operator (hereinafter, the "Retained Employees"). Nothing in this paragraph, however, create any right in favor of any person not a party hereto, including without limitation, the Current Employees, or constitute an employment agreement or condition of employment for any employee of Old Operator or any affiliate of Old Operator who is a Current Employee.

c.     Old Operator and New Operator shall calculate, as of the Closing Date, the amount of all of the accrued (whether vested, unvested, contingent or mature) paid time off (which shall include all days for which Retained Employees are paid but do not actually work, such as sick days, vacation days, and holidays) and all other accrued but unpaid payroll obligations including but not limited to all FICA, withholding, unemployment, workmen's compensation, union dues or other employment related taxes in connection with the foregoing ("Old Operator's Employment Expenses"). A schedule of Old Operator's Employment Expenses is attached hereto as Schedule 8(c), and shall be updated prior to the Closing to reflect amounts outstanding at the Closing. In the event that New Operator elects to pay any amounts reflecting Old Operator's Employment Expenses following the Closing, such amount paid shall be offset against amounts due under the Holdback Note.

9.     **ACCOUNTS RECEIVABLE**.

a.     Old Operator shall retain the right to collect all unpaid Accounts Receivable of Old Operator with respect to periods prior to the Closing. If at any time after the Closing Date, New Operator shall receive any payment from any federal or state agency, which payment includes any reimbursement with respect to payments or underpayments made to Old Operator for services rendered prior to the Closing Date, then New Operator shall remit such payments to Old Operator. New Operator and Old Operator shall send copies of all Medicaid remittance advices to the other party for purposes of recording and pursuing Accounts Receivable for the period of twelve (12) months following the Closing Date and thereafter as reasonably requested by each party. If at any time after the Closing Date, Old Operator shall receive any payment from any federal or state agency, which payment represents reimbursement with respect to payments or underpayments made to New Operator for services rendered on or after the Closing Date, then Old Operator shall remit such payments to New Operator. Any such remittances pursuant to this Section 9.a. shall occur within three (3) Business Days from the date the party required to make such remittance receives payment thereof.

b.     Any non-designated payments received by New Operator or Old Operator from non-governmental payment sources during a period of sixty (60) days following the Closing shall first be applied to any pre-Closing balances due to Old Operator for services provided prior to the Closing (with the excess, if any, applied to any post-Closing balances due for services rendered by New Operator following the Closing), and any such payments received following such period of sixty (60) days shall first be applied to any post-Closing balances due New Operator for services provided after the Closing (with the excess, if any, applied to any pre-Closing balances due for services rendered by Old Operator prior to the Closing). Notwithstanding the foregoing, the parties agree and acknowledge that Social Security payments received by residents at the Facility, and provided as payment for

12

services at the Facility, shall be applied towards payment for services rendered during the month with respect to which the Social Security payment was received by the resident.

      c.      For avoidance of doubt, any Medicare bad debt payments received by Old Operator following the Closing (prior to such time as assignment of the Medicare Provider Agreement to New Operator has been fully processed) that relate to periods following the Closing, shall be remitted to New Operator within three (3) Business Days of receipt thereof.

      **10.**      **EMPLOYMENT RECORDS**.  Old Operator shall deliver to New Operator, prior to the Closing Date, either the originals or full and complete copies of all employee records for all Retained Employees in its possession (including, without limitation, all employee employment applications, W-4's, I-9's and any disciplinary reports) (collectively, the "<u>Employee Records</u>"). Old Operator represents and warrants to New Operator that the Employee Records delivered to New Operator represent all employee records in Old Operator's possession or control as of the Closing Date.

      **11.**      **ACCESS TO RECORDS**.

      a.      On or before the Closing Date, Old Operator shall, at its sole cost and expense, deliver to New Operator the Books and Records of the Facility, including resident medical records with respect to residents at the Facility at Closing, and financial records. Provided, however, that nothing herein shall be construed as precluding Old Operator from removing from the Facility on the Closing Date its corporate financial records which relate to its operations at the Facility or to its overall corporate operations; and provided, further, that Old Operator shall give New Operator access to any information in any such removed records as is necessary for the efficient and lawful operation of the Facility by New Operator or is otherwise required by law to be maintained at the Facility.

      b.      Subsequent to the Closing Date, New Operator shall allow Old Operator and its Representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including the Closing Date, at its own expense, to the extent reasonably necessary to enable Old Operator to investigate and defend malpractice, employee or other claims, to file or defend cost reports and tax returns.

      c.      Old Operator shall, if allowed by applicable law and subject to the terms of such applicable law, be entitled to remove any records delivered to New Operator, for purposes of litigation involving a resident or employee to whom such record relates, as certified to New Operator in writing prior to removal by an officer of or counsel for Old Operator in connection with such threatened or actual litigation.  Any record so removed shall promptly be returned to New Operator following its use.

      d.      New Operator agrees to maintain such books, records and other material comprising records of the Facility's operations prior to the Closing Date that have been received by New Operator from Old Operator or otherwise, including resident records and

records of patient funds, to the extent required by law, but in no event less than three (3) years.

e.     Old Operator shall retain medical and financial records of residents no longer at the facility at Closing but previously at the Facility at any time during the seven (7) year period prior to Closing, and will retain such records for at least seven (7) years following the Closing.  Old Operator shall allow New Operator reasonable access to the foregoing resident records.

**12.     USE OF TELEPHONE NUMBER AND WEBSITE; POLICY AND PROCEDURE MANUALS.**

a.     New Operator may use the present telephone numbers ("Telephone Numbers") and the parties shall work together in good faith to reach a mutually agreeable arrangement with respect to the websites or internet domain names ("Website Materials") of the Facility.  Old Operator shall as of the Closing Date transfer or cause to be transferred, at its expense, the telephone numbers used by the Facility.

b.     Old Operator agrees to leave its policy and procedure manuals at the Facility and to transfer all of its right, title and interest in and to such policy and procedure manuals to New Operator under the Bill of Sale referenced in Section 2 of this Agreement.

**13.     PROVIDER AGREEMENTS.**  For any periods following the Closing that New Operator is not yet able to bill under its Medicaid, Medicare, and/or Managed Care provider agreements (the "Provider Agreements"), Old Operator shall allow New Operator to bill under Old Operator's Provider Agreements, to the extent permitted by applicable law, and Old Operator shall promptly forward to New Operator any payments received with respect thereto within three (3) Business Days of receipt thereof.  New Operators shall indemnify, defend, and hold harmless Old Operators for any losses or liabilities to Old Operators arising from or relating to New Operators operating under Old Operators' Provider Agreements as contemplated herein.

**14.     COOPERATION; INTERIM OPERATIONS OF THE FACILITY.**  Old Operator agrees to cooperate with New Operator, and New Operator agrees to cooperate with Old Operator to affect an orderly transfer of the operation of the Facility.  Old Operator shall fully cooperate with New Operator in connection with submitting an application to DOH with respect to the Licensure, as well as any applications with respect to the Provider Agreements, and shall also fully cooperate with regard to any additional actions or information required with respect to approval of the Licensure and/or New Operator's Provider Agreements, or otherwise requested in connection with the transactions contemplated herein.

From the date of this Agreement until the Closing, Old Operator shall operate the Facility in substantially the same manner as it has heretofore operated, use commercially reasonable and diligent efforts to preserve intact the business operations and relationships of the Facility with Third Parties and use best efforts to keep available the services of all of the Facility's employees. Without limiting the generality of the preceding sentences, until the earlier of (i) the Closing Date, or (ii) the termination of this Agreement, Old Operator shall:

14

a.    Operate the Facility in the normal course of business and in compliance with all laws, ordinances, orders, rules, regulations and requirements of any federal, state or municipal governmental agency or authority;

b.    Maintain the Facility's licensure status in substantial compliance with all applicable laws, rules and regulations;

c.    Not sell, transfer or otherwise dispose of any of the Supplies except in the Ordinary Course of Business consistent with the prior practices of Old Operator, in which event Old Operator shall replace the same with similar property of equal quality, value and usefulness;

d.    Not enter into any contract which shall become the obligation of New Operator nor modify, cancel, accept the surrender of or renew (except when any such acceptance of surrender or renewal is non-discretionary) any material Contract which exists at present without New Operator's prior written consent;

e.    Not decrease the private pay rates of the residents of the Facility without the prior written consent of New Operator;

f.    Maintain records in accordance with all applicable federal and state laws and in such manner so that all records will be prepared in a consistent manner and will be current, complete, accurate and true;

g.    Not increase or promise to increase any wages or benefits of, or grant or promise to grant any bonuses to, any of the employees of the Facility without the prior written consent of New Operator;

h.    Not take any action which will or would cause any of the representations or warranties in this Agreement to become untrue or be violated;

i.    Perform all of its obligations in respect of the Facility whether pursuant to any contracts, or other requirements, including payment before the same shall become due of all taxes, duties and other governmental charges that accrue prior to the Closing Date;

j.    Not transfer residents from the Facility to any other skilled nursing facility, other than as requested by such resident or as required for the care of such resident; and

k.    Promptly inform New Operator in writing of any material event adversely affecting the ownership, use, occupancy, operation, management or maintenance of the Facility, whether or not insured against.

l.    New Operator and Old Operator agree and acknowledge that the employees at the Facility provide valuable services that are crucial for the success of the Facility, and New Operator's decision to serve as certified operator of the Facility is based upon the skills and qualifications of such employees.  As such,

15

during the period beginning on the Effective Date and ending upon the date that is two (2) years following the Closing, no person or entity that either directly or indirectly controls, is under common control with or is otherwise affiliated with Old Operator shall solicit or hire for employment any Current Employee. In the event of any breach of the foregoing, Old Operator shall pay to New Operator an amount equal to the greater of (i) Fifty Thousand Dollars ($50,000.00) or (ii) the annual salary for any such Current Employee as liquidated damages, for each such Current Employee that is solicited or hired in violation of this section. The parties agree and acknowledge that actual damages with respect to the foregoing would be difficult to ascertain and that Fifty Thousand Dollars ($50,000.00) is a fair and reasonable approximation of such actual damages.

