**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In Re: | **Case No.: 24-70418-JAD** |
| **POTTSVILLE OPERATIONS, LLC,** *et al.,* [1] | **Chapter 11** |
| | **(Jointly Administered)** |
| **Debtors.** | **Dkt. No.:** |
| | **Related to Dkt. Nos.: 357, 439, 485** |
| **POTTSVILLE OPERATIONS, LLC,** *et al.* | **Hearing Date: April 3, 2025** |
| **Movants,** | **Hearing Time: 10 a.m. (ET)** |
| **-vs-** | |
| **THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF POTTSVILLE OPERATIONS, LLC, et al.,** | **Response Deadline: February 26, 2025 (extended by agreement of the parties)** |
| **Respondents.** | |

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Pottsville Operations, LLC (9467); Pottsville Propco, LLC (8685); Hampton House Operations, LLC (8969); Hampton House Propco, LLC (7258); Kingston Operations, LLC (1787); Kingston Propco, LLC (8562); Williamsport North Operations, LLC (9927); Williamsport Propco, LLC (2039); Williamsport South Operations, LLC (0298); Yeadon Operations, LLC (9296); and Yeadon Propco, LLC (5785) (collectively, the "Pottsville Debtors" and the Pottsville Debtors' chapter 11 cases are collectively referred to as the "Pottsville Cases") and Bedrock Care, LLC (9115); Care Pavilion Operating, LLC (7149); Cliveden Operating, LLC (6546); MAPA Operating, LLC (3750); Maplewood Operating, LLC (0850); Milton Operating, LLC (5523); Parkhouse Operating, LLC (0140); Tucker Operating, LLC (4305); Watsontown Operating, LLC (0236); and York Operating, LLC (2571) (collectively the "Care Pavilion Debtors" and the Care Pavilion Debtors' chapter 11 cases are collectively referred to as the "Care Pavilion Cases"). The Debtors' mailing address is 425 West New England Avenue, Suite 300, Winter Park, Florida 32789.

24645140.v6

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO:**

**THE CARE PAVILION DEBTORS' MOTION FOR ENTRY OF ORDERS (A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE CARE PAVILION DEBTORS' ASSETS, OTHER THAN ACCOUNTS, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE CARE PAVILION DEBTORS' ASSETS, OTHER THAN ACCOUNTS, (C) APPROVING STALKING HORSE BID PROTECTIONS, (D) SCHEDULING AUCTION FOR AND HEARING TO APPROVE THE SALE OF THE CARE PAVILION DEBTORS' ASSETS, (E) APPROVING FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE ORDER HEARING, (F) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (G) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (H) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors of Pottsville Operations, LLC et al., (the "Committee") files this objection (the "Objection") to the *Care Pavilion Debtors' Motion for Entry of Orders (A) Approving Sale of Substantially all of the Care Pavilion Debtors' Assets, other than Accounts, Free and Clear of all Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for Sale of Substantially all of the Care Pavilion Debtors' Assets, other than Accounts, (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve the Sale of the Care Pavilion Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* [Dkt. No. 357] (the "Sale Motion").[2]  In support of this Objection, the Committee respectfully states as follows:

---

[2]        Capitalized terms not defined herein shall have the meaning ascribed to them in the Sale Motion.  Unless otherwise indicated, citations to a docket number without a case number listed shall be to these cases jointly administered under Case No. 24-70418.

2

## PRELIMINARY STATEMENT

1.      The Committee objects to the Sale Motion because the proposed sale transactions (the "Sale Transactions") of the Care Pavilion Debtors' assets (the "OcCo Assets") do not meet the requirements of section 363(b) or (m) of the Bankruptcy Code for the following key reasons:

2.      First, the Sale Transactions do not comply with section 363(b) of the Bankruptcy Code in that they would provide no cash to the estates, leave too many liabilities behind, and be the result of a suspect marketing process that chilled bidding.

3.      Second, there are significant barriers to the Court being able to make a finding of good faith as to the Stalking Horse Bidders under section 363(m) of the Bankruptcy Code.

4.      Accordingly, the Committee requests that the Court deny the Sale Motion.

## BACKGROUND

5.      On November 18, 2024 (the "Petition Date"), the Care Pavilion Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the Care Pavilion Cases. The Care Pavilion Cases are jointly administered with the Pottsville Cases.