## 15. <u>INDEMNIFICATION</u>.

a. <u>By Old Operator</u>. In addition to and not in lieu, place, stead and/or substitution of any other indemnity set forth elsewhere herein, Old Operator shall indemnify, save, protect, defend and hold harmless, New Operator, its Affiliates, and their respective members, managers, employees, shareholders, officers, directors and agents (collectively, the "<u>New Operator Indemnitees</u>"), from and against any and all Losses incurred or suffered by any such New Operator Indemnitee arising from, by reason of or, in connection with (i) any misrepresentation or inaccuracy in, or breach of any representation or warranty of Old Operator contained in this Agreement or any certificate delivered pursuant hereto on the part of Old Operator, (ii) any breach by Old Operator of any covenant or agreement made by Old Operator in this Agreement (including under this <u>Section 15</u>), (iii) operation of the Facility prior to the Effective Time, (iv) any fraud or intentional misrepresentation on the part of any Old Operator or its Representatives, (v) any Recapture Claim, , or (vi) the Excluded Liabilities.

b. <u>By New Operator</u>. In addition to and not in lieu, place, stead and/or substitution of any other indemnity set forth elsewhere herein, New Operator shall indemnify, save, protect, defend and hold harmless Old Operator, their employees, members, managers, shareholders, officers, directors and agents (collectively, the "<u>Old Operator Indemnitees</u>"), from and against any and all applicable Losses incurred or suffered by any such Old Operator Indemnitee arising from, by reason of or, in connection with (i) any breach by New Operator of its obligations, representations, warranties, agreements or covenants hereunder, and (ii) New Operator's operation of the Facility following the Effective Time.

c. In the event that any liability, claim, demand or cause of action which is indemnified against by or under any term, provision, section or paragraph of this Agreement is made against or received by any indemnified party (hereinafter "<u>Indemnitee</u>") hereunder or upon an Indemnitee becoming aware of a fact, condition or event that otherwise constitutes a basis for a claim for indemnification against the Indemnitor (an "<u>Indemnitee's Claim</u>"), said Indemnitee shall notify the indemnifying party (hereinafter "<u>Indemnitor</u>") in writing within twenty one (21) calendar days of Indemnitee's receipt of written notice of said Indemnitee's Claim, provided, however, that Indemnitee's failure to timely notify Indemnitor of an Indemnitee's Claim shall not impair, void, vitiate

16

or invalidate Indemnitor's indemnity obligations hereunder nor release Indemnitor from the same, which duty, obligation and indemnity shall remain valid, binding, enforceable and in full force and effect so long as Indemnitee's delay in notifying Indemnitor does not, solely by itself, directly and materially prejudice Indemnitor's right or ability to defend or indemnify the Indemnitee's Claim. Upon its receipt of any or all Indemnitee's Claim(s), Indemnitor shall diligently and vigorously defend, compromise or settle said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense and shall promptly provide Indemnitee evidence thereof within fourteen (14) calendar days of the final, unappealable resolution of said Indemnitee's Claim. Upon the receipt of the written request of Indemnitee, Indemnitor shall within two (2) calendar days provide Indemnitee a true, correct, accurate and complete written status report regarding the then current status of said Indemnitee's Claim. Prior to an Indemnification Default (as defined herein), Indemnitee may not settle or compromise an Indemnitee's Claim without Indemnitor's prior written consent. Failure to obtain such consent shall be deemed a forfeiture by Indemnitee of its indemnification rights hereunder. In the event that Indemnitor fails or refuses to indemnify, save, defend, protect or hold Indemnitee harmless from and against an Indemnitee's Claim (or in the event sufficient funds are not available for such indemnification) and/or to diligently pursue the same to its conclusion, or in the event that Indemnitor fails to timely report to Indemnitee the status of its efforts to reach a final resolution of an Indemnitee's Claim, on seven (7) calendar days prior written notice to Indemnitor during which time Indemnitor may cure any alleged default hereunder, the foregoing shall immediately, automatically and without further notice be an event of default hereunder (an "Indemnification Default") and thereafter Indemnitee may, but shall not be obligated to, immediately and without notice to Indemnitor, except such notice as may be required by law and/or rule of Court, intervene in and defend, settle and/or compromise said Indemnitee's Claim at Indemnitor's sole and exclusive cost and expense, including but not limited to attorneys' fees, and, thereafter, within seven (7) calendar days of written demand for the same Indemnitor shall promptly reimburse Indemnitee all said Indemnitee's Claims and the reasonable costs, expenses and attorneys' fees incurred by Indemnitee to defend, settle or compromise said Indemnitee's Claims.

d. For avoidance of doubt, Old Operator has agreed that New Operator's rights to indemnification pursuant to this Agreement shall not be affected or waived by virtue of any investigations or due diligence performed by New Operator.

e. The parties' obligations under this <u>Section 15</u> shall survive the Closing for a period of twelve (12) months.

f. <u>Holdback Note</u>. The obligations of Old Operator under this Section 15 are secured by the Holdback Note (as defined in the Purchase Agreement), and pursuant to the Holdback Note and Purchase Agreement, to the extent any amounts due to New Operator under Section 15 of the OTA are not paid upon demand, the Purchaser may set off such amounts against any payments due to Seller under the Holdback Note.

**16.** **REPRESENTATIONS AND WARRANTIES OF NEW OPERATOR**. As an inducement to Old Operator to enter into this Agreement, New Operator covenants and makes the following representations and warranties set forth below, which are true and correct as of the date

hereof and which shall be true and correct on the Closing Date:

      a.     <u>Organization and Authority</u>.  New Operator is a limited liability company duly organized, validly existing and in good standing under the laws of the State of [_____] and as of the Closing Date will have, all necessary power and authority to enter into this Agreement and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individual executing this Agreement to do so.  This Agreement has been duly and validly executed and delivered by New Operator and is enforceable against New Operator in accordance with its terms.

      b.     <u>No Violations</u>.  Neither the execution and delivery of this Agreement, or any agreement referred to or contemplated hereby, by New Operator will:

      i.     Violate any provision of its Operating Agreement; or

      ii.     Be in conflict with constitute a default or create a right of termination or cancellation under any agreement or commitment to which New Operator is a party.

      c.     <u>No Broker</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Other Document based upon arrangements made by or on behalf of New Operator.

      d.     <u>Accuracy of Representations and Warranties of New Operator</u>.  No representation or warranty by or on behalf of New Operator contained in this Agreement and no statement by or on behalf of New Operator in any certificate, list, exhibit, schedule or other instrument furnished or to be furnished to Old Operator by or on behalf of New Operator pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

      e.     <u>Survival of Representations and Warranties of New Operator</u>.  Each representation and warranty of New Operator hereunder shall be true, complete and correct as of the Closing Date with the same force and effect as though such representation or warranty was made on such date, and all representations and warranties shall survive the Closing for a period of twelve (12) months.

    **17.**    <u>**REPRESENTATIONS AND WARRANTIES OF OLD OPERATOR**</u>.  Except as set forth in the Old Operator Disclosure Schedules (it being understood that (i) nothing in Old Operator Disclosure Schedules shall be adequate to disclose an exception to a representation or warranty made in this <u>Section 17</u>, unless such section or subsection of the Old Operator Disclosure Schedules identifies the exception with reasonable particularity, (ii) the mere listing or referencing (or inclusion of a copy) of a document or other item shall not be adequate to disclose an exception to a representation or warranty, unless the representation or warranty has to do with the existence of such document or item and (iii) no exceptions to any representations or warranties disclosed in

any specific section or subsection of the Old Operator Disclosure Schedule shall constitute an exception to any other representations or warranties Old Operator in this <u>Section 17</u>), and as an inducement to New Operator to enter into this Agreement, Old Operator covenants and makes the following representations and warranties, which are true and correct as of the date hereof:

  a. <u>Organization and Authority</u>.  Old Operators are limited liability companies that validly exists under the laws of the Commonwealth of Pennsylvania. Old Operator has full power and right to enter into and perform its obligations under this Agreement and the Other Documents.  The execution and delivery of this Agreement and the Other documents to which Old Operator is a party and the consummation of the transactions contemplated hereby and thereby (1) have been duly authorized by all necessary action on the part of Old Operator, (2) do not require any governmental or other consent and (3) will not result in the breach of any agreement, indenture or other instrument to which Old Operator is a party or is otherwise bound.

  b. <u>Condition of the Transferred Assets</u>.  The Transferred Assets shall be delivered at the time of the Closing in the same condition as they are in on the date hereof, reasonable wear and tear excepted. Except in the ordinary course of business and consistent with past practices, and then only in the event the same is replaced, nothing individually or in the aggregate comprising a material portion of the Transferred Assets shall be sold, transferred, leased to others or wasted and Old Operator shall not otherwise dispose of any of the Transferred Assets or anything constituting a portion of the Transferred Assets, or cancel or compromise any debt or claim, or waive or release any right of substantial value constituting a part of or relating to all or any material part of the Transferred Assets.

  c. <u>Environmental Condition</u>.  Old Operator (i) has no Knowledge of and has not received any written notice from any Governmental Entity asserting that any of the operations or activities upon, or any use of occupancy of the Facility are not in compliance with any laws relating to Hazardous Substances, including the discharge and removal of Hazardous Substances, and (ii) has not received any written notice of any potential liability under any Environmental Laws. To Old Operator's Knowledge, at all times that Transferor has operated the Facility, the Facility have been operated in compliance in all respects with all Environmental Laws, and there are no Hazardous Substances present on, under or in the Facility that violate any Environmental Laws. Old Operator has no Knowledge of, or has not received any written notice of, any alleged, actual or potential responsibility for, or any inquiry or investigation regarding, the presence or release of any Hazardous Materials at the Facility in violation of Environmental Laws or any other violation of Environmental Laws. Old Operator has not received any written notice of any other claim, demand or action by any Person alleging any actual or threatened injury or damage to any person or entity, property, natural resource or the environment arising from or relating to the presence or release of any Hazardous Materials in violation of Environmental Laws at, on, under, in, to or from the Facility or in connection with any operations or activities of the Old Operator. To Old Operator's Knowledge, the

Facility and/or the property contains no underground storage tanks, and any such tanks that have been removed from have been properly certified by the Department of Environmental Protection.

d.  <u>Leases</u>.  Other than the Old Lease, which shall be terminated as of the Closing Date, there are currently, and as of the Closing Date there shall be, no occupancy rights (written or oral), leases or tenancies presently affecting the Property or the Facility and the portion of the Property which it is located, other than any occupancy rights of any residents of the Facility.

e.  <u>Permits</u>.  The Permits as listed on <u>Schedule 17(j)</u> hereto are all of the material certificates, licenses and permits from governmental authorities held by Old Operator in connection with the ownership, use, occupancy, operation and maintenance of the Facility, and are all of the certificates, licenses, accreditations and permits necessary in connection with the current ownership, use, occupancy, operation and maintenance thereof.

f.  <u>Required Consents</u>.  No consent, order, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required in connection with the execution or delivery by Old Operator of this Agreement, or the performance of the transactions contemplated thereunder, except (1) approval by DOH of the Licensure, and (2) such consents, certifications or licenses from the DOH, United States Department of Health and Human Services, CMS or any other governmental agency with jurisdiction over the Facility as are necessary to permit Old Operator to operate the Facility prior to the Closing Date.