6.      The Care Pavilion Debtors continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On December 18, 2024, the Court entered its *Final DIP Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors' Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Dkt. No. 438]  (the "DIP Order"), which granted the Care Pavilion Debtors' motion to authorize them to obtain debtor-in-possession financing [Dkt. No. 12, Case No. 24-70473] (the "DIP Motion").

3

8.      The debtor-in-possession lender under the DIP Order is Argnt Holdings, LLC (the "DIP Lender").  The DIP Lender is also the assignee of prepetition obligations (the "Prepetition Loan Obligations") allegedly owed by some or all of the Care Pavilion Debtors to Dime Community Bank and Metropolitan Commercial Bank (the "Banks")[3] in the approximate amount of $18.575 million.

9.      The DIP Order incorporates a term sheet (the "Term Sheet") between the DIP Lender and the Care Pavilion Debtors containing items that were, upon information and belief, required by the DIP Lender to obtain its agreement to provide debtor-in-possession financing. These include, without limitation, certain milestones for progress in these cases and make it an event of default (thereunder) if the milestones are not met.  Among the milestones is the requirement that the Care Pavilion Debtors "file a sale and bidding procedures motion acceptable to the DIP Lender[.]"  [Dkt. No. 438, p. 72.]

10.     The Care Pavilion Debtors satisfied the foregoing requirement (and others), and the Court authorized bidding and marketing procedures in its *Order (A) Approving Sale of Substantially All of the Care Pavilion Debtors' Assets, Other than Accounts, Free and Clear of All Lies, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for Sale of Substantially All of the Care Pavilion Debtors' Assets, Other Than Accounts, (C) Approving Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve the Sale of the Care Pavilion Debtors' Assets (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing*

---

[3]      By agreement between the Committee and the DIP Lender, the Committee's deadline to challenge the validity, perfection, priority, or enforceability of the Prepetition Loan Obligations and related collateral interests has been (and remains) enlarged.

*Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* [Dkt. No. 439] (the "Bid Procedures Order").

11.    In obtaining entry of the Bid Procedures Order, the Care Pavilion Debtors made a number of important allegations in the Sale Motion, many of which were supported by citation to the *Declaration of Neil Luria, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions and Various First Day Applications and Motions* [Dkt. No. 3, Case No. 24-70473] (the "CP First Day Declaration"), in addition to allegations in the CP First Day Declaration itself. These include:

- The Care Pavilion Debtors lease their facilities (the "Facilities") under Master Leases administered by Ventas Inc. ("Ventas") on behalf of the Landlords.[4]  Sale Motion, ¶ 8; CP First Day Declaration, ¶ 12.

- "By letter dated May 1, 2023, the Debtors were informed that SHI LL Holdco, LLC had succeeded in ownership to the landlords and to direct all future lease correspondence and notices to Ventas, Inc. …"  CP First Day Declaration, ¶ 12.[5]

- Under the Master Leases, MAPA Operating, LLC ("MAPA Operating") had a right of first refusal to purchase the Facilities.  Sale Motion, ¶ 13; CP First Day Declaration, ¶ 32.  On August 19, 2024, MAPA Operating received a letter from Ventas enclosing a purchase and sale agreement (the "Property PSA") between the Landlords and a group of entities defined as the Property Purchasers[6] pursuant to which the Property Purchasers offered to buy the Facilities for $150 million and provided a $10 million deposit.  Sale Motion, ¶ 13; CP First Day Declaration, ¶ 39.

- "The Care Pavilion Debtors were unable to exercise their right of first refusal" and "[t]he Landlords are moving forward with the sale of real property to the Property

---

[4]    The Landlords are defined in the CP First Day Declaration as being: GA HC REIT II Royersford SNF, LLC; GA HC REIT II Watsontown SNF, LLC; GA HC REIT II Milton SNF, LLC; G&E HC REIT II Care Pavilion SNF, L.P.; G&E HC REIT II Maplewood Manor SNF, L.P.; G&E HC REIT II Cheltenham York SNF, L.P.; G&E HC REIT II Tucker House SNF, L.P.; and G&E HC REIT II Cliveden SNF, L.P.

[5]    It is unclear if "landlords" in this sentence refers to the "Landlords" (who were also defined as such in the preceding sentence in paragraph 12).  However, the Landlords filed a response and reservation of rights to the Sale Motion in which they asserted they own the Facilities.  [Dkt. No. 403].