g.  <u>Sufficiency of Assets</u>.  The Purchased Assets (as defined in the Purchase Agreement), together with the Transferred Assets constitute all of the assets, tangible and intangible, real and personal of any nature whatsoever, necessary and sufficient for operation of the Facility for the number of skilled nursing dually-certified beds, in compliance with all Applicable Laws and in the manner presently operated by Old Operator set forth next to the Old Operator's name on **<u>Exhibit A</u>**.  There are at the Facility a number of beds equal to the maximum bed capacity as permitted under the Facility license.  Each bed is in good repair and conforms with the minimum standards set forth under the regulations adopted by DOH.  For each such bed, there also exists the minimum furnishings, fixtures and other accessories required by DOH.

h.  <u>Litigation</u>.  Except as set forth in <u>Schedule 17(m)</u>, there are no pending or threatened litigation, investigations, claims, lawsuits, governmental actions or other proceedings, including without limitation, any desk audit or full audit, involving the Transferred Assets, or the operation thereof before any court, agency or other judicial, administrative or other governmental or quasi-governmental body or arbitrator.

i. <u>Compliance with Applicable Laws</u>.   To Old Operator's knowledge, the Transferred Assets have been and are presently used and operated in compliance with, and in no way violate any Applicable Law of any kind whatsoever affecting the Transferred Assets or any part thereof. In addition, no waivers have been obtained or are required to make the representations contained in this <u>Section 17(i)</u> fully true and correct and not misleading in all respects.

j. <u>Taxes</u>.   Old Operator has timely filed all Tax Returns and reports required by law to have been filed by it and has paid all taxes and governmental charges due and payable with respect to such returns, except for certain sums due to the Commonwealth of Pennsylvania or its agencies and as set forth on <u>Schedule 17.j.</u> attached hereto

k. <u>Sprinklers</u>. There is a sprinkler system at the Facility that is in full operational compliance with all applicable requirements.

l. <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Other Document based upon arrangements made by or on behalf of Old Operator.

m. <u>No Defaults</u>.     The execution, delivery and performance of this Agreement and any of the Other Documents by Old Operator does not and will not:

i.      Conflict with or result in any breach of the provisions of, or constitute a default under any Old Operator's certificate of formation or operating agreement;

ii.     Violate any restriction to which Old Operator is subject or, with or without the giving of notice, the passage of time, or both, violate (or give rise to any right of termination, cancellation or acceleration under) any mortgage, deed of trust, license, material lease, indenture or other material agreement or instrument, whether oral or written, to which Old Operator or the Facility is a party, or by which it or its property is bound, which will not be satisfied or terminated on or prior to the Closing as a result of the transactions contemplated in this Agreement, or result in the termination of any such instrument or termination of any provisions in such instruments that will have a material adverse effect upon or result in the creation or imposition of any Lien upon the Transferred Assets; or

iii.    Constitute a violation of any applicable law by which Old Operator or the Facility is subject, the violation of which will have a material adverse effect upon the Facility.

n. <u>Health Care Matters</u>.

i.      All material Medicare and Medicaid provider agreements, certificates of need, if applicable, certifications, governmental licenses, permits,

21

regulatory agreements or other agreements and approvals, including certificates of operation, completion and occupancy, and state nursing facility licenses or other licenses required by DOH or any other health care authorities for the legal use, occupancy and operation of the Facility (collectively, "Health Care Licenses") have been obtained by the party required to hold such Health Care Licenses and are in full force and effect. Old Operator will own and operate the Facility in such a manner that the Health Care Licenses shall remain in full force and effect. Set forth on Schedule 17(n) attached hereto is a list of the Facility's Medicare and Medicaid provider numbers and a list of all Health Care Licenses.

      ii.      The Facility is duly licensed as a skilled nursing facility as required under the applicable laws of the Commonwealth of Pennsylvania. All licensed beds at the Facility are certified for both Medicare and Medicaid. The licensed bed capacity of the Facility is as set forth on Schedule 17(n) attached hereto, the actual bed count operated at the Facility is as set forth on Schedule 17(n) and all such beds are certified for participation in the Medicare and Medicaid reimbursement programs. Except as disclosed in Schedule 17(n), Old Operator has not applied to reduce the number of licensed or certified beds of the Facility or to move or transfer the right to any and all of the licensed or certified beds of the Facility to any other location or to amend or otherwise change the Facility and/or the number of beds approved by DOH (or any subdivision) or other applicable state licensing agency, and except as disclosed in Schedule 17(n), there are no proceedings or actions pending or contemplated to reduce the number of licensed or certified beds of the Facility.

      iii.      The Health Care Licenses (i) have not been (A) transferred to any location other than the location for which issued or (B) pledged as collateral security or unless such pledge will be released at Closing, (ii) are held free from restrictions or known conflicts that would materially impair the use or operation of the Facility as intended, and (iii) are not provisional, probationary, or restricted in any way.

      iv.      Except as disclosed in Schedule 17(n), Old Operator has not taken any action to rescind, withdraw, revoke, amend, modify, supplement or otherwise alter the nature, tenor or scope of any Health Care License or applicable provider payment program other than non-material alterations effected in the Ordinary Course of Business.

      v.      Except as disclosed in Schedule 17(n), Old Operator is in material compliance with the requirements for participation in the Medicare and Medicaid programs with respect to the Facility and Old Operator has a current provider agreement under Title XVIII and/or XIX of the Social Security Act which is in full force and effect. Except as disclosed in Schedule 17(n), during the period of three (3) years prior to Closing Date neither Old Operator nor the Facility has received any of the following with respect to the Facility:

      1.      A notice of "immediate jeopardy" violations;

2.       A notice of termination of the license issued by DOH to operate the Facility for the number of skilled beds listed in Exhibit A;

3.       A notice of termination of the certification issued by DOH or CMS of the Facility to participate in the Medicare and/or Medicaid reimbursement programs;

4.       A notice that the Facility is not in substantial compliance with the requirements for participation in the Medicare and/or Medicaid reimbursement programs;

5.       A notice that the Facility has been placed, or will be placed, on the special focus facilities list;

6.       A notice that the Facility will be prohibited from admitting, or will not be reimbursed for, new residents; and

7.       A notice of imposition of civil monetary penalties or other intermediate sanctions in accordance with 42 CFR § 488.430 et seq.

vi.       Except as disclosed in Schedule 17(n), neither Old Operator nor the Facility is a target of, participant in, or party to any action, proceeding, suit, audit, investigation or sanction by any Governmental Authority or any other administrative or investigative body or entity or any other third party payor or any resident (including, without limitation, whistleblower suits, or suits brought pursuant to federal or state false claims acts, and Medicaid/Medicare/state fraud/abuse laws, but excluding medical malpractice claims and other civil liability lawsuits for which Old Operator or the Facility is maintaining insurance coverage in the Ordinary Course of Business) which would reasonably be expected to result, directly or indirectly or with the passage of time, in the imposition of a material fine, penalty, alternative, interim or final sanction, a lower rate certification, recoupment, recovery, suspension or discontinuance of all or part of reimbursement from any Governmental Authority, third-party payor, insurance carrier or private payor, a lower reimbursement rate for services rendered to eligible residents, or any other civil or criminal remedy, or which could reasonably be expected to have a material adverse effect on Old Operator, or the operation of the Facility, including, without limitation, the Facility's ability to accept or retain residents, or which could result in the appointment of a receiver or manager, or in the modification, limitation, annulment, revocation, transfer, surrender, suspension or other impairment of a Health Care License, or affect Old Operator's and the Facility's participation in the Medicare, Medicaid, or third-party payor program, as applicable, or any successor program thereto, at current rate certification, nor to the knowledge of Old Operator has any such action, proceeding, suit, investigation or audit been threatened.

vii.     There are no agreements with residents of the Facility or with any other persons or organizations that deviate in any material adverse respect from or that conflict with any statutory or regulatory requirements.

viii.     Other than the Medicare and Medicaid programs, to their knowledge neither Old Operator nor the Facility is a participant in any federal, state or local program whereby any federal, state or local government or quasi-governmental body, or any intermediary, agency, board or other authority or entity may have the right to recover funds with respect to the Facility by reason of the advance of federal, state or local funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291 *et seq.*).  Neither Old Operator nor the Facility has received notice of, and there is no violation of, applicable antitrust laws by Old Operator in connection with the Facility.

ix.     Old Operator has instituted, and the Facility is operated in material compliance with, a compliance plan which is consistent with best industry practices.

x.     Except as disclosed in <u>Schedule 17(n)</u>, Old Operator is in material compliance with the Health Care Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act, as incorporated in the American Recovery and Reinvestment Act of 2009, and the regulations promulgated under each.

xi.     Except as disclosed in <u>Schedule 17(n)</u>, there is no pending or, to Old Operator's knowledge, threatened revocation, suspension, termination, probation, restriction, limitation or non-renewal affecting Old Operator or the Facility or any provider agreement with any third-party payor, Medicare or Medicaid.

xii.     To Old Operator's knowledge, all Medicare, Medicaid, and private insurance cost reports and financial reports submitted by or on behalf of the Facility are materially accurate and complete and are not misleading in any material respects.  Except as disclosed in <u>Schedule 17(n)</u>, to Old Operator's knowledge, there are no current, pending or outstanding Medicare, Medicaid or other third-party payor program reimbursement audits or appeals pending at the Facility. Except in the normal course of business, there are no cost report years that are subject to audits and no cost reports remain "open" or unsettled.  To Old Operator's knowledge, except in the normal course of business, there are no current or pending Medicare, Medicaid or third-party payor program recoupment efforts at the Facility.

xiii.     Except as disclosed in <u>Schedule 17(n)</u>, there have been no clawback or overpayment claims made or, to the knowledge of Old Operator, threatened, against Old Operator or with respect to operations at the Facility by Medicare, Medicaid or any third-party payor during the previous three (3) years.  Old Operator has provided, or will provide, to Purchaser a complete and accurate list of all rate adjustments made by Medicare or Medicaid with respect to Old Operators and the

24

Facility during the previous three (3) years, and shall provide Purchaser an updated list as of the Closing Date.

    xiv.      Old Operator has delivered, or caused to be delivered, to Purchaser true, correct and complete in all material respects resident census information for the Facility's last three (3) fiscal years and current year-to-date broken out by month.

    xv.      Except as disclosed in <u>Schedule 17(n)</u>, neither Old Operator nor the Facility has any contract or agreement with the Department of Veterans Affairs or any division thereof for the provision of services to patients or residents at the Facility.