[6]    The Property Purchasers are defined in the CP First Day Declaration as being: 6212 Walnut Realty LLC, Maplewood Manor Propco LLC, 7107 York Realty LLC, 6400 Greene Realty LLC, 743 Mahoning Realty LLC, 245 East Eighth Realty LLC, and 1600 Black Rock Realty, LLC.

24645140.v6

Purchasers."  Sale Motion, ¶ 13.  This transaction is alleged to be outside the Court's jurisdiction.

- Also of note, "[t]he Property Purchasers identified new operators for the Facilities (the "<u>New Operators</u>" or "<u>Stalking Horse Bidders</u>") [*sic*] and the Care Pavilion Debtors and the [Stalking Horse Bidders] negotiated operations transfer agreements to handle the transition of the operations to the [Stalking Horse Bidders] (the "<u>OTAs</u>") [*sic*]."  Sale Motion, ¶ 14.

12. There are also a number of facts that are not disclosed in the Sale Motion or CP

First Day Declaration as well as questions raised by known facts.  These include:

- There has been no disclosure of when and how the Landlords became owners of the Facilities, whether any entity or person affiliated with the Care Pavilion Debtors or their insiders was a seller, who received sale proceeds, or whether the sale proceeds constituted reasonably equivalent value for the assets transferred.

- There is no disclosure of how the Property Purchasers learned of the opportunity to purchase the Facilities and entered into the Property PSA with the Landlords.  (In other words, were the Facilities being marketed generally at that time or did someone associated with the Care Pavilion Debtors bring the opportunity to the attention of the Property Purchasers—and why?)

- The Care Pavilion Debtors assert that "[u]pon information and belief, the Property Purchasers are unrelated to the Debtors."  CP First Day Declaration, ¶ 39.  While there were representations at a prior hearing that those parties are unrelated, questions remain as to the identity of the ultimate owners of the Property Purchasers and the DIP Lender and whether they have *connections* or *relationships* (formal or informal) with the Care Pavilion Debtors or their ultimate owners.

- The Committee understands that the DIP Lender's principal is also a principal or insider of the Property Purchasers but does not know if there are other owners or business partners whose identity is relevant.  Given that the Care Pavilion Debtors had a copy of the Property PSA months before the Petition Date, the Committee questions why the common control or ownership of the DIP Lender and Property Purchasers was not disclosed in the DIP Motion and supporting documents.

- Upon information and belief, there have been multiple parties potentially interested in the Care Pavilion Debtors' operating assets—but only if the Facilities could be purchased too.  Due to the Property PSA, Ventas (apparently on behalf of the Landlords) has indicated that it will only entertain offers for the Facilities if the Property Purchasers consent.  Upon information and belief, there has not been consent provided.

6

- Because the Facilities are effectively "locked up" and unavailable for potential purchasers of the Care Pavilion Debtors' operating assets, bidding is chilled and creditors are likely to face worse recoveries.

13.      These facts and questions take on greater significance in light of additional information that the Committee has learned in its diligence to date (which is continuing and not yet complete).  This includes:

- Between and among all of the Debtors (the Pottsville Debtors and the Care Pavilion Debtors), there are not less than $8.9 million in unsecured claims to entities and persons who are, upon information and belief, insiders, affiliates, or otherwise connected to the Debtors or their insiders.  This does not include claims that any one Debtor may hold against another Debtor.

- Between and among all of the Debtors, there are more than $2 million in transfers to entities and persons who are, upon information and belief, insiders, affiliates, or otherwise connected to the Debtors or their insiders that are listed as *90-day transfers to non-insiders* on the Debtors' various statements of financial affairs.  Again, this does not include transfers by any one Debtor to another Debtor.

- There is a charitable foundation called the David and Chaya Zahler Foundation, Inc. (the "DCF Foundation") with a mailing address of 2 Bedford Road, Monsey NY 10952.  Upon information and belief, this is the residence of David Zahler, one of the ultimate owners of some or all of the Debtors.  Some of the creditors and transferees referred to in the preceding bullet points are contributors to the DCF Foundation, per the DCF Foundation's IRS Form 990 for tax year 2023.  Other contributors have mailing addresses that are identical to some of these creditors and transferees, raising the question of whether they are insiders, affiliates, or otherwise connected to the Debtors.  Further, some of the recipients of contributions from the DCF Foundation are other organizations located at 2 Bedford Road, Monsey, NY 10952.