o.    <u>Labor Unions</u>.    Old Operator is not party to any collective bargaining agreement with any labor union or similar organization, nor does Old Operator know of any such organization which represents or claims to represent any of Old Operator's employees or intends to organize any of Old Operator's employees.

p.    <u>Financial Materials</u>.    All materials and/or documents relating to the financial condition and/or census of the Facility, provided to New Operator, are true and complete in all material respects, and are not misleading in any material respect.

q.    <u>COVID Funds</u>.    A description of all COVID Funds received with respect to the Facility is set forth on <u>Schedule 17(q)</u> hereof.  To Old Operator's knowledge, Old Operator has applied for and utilized, as applicable, all COVID Funds in accordance with applicable law.  For purposes of this Agreement, "COVID Funds" shall mean all grants, funds or payments from state or federal sources (including, without limitation, pursuant to the Coronavirus Aid, Relief and Economic Security (CARES) Act and the Economic Injury Disaster Loan program, Medicare advance payments, loans in connection with Paycheck Protection Program, deferral of payroll taxes or other governmental economic benefits) in each case received with respect to or pertaining to the Facility as a result of the COVID-19 pandemic. All COVID Funds received by Old Operator are set forth on <u>Schedule 17(q)</u> attached hereto.

r.    <u>Truth and Accuracy of Representations and Warranties</u>.  No representation or warranty by or on behalf of Old Operator contained in this Agreement and no statement by or on behalf of Old Operator in any certificate, list, exhibit or other instrument furnished or to be furnished to New Operator by or on behalf of Old Operator pursuant hereto contains any untrue statement of fact, or omits or will omit to state any facts which are necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading in any respect.

s. <u>Survival of Representations and Warranties</u>. The representations and warranties of Old Operator contained herein shall survive the Closing for a period of twelve (12) months.

18. **NO JOINT VENTURE**. Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof. The parties hereto do not intend that any third party shall have any rights under this Agreement.

19. **EXHIBITS AND SCHEDULES**. If any exhibits or schedules are not attached hereto, the parties hereto agree to attach such exhibits and schedules as soon as reasonably practicable but in any event prior to ten (10) days before the Closing Date. New Operator's obligations to close pursuant to this Agreement shall be conditioned upon New Operator approving all exhibits and schedules within seven (7) days of submission thereof to New Operator. The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date. For the avoidance of doubt, the closing conditions set forth in <u>Section 2</u> and the indemnification provisions of <u>Section 15</u> shall be read without giving effect to any update to the Schedule or other written notices delivered pursuant to this <u>Section 19</u>.

20. **EVENTS OF DEFAULT; REMEDIES**. Except as to those specific notices and cure periods, if any, particularly set forth elsewhere herein, the breach by either party ("<u>Defaulting Party</u>") hereto of any term, provision, condition, promise, covenant, agreement, representation, warranty, guaranty, indemnity, duty or obligation if not cured within fourteen (14) Business Days of the earlier of said Defaulting Party's receipt or refusal of written notice of the same from the other party ("<u>Non-Defaulting Party</u>") hereto shall automatically and without further notice hereunder be an immediate event of default ("<u>Event of Default</u>") entitling the Non-Defaulting Party to exercise any and all remedies available to it hereunder. The Non-Defaulting Party's rights and remedies hereunder shall be cumulative and not mutually exclusive and the exercise by the Non-Defaulting Party of one or more rights or remedies granted it hereunder or in law or equity shall not be deemed, interpreted or construed as an election of the same or to bar, prevent or preclude the simultaneous or consecutive exercise of any other right or remedy granted to the Non-Defaulting Party hereunder or in law or equity. The Non-Defaulting Party shall not be required to post any bond, surety or security of any nature whatsoever to pursue injunctive relief, the necessity or requirement for the same being hereby waived by the Defaulting Party. Upon any termination of the Purchase Agreement this Agreement shall automatically terminate and neither party shall have any rights or obligations hereunder.

21. **CHOICE OF LAW**. **THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS SHALL BE GOVERNED AND CONTROLLED BY THE INTERNAL LAWS OF THE COMMONWEALTH OF PENNSYLVANIA AS TO INTERPRETATION, ENFORCEMENT, VALIDITY, CONSTRUCTION, EFFECT, AND IN ALL OTHER RESPECTS.**

22. **NON-COMPETE**. For a period of two (2) years following the closing, neither Old Operator nor any affiliate of Old Operator shall have any involvement, whether as a member, partner, consultant or otherwise, in the operation of any elder care facility within a radius of 25

miles of the Facility.

23. **DISPUTE RESOLUTION**.  The parties hereto agree that with respect to all disputes, problems or claims arising out of or in connection with this Agreement and all other agreements or other instruments executed in connection herewith (collectively "Disputes"), the parties hereto shall, in good faith, use their reasonable best efforts to resolve the Dispute.  If after such efforts the parties hereto are unable within ten (10) days of the arising of the Dispute to resolve the Dispute then any party may file a motion or proceeding with the Bankruptcy Court seeking relief.  The Bankruptcy Court shall have exclusive jurisdiction over all Disputes and any other disagreement arising from or related to this Agreement.

24. **PERSONAL SERVICE**.  EACH OF THE PARTIES HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON SUCH PARTIES BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY, AT THE ADDRESS SET FORTH FOR NOTICE IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED. **THE PARTIES HERETO HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST SUCH PARTY IN ACCORDANCE WITH THIS SECTION.**

25. **DEFINITIONS**.  For purposes of this Agreement, the following terms shall have the following meanings (all terms used in this Agreement which are not defined in this paragraph shall have the meanings set forth elsewhere in this Agreement):

26. **MEDICARE ADVANCE**.  In the event that Old Operator has received any advance on Medicare payments with regard to the Facility ("Advances") at any time prior to the Closing Date that have not been re-paid prior to Closing, Old Operator shall pay to New Operator at Closing an amount equal to 100% of all such Advances.

27. **GENERAL PROVISIONS**.

a.   Each party hereto agrees to use commercially reasonable efforts to cause the conditions to its obligations and to the other party's obligations herein set forth to be satisfied at or prior to the Closing Date.  Each of the parties hereto agrees to execute and deliver any further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.  Each party shall promptly notify the other party of any information delivered to or obtained by such party which would prevent the consummation of the transactions contemplated hereby, or which would indicate a breach of the representations or warranties of any other party hereto.

b.   All notices to be given by either party to this Agreement to the other party hereto shall be in writing, and shall be: (i) given in person; (ii) deposited in the United States mail, certified or registered, postage prepaid, return receipt requested; (iii) sent by national overnight courier service, priority next business day service; or (iv) sent by facsimile or e-mail (followed by delivery by one of the other means identified in (i)-(iii)) each addressed as follows:

if to Old Operator:

with a copy to:                    BAKER & HOSTETLER LLP
                                      200 S. Orange Avenue, Suite 2300
                                      Orlando, Florida 32801
                                      Attn: Elizabeth Green, Esq.; Andrew Layden,
Esq.
Email: egreen@bakerlaw.com;
alayden@bakerlaw.com

if to New
Operator:                       c/o Eden Senior Care
8170 McCormick Blvd., Suite 112
Skokie, IL 60076
Attention: Max Stesel
Email: max@pritokcapital.com

with a copy to:                    GUTNICKI LLP
4711 Golf Road, Suite 200
Skokie, Illinois 60076
Attention: Aaron Rokach, Esq.
Email: arokach@gutnicki.com

Any such notice personally delivered shall be deemed delivered when actually received; any such notice deposited in, the United States mail, registered or certified, return receipt requested, with all postage prepaid, shall be deemed to have been given on the earlier of the date received or the date when delivery is first refused; any notice deposited with an overnight courier service for delivery shall be deemed delivered on the next business day following such deposit; and any such notice delivered via facsimile shall be deemed delivered upon the notifying party's receipt of facsimile confirmation provided that the notifying party follows up such facsimile transmission with one of the other means identified above. Any party to whom notices are to be sent pursuant to this Agreement may from time to time change its address for further communications thereunder by giving notice in the manner prescribed herein to all other parties hereto.

        c.      Each party hereto shall bear its own legal, accounting and other expenses incurred in connection with the preparation and negotiation of this Agreement and the consummation of the transaction contemplated hereby, whether or not the transaction is consummated.

        d.      This Agreement, together with all exhibits and schedules attached hereto and any other agreements referred to herein, constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.

        e.      This Agreement may not be modified or amended except in writing signed

by the parties hereto.

f.    No waiver of any term, provision or condition of this Agreement, if any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

g.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. Captions of paragraphs are for convenience only and are not part of this Agreement and do not affect, change or modify the paragraphs they precede.

h.    All understandings and agreements heretofore and between the parties are merged in this Agreement and all exhibits and schedules attached hereto, which alone fully and completely expresses their agreement.

i.    This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original, and all of such counterparts shall together constitute one and the same agreement.

j.    All of the provisions of this Agreement shall be deemed and construed to be "conditions" and "covenants" as though the words specifically expressing or importing covenants and conditions were used in each separate provision hereof

k.    Each party hereto agrees to use such party's reasonable best efforts to cause the conditions to such party's obligations herein set forth to be satisfied at or prior to the Closing. Each of the parties agrees to execute and/or deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by any other party to assist with consummation of the transactions contemplated herein, or to evidence its rights hereunder.

l.    The recitals set forth at the beginning of this Agreement constitute an integral part of this Agreement and are hereby incorporated by reference herein and made apart hereof as if fully set forth herein.

m.    All nouns and pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons, firm or firms, corporation or corporations, entity or entities or any other thing or things may require, or "any" shall mean "any and all"; "or" shall mean "or" "including" shall mean "including without limitation.

n.    If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions of this Agreement shall not be affected thereby, but each term and provision shall be valid and be enforced to the fullest extent permitted by law.

o.      Notwithstanding anything to the contrary contained in this Agreement, Old Operator agrees that it does not have and will not have any claims against any New Operator Affiliate, member, director, officer, employee, or any party related to New Operator (other than New Operator), arising out of or in connection with this Agreement or the transactions contemplated hereby.  Except as otherwise specifically set forth in this Agreement, Old Operator agrees to look solely to New Operator for the satisfaction of any liability or obligation of New Operator arising under this Agreement or the transactions contemplated hereby, or for the performance by New Operator of any of the covenants, representations, warranties or other agreements contained herein, and further agrees not to sue or otherwise seek to enforce any personal obligation against any of New Operator's other assets or properties or any other New Operator Affiliate, member, director, officer, employee, or any other party related to New Operator (or their assets or properties) with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby

p.      The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any of the parties hereto.

q.      Certain Definitions.   Capitalized terms used in this Agreement, but not defined in this Agreement shall have the meanings ascribed to them in **Exhibit E**.