While there may be adequate explanations, this information is concerning, including because of the number of transfers identified as being to non-insiders in the 90 days before the Petition Date that may be to various related parties.

14.      To summarize the Committee's concerns: The Court was presented with a DIP Motion with milestones that set the course of events in these cases apparently without disclosure that the DIP Lender's related entities were the Property Purchasers, that the Property Purchasers

selected the Stalking Horse Bidders, and that the Property Purchasers were going to block any other party from being able to purchase the Facilities.  At the same time, there are reasons for heightened scrutiny in light of the tangled web of transactions between the Care Pavilion Debtors and parties who may be related or affiliated (based on preliminary diligence which is not yet complete).

<u>**ARGUMENTS IN OBJECTION**</u>

15.     Against this backdrop, the Committee objects to the Motion for several reasons. First and foremost, the proposed sale of the OpCo Assets does not meet the requirements of an asset sale under sections 363(b) of the Bankruptcy Code.  There is no cash consideration for the Care Pavilion Debtors' estates, there are significant concerns about the adequacy of marketing, and the OTAs are unfavorable for the estates.  Second, there is inadequate information known to date for the Court to make a finding of good faith under section 363(m) of the Bankruptcy Code. Due to the complexity of the businesses owned by the ultimate apparent owners of the Care Pavilion Debtors, more scrutiny is required to confirm there are no connections between the Stalking Horse Bidders, the Property Purchasers, and the Care Pavilion Debtors.

**I.      The Sale Transactions Do Not Meet the Requirements of Section 363(b) of the <u>Bankruptcy Code.</u>**

16.     The Committee objects to the Motion and any effort to approve the Sale Transactions because they do not meet the requirements of section 363(b) of the Bankruptcy Code.

17.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  A sale of estate property under section 363(b) "must be approved by the Court to ensure the asset's value is preserved for the benefit of creditors."  *In re Aller*, 649 B.R. 662, 666 (Bankr. W.D. Pa. 2023).  This Court has described the relevant standard of review as follows:

In reviewing the Debtor's exercise of its business judgment, the Court looks at whether the proposed transaction (1) represents a business decision, (2) is made with disinterestedness, (3) is made with due care, (4) is made in good faith, and (5) does not constitute an abuse of discretion or waste of corporate assets.

*In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 641 (Bankr. W.D. Pa. 2010) (*citing In re Adelphia Communications Corp.*, No. 02-41729REG, 2004 WL 1634538, at *2 (Bankr. S.D.N.Y. June 22, 2004)).  Other formulations of this test consider whether "(1) there is a '[s]ound business reason' for the sale; (2) the debtor has provided '[a]ccurate and reasonable notice' of the transaction; (3) the proposed sale price is 'fair and reasonable;' and (4) '[g]ood faith exists.'" *Aller*, 649 B.R. at 666  (*quoting In re Primel*, 629 B.R. 790, 798 (Bankr. W.D. Pa. 2021)). However, this Court has observed that the factors in *Aller*, which are derived from *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983), are essentially subsumed in the five-part test identified in *Shubh Hotels Pittsburgh.  Shubh Hotels Pittsburgh*, 439 B.R. at 641 n.4.

18.     Good faith in this context focuses on the validity of the sale process rather than simply the good faith of the buyer under section 363(m).  *Primel*, 629 B.R. at 800.  Thus there could be a sale with a bad-faith purchaser that is conducted in good faith and providing fair value for assets.  *Id.*; *Shubh Hotels Pittsburgh*, 439 B.R. at 642.

19.     "The strength of the showing necessary to satisfy each of these elements is heightened by the fact that the protections of [the chapter 11 plan process] are absent, and such agreements are typically considered on an expedited basis, thus impeding interested parties from making the complete investigation and amassing of contrary evidence which otherwise would be possible."  *In re After Six, Inc.*, 154 B.R. 876, 881 (Bankr. E.D. Pa. 1993).[7]

---

[7]      No particular deference should be paid to a liquidating debtor's management's judgments regarding the liquidation, and a committee's views should carry at least equal, if not superior weight.  *In re Commercial Mortgage and Finance Co.*, R. 389, 394 (Bankr. N.D. Ill. 2009) (*citing In re S.N.A. Nut Co.*, 186 B.R. 98, 105 (Bankr. N.D. Ill. 1995)); *see also In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (noting that a liquidating chapter 11

20.    On balance, the *Shubh Hotels Pittsburgh* factors weigh against approval of the Sale

Transactions.