[SIGNATURE PAGE FOLLOWS ON NEXT PAGE]

   **IN WITNESS WHEREOF**, the parties hereby execute this Agreement as of the day and year first above written.

**OLD OPERATOR:**

**Hampton House Operations LLC,**
**a Pennsylvania limited liability company**


By: _____
Name: Jacob Zahler
Its: Member

**Kingston Operations LLC,**
**a Pennsylvania limited liability company**


By: _____
Name: Jacob Zahler
Its: Member

**Yeadon Operations LLC,**
**a Pennsylvania limited liability company**


By: _____
Name: Jacob Zahler
Its: Member

**Pottsville Operations LLC,**
**a Pennsylvania limited liability company**


By: _____
Name: Jacob Zahler
Its: Member

**Williamsport North Operations LLC,**
**a Pennsylvania limited liability company**


By: _____
Name: Jacob Zahler
Its: Member

**Williamsport South Operations LLC**,
**a Pennsylvania limited liability company**


By: _____

Name: Jacob Zahler

Its**:** Member

2

**IN WITNESS WHEREOF**, the parties hereby execute this Agreement as of the day and year first above written.

**NEW OPERATORS:**

**Hampton Operations, LLC**,
**a Pennsylvania limited liability company**

By: _____

Name:  Maxim Stesel
Its:  Manager

**Kingston SNF Operations, LLC**
**a Pennsylvania limited liability company**

By: _____

Name:  Maxim Stesel
Its: Manager

**Pottsville SNF Operations, LLC**
**a Pennsylvania limited liability company**

By: _____

Name:  Maxim Stesel
Its:  Manager

**Williamsport North SNF Operations, LLC**
**a Pennsylvania limited liability company**

By: _____

Name: Maxim Stesel
Its:  Manager

**Williamsport South SNF Operations, LLC**
**a Pennsylvania limited liability company**

By: _____

Name: Maxim Stesel
Its: Manager


**Yeadon SNF Operations, LLC**
**a Pennsylvania limited liability company**

By: _____

Name: Maxim Stesel
Its: Manager

**EXHIBIT A**

**TRANSACTION INFORMATION**

| Facility Name and Address | Licensed Beds | Seller | Old Operator | Purchaser | New Operator |
|---|---|---|---|---|---|
| Hampton Nursing and Rehab Center 1548 Sans Souci Pkwy Wilkes-Barre, PA 18706 | | [_____], a [_____] [_____] | [_____], a [_____] | [_____], a [_____] limited liability company | [_____], a [_____] limited liability company |
| Kingston Rehab and Nursing Center 200 2nd Ave, Kingston, PA 18704 | | [_____], a [_____] [_____] | [_____], a [_____] | [_____], a [_____] limited liability company | [_____], a [_____] limited liability company |
| Pottsville Rehabilitation and Nursing Center 420 Pulaski Dr, Pottsville, PA 17901 | | [_____], a [_____] [_____] | [_____], a [_____] | [_____], a [_____] limited liability company | [_____], a [_____] limited liability company |
| Williamsport North Nursing and Rehabilitation Center 300 Leader Dr, Williamsport, PA 17701 | | [_____], a [_____] [_____] | [_____], a [_____] | [_____], a [_____] limited liability company | [_____], a [_____] limited liability company |
| Williamsport South Nursing and Rehabilitation Center 101 Leader Dr, Williamsport, PA 17701 | | [_____], a [_____] [_____] | [_____], a [_____] | [_____], a [_____] limited liability company | [_____], a [_____] limited liability company |
| Yeadon Rehabilitation and Nursing Center | | [_____], a [_____] | [_____], a [_____] | [_____], a [_____] | [_____], a [_____] |

| 14 Lincoln Ave, Yeadon, PA 19050 | | [_____] | [_____] | limited liability company | limited liability company |
|---|---|---|---|---|---|

## **EXHIBIT B**

## **TERMS OF THE SALE MOTION AND SALE ORDER; BIDDING PROCEDURES**

1.1     <u>Sale Motion</u>.  By no later than five (5) Business Days following the first day hearing in the Bankruptcy Cases (unless otherwise agreed), the Debtors shall file with the Bankruptcy Court the Sale Motion, which shall include, among other things, a proposed form of the Bidding Procedures Order. The Debtors shall promptly serve true and correct copies of the Sale Motion and all related pleadings, or notice thereof in form satisfactory to Buyers, to all creditors of the Debtors and other parties in interest in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the Western District of Pennsylvania and any other applicable order of the Bankruptcy Court. The Debtors shall also promptly serve the Sale Motion to any other party designated in writing by Buyers in their sole discretion.  The Debtors and their bankruptcy estates shall be responsible for all costs of service of the Sale Motion and any other motions or notices related to the Sale Motion, Bidding Procedures, or Transactions.

1.2     <u>Bidding Procedures and Auction</u>.  Purchaser and New Operators acknowledge that Debtors are seeking to find other parties that would be willing to pay more for the Transaction Assets.  In connection with this effort, the parties acknowledge that the Debtors will request the Bankruptcy Court, in the Sale Motion, to approve certain procedures related to this effort, including the procedures for soliciting competing bids for the Transaction Assets and selling the Transaction Assets at a sale auction (the "<u>Auction</u>") should there be other Qualifying Bidders, and certain bidding protections to Purchaser as consideration for serving as the stalking horse.  In that regard, the Debtors shall take such actions as are reasonably necessary to obtain (on an expedited basis following the filing of the Sale Motion) the Bidding Procedures Order from the Bankruptcy Court approving, among other things, payment of the Expense Reimbursement and Termination Fee and procedures for the marketing, competitive bidding, auction, and sale of the Purchased Assets that include, without limitation, the following (collectively, and as more fully set forth in the Bidding Procedures Order, the "<u>Bidding Procedures</u>"):

a.      Minimum Initial Topping Bid: $65,690,000.00;

b.      Minimum Bid Increments Thereafter: $500,000.00, which may thereafter be modified in the debtor's reasonable discretion;

c.      Other bidders to provide to Debtors, among other things, a blackline comparison of the APA and OTA, and satisfactory proof of financing or financial ability to close prior to the expiration of the Bid Deadline in order to qualify as a bidder for the Auction (such other bidders meeting such qualifying criteria shall be referred to herein as "<u>Qualifying Bidders</u>").  For the avoidance of doubt, and provided that the APA and other Transaction Documents have not been terminated prior to the Bid Deadline, Purchaser's purchase offer pursuant to the APA and OTA and the other Transaction Documents shall constitute a qualifying bid.

d.      Qualifying Bidders will have a due diligence period that expires at the conclusion of the Bidding Solicitation Period;

e.      If there are other Qualifying Bidders, an Auction to be held no more than three (3) days after the Bid Deadline (unless such different date is established by the Bankruptcy Court in the Bidding Procedures Order), at which the Debtors will select the winning bidder (the "<u>Successful Bidder</u>");

f.      Buyers shall be entitled to credit bid the amount of the Termination Fee and Expense Reimbursement towards any subsequent bid at the Auction;

g.      If there are no other Qualifying Bidders as of the Bid Deadline, then Buyers shall be deemed the Successful Bidder. Additionally, Buyers shall be required to serve as the Backup Bidder upon the Debtors' selection of another party or parties as the Successful Bidder(s); provided that Buyers shall not be required to serve as Backup Bidder for longer than thirty (30) days following such selection of another party as the Successful Bidder; and

h.      No extension of the Bidding Solicitation Period, the Bid Deadline, or date of the Auction unless ordered by the Bankruptcy Court or approved by Buyers in writing. Without limiting the foregoing, Debtors shall not file any motion or otherwise seek to change, modify or amend: i) the Transaction Documents, without prior written approval of the Buyers, ii) the Bidding Procedures Order, or the Sale Order, without prior consultation with Buyers; provided that any such matter that would negatively impact Buyers and/or New Operators shall not be pursued without the prior written consent of Buyers.

     1.3    <u>Sale Order Hearing and Sale Order</u>. Within three (3) days following the Auction, if there are other Qualifying Bidders, Debtors shall file with the Bankruptcy Court the results of the bidding solicitation process and the Auction, along with the purchase agreement of the Successful Bidder and all documents to be filed on behalf of the Debtors with the Bankruptcy Court for approval of the sale to the Successful Bidder and entry of the Sale Order. If there are no additional Qualifying Bidders as of the Bid Deadline, Debtors shall file a notice with the Bankruptcy Court within three (3) days of the Bid Deadline that Purchaser was the Successful Bidder and seeking the Court's entry of the Sale Order approving the APA, OTA, and other Transaction Documents. Purchaser and New Operators agree that they will promptly take such actions as are reasonably requested by the Debtors to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that Purchaser and New Operators are a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

     1.4    <u>Contracts</u>.

(a)     Seller and Old Operators shall provide to Purchaser and New Operators a list of Contracts relating to the operations and leasing of the Facilities (the "<u>Available Contracts List</u>").  Seller and Old Operators will use best efforts to insure that the Available Contracts List contains all Contracts which the Purchaser may seek to assume.  At any time prior to the Sale Hearing, the Purchaser and New Operators, in their sole and absolute discretion, and subject to the their right to subsequently amend their designations until the Closing, may deliver one or more written notices to the Seller and Operators (each such notice, a "<u>Designation Notice</u>"), pursuant to which Purchaser and New Operators shall designate in writing any Available Contracts that Purchaser or New Operators wish to assume at Closing.  Any Available Contracts so designated shall be deemed the Assumed Contracts.

(b)     Any Contracts that Purchaser or New Operators do not indicate they desire to assume and continue shall be deemed rejected by Purchaser and New Operators (the "<u>Rejected Contracts</u>"), and Seller and Old Operators may reject and terminate such Rejected Contracts pursuant to the Bankruptcy Code.  Any Contract not expressly designated by Purchaser or New Operators as an Assumed Contract pursuant to a Designation Notice, including any Contract discovered after the Closing, shall be deemed a Rejected Contract.

(c)     The Sale Motion and Bidding Procedures Order shall include the procedures for the assumption and assignment of the Assumed Contracts to the Purchaser and New Operators on the terms set forth herein.  By no later than November 30, 2024, the Debtors shall serve an initial notice on all counterparties to each Contract on the Available Contracts List specifically stating that the Debtors are or may be seeking the assumption and assignment of such Contracts, the Debtors' calculation of the associated Cure Costs, and the deadline for objecting to the Cure Costs or any other aspect of the proposed assumption and assignment of their Contracts to Purchaser, New Operators, or any other Successful Bidder (the "<u>Initial Assumption and Assignment Notice</u>").  The Debtors will not serve any such notice to a current resident or patient of any Facility without Purchaser's prior approval of the form of such notice.