### A.    The Business Decision is not Sound.

21.    Inherent in considering whether there is a "sound business decision" are the

questions of whether the Care Pavilion Debtors should consummate the Sale Transactions, whether

they took reasonable steps to get the best deal they could, and whether there are terms of the deal

that are counter to the best interests of the companies (such that it is outside the protection of the

business judgment rule).  *In re Adelphia Communications Corp.*, No. 02-41729REG, 2004 WL

1634538, at *2.  The answer to each of these questions is "no" or that there is inadequate

information.

### i.    There are no Cash Proceeds.

22.    First and foremost, the Sale Transactions will not result in any proceeds for

distribution to any creditors, let alone general unsecured creditors, and will leave significant

liabilities behind.  The only parties who will benefit are the DIP Lender, its affiliated Property

Purchasers, and the Property Purchaser's pre-selected Stalking Horse Bidders.  Virtually all

creditors of the Care Pavilion Debtors will receive no benefit.

### ii.    There is no Indication of Reasonable Steps to get the Best Deal.

23.    Second, it is entirely unclear whether the Care Pavilion Debtors took reasonable

steps to get the best deal that they could.  Indeed, all signs suggest otherwise. While it is generally

accepted that the price obtained at an auction resulting from a fair marketing process should be

treated as establishing the value of assets sold, that is only true when the process itself is fair.  *See*

*In re Abbotts Dairies*, 788 F.2d 143, 149 (3d Cir. 1986) (holding that while "an auction may be

---

case justifies "some greater deference to the Committee's viewpoints").  Accordingly, the Care Pavilion Debtors'
business judgment with respect to the Sale Transactions is entitled to no deference.

sufficient to establish that one has paid 'value' for the assets of a bankrupt," it does not establish

value when there is collusive conduct.).  Here, however, there is no information about when the

Landlords became owners of the Facilities, whether entities affiliated with the Care Pavilion

Debtors participated as sellers in that transaction (and, if so, the strategic purpose), or whether sale

proceeds benefited insiders of the Care Pavilion Debtors.  Assuming there are no issues with these

questions, there is also no information about how or why the Property Purchasers ended up entering

into the Property PSA with the Landlords, why they selected the Stalking Horse Bidders, and

whether there was any way to structure a transaction that would have permitted the Facilities to be

"in play" rather than "locked up."

24.    Indeed, the Court does not need to look any further than the sale transaction

involving the Pottsville Debtors to understand that the lack of any purchase price is highly suspect

here.  In the Pottsville Cases, the buyer agreed to pay $63 million for all of the Pottsville Debtors'

assets.  [Dkt. No. 557].  While the purchase price allocation in the Pottsville Cases is not binding

on the Committee, that buyer allocated several million dollars to assets of the operating companies

and goodwill rather than real property assets.  Thus the transactional history in these jointly

administered cases strongly suggests that the OpCo Assets must have *some* value, even when

certain liabilities are being assumed, yet no cash is being provided.

### iii.    The Terms of the Deal are Counter to the Estates' Interests.

25.    Third, the OTAs are not favorable to the Care Pavilion Debtors' estates and saddle

them with too many liabilities and risks.[8]  As noted above, there is no cash consideration, even

though the sale of the Pottsville Debtors' assets provides a clear market signal that operating

---

[8]    The OTAs are substantially the same.  Consequently, this portion of the Objection will only cite to one of the
OTAs.

24645140.v6

company assets have *some* value in this context.  There are also a number of technical issues with the OTAs.

26.    The OTAs define certain estate liabilities as "Excluded Liabilities" that will remain with the Care Pavilion Debtors' estates.  These Excluded Liabilities encompass substantial obligations that customarily would be transferred to a buyer outside of bankruptcy or are typically left with an estate—when a bankruptcy buyer provides substantial value and there is adequate marketing sufficient to justify approval of a sale under section 363(b) of the Bankruptcy Code.

- **Recapture Claims:** Liabilities arising from Medicare or Medicaid overpayments or recoupments appear to remain the estate's responsibility with post-closing indemnification obligations running from Care Pavilion Debtors' estates to the Stalking Horse Bidders.  *See, e.g.,* OTA, pp. 8-9, § 3(a)(vi).[9]

- **Pre-Closing Employee Obligations:** The estate retains liability for accrued salaries, paid time off, and other pre-closing employee-related obligations.  *See, e.g.,* OTA, p. 8, § 3(a)(v).  Also of concern, the estates will remain liable for potential WARN Act obligations and COBRA coverage for terminated employees. *See, e.g.,* OTA, pp. 15-16, § 8.5(c), (f).