(d)     Pursuant to the Bidding Procedures Order, the counterparties to the Contracts shall have an opportunity to file any objections to the assumption and/or assignment of any Contracts on the Available Contracts List.  Upon any such objection, such Contract shall become a "<u>Disputed Contract</u>" and, unless the Disputed Contract is a Rejected Contract, the Debtors, with Purchaser's and New Operators' consent to be provided or withheld in their sole discretion, shall either settle the objection of such counterparty or shall litigate such objection under such procedures as the Bankruptcy Court shall approve as part of the Bidding Procedures Order.  The Debtors shall not settle a disputed Cure Cost for any amount with regard to any Contract that has been designated as an Assumed Contract pursuant to a Designation Notice without the express written consent of Purchaser or New Operators, as applicable.  Upon a Final Order or settlement determining any Cure Costs regarding any Disputed Contract after the Closing or at any time prior to such Final Order or settlement, Purchaser and New Operators shall have the option to (x) pay the Cure Cost with respect to such Disputed Contract and assume the Disputed Contract as an Assumed Contract or (y) designate the Disputed Contract as an Rejected Contract and not be responsible for the Cure Cost.

(e)     At Closing, Purchaser or New Operators, as applicable, shall pay all Cure Costs in connection with the assumption and assignment of the Assumed Contracts.

1.5     <u>Good Faith Efforts</u>. The Debtors agree to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order. In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, the Debtors shall use their best efforts to defend such appeal. The Debtors shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, or (ii) imposed by the Bidding Procedures Order or the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

1.6     <u>Sale Free and Clear</u>. The Debtors acknowledge and agree, and the Sale Order shall provide, that on the Closing Date and concurrently with the Closing, the Purchased Assets shall be transferred to Buyers and New Operators free and clear of all then existing or thereafter arising Claims and Encumbrances to the fullest extent permitted by Section 363(f) of the Bankruptcy Code, including without, limitation, any amounts owed by any of the Debtors to DHS or DOH, including, without limitation, for nursing facility assessments whether due and payable, or relating to periods prior to the Closing but not yet due and payable (the "<u>Provider Assessments</u>").  The Debtors acknowledge and agree that this requirement is a precondition to Buyers' and New Operators' obligation to close the Transactions.

1.7     <u>Definitions</u>. For purposes of this Exhibit B and the Transaction Documents, the following terms shall have the meaning ascribed to them below:

"<u>Alternative Transaction</u>" means (a) the approval by the Bankruptcy Court of a sale or sales of all or any portion of the Purchased Assets to a Successful Bidder other than Buyers, or (b) the filing of a plan of reorganization that does not contemplate the sale of the Purchased Assets to Buyers in accordance with the terms hereof.

"<u>APA</u>" means the Asset Purchase Agreement entered into by Seller and Purchaser dated October 14, 2024,as may be amended by the parties pursuant to the terms therein, pursuant to which Purchaser will purchase from Seller certain real and personal property on the terms more specifically set forth therein.

"<u>Assumed Contracts</u>" means any Contracts of Sellers or Operators which Purchaser or New Operators designate in writing to be assumed and assigned to Buyers or New Operators, as applicable, as pursuant to section 365 of the Bankruptcy Code and the terms of the PSA, OTA, and Sale Order, including, without limitation, the Resident Agreements and Provider Agreements (each as defined in the OTA).

"<u>Avoidance Actions</u>" means causes of action arising under Bankruptcy Code sections 502, 510, 541, 544, 545, 547, 548, 549, 550, 551, or 553, or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws, whether or not litigation is commenced to prosecute such causes of action.

"Bid Deadline" means 5:00 p.m. E.S.T. on the date that is 45 days after the filing of the Sale Motion or such other date as is set by Order of the Bankruptcy Court.

"Bidding Procedures Order" means an Order of the Bankruptcy Court, the proposed form of which shall be included with the Sale Motion following approval by Sellers and Buyers, that contains at least the following: (i) the approval of the APA and OTA as the stalking horse contract and the Purchaser and New Operators as the stalking horse bidders, (ii) the approval of the Bidding Procedures governing the sale and solicitation process and the Auction, the deadlines and dates relating thereto, and the bid protections included therein (including, without limitation, the Termination Fee, Minimum Overbid and the Expense Reimbursement), and (iii) setting a date for the Sale Hearing as soon as possible following the Auction, if there are other Qualifying Bidders, or following the end of the Bidding Solicitation Period, if there are no other Qualifying bidders, to confirm the Auction results, if applicable, and enter the Sale Order.

"Bidding Solicitation Period" means the time period running from the date of the filing of the Sale Motion to the Bid Deadline, or such other time period as is set by Order of the Bankruptcy Court.

"Claim" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, inter alia, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and Liabilities of any kind, description, or nature under contract, at law or in equity, whether direct or indirect, known or unknown, contingent or matured, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and all rights, remedies, costs, or expenses with respect thereto.

"Contracts" shall mean all executory contracts, agreements, leases, commitments and arrangements (whether written or oral), including all service contracts, maintenance contracts and consulting agreements, and all of any Seller's or Old Operator's duties, obligations, covenants, promises, rights and privileges therein or thereunder to which any Seller or Old Operator or its respective predecessors or agents is a party and which relate to the Facilities (or any one of the Facilities) and the operations thereof.

"Cure Costs" shall mean all costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Contracts including the cost of obtaining consents in respect of the Assumed Contracts. For the avoidance of doubt, Cure Costs shall not include known liabilities due and owing under the Provider Agreements on the Closing Date. For avoidance of doubt, "Encumbrance" shall not include any Medicare or Medicaid Recoupments unknown at the time of Closing.

"Encumbrance" means any lien (including a "lien" as defined in Section 101(37) of the Bankruptcy Code), encumbrance, Claim, right, demand, charge, mortgage, deed of trust, lease, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, proxy, voting trust or agreement, transfer restriction under any shareholder agreement or similar agreement, judgment, conditional sale or other title retention agreement, or other imposition, imperfection or defect of title or restriction on transfer or use of any nature whatsoever.

5

"<u>Expense Reimbursement</u>" means all reasonable fees and expenses incurred by Purchaser, including, without limitation, professional fees and out-of-pocket fees, costs and expenses of Purchaser incurred in connection with the due diligence, preparation, negotiation, execution, delivery and performance of the Transaction Documents; provided the total Expense Reimbursement shall be capped at $300,000.00. The obligations of the Debtors to pay the Expense Reimbursement (i) shall be entitled to super-priority administrative expense claim status under Sections 503 and 507 of the Bankruptcy Code, (ii) shall not be subordinate to any other administrative expense claim against the Debtors, and (iii) shall survive the termination of any Transaction Documents.

"<u>Final Order</u>" means an Order that is unstayed and in effect and as to which (i) the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing thereof has been filed or sought, such Order shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

"<u>Governmental Authority</u>" means any U.S. federal, state or local or any supra-national, territorial or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral (public or private) body.

"<u>Liabilities</u>" means any liability, debt, guarantee, claim, demand, expense, commitment, damages, assurances or obligation (whether direct or indirect, fixed, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of every kind and description, including all costs and expenses related thereto.

"<u>Minimum Initial Topping Bid</u>" means an initial bid amount in the Auction by a bidder other than Purchaser, that includes consideration of not less than an amount equal to the Purchase Price, plus the Termination Fee, plus the Expense Reimbursement, plus an initial bid increment of $500,000.

"<u>Order</u>" means any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination, settlement or award entered by or with any Governmental Authority.

"<u>OTA</u>" means the Operations Transfer Agreement entered into by Old Operators, and New Operators dated October 14, 2024, as may be amended by the parties pursuant to the terms therein, and pursuant to which the Old Operators will transfer the operations of and certain assets related to the Facilities to the New Operators.

"<u>Sale Motion</u>" means the motion or motions of the Debtors, in form and substance approved by Seller, Old Operators, Purchaser, and New Operators seeking (i) approval and entry

of the Bidding Procedures Order on an expedited basis, (ii) the scheduling of the Auction (if there are other qualifying bidders) and the Sale Hearing, (iii) the entry of the Sale Order following the Auction, if there are other qualifying bidders, or following the end of the Bidding Solicitation Period, if there are no other qualifying bidders, and (iv) any other relief necessary to consummate the Transactions.

"Sale Order" means an Order of the Bankruptcy Court, the proposed form of which shall be included with the Sale Motion following approval by Seller, Old Operators, Purchaser, and New Operators, that contains at least the terms set forth in this **Exhibit B** as well as the following: (i) authorization and approval of (a) the APA, the OTA and the other Transaction Documents, and the consummation of the Transactions on the terms and conditions set forth therein, and (b) the assumption and assignment of the Assumed Contracts to the Purchaser or New Operators, as applicable, and (ii) findings of fact, conclusions of law and ordering provisions that (a) the consummation of the Transactions contemplated by the Transaction Documents, on the terms and conditions set forth therein are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 363(n), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Transactions, (b) pursuant to section 105(a) and 363(f) of the Bankruptcy Code, the sale of the Transaction Assets to Purchaser, New Operators, or their designee(s) shall be free and clear of any Claims or Encumbrances other than the Permitted Encumbrances and Assumed Liabilities (as defined in the OTA), (c) Purchaser, New Operators, and any designee(s) of Buyers or New Operators are purchasers of the Purchased Assets in "good faith" pursuant to section 363(m) of the Bankruptcy Code, (d) the Debtors, the Purchaser, affiliate of Purchaser, any designee of Purchaser, the New Operators, any affiliates of New Operators, and any designee of New Operators, did not engage in any conduct which would allow any Transaction Documents or Transactions to be set aside pursuant to section 363(m) of the Bankruptcy Code, (e) none of the Debtors, Purchaser, any affiliate of Purchaser, nor any designee of Purchaser, or the New Operators, any affiliates of New Operators, nor any designee of New Operators, engaged in any conduct that would cause or permit the Transaction Documents or Transactions to be avoided or costs and damages to be imposed against Purchaser, their affiliates, or designees under section 363(n) of the Bankruptcy Code; (f) none of the Purchaser, any affiliate of Purchaser, nor any designee of Purchaser, or the New Operators, any affiliates of New Operators, nor any designee of New Operators are a successor to Seller, Old Operators, or the bankruptcy estate(s) of Debtors by reason of any theory of law or equity, and none of Purchaser, any affiliate of Purchaser, nor any designee of Purchaser, or the New Operators, any affiliates of New Operators, nor any designee of New Operators shall assume or in any way be responsible for any liability of Seller or the bankruptcy estate(s) of the Debtors, except as otherwise expressly provided in the Transaction Documents, (g) the form of notice of the Sale Motion and any hearing thereon was proper, adequate, and reasonable under the circumstances and no further notice to any party, including any creditors of the Seller, Old Operators, or Debtors, is necessary for purposes of authorizing the free and clear sale of the Purchased Assets to Purchaser and New Operators pursuant to the Bankruptcy Code or other applicable law, (h) the form of notice to counterparties of any Assumed Contracts was proper, adequate, and reasonable under the circumstances and no further notice to any such contract counterparty is necessary, (i) each of the counterparties to the Assumed Contracts was given adequate notice of the Seller's and Old Operators' proposed assumption thereof and the terms of such assumption, and (j) the final amount of Cure Costs under the Bankruptcy Code and

applicable law for each of the Assumed Contracts other than with respect to any Disputed Contract that may be resolved pursuant to the procedures set forth in the Transaction Documents or Bidding Procedures Order.