- **Litigation and Claims:** All malpractice, professional liability, resident rights violations, and employee rights claims related to pre-closing periods remain with the estate.  *See, e.g.,* OTA, p. 8, § 3(a)(viii).

- **Unpaid Taxes and Regulatory Fines:** The estates retain responsibility for all taxes and civil monetary penalties, including those arising from the Sale Transactions. *See, e.g.,* OTA, p. 8, § 3(a)(iii).

- **Collective Bargaining and Pension Liabilities:** The estate remains liable for any union pension withdrawal liabilities.  *See, e.g.,* OTA, p. 8, § 3(a)(x).  Further, the Stalking Horse Bidders are not, as of yet, assuming collective bargaining agreements, yet the Care Pavilion Debtors have not requested any relief pursuant to section 1113 of the Bankruptcy Code, nor have they addressed whether applicable non-bankruptcy law would treat the Stalking Horse Bidders as being subject to collective bargaining agreements in the absence of rejection under section 1113 of the Bankruptcy Code.

---

[9]    Page citations are to the page number as indicated in the Court's CM/ECF filing system header.

24645140.v6

- **<u>Nursing Home Assessments Owed to the Commonwealth</u>:** The OTAs also saddle the estate with significant assessments by the Commonwealth by virtue of the Care Pavilion Debtors' status as nursing homes, as well as tax liabilities.

27.    Another item of concern is the fact that the OTAs contain broad indemnification provisions that further shift risk onto the Care Pavilion Debtors' estates. The Care Pavilion Debtors must indemnify the Stalking Horse Bidders for "any and all" claims arising from pre-closing operations, including lawsuits, Medicare recapture claims, and regulatory penalties. *See, e.g.,* OTA, p. 19, § 15(a). In contrast, the Stalking Horse Bidders indemnification of the Care Pavilion Debtors is limited solely to assumed liabilities and post-closing claims. *See, e.g.,* OTA, p. 19, § 15(b). These provisions leave the estates vulnerable to unknown claims post-closing, further reducing potential creditor recoveries.

28.    There is also significant risk in the handling of accounts receivable. The OTAs leave pre-closing accounts receivable with the Care Pavilion Debtors but rely upon a contingency-based collection agreement with the Stalking Horse Bidders. As the Committee understands it, the Stalking Horse Bidders are not obligated to actively collect receivables and, instead, will only receive a contingency fee for amounts collected. *See, e.g.,* OTA, pp. 17-17 § 9(a). If no agreement is reached on collection, then the estates will need to engage a third-party at their own expense. *See, e.g.,* OTA, p. 18, § 9(a).

29.    Another item of concern is the treatment of the DIP Lender's claim and the Banks' claims (now held by the DIP Lender). While the OTAs broadly state that the Stalking Horse Bidders will not assume certain liabilities, the Sale Transactions were engineered by the DIP Lender and Property Purchasers for their own purposes. However, the OTAs do not appear to provide for assumption of the DIP Lender's claim or the Bank's claims (now held by the DIP Lender), raising a risk of administrative insolvency following a closing.

13

24645140.v6

30.     In light of the foregoing, the Committee objects to the terms of the OTAs as currently drafted because they are inequitable and detrimental to the interest of unsecured creditors.  The Committee respectfully requests that the Court deny approval of the OTAs in their present form and require modifications to ensure a fair and equitable allocation of liabilities and consideration that aligns with bankruptcy principles and protects the rights of creditors.

### B.      There is Inadequate Information Regarding Disinterestedness and Due Care.

31.     The Sale Motion and related documents before the Court do not provide sufficient information to make a clear case that the Sale Transactions are the result of disinterestedness or due care.

32.     As for disinterestedness, the wheels for the Sale Transactions were set in motion at least as far back as August 2024 when the Care Pavilion Debtors received notice of the Property Purchasers' intention to purchase the Facilities and a copy of the Property PSA.  However, there has been no disclosure of how or why that came to be, whether the Care Pavilion Debtors' insiders participated in some way, or whether the Care Pavilion Debtors' insiders will participate in any way post-closing.