"Sale Order Hearing" means the hearing following the Auction, if there are other qualifying bidders, or following the end of the Bidding Solicitation Period, if there are no other qualifying bidders, seeking approval of the Successful Bidder and entry of the Sale Order.

"Termination Fee" means the amount of $1,890,000.00 to be paid to Purchaser upon the closing of an Alternative Transaction as a bid protection and in consideration of Purchaser's and New Operators' willingness to enter into the APA and OTA and serve as the stalking horse for the Debtors pursuant to the terms and conditions herein and the significant efforts expended by Purchaser in connection with the possible acquisition of the Purchased Assets that will be marketed to other competing bidders despite the Agreement. The obligations of the Debtors to pay the Termination Fee (i) shall be entitled to super-priority administrative expense claim status under Sections 503 and 507 of the Bankruptcy Code, (ii) shall not be subordinate to any other administrative expense claim against the Debtors, and (iii) shall survive the termination of any Transaction Documents.

"Transactions" means the transactions contemplated by the APA, OTA, and the other Transaction Documents.

"Transaction Documents" means the APA, the OTA, the Bill of Sale, the Deeds, and any other agreements, instruments or documents required to be delivered at the Closing or pursuant to the APA or OTA, in each case, including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

## EXHIBIT C

## FORM OF BILL OF SALE

## BILL OF SALE

Effective as of [_____ __], 2023

[_____], a [_____] [_____] ("Old Operator"), in consideration of Ten and No/100 Dollars ($10.00), receipt of which is hereby acknowledged, does hereby sell, assign, transfer and set over to [_____], a [_____] limited liability company ("New Operator"), all of its right, title and interest in and to the following described personal property, to-wit:

All of the "Transferred Assets", as defined in that certain Operations Transfer Agreement ("OTA"), dated as of [_____ __], 2024, by and among Old Operator, New Operator and certain other parties thereto.

Old Operator warrants to New Operator it has good and marketable title to said Transferred Assets, full authority to sell and transfer said property, and that said Transferred Assets are sold free of all liens, incumbrances, liabilities and adverse claims of every nature and description whatsoever.

This Instrument shall be subject to the terms, conditions, and covenants set forth in the OTA. Nothing in this Instrument supersedes, expands, or extinguishes any of the obligations, agreements, covenants, or warranties of Old Operator or New Operator contained in the OTA. If any conflict exists between this Instrument and the OTA, then the terms of the OTA shall control. This Instrument shall in all respects be governed by and construed in accordance with the internal laws of the State of Pennsylvania, without regard to the principles of conflicts of laws thereof. This Instrument may be executed in any number of counterparts, whether original or by facsimile or portable document format (.pdf), each of which shall deemed an original, but all of which shall together constitute one and the same instrument.

(Signatures on following page)

**IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale to be signed as of the day and year first above written.

**OLD OPERATOR:**

[_____],
a [_____][_____]

By: _____
Name: _____
Its: _____

**NEW OPERATOR:**

[_____],
a [_____] limited liability company

By: _____
Name: _____
Its: _____

## EXHIBIT D

## FORM OF GENERAL ASSIGNMENT

GENERAL ASSIGNMENT

**THIS ASSIGNMENT**, is made as of the [__] day of [_____], 2024, by [_____], a [_____] [_____] ("Assignor"), to [_____], a [_____] limited liability company ("Assignee").

W I T N E S S E T H:

**WHEREAS**, by Operations Transfer Agreement (the "OTA"), dated as of [_____], 202, by and among Assignor, Assignee and certain other parties thereto, Assignor agreed to sell to Assignee certain personal property and such other assets, as more fully described in the OTA (the "Transferred Assets") (capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the OTA); and

**WHEREAS**, the OTA provides, inter alia, that Assignor shall assign to Assignee, the Assumed Contracts, the Patient Trust Funds and Property, the Provider Agreements, the Resident Agreements, the Telephone Numbers, and the Website Material and certain other items applicable to the Transferred Assets, as more fully provided in the OTA;

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1. **Transfer of Assumed Contracts**. Assignor hereby assigns, sets over and transfers to Assignee all of Assignor's right, title and interest in, to and under the transferable Assumed Contracts.

2. **Transfer of Patient Trust Funds and Property**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to and under the Patient Trust Funds and Property.

3. **Transfer of Provider Agreements**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Provider Agreements.

4. **Transfer of Resident Agreements**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Resident Agreements.

5. **Transfer of Telephone Numbers**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Telephone Numbers.

6. **Transfer of Website Material**. Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's right, title and interest in, to the Website Material.

7.      **Assumption**.  Assignee hereby accepts the foregoing assignments set forth in Sections 1, 2, 3, 4, 5 and 6 hereof, provided, that said assignment and assumption shall in all respects be subject to the terms of the OTA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Assignment shall contradict the OTA, the OTA shall control.

8.      **Miscellaneous**.  This Assignment and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions referred to in the OTA shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of Pennsylvania and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.  This Assignment may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument.

(Signatures on following page)

Exhibit B - Stalking Horse Agreement Page 138 of 145

**IN WITNESS WHEREOF**, Assignor has duly executed this Assignment as of the day and year first above written.

**ASSIGNOR**:

[_____],
a [_____] [_____],


By: _____
Name: _____
Its: _____


**ASSIGNEE**:

[_____],
a [_____] limited liability company


By: _____
Name: _____
Its: _____

# EXHIBIT E

## DEFINITIONS

The terms defined in this <u>Exhibit</u>, whenever and wherever used in this Agreement (including in all Exhibits and Schedules, unless otherwise defined therein), shall have the respective meanings ascribed to them below for all purposes of this Agreement (each such meaning to be equally applicable to the singular and the plural forms of the respective terms defined). All reference herein to a Section, Exhibit or Schedule are to a Section, Schedule or Exhibit of or to this Agreement, unless otherwise indicated. The words "hereby", "herein", "hereof", "hereunder" and words of similar import refer to this Agreement as a whole (including all Exhibits and Schedules hereto) and not merely to the specific section, paragraph or clause in which such word appears. The words "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation." Unless the context requires otherwise, the word "or" shall not be interpreted as an expression of either state of possibility but shall be construed to mean "and/or." Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

"<u>Accounts Receivable</u>" means all accounts and notes receivables (whether current or non-current) of Old Operator, including trade account receivables outstanding as of the Effective Time and any other rights to receive payment as of the Effective Time in respect of services rendered prior to the Effective Time.

"<u>Action</u>" means any claim, controversy, action, cause of action, suit, litigation, arbitration, investigation, opposition, interference, audit, assessment, hearing, compliant, demand or other legal proceeding (whether based in contract, tort or otherwise, whether civil or criminal and whether brought at law or in equity) that is commenced, brought, conducted, tried or heard by or before, or otherwise involving, any Governmental Authority.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such specified Person. For purposes of the foregoing, (a) a Person shall be deemed to control a specified Person if such person (or a Family Member of such Person) possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such specified Person or (b) if such other person is at such time a direct or indirect beneficial holder of at least 25% of any class of equity interests of such specified Person.

"<u>Applicable Law</u>" means, with respect to any Person, any federal, state or local statue, law, ordinance, rule, regulation, writ, Order or other requirement of any Governmental Authority applicable to such Person or any of its Affiliates or any of their respective properties, assets, officers, directors, members, partners or employees (in connection with such officer's, director's member's, partner's or employee's activities on behalf of such person or any of its Affiliates).

"<u>Benefits Plan</u>" means any "employee pension benefit plan" (as defined in Section 3(2) of ERISA, "employee welfare benefit plan (as defined in Section 3(1) of ERISA) and all other bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, phantom stock, equity-based retirement, vacation, severance, employment

agreement, change in control agreement, disability, death benefit, hospitalization, medical or other plan, arrangement or understanding (whether or not legally binding) providing benefits to any current or former Employee of Old Operator or with respect to which Old Operator has any Liability to contribute.

"Books and Records" means all books, records, resident records, employee records, and other materials pertaining to the Old Operator or the Business of any and every kind, including lists (e.g., business contacts of Old Operator), programs, correspondence, compact disks, compact disk lists, ledgers, files, reports, plans, drawings and operating records of every kind, held or maintained by Old Operator or any of Affiliate of Old Operator, disk or tape files, printouts, runs or other computer-prepared information pertaining to the Transferred Assets or the Business.

"Business" means the business conducted by Old Operator and proposed to be conducted by Old Operator as of the Effective Date.

"Business Day" means any day other than a Saturday, Sunday or a weekday on which banks in Pennsylvania are authorized or required to be closed.

"CMS" means the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Environmental Laws" means all federal, state and local statutes, regulations, ordinances, directives and other provisions having the force or effect of law, all judicial and administrative Orders and determinations, all contractual obligations and all common law, in each case concerning public  health and safety, worker health and safety, pollution or protect of the environment, including all those relating to the presence, use, production, generation, handling, transportation, storage, disposal, distribution, labeling, testing, processing, discharging, release, threatened release, control or cleanup of any Hazardous Substances, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. Sections 9601, *et seq*.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, *et seq*.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. Sections 6921, *et seq*.) and regulations adopted thereunder.

"Existing Contracts" means all of Old Operator's contracts, leases, subleases, licenses, Permits, purchase and sale orders and any other agreement, commitments or binding arrangements or understandings, whether written or oral, to which Old Operator is a party, including each amendment, modification, renewal or extension or other ancillary document pertaining thereto.

"Governmental Authority" means any federal, state local or municipal government or any subdivision thereof, any regulatory or administrative authority, or any agency or commission or any court, tribunal or judicial or arbitral body.