33.     As for due care, the Property Purchasers entered into the Property PSA, selected the Stalking Horse Bidders, purchased the Bank's claims (through another entity), and provided funding (through the DIP Lender) for these cases in a process that kept the most attractive asset— the Facilities—away from interested purchasers.  The Committee does not doubt that the Care Pavilion Debtors' legal and professional advisors provided diligent and competent advice, but there is only so much care that can be exercised on these facts.

C.    **This Sale Process Lacks Good Faith.**

34.    The Committee has already addressed a number of facts relevant to a lack of good faith with respect to the sale process due to the significant degree of control that the DIP Lender, Property Purchasers, and Stalking Horse Bidders have exercised over disposition of the OpCo Assets. This control has set the deadlines and pace for these cases, selected the Stalking Horse Bidders, and functionally "locked up" the Facilities such that no other party was likely to make an offer. Indeed, upon information and belief, the Property PSA disincentivized Ventas from entertaining offers for the Facilities from parties interested in purchasing the OpCo Assets.

35.    These dynamics are deeply concerning to the Committee because they raise questions about whether the sale process in these cases has been fair or a fig leaf—and whether undisclosed constraints on marketability of the Facilities represents the type of control and power that courts should not permit in cases like these. *See In re Chrysler LLC*, 576 F.3d 108, 116 (2d Cir.), *vacated as moot*, 592 F.3d 370 (2d Cir. 2010) (regarding section 363(b) asset sales, "the thrust of criticism remains what it was in *Lionel*: fear that one class of creditors may strong-arm the debtor-in-possession, and bypass the requirements of Chapter 11 to cash out quickly at the expense of other stakeholders, in a proceeding that amounts to a reorganization in all but name, achieved by stealth and momentum.").

36.    Moreover, the Committee does not recall that the relationship between the DIP Lender and Property Purchasers was disclosed when the DIP Motion was presented to the Court and the Bid Procedures Order was entered. *See In re Colony Hill Assocs.*, 111 F.3d 269, 277 (2d Cir. 1997) ("Although full disclosure to the bankruptcy court may not always neutralize conduct that would otherwise constitute bad faith, disclosure should certainly weigh heavily in a bankruptcy court's decision on that issue.").

15

**D.      The Sale Transactions Represent an Abuse of Discretion and Waste of Corporate Assets.**

37.      For all of the reasons set forth above, the Sale Transactions also represent an abuse of the Care Pavilion Debtors' discretion and would result in a waste of corporate assets.

**II.      The Stalking Horse Bidders are not Entitled to a Finding of Good Faith under Section 363(m) of the Bankruptcy Code.**

38.      Finally, there are significant barriers to the Court making a finding of good faith as to the Stalking Horse Bidders, as required under section 363(m) of the Bankruptcy Code to protect the Stalking Horse Bidders in the event of a reversal or modification on appeal.

39.      Under section 363(m):

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal

11 U.S.C. § 363(m).

40.      Courts in the Western District of Pennsylvania tend to follow the Third Circuit's *Abbotts Dairies* case, which observed that the Bankruptcy Code does not define good faith and that courts should apply equitable principles under section 363(m). *See  In re Mazzocone*, No. 93-12296S, 1995 WL 80090, at *2 (E.D. Pa. Feb. 24, 1995) (*quoting Abbotts Dairies*, 788 F.2d at 147 (3d Cir. 1986) ("[t]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.")); *Primel*, 629 B.R. at 799 (*quoting Abbotts Dairies*, 788 F.2d at 147) (same).

16

41.     However, other courts in the Third Circuit (and elsewhere) have applied a factoring test to determine the good faith of a purchaser pursuant to section 363(m).  In employing this factoring test, courts consider whether:

> (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; (ii) the Buyer complied with the provisions in the Bidding Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed; (v) neither the Buyer nor the Buyer Designee has violated section 363(n) of the Bankruptcy Code by any action or inaction; (vi) no common identity of directors or controlling stockholders exists between the Buyer or the Buyer Designee, on the one hand, and any of the Debtors, on the other hand; and (vii) the negotiation and execution of the Asset Purchase Agreement and Transaction Documents were at arms' length and in good faith.