"has provided," "made available" and similar formulation means such information in question that was delivered or provided by Old Operator or its Representatives to Purchaser by way of online file sharing, cloud file sharing, email attachments, written correspondences, compact

disks, disk or tape files, printouts, compressed file containers or other electronic or physical delivery means.

"<u>Hazardous Substances</u>" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes regulated under any Environmental Laws.

"<u>Indebtedness</u>" means, with respect to any Person, and without duplication, (i) any indebtedness or other obligation for borrowed money; (ii) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the Ordinary Course of Business; (iii) the face amount of all letters of credit issued for the account of such Person; (iv) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens; (v) capitalized lease obligations; (vi) unfunded obligations for pension, retirement, severance benefits for any officer, director or employee of such Person; (vii) unfunded obligations for deferred compensation for any officer, director or employee of such Person; (viii) all guarantees and similar obligations of such Person; (ix) all bankers acceptances and overdrafts; (x) all interest, prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness; (xi) under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (xii) issued or assumed as the deferred purchase price of property or services (other than trade accounts payable or accounts payable to independent contractors), and (xiii) for all accrued interest on, and arising from any breach of, any of the foregoing.

"<u>Liability</u>" means any liability, obligation, claim, Indebtedness, penalty, cost or expenses (including costs of investigation, collection, defense, and environmental remediation or investigation), deficiency, guaranty or endorsement of or by any Person of any type, secured or unsecured, whether accrued, fixed, absolute, or contingent, asserted or unasserted, due or to become due, whether or however arising (including contract, tort, negligence or strict liability), liquidated or unliquidated, known or unknown and whether or not current or long term.

"<u>Lien</u>" means any claim, lien (statutory or otherwise), encumbrance, pledge, Liability, restriction, charge, instrument, license, preference, priority, security agreement, covenant, right of recovery, option, charge, hypothecation, easement, security interest, interest, right of way, encroachment, mortgage, deed of trust, imperfection of title, prior assignments, Tax (including federal, state and local Tax), Order or other encumbrance or charge of any kind or nature whatsoever including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing; (ii) any assignment or deposit arrangement in the nature of a security device; and (iii) any leasehold interest, license or other right, in favor of a Third Party or Old Operator, to use any portion of the Transferred Assets, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"<u>Loss</u>" means, in respect of an indemnifying party's indemnification obligations, all direct and indirect Liabilities, judgments, claims, suits, proceedings, settlements, losses, damages, fees,

Liens, Taxes, penalties, interest obligations, expenses (including out of pocket costs of investigation and defense and reasonable attorney fees and expenses), and any diminution in value of the Transferred Assets resulting therefrom that are or have been incurred or suffered by an indemnified party.

"DOH" means the Pennsylvania Department of Health.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Ordinary Course of Business" means the ordinary course of business of Old Operator consistent with past custom and practice.

"Other Documents" means Bill of Sale, General Assignment, Old Operator Disclosure Schedule, and any certificates, instruments, agreements and other documents contemplated under this Agreement.

"Permits" means all municipal, state, federal and local consents, Orders, filings, franchises, permits, approvals, certificates, licenses, agreements, waivers, and authorizations issued by, or otherwise granted by, any Governmental Authority that are held by, or used in connection with, or required for, the Business or the Transferred Assets (including all modifications thereto or renewals thereof).

"Person" means any person, firm, corporation, partnership, joint venture, limited liability company, association or other entity (governmental or private).

"Regulatory Approval" means any consent, approval, authorization, waiver, permission, concession, agreement, license, exemption or Order of, or declaration of any Governmental Authority.

"Representative" means, with respect to any Peron, any of its attorneys, accountants, agents, consultants or other representatives.

"OIG" means the United States Department of Health and Human Services, Office of Inspector General.

"Old Operator Disclosure Schedules" means the schedules of exceptions to the representations and warranties of Old Operator in this Agreement (which shall be delivered to New Operator by Old Operator prior to the execution and delivery of this Agreement by the parties hereto).

"Old Operator's Knowledge," "Knowledge of Old Operator" and similar formulations means the actual knowledge of any director, managing member, managing partner, officer or employee of Old Operator with respect to the relevant fact or other matters at issue or should have had actual knowledge of such relevant fact or other matter assuming the diligent exercise of such individual's duties as a director, managing member, managing partner, officer or employee of Old Operator, and after reasonable investigation of all employees of Old Operator or any Affiliate thereof reasonably expected to have actual knowledge of such fact or matter.

"<u>Organizational Documents</u>" means certificate of incorporation, articles of incorporation, charter, bylaws, articles of formation, certificate of formation, operating agreement, certificate of limited partnership, partnership agreement and all other similar documents, instruments or certificates adopted or filed in connection with the creation, formation or organization of a Person, including any amendments, restatements and supplements thereto.

"<u>Tax</u>" and, with correlative meaning, "<u>Taxes</u>" means with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated gross income, gross receipts, sales, use, ad valorem, value added, transfer, capital stock franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment, charge, or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority responsible for the imposition of any such tax (domestic or foreign) whether such Tax is disputed or not; (ii) liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person; or (iii) liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any affiliated group as defined in Section 1504 of the Code, or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax law (or being included (or required to be included) in any Tax Return relating thereto).

"<u>Tax Return</u>" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by Old Operator relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"<u>Third Party</u>" means any Person other than Old Operator, New Operator or any of their respective Affiliates.

"<u>Transaction Expenses</u>" shall mean (i) the aggregate attorneys', accountants' and brokers' fees and expenses incurred or to be incurred by Old Operator that remain unpaid as of the Effective Time, (ii) the amount of real estate transfer tax imposed by Applicable Law and consistent with payment customs of the location in which the relevant real estate property is located in connection with the transactions contemplated by this Agreement, (iii) payment of all special and betterment assessments, water rates and sewer charges, in each case on a prorated basis and adjusted as of the Effective Time, (iv) Old Operator's Employment Expenses and (v) all other fees and expenses relating to the transfer of Property in accordance with this Agreement (including, without limitation, cost of recording, preparing the Deed and applicable brokerage commissions), in each case of (i), (ii), (iii) and (iv), to the extent not paid in full prior to or at the Closing or taken in to account on a dollar-for-dollar basis in the reduction of the Purchase Price (as defined in the Purchase Agreement).

"<u>Transferred Assets</u>" means collectively, the Website Materials, telephone number of Old Operator, the Employee Records, the Books and Records of the Facility, the Supplies, the Resident

Agreements, the Assumed Contracts, Provider Agreements, and other assets owned by Old Owner and held at or used in connection with the operation of the Facility.

"WARN Act" means the Worker Adjustment and Retaining Notification Act of 1988, as amended.

The following terms used in this Agreement shall have the meanings set forth in the corresponding Paragraphs, subparagraph, Sections or subsections of this Agreement:

| Defined Term | Section |
|---|---|
| "Agreement" | Recitals |
| "Effective Date" | Recitals |
| "Old Operator" | Recitals |
| "New Operator" | Recitals |
| "Seller" | Recitals |
| "Facility" | Recitals |
| "Personal Property" | Recitals |
| "Property" | Recitals |
| "Purchaser" | Recitals |
| "Purchase Agreement" | Recitals |
| "Old Lease" | Recitals |
| "Closing' | Section 1 |
| "Effective Time" | Section 1 |
| "Bill of Sale" | Section 2 |
| "General Assignment" | Section 2 |
| "CMP" | Section 2 |
| "Penalty" | Section 2 |
| "Recapture" | Section 2 |
| "Waiving Party" | Section 2 |

| | |
|---|---|
| "Excluded Liabilities" | Section 3 |
| "Excluded Assets" | Section 3 |
| "Supplies" | Section 4 |
| "Patient Trust Funds and Property" | Section 5 |
| "Recapture Claim" | Section 6 |
| "Assumed Contract" | Section 7 |
| "Rejected Contract" | Section 7 |
| "Resident Agreement" | Section 7 |
| "Current Employee" | Section 8 |
| "Old Operator's Employment Expenses" | Section 8 |
| "Employee Records" | Section 10 |
| "Website Materials" | Section 12 |
| "Provider Agreements" | Section 13 |
| "New Operator's Indemnitees" | Section 15 |
| "Old Operator's Indemnitees" | Section 15 |
| "Indemnitee" | Section 15 |
| "Indemnitee's Claim" | Section 15 |
| "Indemnitor" | Section 15 |
| "Indemnification Default" | Section 15 |
| "Health Care Licenses" | Section 17 |
| "Defaulting Party" | Section 20 |
| "Non-Defaulting Party" | Section 20 |
| "Event of Default" | Section 20 |
| "Disputes" | Section 23 |
| "AAA" | Section 23 |

**EXHIBIT 2**

**Memorandum of Agreement**

## MEMORANDUM OF AGREEMENT ("MOA")

### Between

### Eden East Healthcare Management ("Employer")

### And

### Local 262 of N.J. RWDSU/UFCW ("Union")

**WHEREAS,** Union and former company ("Bedrock") through the employers listed below are parties to the following three Collective Bargaining Agreements ("Existing CBAs") covering these three facilities (the "Facilities") with the following effective dates:

- Pottsville Rehab and Nursing Center 12-16-2022 to 12-15-2025
- Williamsport North Rehab and Nursing Center 12-20-2022 to 12-19-2025
- Williamsport South Rehab and Nursing Center 12-20-2022 to 12-19-2025 Pottsville

**WHEREAS,** the Employer is seeking to buy the Facilities through a purchase (the "Purchase") in the bankruptcy proceedings in Case No. 24-70418 (W.D.Pa.), and

**NOW, THEREFORE,** Union and Employer Agree as follows:

1. The Employer recognizes Union and pursuant to this MOA agrees it will enter into three new CBAs effective on the closing of the Purchase of above Facilities (the "Effective Date"), with the new CBAs having the same terms as the Existing CBAs except any logistic modifications on which the parties come to an agreement. Notwithstanding the foregoing, the following paragraphs 2-4 of this MOA shall not be modified. Eden East Healthcare Management and Local 262 RWDSU/UFCW agree to begin negotiations on successor contracts within 60 days of the Effective Date of the Purchase of these three facilities. The negotiations will cover Union and Employer proposals.

2. Employer shall employ all those employees covered by the CBA upon its purchase of the three facilities.

3. Employer shall recognize the facility seniority the members had with Bedrock.

4. Employer shall recognize the employees accrued vacation/sick time (PTO) that the employees earned with Bedrock.

| _____ 1/14/25 | _____ 1-14-25 |
|---|---|
| Eden East Healthcare Management    Date | Local 262 of N.J. RWDSU/UFCW    Date |