*In re OCZ Tech. Grp., Inc.*, No. 13BK13126, 2014 WL 551832, at *4 (Bankr. D. Del. Jan. 16, 2014).  *See also In re Ormet Corp.*, No. 13-10334-MFW, 2011 WL 13492604, at *4 (Bankr. D. Del. Jan. 6, 2011) (using the same factoring test); *Barnes v. 309 Rte 100 Dover LLC,* No. 2:20-CV-00045, 2020 WL 6565197, at *2 (D. Vt. Nov. 6, 2020) (same).

42.     Whether under *Abbots Dairies* or *OCT Tech Grp.* and related cases, courts place significant weight on proper disclosure when making a determination of a buyer's good faith under section 363(m).  For example, in *Mazzocone*, which applied *Abbotts Dairies*, the court ultimately made a finding of good faith where the identity of investors providing funds for a purchase were unknown but there was testimony that was sufficient for the court to determine there were no financial *or other relationships* between the buyer or law firm representing the buyer.  *In re Mazzocone*, No. 93-12296S, 1995 WL 80090, at *3.  Similarly, in *Barnes*, the district court reviewed the bankruptcy court's determination of good faith under section 363(m) (using the same test employed in *ORZ* and *Ormet*) and placed weight on evidence that the buyer was not an insider of the debtor, stating "there is no evidence that the [buyer] had a 'relationship' with the Debtors

close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties." *Barnes*, No. 2:20-CV-00045, 2020 WL 6565197, at *2.

43.    The facts before this Court cut the other way.  This Court has no information on the identity of the Stalking Horse Bidders or their relationships with the Care Pavilion Debtors (or their insiders).  The Court also has no information about the relationship between the Stalking Horse Bidders and the DIP Lender/Property Purchasers or between the DIP Lender/Property Purchasers and the Care Pavilion Debtors (or their insiders).  While it may be that there is nothing to worry about, the Committee has significant concerns given the control that the DIP Lender/Property Purchasers have exercised in this case and the complete lack of disclosure when the Court was presented with the DIP Motion of the important fact that the DIP Lender is connected to the Property Purchasers and that the Property Purchasers selected the Stalking Horse Bidders. *See In re Colony Hill Assocs.*, 111 F.3d 269, 277 (2d Cir. 1997) ("Although full disclosure to the bankruptcy court may not always neutralize conduct that would otherwise constitute bad faith, disclosure should certainly weigh heavily in a bankruptcy court's decision on that issue.").

44.    Accordingly, the Committee submits that there significant impediments to a finding of good faith and that the Court either should decline to make such a finding without sufficient evidence to address these concerns.

## RESERVATION OF RIGHTS

45.    The Committee expressly reserves all rights to, among other things, complement, supplement, amend, alter, substitute and/or modify this Objection and to conduct any and all discovery as may be required or deemed necessary, and to assert such other grounds as may become apparent.  The Committee further reserves and does not waive any right to object to

24645140.v6

approval of the sale to the Stalking Horse Bidders or any other party, including any objection to

the contents of the Stalking Horse Agreements.

**<u>CONCLUSION</u>**

Based on the foregoing, the Committee respectfully requests that the Court sustain this

Objection and (A) deny the Sale Motion without prejudice or hold further proceedings with respect

to the Sale Motion; and (B) grant such further and additional relief as the Court deems just and

proper.

Dated: March 21, 2025

By: /s/ *Andrew C. Helman*
Thomas D. Maxson (Pa. ID 63207)
Dentons Cohen & Grigsby, P.C.
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222
Phone: (412) 297-4706
Email: thomas.maxson@dentons.com

and

Andrew C. Helman (admitted *pro hac vice*)
Dentons Bingham Greenebaum LLP
One City Center,, Suite 11100
Portland, ME 04101
Phone: (207) 619-0919
Email: andrew.helman@dentons.com

and

Lauren M. Macksoud (admitted *pro hac vice*)
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020
Phone: (212) 768-5347
Email: lauren.macksoud@dentons.com

24645140.v6

## CERTIFICATE OF SERVICE

I, Andrew C. Helman, an individual eighteen years of age or older, hereby certify that on the date set forth below, I caused the foregoing document to be served on all parties receiving notice and service in this case through the Court's CM/ECF electronic filing service, which served the same on the parties receiving notice via the CM/ECF system.

Date: March 21, 2025

/s/ Andrew C. Helman
Andrew C. Helman (admitted *pro hac vice*)
Dentons Bingham Greenebaum LLP
One City Center, Suite 11100
Portland, ME  04101
Phone: (207) 619-0919
Email: andrew.helman@dentons.com

24645140.v6